Martin J. Barab (State Bar No. 47419)
A. Raymond Hamrick, III (State Bar No. 93821)
Josh H. Eichenstein (State Bar No. 299392)
HAMRICK & EVANS, LLP
2600 West Olive Avenue, Suite 1020
Burbank, California 91505
Telephone No.: (818) 763-5292
Fax No.: (818) 763-2308

Attorneys for Plaintiff
BONDIT LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BONDIT LLC, a California limited liability company,<br><br>                    Plaintiff,<br><br>          v.<br><br>HALLOWS MOVIE INC., a Nova Scotia corporation; HALLOWS MOVIE, LLC, a Puerto Rico limited liability company; HALLOWS MOVIE LLC, a Louisiana limited liability company; UTOPIA FILM L.L.C., a Puerto Rico limited liability company, CROSSFACE LLC, a Louisiana limited liability company; LET IT PLAY LLC, a Connecticut limited liability company; ALEX A. GINZBURG, an individual; DONGKWAN "TONY" LEE, an individual; HYUN KIM, an individual; JORGE ALBERTO MARTINEZ-DAVILA, an individual,<br><br>                    Defendants. | Case No.:  **2:19-cv-9832**<br><br>COMPLAINT FOR DAMAGES FOR :<br><br>1. VIOLATIONS OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT [18 U.S.C. § 1962(c)];<br>2. CONSPIRACY TO COMMIT VIOLATIONS OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT [18 U.S.C. § 1962(c)];<br>3. VIOL. OF CAL. *PENAL CODE* § 496;<br>4. BREACH OF WRITTEN CONTRACTS;<br>5. MONEY HAD AND RECEIVED;<br>6. BREACH OF AMENDED WRITTEN CONTRACTS;<br>7. FRAUD- CONCEALMENT AND NON-DISCLOSURE;<br>8. NEGLIGENT MISREPRESENTATION;<br>9. INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS;<br>10. UNFAIR COMPETITION;<br>11. CONVERSION;<br>12. FRAUDULENT CONVEYANCE;<br>13. BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING; AND<br>14. DECLARATORY RELIEF<br><br>DEMAND FOR JURY TRIAL |

//

//

HAMRICK & EVANS, LLP

Plaintiff BONDIT LLC, a California limited liability company, ("BondIt" or "Plaintiff") alleges as follows:

## INTRODUCTION

1.     This action arises from the financing of a feature-length motion picture entitled *Crossface* (the "Picture"). Pursuant to the terms and conditions of a Loan and Security Agreement between BondIt and Defendant HALLOWS MOVIE INC., a Nova Scotia corporation, ("HM-Canada") (the "BondIt Loan and Security Agreement"), BondIt agreed to advance the sum of $1.5 Million Dollars to HM-Canada to finance the production of the Picture (the "BondIt Loan").

2.     The BondIt Loan was collateralized by: (i) a Kentucky film tax credit, which was represented by Defendant ALEX A. GINZBURG ("Ginzburg") to be valued at $2.5 Million Dollars, (ii) a corporate guarantee from Defendant LET IT PLAY LLC, a Connecticut limited liability company, ("Let It Play"), and (iii) personal guarantees from Defendant Ginzburg, Defendant DONGKWAN "TONY" LEE ("Lee"), and Defendant HYUN KIM ("Kim"), which secured repayment of the loan.

3.     The BondIt Loan was a key component of the finance plan for the Picture, which had a total budget of $7 Million Dollars consisting of the BondIt Loan for $1.5 Million Dollars and equity financing in the amount of $5.5 Million Dollars from Defendant Kim. The BondIt Loan was funded on October 6, 2017.

4.     Following defaults by HM-Canada with respect to the commencement of principal photography and the timely submission of an audit for the Kentucky tax credit, HM-Canada defaulted with respect to the repayment of the BondIt Loan by failing and refusing to repay the loan when due. Despite the fact that the production of the Picture never commenced, and the Picture has never been made, HM-Canada kept the loan amount and refused to return the principal amount of the BondIt Loan.

5.     In an attempt to satisfy HM-Canada's repayment obligation on the BondIt Loan, Defendants Ginzburg and Lee proposed to pledge to BondIt certain film

tax credits on the motion pictures entitled *Utopia* and *The Recovery aka Above*. Based upon this proposal, on October 20, 2018, BondIt entered into an First Amendment to the BondIt Loan and Security Agreement with Defendant HM-Canada, a Security and Guaranty Agreement with Defendant HALLOWS MOVIE, LLC, a Puerto Rico limited liability company, ("HM-Puerto Rico"), and a Security and Guaranty Agreement with Defendant UTOPIA FILM L.L.C., a Puerto Rico limited liability company, ("Utopia Film-Puerto Rico").

6.     Unfortunately, Defendants' offers to cure the defaults on the BondIt Loan by assigning future proceeds and film tax credits associated with different films produced by Defendants were part of an elaborate shell game. BondIt is informed and believes, and based thereon alleges, that at the time of the funding of the BondIt Loan, Defendants were already fully aware that the loan proceeds advanced by BondIt to HM-Canada would not be used for the production of the Picture, that production would never commence and that the Picture would never be made.

7.     BondIt is further informed and believes, and based thereon alleges, that the film tax credit on *The Recovery aka Above* was used by Defendants to pay off another lender (and not BondIt) and that the collateral pledged to BondIt to repay the BondIt Loan was never owned and/or controlled by Defendant HM-Puerto Rico or no longer existed. Indeed, the film tax credit purportedly assigned to BondIt by Defendant HM-Puerto Rico was, in fact, owned and/or controlled by Defendant HALLOWS MOVIE LLC, a Louisiana limited liability company, ("HM-Louisiana"). Moreover, BondIt is further informed and believes, and based thereon alleges, that the proceeds of the film tax credit purportedly assigned to BondIt by Defendant HM-Puerto Rico were used to: (i) pay off the October 14, 2018 lien of Three Point Capital, another lender, that was filed only six days prior to the purported assignment of the same tax credit to BondIt, and (ii) pay Defendant Ginzburg a director's fee on *The Recovery aka Above*, with the balance of the film tax credit proceeds being paid directly to Defendants Ginzburg and Lee.

8.    BondIt is further informed and believes, and based thereon alleges, that the proceeds of film tax credit on *Utopia* were, at the time of their assignment to BondIt, and are, the subject of litigation over competing claims by the owner of Defendant Utopia Film-Puerto Rico, Defendant JORGE ALBERTO MARTINEZ-DAVILA ("Martinez-Davila"), arising from an agreement between Defendants Ginzburg and Martinez-Davila for Defendant Ginzburg to: (i) finance *Utopia*, (ii) pay $75,000 to Defendant Martinez-Davila, and (iii) provide an on screen acting role in *Utopia* for Defendant Martinez-Davila, in exchange for a promise by Defendant Martinez-Davila, who, as a resident of the Commonwealth of Puerto Rico and the owner or controlling member of Defendant Utopia Film-Puerto Rico, was purportedly entitled to a film tax credit of up to ninety percent (90%) of the qualified costs expenditure, to assign to Defendant Ginzburg the proceeds of the *Utopia* film tax credit.

9.    Defendants, and each of them, have repeatedly ignored and avoided BondIt's requests for repayment of the BondIt Loan, as amended, the corporate guarantee, the personal guarantees, and the Security and Guaranty Agreements, even though every possible deadline for repayment has passed, and despite Defendants having received the proceeds of the film tax credits on *Utopia* and *The Recovery aka Above*, which were purportedly assigned to BondIt.

## JURISDICTION AND VENUE

10.    The Court has jurisdiction pursuant to 28 U.S.C. §1331 because this case arises under 18 U.S.C § 1962(c) (civil RICO). This Court also has jurisdiction over the parties under diversity jurisdiction (28 U.S.C. § 1332) as all of the Defendants have citizenship in a different State or foreign state from that of Plaintiff, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. In addition, the Court has supplemental jurisdiction over the state law claims set forth herein pursuant to 28 U.S.C. § 1367, since the claims under state law arise from the same nucleus of operative facts as the claims under federal law.

11. This Court has personal jurisdiction over Defendants because Defendants have sufficient minimum contacts with the State of California and the Central District of California. Plaintiff's Claims for Relief arise directly from Defendants' business contacts and other activities in the State of California and in the Central District of California, in part because the acts and omissions complained of either took place within this judicial district, or had effect within this judicial district, or both.

12. Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(2) because Defendants transact business in this judicial district, and because a substantial portion of the events giving rise to the claims alleged herein occurred in this district.

13. Moreover, personal Jurisdiction and venue are proper in this Court because Defendants contractually consented to submit to the jurisdiction of the State of California and to the United States District Court for the Central District of California, and the agreements at issue in this action were entered into in Los Angeles County.

## **PARTIES**

14. BondIt is a California limited liability company, organized and existing under the laws of the State of California and authorized to do and doing business in Los Angeles County, California with its principal place of business in Santa Monica, California.

15. BondIt is informed and believes, and thereon alleges, that at all times relevant hereto, Defendant HM-Canada was and is a corporation organized and existing under the laws of the Province of Nova Scotia, Canada. HM-Canada does significant business in the County of Los Angeles, State of California and within this judicial district. At one time, HM-Canada was authorized to transact business in the State of Kentucky. However, the Kentucky Secretary of State revoked HM-Canada's authority to transact business in Kentucky on October 16, 2018.

HAMRICK & EVANS, LLP

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

16.     BondIt is informed and believes, and based thereon alleges, that at all times relevant hereto, Defendant HM-Puerto Rico was and is a limited liability company organized and existing under the laws of the Commonwealth of Puerto Rico. HM-Puerto Rico does significant business in the County of Los Angeles, State of California and within this judicial district.

17.     BondIt is informed and believes, and based thereon alleges, that at all times relevant hereto, Defendant HM-Louisiana was and is a limited liability company organized and existing under the laws of the State of Louisiana. HM-Louisiana does significant business in the County of Los Angeles, State of California and within this judicial district. HM – Louisiana is not in good standing with the Louisiana Secretary of State.

18.     BondIt is informed and believes, and based thereon alleges, that at all times relevant hereto, Defendant Utopia Film-Puerto Rico was and is a limited liability company organized and existing under the laws of the Commonwealth of Puerto Rico. Utopia Film-Puerto Rico does significant business in the County of Los Angeles, State of California and within this judicial district.

19.     BondIt is informed and believes, and based thereon alleges, that at all times relevant hereto, Defendant CROSSFACE LLC, a Louisiana limited liability company, ("Crossface") was and is a limited liability company organized and existing under the laws of the State of Louisiana. Crossface does significant business in the County of Los Angeles, State of California and within this judicial district. Crossface is not in good standing with the Louisiana Secretary of State.

20.     BondIt is informed and believes, and based thereon alleges, that at all times relevant hereto, Defendant Let It Play was and is a limited liability company organized and existing under the laws of the State of Connecticut. Let It Play does significant business in the County of Los Angeles, State of California and within this judicial district.

HAMRICK & EVANS, LLP

21.    BondIt is informed and believes, and based thereon alleges, that at all times relevant hereto, Defendant Ginzburg, an individual, was, and at all times mentioned herein, is a resident of the State of Connecticut. At all times mentioned herein, Ginzburg was and is the chief executive officer, president, a shareholder and/or a member of Defendants HM-Canada, HM-Puerto Rico, HM-Louisiana, Utopia Film-Puerto Rico , Crossface and Let it Play.

22.    BondIt is informed and believes, and based thereon alleges, that at all times relevant hereto, Defendant Lee, an individual, was, and at all times mentioned herein, is a resident of the State of Connecticut. At all times mentioned herein, Lee was and is an officer, a shareholder and/or a member of Defendants HM-Canada, HM-Puerto Rico, HM-Louisiana, Utopia Film-Puerto Rico, Crossface and Let it Play.

23.    BondIt is informed and believes, and based thereon alleges, that at all times relevant hereto, Defendant Kim, an individual, was, and at all times mentioned herein, is a resident of a state other than the State of California or a resident of South Korea.

24.    BondIt is informed and believes, and based thereon alleges, that at all times relevant hereto, Defendant Martinez-Davila, an individual, was, and at all times mentioned herein, is a resident of the Commonwealth of Puerto Rico. At all times mentioned herein, Martinez-Davila was and is the chief executive officer, president, a shareholder and/or a member of Defendant Utopia Film-Puerto Rico.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

25.    BondIt provides flexible financing options for media projects, businesses and producers. BondIt is a senior secured media lender, which provides credit financing to film, television and new media projects. BondIt provides loans, or an "advance," which is secured by defined and unencumbered collateral, such as pre-sales agreements (i.e., Minimum Guarantees, tax credits and tax rebates, negative pick ups, etc.). BondIt also provides bridge loans, corporate loans and cash flow solutions to media projects, producers and companies alike.

HAMRICK & EVANS, LLP

**Representations Regarding the BondIt Loan and Security Agreement**

26.     Beginning in 2017, Defendants Ginzburg and Lee pitched to BondIt with an opportunity to partially finance the cost of production of the Picture. As part of this proposal, Defendants Ginzburg and Lee represented to BondIt that a film tax credit issued by the state of Kentucky would be used to repay the loan.

27.     On July 28, 2017, Defendant Ginzburg directed e-mail correspondence to BondIt, a true and correct copy of which is attached hereto as Exhibit "1," setting forth the following representations regarding the Picture and its production:

> a.     The total budget for the Picture was $7 Million Dollars;
>
> b.     BondIt would loan $1.5 Million Dollars to finance production of the Picture;
>
> c.     The Gersh Agency would sell the film domestically;
>
> d.     Casting Options included Jai Courtney, Garrett Hedlund, and Kristen Stewart;
>
> e.     Cassian Elwes had agreed to co-produce the Picture; and
>
> f.     The BondIt loan would be collateralized by a Kentucky film tax credit, which was valued at $2.5 Million Dollars.

28.     BondIt is informed and believes, and based thereon alleges, that the July 28, 2017 e-mail from Defendant Ginzburg to BondIt contained materially false statements, including the claim that Cassian Elwes had agreed to co-produce the Picture and that they would obtain a Kentucky film tax credit in the amount of $2.5 Million Dollars. These intentionally false statements were intended to induce BondIt to advance the sum of $1.5 Million Dollars to HM-Canada to partially finance the production of the Picture.

29.     Prior to execution of the BondIt Loan and Security Agreement, Defendants Ginzburg, Lee and Kim submitted what they claimed to be their bank statements ("Financial Statements") to BondIt for review.

HAMRICK & EVANS, LLP

30.     BondIt relied on these Financial Statements in entering into the BondIt Loan. BondIt is informed and believes, and based thereon alleges, that the Financial Statements submitted by Defendants Ginzburg, Lee, and Kim to BondIt on which BondIt detrimentally relied in entering into the BondIt Loan and Security Agreement and documents related thereto, were false, fraudulent and/or intentionally misleading.

## Execution of the BondIt Loan and Security Agreement

31.     On September 18, 2017, BondIt and Defendant HM-Canada entered into the BondIt Loan and Security Agreement documenting the BondIt Loan, by the terms of which BondIt was to advance the sum of $1.5 Million Dollars to HM-Canada to partially finance the production of the Picture. A true and correct copy of the BondIt Loan and Security Agreement is attached hereto as Exhibit "2."

32.     The BondIt Loan and Security Agreement includes the following material provisions:

a.     "Borrower[1] has requested that Lender lend and advance funds to Borrower for use in the payment of preproduction, production, and post-production costs of the Picture [Crossface] in the aggregate principal amount not to exceed One Million Five Hundred Thousand United States Dollars (US$1,500,000.00) by 10/06/2017." Ex. "2," ¶¶ B, 2.1;

b.     "The Commitment Amount and any Default Interest on the Promissory Note shall be immediately due and payable on the following dates (the "Repayment Date(s)"): (i) US$1,925,000.00 on the earlier of 9/14/2018 or Borrower receiving any monies from the tax incentive proceeds." Ex. "2," ¶ 2.7;

c.     "The unpaid Indebtedness shall bear no interest until the applicable Repayment Date other than a return interest fee equal to Three Hundred and Eighty Five Thousand Dollars (US $385,000,00.00) (the "Interest Fee"), which Interest Fee may be deemed interest; provided that from and after the occurrence of an Event of Default (and without constituting a waiver of such Event

---

[1] For purposes of the BondIt Loan and Security Agreement, "Borrower" means HM-Canada, which at one time was authorized to is registered to do business in the state of Kentucky.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

HAMRICK & EVANS, LLP

of Default), the unpaid Indebtedness will bear interest ("Default Interest") at a rate equal to three percent (3%) until the Event of Default has been cured. All interest provided for in this paragraph 2.8.1 will be compounded monthly and payable on demand.." Ex. "2," ¶ 2.8.1; and

d.    "If the provisions of this Agreement or the Promissory Note would at any time otherwise require payment to Lender of an amount of interest in excess of the maximum amount then permitted by the law applicable to the Loan, such interest payments shall be reduced to the extent necessary so as to ensure that Lender shall not receive interest in excess of such maximum amount." Ex. "2," ¶ 2.8.2.

33.    In addition, the BondIt Loan and Security Agreement also sets out deadlines regarding the commencement of principal photography and audits for film tax credits, which are the interests against which BondIt's first priority position was secured, Defendant HM-Canada's submission to the jurisdiction of the California state courts and the United States District Court for the Central District of California for the purpose of any suit, action or other proceeding, and the waiver of any offsets or counterclaims in any such action, suit or proceeding, in pertinent part, as follows:

a.    "Principal Photography shall commence on or about February 28, 2018." Ex. "2," ¶5.10;

b.    "Hollows Movie Inc., shall apply to the Kentucky Tourism Development Finance Authority a voluntary audit to verify and request the "Certificate of Tax Credits" no later than May 31, 2018." Ex. "2," ¶7.1.2;

c.    "BONDIT will have first priority position secured against the Kentucky Film Tax Rebate, and to any and all rights, intellectual property, profits, cash, equipment, tangible and intangible assets, and virtually any other assets or things of value in the Project." Ex. "2," ¶¶ 1.54, 4.1, 5.7; and

d.    "Borrower (i) hereby irrevocably submits itself to the jurisdiction of the state courts of the State of California and to the jurisdiction

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

HAMRICK & EVANS, LLP

of the United States District Court for the Central District of California, for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, the Promissory Note or any of the Loan Documents or the subject matter hereof or thereof brought by Lender or its successors or assigns … and (iii) hereby waives any offsets or counterclaims in any such action, suit or proceeding." Ex. "2," ¶10.3.

34.    Paragraphs 9.1.1-9.1.15 of the BondIt Loan and Security Agreement enumerate 18 events of default, including, but not limited to, the following:

1.    "9.1.1. Borrower's failure to make (or cause to be made) any payments to Lender hereunder when the same are due, including without limitation, payment of the Commitment Amount (and Default Interest, if any), by the applicable Repayment Date(s);

2.    9.1.2 Borrower's failure to pay any Tax Credit Proceeds to Lender in accordance with paragraph 7.1.5 hereof; or

3.    9.1.3 Borrower's failure to submit the AUP Audit to the Film Office by the date specified in paragraph 7.1.2; or

4.    9.1.5 Default in the due and timely observance or performance of the terms, provisions, covenants, conditions, agreements or obligations of Borrower contained in this Agreement, the Promissory Note or in any other agreement relating to the Loan or the Collateral which would materially adversely affect the validity, perfection or priority of the Lender's Security Interest in the Collateral, or the value of the Collateral or the Promissory Note; or

5.    9.1.6 Borrower's failure to perform or observe, in a due and timely manner, any of the other (i.e., other than those subject to the immediately preceding subparagraphs 9.1.1 through 9.1.5) material terms, provisions, covenants, conditions, agreements or obligations contained herein, in the Loan Documents or in any other agreement, contract, indenture, document or instrument executed, or to be executed, by Borrower in connection with this Agreement or pursuant hereto and which would have a material adverse effect on the ability or obligation of Borrower to perform

HAMRICK & EVANS, LLP

its obligations under this Agreement and under the other Loan Documents to be executed by Borrower pursuant hereto; or

6.      9.1.12 If there shall exist or occur, and Lender shall notify Borrower of, any event or condition which in Lender's good faith business judgment (exercised in Lender's sole discretion) is an Event of Default or which would have a material adverse effect on the ability or obligation of Borrower to perform its material obligations under this Agreement and under the other Loan Documents to be executed by Borrower pursuant hereto; or

7.      9.1.13 If final judgment or judgments for the payment of money aggregating in excess of Fifty Thousand Dollars ($50,000.00) shall be entered or affirmed by a court against Borrower, and Borrower shall not discharge the same or provide for its or their discharge in accordance with its or their terms or procure a stay of execution thereof within sixty (60) days from the date of entry thereof; or

8.      9.1.15 If Borrower shall default under any Loan Document and such default is not cured with the proscribed cure period thereunder; or 9.1.16 If there shall exist any material change in lowering the Budget, lowering qualified production costs, financing structure, timing of production, including post-production, or the key production team of the Picture (i.e., Alex Ginzburg and Dong Lee are no longer producers) unless approved by Lender …" Ex. "2," ¶¶ 9.1.1 - 9.1.15.

35.     Also, on September 18, 2017, BondIt and Defendant HM-Canada entered into a several additional agreements concurrent with the execution of the BondIt Loan and Security Agreement, including the following five Guaranty Agreements, an Assignment of Proceeds of the Kentucky tax credit, a Promissory Note, a Copyright Mortgage and Assignment and a Power of Attorney.

## The Guaranty Agreements

36.     Defendants HM-Canada, Let It Play, Ginzburg, Lee and Kim each executed a separate and identical "Guaranty Agreement" with BondIt. Attached hereto as Exhibits "2"-"7" are true and correct copies of the Guaranty Agreements

-12-

HAMRICK & EVANS, LLP

between BondIt, on the one hand, and Defendants HM-Canada, Let It Play, Ginzburg, Lee and Kim, each, on the other hand.

37. The provisions of the Guaranty Agreements that are material to BondIt's claims for relief in this action include, but are not limited to, the following:

a. "Guarantor hereby unconditionally, absolutely and irrevocably Guarantees to Beneficiary and its successors and assigns the full, faithful and complete performance by Borrower of each and every covenant, agreement, duty, liability and/or obligation (known, unknown, fixed, contingent or otherwise) of Borrower under or contained in any Subject Agreement including, without limitation, the due and timely payment of amounts payable by Borrower under any Subject Agreement, all in strict accordance with the terms and provisions of such Subject Agreement (collectively the "Borrower's Obligations"), and all as if Guarantor were the primary obligor with respect to each and all of the Borrower's Obligations. Guarantor acknowledges and agrees that this Guaranty constitutes a Guaranty of payment and performance and not merely of collection. At the written request of Beneficiary, Guarantor will provide financial reports demonstrating the ability of the Guarantor to cover the Borrower's Obligations." Exs. "2"-"7," ¶ 2; and

b. "Legal Proceedings. Guarantor hereby agrees that any legal action, suit or proceeding against Guarantor (or any successor-in-interest thereto) arising out of or relating to this Guaranty may (but need not) be initiated by Beneficiary in a state or federal court located in the County of Los Angeles, State of California. By execution and delivery of this Guaranty, Guarantor hereby (a) waives any objection that it may now or hereafter have to the laying of venue of any such action, suit or proceeding in any such court, (b) waives any claim that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum, (c) submits to the personal jurisdiction of any such court in any such action, suit or proceeding, and (d) agrees to be bound by any judgment, order or decree rendered by any such court in any such action, suit or proceeding." Exs. "2"-"7," ¶ 13.

//

//

HAMRICK & EVANS, LLP

**The Assignment of Proceeds of the Kentucky Tax Credit**

38.     Defendant HM-Canada also executed an Assignment of Proceeds, a true and correct copy of which is attached hereto as Exhibit "8," Pursuant to the terms and conditions of the of the Assignment of Proceeds, Defendant HM-Canada assigned all right, title and interest to the proceeds of any and all Kentucky film tax credits issued for the Picture as set forth in pertinent part below:

a.     "WHEREAS, contemporaneously herewith Assignor and Assignee have entered into that certain Loan and Security Agreement (the "Agreement"), dated as of the date hereof, for the financing of the motion picture presently entitled "Crossface" (the "Picture"), the indebtedness under which Agreement is to be primarily repaid by Assignor with all refunds, subsidies, rebates or other amounts payable by Kentucky State, its agencies or instrumentalities in connection with any Tax Credits (the "Proceeds")." Ex. "8," Second Full Paragraph;

b.     "Subject to the terms and conditions hereinafter set forth, Assignor does hereby transfer, assign and deliver unto Assignee all of the right, title and interest of Assignor in and to the Proceeds together with all the rights, privileges and appurtenances now or hereafter in any way belonging or pertaining thereto." Ex. "8," ¶ 1;

c.     "This Assignment shall be governed and construed in accordance with the laws of the State of California without resort to its conflicts of laws rules. Each party hereto hereby irrevocably submits itself to the jurisdiction of the state courts of the State of California. California law shall govern (i) the validity and interpretation of the Agreement, (ii) the performance of the parties of their respective obligations hereunder, and (iii) all other causes of action (whether sounding in contract or in tort) arising out of or relating to this Agreement or the termination of this Agreement. The parties irrevocably submit to the exclusive jurisdiction of the United States District Court for the Central District of California, for the purpose of any suit, action or other proceeding arising out of or based upon this Assignment or the subject matter hereof, and each party hereby waives, and agrees not to assert, by way of motion, a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

jurisdiction of the above-named courts, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Assignment or the subject matter hereof may not be enforced in or by such court (provided, however, that the then applicable jurisdiction minimums are not waived)." Ex. "8," ¶ 5, Second Paragraph.

### The Promissory Note

39.    Defendant HM-Canada also executed a promissory note, in the amount of $1.925 Million Dollars, payable to BondIt by the repayment date of September 14, 2018 in accordance with the BondIt Loan and Security Agreement (the "Promissory Note"), a true and correct copy of which is attached hereto as Exhibit "9." The material provisions of the Promissory Note provide in pertinent part as follows:

a.    "US $1,925,000.00 ("Commitment Amount") As of September 18th , 2017 (the "Effective Date") FOR VALUE RECEIVED, the undersigned, Hallows Movie Inc., a Canadian corporation, registered to do business in the state of Kentucky with an address at 212 North 2nd St. Suite 100 Richmond, Kentucky 40475, ("Borrower"), hereby promises to pay to the order of BONDIT LLC ("Lender"), or holder, at 1639 11th St. Santa Monica, CA 90404, or at such other address as the holder may specify in writing, the Commitment Amount (i.e., the Loan, plus the Interest Fee and the Legal Fee), in lawful money of the United States of America, on or prior to the Repayment Dates as determined pursuant to that certain Loan and Security Agreement by and between the Borrower and Lender dated as of September 18th , 2017, (the "Loan and Security Agreement"). Any capitalized terms not otherwise defined hereunder shall have the meaning as set forth in the Loan and Security Agreement." Ex. "9," ¶ 1;

b.    "If this Promissory Note is not paid in full when due, the Borrower promises to pay all third party, actual, out-of-pocket costs and expenses of collection and reasonable outside attorneys' fees and court costs (including, without limitation, reasonable travel and accommodation expenses) incurred by the holder hereof on account of such collection, whether or not a suit is filed in relation thereto." Ex. "9," ¶ 3; and

c.   "This Promissory Note is executed under and shall be governed by and construed in accordance with the laws of the State of California without reference to the conflict of laws provisions thereof. In any action brought under 2 or arising out of this Promissory Note, the Borrower hereby irrevocably submits to the jurisdiction of the state courts of the State of California and to the jurisdiction of the United States District Court for the Southern District of California and hereby consents to service of process by registered mail at the address first written above. The Borrower hereby waives any right which the Borrower may have to transfer or change the venue of any action brought by the holder of this Promissory Note." Ex. "9," ¶ 8.

### The Copyright Mortgage and Assignment

40.   Further, Defendant HM-Canada executed a Copyright Mortgage and Assignment, a true and correct copy of which is attached hereto as Exhibit "10," documenting BondIt's first priority security interest in the Kentucky film tax credit and related proceeds, and to all of HM-Canada's assets, including, without limitation, all right, title and interest in connection with the Picture, as follows:

"Mortgagor [HM-Canada] hereby irrevocably, unconditionally and absolutely grants to Mortgagee [BONDIT] a first priority security interest in and to the Tax Credit and Tax Credit Proceeds and Mortgagee shall further be granted a first priority security interest, subordinate only to the applicable guilds, in all of Mortgagor's assets, whether now owned or hereafter acquired, including, without limitation, all of Mortgagor's right, title and interest in connection with 'Crossface'…" Copyright Mortgage and Assignment, at Ll. 8-12.

### The Power of Attorney

41.   Finally, Defendant HM-Canada executed a Power of Attorney, a true and correct copy of which is attached hereto as Exhibit "11," granting BondIt power of attorney for the purposes of communicating with the Kentucky Film Office to collect the proceeds of the Kentucky film tax credit in connection with the Picture.

HAMRICK & EVANS, LLP

HAMRICK & EVANS, LLP

**Defendants' Initial Breaches of the BondIt Loan and Security Agreement and the Guaranty Agreements**

42.     On October 6, 2017, pursuant to the terms and conditions of the BondIt Loan and Security Agreement, including Paragraph 2.1, BondIt advanced substantial funds, in the principal amount of $1.5 Million Dollars, via wire transfer, to Defendant HM-Canada.

43.     Defendants HM-Canada, Let it Play, Ginzburg, Lee and Kim first breached the BondIt Loan and Security Agreement and the Guaranty Agreements by failing to commence principal photography by February 28, 2018 (¶ 5.10), and failing to apply for the film tax credit audit by May 31, 2018 (¶7.1.2).

44.     On May 3, 2018, BondIt provided written notice to Defendants HM-Canada, Dong Lee and Alex Ginsburg, a true and correct copy of which is attached hereto as Exhibit "12," of their default by failing to commence principal photography by February 28, 2018 and failing to apply for the film tax credit audit by May 31, 2018. The May 3, 2018 Notice of Default provided in pertinent part as follows:

> "We hereby notify you that Events of Default have occurred (and are continuing) under Sections 9.1.5, 9.1.6, 9.1.12, 9.1.15, and 9.1.16 of the Loan Agreement (all of the foregoing referred to here as "Defaults") as a result of, among other things, Company's failure to adhere to the agreed upon Production Schedule, and Company's failure to start Principal Photography by February 28, 2018 (5.10). Inevitably, the mismanagement of Company will result in delinquencies which will constituent additional Events of Default on or before May 30, 2018 (Sections 9.1.1, 9.1.2, and 9.1.3.). Upon the occurrence of any of the Events of Default set forth in paragraph 9.1, subject to paragraph 9.3, all Indebtedness is hereby immediately due and payable." Ex. "12," ¶ 2.

45.     On May 31, 2018, in response to BondIt's Notice of Default, Defendant Ginzburg conveyed to BondIt, via e-mail, an offer to provide additional security to BondIt, a true and correct copy of which is attached hereto as Exhibit "13," in an

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

attempt to address Defendants' initial breaches of the BondIt Loan and Security Agreement and the Guaranty Agreements. The May 31, 2018 e-mail proposed to convey to BondIt the following additional collateral and security interests:

    a.    A $1.5 Million Dollar tax credit to be issued by the Commonwealth of Puerto Rico in connection with *Utopia* (the "Puerto Rico Tax Credit");

    b.    A $1.55 Million Dollar tax credit to be issued by the State of Alabama in connection with *The Recovery aka Above* (the "Alabama Tax Credit"); and

    c.    Future earnings on the motion picture entitled *Fistful of Dirt aka Creatures of the Storm*.

46.    Based on the representations by Defendants, and each of them, to BondIt, including the material representations set forth in the May 31, 2018 e-mail from Defendant Ginzburg, BondIt reasonably believed that Defendants were acting in good faith and, on that basis, justifiably relied on these material representations by Defendants, and each of them, in entering into the following amendments to the BondIt Loan and Security Agreement.

### The First Amendment to the BondIt Loan and Security Agreement

47.    On October 20, 2018, Plaintiff and Defendant HM-Canada entered into a First Amendment to the BondIt Loan and Security Agreement, (the "Amended LSA"), a true and correct copy of which is attached hereto as Exhibit "14," as to which Defendants HM-Puerto Rico and Utopia Film-Puerto Rico were also added as additional signatories.

48.    The terms and conditions of the Amended LSA effected material changes to the provisions of the BondIt Loan and Security Agreement, including, but not limited to, the following:

    a.    "2.1    Paragraph 1.5 of the Loan Agreement is deleted in its entirety and is replaced with the following:

HAMRICK & EVANS, LLP

"Borrower" means Hallows Movie Inc., a Canadian corporation, registered to do business in the state of Kentucky. For purposes of Paragraphs 4 and 5, **Borrower shall mean the following**: (i) **Hallows Movie Inc., a Canadian corporation**, registered to do business in the state of Kentucky; (ii) **Hallows Movie LLC, a Puerto Rican limited liability company**, currently producing the motion picture entitled Recovery in the state of Alabama, and **Utopia Film LLC, a Puerto Rican limited liability company** that produced the motion picture currently entitled Utopia, and is in the process of claiming its Puerto Rican tax credit." Ex. "14," ¶ 2.1 (emphasis added);

b.    "2.2.  Paragraph 4.1.1 of the Loan Agreement is deleted in its entirety and is replaced with the following:

4.1.1. Film Collateral and Copyright. **The Picture** [Crossface], the motion picture project currently entitled **The Recovery** and the motion picture project entitled **Utopia**, (the "Additional Pictures"), and all of Borrower's rights therein and thereto, and all properties and things of value pertaining thereto, and all products and proceeds thereof, whether now in existence or hereafter made, acquired or produced (as used in this paragraph, the term the "Picture" shall mean and include the Picture, all of the aforesaid rights and the rights of Borrower set forth in subparagraphs 4.2.1.1 through 4.2.1.16 below), including, without limitation:[.]" Ex. "14," ¶ 2.2 (emphasis added);

c.    "2.3. Paragraph 4.1.5 of the Loan Agreement is deleted in its entirety and is replaced with the following:

4.1.5 Tax Credit Proceeds. The Tax Credits and Tax Credit Proceeds, whether now owned or hereafter acquired (including all property and/or assets converted or substituted for such Tax Credits or Tax Credit Proceeds), and to the extent not included in the items described herein and above, all Tax Credits and Tax Credit Proceeds whether now owned or hereafter acquired for and to the Additional Pictures." Ex. "14," ¶ 2.3;

d.    "2.4. The following shall be inserted as Paragraph 4.2.1 of the Loan Agreement:

Concurrently with the execution of this Amendment, Borrower hereby authorizes Lender to file the appropriate financing statement(s) in the applicable jurisdictions under the UCC, pursuant to Exhibits 1 and 2 to this Amendment." Ex. "14," ¶ 2.4; and

e.  "Paragraph 2.7 of the Loan Agreement is deleted in its entirety and is replaced with the following:

2.7. Repayment Dates. The Commitment Amount and any Default Interest on the Promissory Note shall be immediately due and payable on the following dates (the "Repayment Date(s)")": (i) US$1,925,000.00 on the earlier of September 14, 2018 or Borrower receiving any monies from the tax incentive proceeds for the Additional Pictures." Ex. "14," ¶ 2.5.

49.   The Amended LSA includes an acknowledgment that "an Event of Default Occurred and that in the event that Borrower fails to repay US$1,925,000.00, then Lender is entitled to charge Borrower all Default Interest as if the Event of Default had occurred as of February 28, 2018." Ex. "14," ¶ 3.

**The Purported Assignments of Additional Collateral**

50.   Also, on October 20, 2018, and concurrent with the execution of the Amended LSA, Defendants HM-Puerto Rico and Utopia Film-Puerto Rico each also executed a Security and Guaranty Agreement in accordance with the provisions of Paragraph 4 of the Amended LSA. Attached hereto as Exhibits "15" and "16" are true and correct copies of the Security and Guaranty Agreements entered into between Defendants HM-Puerto Rico and Utopia Film-Puerto Rico, respectively, and BondIt.

51.   The Security and Guaranty Agreements each contain the following material terms and conditions:

2.   "GRANT OF SECURITY INTEREST. The Guarantor[2] hereby irrevocably and unconditionally pledges, assigns and grants to the Lender a security interest in all of the Guarantor's right, title and

---

[2] Defined as HM-Puerto Rico, and Utopia Film ‒ -Puerto Rico in their respective agreements.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

interest in, to the Picture[3] and the Collateral[4], as collateral security to secure the payment and performance in full of all the Obligations." Exs. "15" & "16," ¶ 2; and

…

6.   "CERTAIN COVENANTS. The Guarantor hereby covenants to the Lender that, unless compliance is waived in writing by the Lender, from and after the date of this Agreement until the Obligations have been paid in full:

(a) The Guarantor will keep the Collateral free of all liens, claims, security interests and encumbrances of any kind or nature, whether voluntary or involuntary.

(b) The Guarantor agrees to pay prior to delinquency all taxes, charges, liens and assessments against the Collateral, and upon the failure of the Guarantor to do so, the Lender at its option may pay any of them and shall be the sole judge of the legality or validity thereof and the amount necessary to discharge the same.

(c) The Guarantor shall not voluntarily (i) sell, assign, lease, transfer, trade, withdraw, redeem, substitute or otherwise dispose of any of the Collateral, or enter into any agreement to do so.

(d) The Guarantor shall give the Lender at least ten (10) days prior written notice before changing its name, its jurisdiction of organization or, in the case of an individual, the location of its principal residence." Exs. "15" & "16," ¶ 6.

//
//
//
//
//

---

[3] Defined in the HM-Puerto Rico agreement as "The Recovery" and in the Utopia Film -Puerto Rico agreement as "Utopia."

[4] Defined in the HM-Puerto Rico agreement as The Alabama Tax Credit and in the Utopia Film-Puerto Rico agreement as The Puerto Rico Tax Credit.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

HAMRICK & EVANS, LLP

HAMRICK & EVANS, LLP

1

## Defendants' Representations Regarding the Film Tax Credits

2       52.     Following the execution of the Amended LSA and the Security and

3  Guaranty Agreements, attached hereto as Exhibits "14"-"16," one or more of the

4  Defendants provided BondIt with regular updates and timelines regarding the

5  expected payment of the film tax credits pledged to BondIt. For example, on January

6  29, 2019, Defendants sent BondIt the following timeline graphic purporting to

7  illustrate the payment dates for the *Utopia* and *The Recovery aka Above* film tax

8  credits:

9



14

## BondIt's Discovery of the True Holder of the *Utopia* Film Tax Credit

16       53.     In March 2019, when the first half of the Utopia film tax credit proceeds

17  were due to BondIt, Defendant Ginzburg for the first time advised BondIt that the

18  proceeds of the film tax credit were instead issued by the Puerto Rico Film

19  Commission to Defendant Martinez-Davila. In addition, Defendant Ginzburg also

20  advised BondIt that he had filed suit in the United States District Court for the District

21  of Puerto Rico against the owner of Defendant Utopia Film-Puerto Rico, Defendant

22  Martinez-Davila, based on the failure of Defendant Martinez-Davila to assign to

23  Defendant Ginzburg the proceeds of the Utopia film tax credit, the value of which

24  Defendant Ginzburg stated was $810,633.29.

25  ## Defendants' Misrepresentations Regarding the Alabama Tax Credit

26       54.     BondIt is informed and believes, and based thereon alleges, that on or

27  around July 29, 2019, the proceeds of the Alabama Tax Credit to be issued by the

28  State of Alabama in connection with *The Recovery aka Above*, which by the terms

1  and conditions of the Amended LSA were pledged to BondIt were, instead, paid to

2  one or more of the Defendants.

3      55.    Despite the distribution of the proceeds of the Alabama Tax Credit to

4  one or more of the Defendants, on August 20, 2019, Defendant Lee directed an e-mail

5  communication to BondIt falsely stating that Alabama Tax Credit had not yet been

6  issued, but that it was expected to be issued around "Labor Day" [September 2, 2019].

7  Attached hereto as Exhibit "17" is a true and correct copy of Defendant Lee's August

8  20, 2019 e-mail to BondIt.

9      **Defendants' Shell Game is Exposed and Their Fraud Unravels**

10      56.    On or around September 6, 2019, during the course of discussions

11  between BondIt and representatives of Defendant Ginzburg regarding the ongoing

12  litigation between Defendant Martinez-Davila and Defendant Ginzburg regarding the

13  proceeds of the *Utopia* film tax credit, Defendant Ginzburg confirmed that the

14  proceeds of the Alabama Tax Credit in connection with *The Recovery aka Above*,

15  which were pledged to BondIt were, instead, paid to one or more of the Defendants,

16  who then used the proceeds to pay a third party lender who BondIt is informed and

17  believes, and based thereon alleges, was Three Point Capital, LLC, which is a debt

18  financier in the film and television industry.

19      57.    Defendants and each of them, also fraudulently concealed a creditor lien

20  against the Alabama Tax Credit. BondIt is informed and believes, and based thereon

21  alleges, that Defendant HM-Puerto Rico, the entity that Defendants, and each of them,

22  used to assign the Alabama Tax Credit to BondIt never held any right, title or interest

23  to the Alabama Tax Credit, which fact was known to Defendants, and each of them,

24  as of the time of the execution of the Amended LSA on October 20, 2018. Notably,

25  BondIt is informed and believes, and based thereon alleges, that Defendant HM-

26  Louisiana not only held all right, title or interest to the Alabama Tax Credit, but was

27  paid the proceeds of the Alabama Tax Credit on the direction and with the consent of

28  Defendants and each of them.

HAMRICK & EVANS, LLP

58.    BondIt is informed and believes, and based thereon alleges, that on or around October 14, 2018, six days before Defendants, and each of them, assigned the Alabama Tax Credit to BondIt, Three Point Capital, LLC filed a lien against HM-Louisiana for the proceeds of the Alabama Tax Credit. BondIt is further informed and believes, and based thereon alleges, that Defendants, and each of them, willfully and intentionally assigned the Alabama Tax Credit to BondIt through HM-Puerto Rico in an effort to conceal the pre-existing lien by Three Point Capital, LLC against the Alabama Tax Credit payable to HM-Louisiana.

59.    BondIt is informed and believes, and based thereon alleges, that HM-Louisiana transferred $612,000 of the Alabama Tax Credit to Three Point Capital, LLC. BondIt is informed and believes, and based thereon alleges, that the balance of the Alabama Tax Credit, in the amount of $779,000, was thereafter transferred by Defendants, and each of them, to the bank account of Defendant HM-Puerto Rico bank account, which is under the control of one or more of the Defendants. Each of these actions by Defendants, and each of them, was intentionally concealed from, and undertaken without notice to, BondIt.

60.    In addition, Defendants, and each of them, also fraudulently assigned BondIt the proceeds of the Puerto Rico Tax Credit in connection with *Utopia*. In this regard, BondIt is informed and believes, and based thereon alleges, that Defendant Ginzburg intentionally misrepresented himself as a managing member of Defendant Utopia Film-Puerto Rico as part of the scheme to avoid repayment of the BondIt Loan, including entering into the Amended LSA and the execution of Security and Guaranty Agreements by Defendants HM-Puerto Rico and Utopia Film-Puerto. The true facts are that Defendant Ginzburg did not have the authorization of the sole member of Defendant Utopia Film-Puerto Rico, Defendant Martinez-Davila, to assign the Puerto Rico Tax Credit to BondIt.

//

//

HAMRICK & EVANS, LLP

## **AGENCY AND ALTER EGO**

61.     BondIt is informed and believes, and based thereon alleges, that at all times relevant hereto, Ginzburg and Lee were, and now are, the alter egos of HM-Canada, HM-Puerto Rico, HM-Louisiana, Crossface and Let it Play. BondIt is further informed and believes, and based thereon alleges, that at all times relevant hereto, there is a unity of interest and ownership between Ginzburg and Lee, on the one hand, and HM-Canada, HM-Puerto Rico, HM-Louisiana, Crossface and Let it Play, on the other hand, such that any individuality and separateness between said Defendants have ceased. In particular, BondIt is informed and believes, and based thereon alleges, that at all times relevant hereto: (1) Ginzburg and Lee are the sole or majority shareholders of, or the controlling or sole members of the limited liability companies, owners, directors, officers and/or managers of, and manage and control, HM-Canada, HM-Puerto Rico, HM-Louisiana, Crossface and Let it Play; (2) at the time Ginzburg and Lee formed HM-Canada, HM-Puerto Rico, HM-Louisiana, Crossface and Let it Play, they knew HM-Canada, HM-Puerto Rico, HM-Louisiana, Crossface and Let it Play were undercapitalized and that HM-Canada, HM-Puerto Rico, HM-Louisiana, Crossface and Let it Play would not have sufficient assets to pay their obligations; and (3) Ginzburg and Lee have used their control over HM-Canada, HM-Puerto Rico, HM-Louisiana, Crossface and Let it Play to manipulate assets and liabilities for their own personal benefit by, among other things, using the legal fiction of separateness between Ginzburg, Lee, HM-Canada, HM-Puerto Rico, HM-Louisiana, Crossface and Let it Play as a ruse to pay Ginzburg, Lee, HM-Canada, HM-Puerto Rico, HM-Louisiana, Crossface and Let it Play sums of money ahead of senior creditors.

62.     Adherence to the fiction of a separate existence of HM-Canada, HM-Puerto Rico, HM-Louisiana, Crossface and Let it Play as entities distinct from Ginzburg and Lee would, under the circumstances, permit an abuse of the corporate privilege, sanction fraud and promote an injustice in that Ginzburg and Lee have used the corporate form of HM-Canada, HM-Puerto Rico, HM-Louisiana, Crossface and

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

Let it Play as a device to funnel substantial sums of money to themselves while, at the same time, shielding themselves from personal liability in connection with the conduct used to acquire that money. Furthermore, BondIt is informed and believes, and based thereon alleges, that at all times relevant hereto, as a result of the improper manipulation of assets and the improper diversion of funds, Ginzburg, Lee, HM-Canada, HM-Puerto Rico, HM-Louisiana, Crossface and Let it Play have become insolvent and unable to repay their debts, including the debts alleged herein.

63.     BondIt is informed and believes, and based thereon alleges, that at all times relevant hereto, Martinez-Davila was, and now is, the alter ego of Utopia Film-Puerto Rico. BondIt is further informed and believes, and thereon alleges, that at all times relevant hereto, there is a unity of interest and ownership between Martinez-Davila, on the one hand, and Utopia Film-Puerto Rico, on the other hand, such that any individuality and separateness between said Defendants have ceased. In particular, BondIt is informed and believes, and based thereon alleges, that at all times relevant hereto: (1) Martinez-Davila is the sole shareholder of, is a director, officer and/or manager of, and manages and controls, Utopia Film-Puerto Rico; (2) at the time Martinez-Davila formed Utopia Film-Puerto Rico, he knew it was undercapitalized and that it would not have sufficient assets to pay its obligations; and (3) Martinez-Davila has used his control over Utopia Film-Puerto Rico to manipulate assets and liabilities for his own personal benefit by, among other things, using the legal fiction of separateness between Martinez-Davila and Utopia Film-Puerto Rico as a ruse to pay Martinez-Davila and Utopia Film-Puerto Rico sums of money ahead of senior creditors.

64.     Adherence to the fiction of a separate existence of Utopia Film-Puerto Rico as an entity distinct from Martinez-Davila would, under the circumstances, permit an abuse of the corporate privilege, sanction fraud and promote an injustice in that he has used the corporate form of Utopia Film-Puerto Rico as a device to funnel substantial sums of money to himself while, at the same time, shielding himself from

HAMRICK & EVANS, LLP

personal liability in connection with the conduct used to acquire that money. Furthermore, BondIt is informed and believes, and based thereon alleges, that at all times relevant hereto, as a result of the improper manipulation of assets and the improper diversion of funds, Martinez-Davila and Utopia Film-Puerto Rico have become insolvent and unable to repay their debts, including the debts alleged herein.

65.     BondIt is informed and believes, and based thereon alleges, that at all times relevant hereto, each of the Defendants was, at all times mentioned in this Complaint, acting as the agent, employee and co-conspirator of every other Defendant and, in doing the things mentioned herein, was acting within the course and scope of such agency, employment and conspiracy.

## FIRST CLAIM FOR RELIEF

## (Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) Against All Defendants)

66.     BondIt incorporates herein by reference each and every allegation contained in paragraphs 1 through 65, inclusive.

67.     BondIt is informed and believes, and based thereon alleges, that Defendants, and each of them, in any combination associated in fact, are an "Enterprise" as defined in 18 U.S.C. § 1961(4) (the "Enterprise"). Specifically, Defendants, and each of them, were, and are, a union or group that are associated in fact, constitute an ongoing organization, and function as a continuing unit. This is due to their contractual and financial relationship, their common ownership, their common goal of inducing others to enter into investment, financing, and business transactions, and their continuing and substantial interaction and involvement as alleged herein.

68.     Defendants, and each of them, were, and are, associated for a common purpose of engaging in a course of conduct, at least one aspect of which is attempting to extract money through false representations and other fraudulent conduct as set forth herein, in order to induce victims into entering improper investment, financing,

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

and business transactions. Defendants, and each of them, have relationships among those associated with the Enterprise, including relationships between and among their respective members, executive, and employees. The association between these individuals and entities also have longevity sufficient to permit these associates to pursue the Enterprise's purpose, including by virtue of their ongoing contractual and financial relationship, alignment of interest, and ongoing interactions.

69.     BondIt is informed and believes, and based thereon alleges, that the Enterprise engaged in, and its activities have an effect on, interstate and foreign commerce in connection with the Enterprise's business of enticing individuals and companies to enter into investment, financing, and business transactions with the Enterprise, based upon the Enterprise's false representations and other fraudulent conduct as set forth herein. The Enterprise uses the instrumentalities of telephone calls, text messages, e-mail, and wire transfers, and it has engaged in business dealings with multiple United States citizens in connection with the Enterprise's business and activities.

70.     BondIt is informed and believes, and based thereon alleges, that in violation of 18 U.S.C. §1962(c), Defendants, and each of them, and those acting at their direction, have conducted, controlled, and participated in the conduct of the Enterprise's affairs through a pattern of unlawful racketeering activity.

71.     BondIt is informed and believes, and based thereon alleges, that the pattern of racketeering activity referred to herein consists of a variety of unlawful schemes, which were, and are, specifically intended to, and, do use unlawful means and influence to enrich Defendants, and each of them, at the expense of BondIt and others.  These unlawful schemes involved acts of wire fraud in violation of 18 U.S.C. §1343.

72.     BondIt is informed and believes, and based thereon alleges, that Defendants, and each of them, individually or collectively, and through the conduct of the Enterprise, were, and are, engaged in numerous acts of wire fraud and/or

devised an overall scheme or artifice to defraud, and are attempting, and have attempted, to commit fraud and carry out such scheme in violation of 18 U.S.C. §1343, which constitute "predicate acts" under 18 U.S.C. §1961 in furtherance of their campaign to enhance their wealth through unlawful means, including but not limited to, operating a scheme to defraud by which Defendants, and each of them, sought to induce individuals and companies to enter into investment, financing, and business transactions with Defendants, and each of them, to extract money through false representations and other fraudulent conduct as set forth herein.

73.     In furtherance of their scheme to defraud, Defendants, and each of them, have made interstate and foreign telephone calls, including the telephone calls between September 2017-October 20, 2018 from Defendants Ginzburg and Lee (who BondIt is informed and believes, and based thereon alleges, were not located in the State of California at the time of the telephone calls) to BondIt (which is based and physically located in the State of California) that led to the subsequent business dealings and transactions between BondIt and Defendants, and each of them. Defendants, and each of them, have also sent and received text messages, and have sent and received multiple e-mails. Defendant HM-Canada also requested and accepted the transfer of funds by wire from the State of California, which transfers were precipitated and caused by telephone calls, e-mails and other communications that originated in the United States.

74.     BondIt is informed and believes, and based thereon alleges, that these predicate acts are related because they had common purposes and goals (such as the unlawful enrichment of Defendants, and each of them, in violation of BondIt's rights), common methods of commission (including, but not limited to, the fraudulent use of wire transfers), and common participants (namely, Defendants Ginzburg, Lee and Kim, and those acting at their direction).

75.     BondIt is informed and therefore alleges that each of the foregoing acts of racketeering by Defendants, and each of them, is related, continuous, ongoing and

HAMRICK & EVANS, LLP

1  part of a pattern of conduct pertaining to multiple fraudulent representations and

2  transactions, directed at multiple victims, and continuing since at least 2017.

3  Accordingly, Defendants, and each of them, individually or collectively, have

4  engaged, and are engaging, in a continuing and related pattern of racketeering activity

5  within the meaning of 18 U.S.C. §1961(5), which poses a threat of continued unlawful

6  activity.  With respect to Defendants, and each of them, the pattern of unlawful

7  activity has open-ended continuity in that the unlawful acts are continuing, including

8  in connection with the ongoing efforts to improperly mislead and defraud targets

9  regarding investment, financing, and business transactions for the benefit of the

10 Enterprise.

11     76.    BondIt is informed and believes, and based thereon alleges, that

12 Defendants, and each of them, have treated other individuals and entities in the same

13 unlawful manner as alleged herein.

14     77.    Defendants, and each of them, have engaged in a pattern of racketeering

15 activity, in that they have engaged in multiple financial transactions within the United

16 States with knowledge that the property involved represented the proceeds of

17 unlawful activity. Defendants, and each of them, have used and invested the proceeds

18 of their pattern of racketeering activity in the operation of the Enterprise, in violation

19 of 18 U.S.C. § 1962(a).

20     78.    As a direct and proximate result of the participation in, and conduct of,

21 the affairs of the Enterprise alleged herein by Defendants, and each of them, through

22 a pattern of racketeering activity in violation of 18 U.S.C. §1962(c), BondIt has been

23 directly and proximately injured in its business and property, and is entitled to all

24 remedies available under the law.  As an intended, actual and proximate consequence

25 of the unlawful actions of Defendants, and each of them, BondIt has been forced to

26 incur the costs associated with significant disruption to its business, disruption to its

27 ability to invest in motion picture productions other projects, and obtain returns on its

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

investment, and other disruptions to BondIt caused by the unlawful of conduct of Defendants, and each of them, in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

### (Conspiracy to Violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d) Against All Defendants)

79.     BondIt incorporates herein by reference each and every allegation contained in paragraphs 1 through 78, inclusive.

80.     Defendants, and each of them, together with others known and unknown to BondIt, have unlawfully, fraudulent, and intentionally conspired together to plan and perpetrate a fraudulent scheme to carry out the common purpose of extracting money from individuals and entities, including BondIt, by inducing these individuals and entities to enter into investment, financing, and business transactions, based upon the false representations and other fraudulent conduct as set forth herein.

81.     As a direct and proximate result of the participation in, and conduct of, the affairs of the Enterprise alleged herein by Defendants, and each of them, through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c), BondIt has been directly and proximately injured in its business and property, and is entitled to all remedies available under the law.  As an intended, actual and proximate consequence of the unlawful actions of Defendants, and each of them, BondIt has been forced to incur the costs associated with significant disruption to its business, disruption to its ability to invest in motion picture productions other projects, and obtain returns on its investment, and other disruptions to BondIt caused by the unlawful of conduct of Defendants, and each of them, in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF

### (Violation of Calif. *Penal Code* § 496 Against All Defendants)

82.     BondIt incorporates herein by reference each and every allegation contained in paragraphs 1 through 81, inclusive.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

HAMRICK & EVANS, LLP

83.     Defendants, and each of them, violated California *Penal Code* Section 496 by obtaining money belonging to BondIt by theft and knowingly concealing and withholding such money from BondIt.

84.     Prior to the filing of this Complaint, BondIt demanded that Defendants, and each of them, return the money belonging to BondIt, which money Defendants, and each of them, obtained by theft and have knowingly concealed and withheld such money from BondIt. Despite demand by BondIt, Defendants, and each of them, have failed and refused to return the money belonging to BondIt.

85.     BondIt has been injured by Defendants' violation of California *Penal Code* Section 496.

86.     Pursuant to California *Penal Code* Section 496(c), BondIt is entitled to three times the amount of its actual damages, an amount to be proven at trial, its reasonable attorneys' fees and costs.

## FOURTH CLAIM FOR RELIEF

### (Breach of Written Contracts Against Defendants HM-Canada, Let it Play, Crossface, Ginzburg, Lee and  Kim)

87.     BondIt incorporates herein by reference each and every allegation contained in paragraphs 1 through 86, inclusive.

### The September 18, 2017 BondIt Loan and Security Agreement

88.     BondIt performed all of its material obligations under the BondIt Loan and Security Agreement, except for any obligations that may have been excused or prevented by Defendants' non-performance, including, but not limited to, advancing substantial funds, in the principal amount of $1.5 Million Dollars to HM-Canada to finance the production of the Picture.

89.      HM-Canada has failed and refused to perform its material obligations under the BondIt Loan and Security Agreement, by failing and refusing to timely pay the principal amount of the BondIt Loan plus all fees, interest, expenses, and costs due and owing under the BondIt Loan and Security Agreement as and when due. HM-

HAMRICK & EVANS, LLP

Canada's failure and refusal to perform its material obligations under the BondIt Loan and Security Agreement constitutes an unjustified material breach of the BondIt Loan and Security Agreement, which renders HM-Canada liable to BondIt for all sums owed.

90.     As a direct and proximate result of HM-Canada's breaches of the BondIt Loan and Security Agreement, BondIt has incurred substantial financial losses and has been damaged in an amount not less than the Commitment Amount of $1.925 Million Dollars under the BondIt Loan and Security Agreement, representing the principal amount of the BondIt Loan, the Interest Fee and the Legal Fee.

91.     As a further direct and proximate result of HM-Canada's breaches of the BondIt Loan and Security Agreement, BondIt is also entitled to Default Interest on the Commitment Amount at a rate equal to three percent (3%), compounded monthly and payable on demand, until the default has been cured.

## The September 18, 2017 Guaranty Agreements

92.     BondIt performed all of its material obligations under the Guaranty Agreements, if any, except for any obligations that may have been excused or prevented by Defendants' non-performance, including, but not limited to, advancing substantial funds, in the principal amount of $1.5 Million Dollars to HM-Canada to finance the production of the Picture.

93.     Defendants, and each of them, as Guarantors of the Commitment Amount of $1.925 Million Dollars under the BondIt Loan and Security Agreement, have failed and refused, despite timely demand, to perform their material obligations under the Guaranty Agreements, by failing and refusing to pay the principal amount of the BondIt Loan plus all fees, interest, expenses, and costs due and owing under the BondIt Loan and Security Agreement as and when due. The failure and refusal of Defendants, and each of them, to perform their material obligations under the Guaranty Agreements constitutes an unjustified material breach of the Guaranty

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

HAMRICK & EVANS, LLP

Agreements and the BondIt Loan and Security Agreement, which renders Defendants, and each of them, liable to BondIt for all sums owed.

94.     As a direct and proximate result of the breaches by Defendants, and each of them, of the Guaranty Agreements and the BondIt Loan and Security Agreement, BondIt has incurred substantial financial losses and has been damaged in an amount not less than the Commitment Amount of $1.925 Million Dollars, representing the principal amount of the BondIt Loan, the Interest Fee and the Legal Fee.

95.     As a further direct and proximate result of the breaches by Defendants, and each of them, of the Guaranty Agreements and the BondIt Loan and Security Agreement, BondIt is also entitled to Default Interest on the Commitment Amount at a rate equal to three percent (3%), compounded monthly and payable on demand, until the default has been cured, from Defendants, and each of them.

## The September 18, 2017 Assignment of Proceeds of the Kentucky Tax Credit

96.     BondIt performed all of its material obligations under the Assignment of Proceeds of the Kentucky Tax Credit, if any, except for any obligations that may have been excused or prevented by Defendants' non-performance, including, but not limited to, advancing substantial funds, in the principal amount of $1.5 Million Dollars to HM-Canada to finance the production of the Picture.

97.     HM-Canada has failed and refused to perform its material obligations under the Assignment of Proceeds of the Kentucky Tax Credit, by failing and refusing to commence principal photography by February 28, 2018, apply for the film tax credit audit by May 31, 2018, or otherwise complete the production of the Picture in order to secure the Kentucky Tax Credit. HM-Canada's failure and refusal to perform its material obligations under the Assignment of Proceeds of the Kentucky Tax Credit constitutes an unjustified material breach of the Assignment of Proceeds of the Kentucky Tax Credit and the BondIt Loan and Security Agreement, which renders HM-Canada liable to BondIt for all sums owed.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

98.    As a direct and proximate result of HM-Canada's breaches of the Assignment of Proceeds of the Kentucky Tax Credit and the BondIt Loan and Security Agreement, BondIt has incurred substantial financial losses and has been damaged in an amount not less than the Kentucky Tax Credit and/or the Commitment Amount of $1.925 Million Dollars under the BondIt Loan and Security Agreement, representing the principal amount of the BondIt Loan, the Interest Fee and the Legal Fee.

99.    As a further direct and proximate result of HM-Canada's breaches of the Assignment of Proceeds of the Kentucky Tax Credit and the BondIt Loan and Security Agreement, BondIt is also entitled to Default Interest on the Commitment Amount at a rate equal to three percent (3%), compounded monthly and payable on demand, until the default has been cured.

### The September 18, 2017 Promissory Note

100.   BondIt performed all of its material obligations under the Promissory Note, if any, except for any obligations that may have been excused or prevented by Defendants' non-performance, including, but not limited to, advancing substantial funds, in the principal amount of $1.5 Million Dollars to HM-Canada to finance the production of the Picture.

101.   HM-Canada has failed and refused to perform its material obligations under the Promissory Note, by failing and refusing to pay the amount of $1.925 Million Dollars to BondIt by the repayment date of September 14, 2018 in accordance with the BondIt Loan and Security Agreement. HM-Canada's failure and refusal to perform its material obligations under the Promissory Note constitutes an unjustified material breach of the Promissory Note and the BondIt Loan and Security Agreement, which renders HM-Canada liable to BondIt for all sums owed.

102.   As a direct and proximate result of HM-Canada's breaches of the Promissory Note and the BondIt Loan and Security Agreement, BondIt has incurred substantial financial losses and has been damaged in an amount not less than the Commitment Amount of $1.925 Million Dollars under the BondIt Loan and Security

HAMRICK & EVANS, LLP

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1  Agreement, representing the principal amount of the BondIt Loan, the Interest Fee

2  and the Legal Fee.

3      103.  As a further direct and proximate result of HM-Canada's breaches of the

4  Promissory Note and the BondIt Loan and Security Agreement, BondIt is also entitled

5  to Default Interest on the Commitment Amount at a rate equal to three percent (3%),

6  compounded monthly and payable on demand, until the default has been cured, along

7  with all third party, actual, out-of-pocket costs and expenses of collection and

8  reasonable outside attorneys' fees and court costs (including, without limitation,

9  reasonable travel and accommodation expenses) incurred by BondIt on account of

10  such collection.

11  **The September 18, 2017 Copyright Mortgage and Assignment**

12      104.  BondIt performed all of its material obligations under the Copyright

13  Mortgage and Assignment, if any, except for any obligations that may have been

14  excused or prevented by Defendants' non-performance, including, but not limited to,

15  advancing substantial funds, in the principal amount of $1.5 Million Dollars to HM-

16  Canada to finance the production of the Picture.

17      105.  HM-Canada has failed and refused to perform its material obligations

18  under the Copyright Mortgage and Assignment, by failing and refusing to irrevocably,

19  unconditionally and absolutely grants to BondIt a first priority security interest in and

20  to the Kentucky Tax Credit and Kentucky Tax Credit proceeds and to grant to BondIt

21  a first priority security interest, subordinate only to the applicable guilds, in all of

22  HM-Canada's assets, whether now owned or hereafter acquired, including, without

23  limitation, all of HM-Canada's right, title and interest in connection with the Picture.

24  HM-Canada's failure and refusal to perform its material obligations under the

25  Copyright Mortgage and Assignment constitutes an unjustified material breach of the

26  Copyright Mortgage and Assignment and the BondIt Loan and Security Agreement,

27  which renders HM-Canada liable to BondIt for all sums owed.

28

HAMRICK & EVANS, LLP

106.   As a direct and proximate result of HM-Canada's breaches of the Copyright Mortgage and Assignment and the BondIt Loan and Security Agreement, BondIt has incurred substantial financial losses and has been damaged in an amount not less than the Commitment Amount of $1.925 Million Dollars under the BondIt Loan and Security Agreement, representing the principal amount of the BondIt Loan, the Interest Fee and the Legal Fee.

107.   As a further direct and proximate result of HM-Canada's breaches of the Copyright Mortgage and Assignment and the BondIt Loan and Security Agreement, BondIt is also entitled to Default Interest on the Commitment Amount at a rate equal to three percent (3%), compounded monthly and payable on demand, until the default has been cured.

## FIFTH CLAIM FOR RELIEF

### (Money Had and Received Against All Defendants)

108.   BondIt incorporates herein by reference each and every allegation contained in paragraphs 1 through 107, inclusive.

109.   Defendants have become indebted to BondIt for monies had and received.

110.   These monies now rightfully belong to BondIt, and BondIt has demanded repayment from Defendants, and each of them, for the amounts outstanding.

111.   Defendants, and each of them, have refused repayment and owe BondIt an amount not less than the Commitment Amount of $1.925 Million Dollars under the BondIt Loan and Security Agreement, all related and concurrently executed agreements, representing the principal amount of the BondIt Loan, the Interest Fee and the Legal Fee.

112.   BondIt is also entitled to Default Interest on the Commitment Amount at a rate equal to three percent (3%), compounded monthly and payable on demand, until the default has been cured, from Defendants, and each of them.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

HAMRICK & EVANS, LLP

## SIXTH CLAIM FOR RELIEF

**(Breach of Amended Written Contracts Against Defendants HM-Canada, HM-Puerto Rico, Utopia Film-Puerto Rico, Let it Play LLC, Crossface, Ginzburg, Lee and Kim)**

113.   BondIt incorporates herein by reference each and every allegation contained in paragraphs 1 through 112, inclusive.

### The First Amendment to the BondIt Loan and Security Agreement

114.   BondIt performed all of its material obligations under the First Amendment to the BondIt Loan and Security Agreement, if any, except for any obligations that may have been excused or prevented by Defendants' non-performance, including, but not limited to, advancing substantial funds, in the principal amount of $1.5 Million Dollars to HM-Canada to finance the production of the Picture.

115.   Defendants HM-Canada, HM-Puerto Rico and Utopia Film-Puerto Rico, and each of them, have failed and refused to perform their material obligations under the First Amendment to the BondIt Loan and Security Agreement, by failing and refusing to: (i) timely pay the principal amount of the BondIt Loan plus all fees, interest, expenses, and costs due and owing under the BondIt Loan and Security Agreement, as amended, as and when due; (ii) timely pay the Commitment Amount and any Default Interest on the Promissory Note on the earlier of September 14, 2018 or receipt of any monies from the *Utopia* and *The Recovery aka Above* film tax credits; (iii) irrevocably, unconditionally and absolutely grant to BondIt a first priority security interest in and to the *Utopia* and *The Recovery aka Above* film tax credits; and (iv) permit BondIt to file the appropriate financing statement(s) in the applicable jurisdictions under the UCC, pursuant to Exhibits "1" and "2" to the First Amendment to the BondIt Loan and Security Agreement. The failure and refusal by Defendants HM-Canada, HM-Puerto Rico and Utopia Film-Puerto Rico, and each of them, to perform their material obligations under the First Amendment to the BondIt Loan and

Security Agreement constitutes an unjustified material breach of the First Amendment to the BondIt Loan and Security Agreement and the BondIt Loan and Security Agreement, which renders Defendants HM-Canada, HM-Puerto Rico and Utopia Film-Puerto Rico, and each of them, liable to BondIt for all sums owed.

116.   As a direct and proximate result of the breaches by Defendants HM-Canada, HM-Puerto Rico and Utopia Film-Puerto Rico, and each of them, of the First Amendment to the BondIt Loan and Security Agreement and the BondIt Loan and Security Agreement, BondIt has incurred substantial financial losses and has been damaged in an amount not less than the Commitment Amount of $1.925 Million Dollars under the BondIt Loan and Security Agreement, representing the principal amount of the BondIt Loan, the Interest Fee and the Legal Fee.

117.   As a further direct and proximate result of the breaches by Defendants HM-Canada, HM-Puerto Rico and Utopia Film-Puerto Rico, and each of them, of the First Amendment to the BondIt Loan and Security Agreement and the BondIt Loan and Security Agreement, BondIt is also entitled to Default Interest on the Commitment Amount at a rate equal to three percent (3%), compounded monthly and payable on demand, until the default has been cured.

### The October 20, 2018 Security and Guaranty Agreements

118.   BondIt performed all of its material obligations under the Security and Guaranty Agreements, if any, except for any obligations that may have been excused or prevented by Defendants' non-performance, including, but not limited to, advancing substantial funds, in the principal amount of $1.5 Million Dollars to HM-Canada to finance the production of the Picture.

119.   Defendants HM-Puerto Rico and Utopia Film-Puerto Rico, and each of them, have failed and refused to perform their material obligations under the Security and Guaranty Agreements, by failing and refusing to: (i) timely pay the principal amount of the BondIt Loan plus all fees, interest, expenses, and costs due and owing under the BondIt Loan and Security Agreement, as amended, as and when due; (ii)

HAMRICK & EVANS, LLP

1   timely pay the Commitment Amount and any Default Interest on the Promissory Note

2   on the earlier of September 14, 2018, or receipt of any monies from the *Utopia* and

3   *The Recovery aka Above* film tax credits; (iii) irrevocably, unconditionally and

4   absolutely grant to BondIt a first priority security interest in and to the *Utopia* and

5   *The Recovery aka Above* film tax credits; and (iv) permit BondIt to file the appropriate

6   financing statement(s) in the applicable jurisdictions under the UCC, pursuant to

7   Exhibits "1" and "2" to the First Amendment to the BondIt Loan and Security

8   Agreement. The failure and refusal by Defendants HM-Puerto Rico and Utopia Film-

9   Puerto Rico, and each of them, to perform their material obligations under the Security

10  and Guaranty Agreements constitutes an unjustified material breach of the Security

11  and Guaranty Agreements and the BondIt Loan and Security Agreement, as amended,

12  which renders Defendants HM-Puerto Rico and Utopia Film-Puerto Rico, and each

13  of them, liable to BondIt for all sums owed.

14      120.  As a direct and proximate result of the breaches by Defendants HM-

15  Puerto Rico and Utopia Film-Puerto Rico, and each of them, of the Security and

16  Guaranty Agreements and the BondIt Loan and Security Agreement, as amended,

17  BondIt has incurred substantial financial losses and has been damaged in an amount

18  not less than the Commitment Amount of $1.925 Million Dollars under the BondIt

19  Loan and Security Agreement, representing the principal amount of the BondIt Loan,

20  the Interest Fee and the Legal Fee.

21      121.  As a further direct and proximate result of the breaches by Defendants

22  HM-Puerto Rico and Utopia Film-Puerto Rico, and each of them, of the Security and

23  Guaranty Agreements and the BondIt Loan and Security Agreement, as amended,

24  BondIt is also entitled to Default Interest on the Commitment Amount at a rate equal

25  to three percent (3%), compounded monthly and payable on demand, until the default

26  has been cured.

27  //

28  //

HAMRICK & EVANS, LLP

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

HAMRICK & EVANS, LLP

## SEVENTH CLAIM FOR RELIEF

### (Fraud- Concealment and Non-Disclosure Against Defendants HM-Canada, Let it Play, Crossface, Ginzburg, Lee, Kim, HM-Puerto Rico, HM-Louisiana and Utopia Film-Puerto Rico)

122.   BondIt incorporates herein by reference each and every allegation contained in paragraphs 1 through 121, inclusive.

123.   Defendants, and each of them, acting in concert, made various material misrepresentations to BondIt with the intent to induce BondIt to rely on those misrepresentations in entering into the BondIt Loan and Security Agreement, the First Amendment to the BondIt Loan and Security Agreement and all agreements executed contemporaneously or at a later time.

124.   At the time that Defendants, and each of them, acting in concert, made these misrepresentations, they had no intention of repaying BondIt the principal amount of the BondIt Loan plus all fees, interest, expenses, and costs due and owing under the BondIt Loan and Security Agreement, the First Amendment to the BondIt Loan and Security Agreement and all agreements executed contemporaneously or at a later time.

125.   However, Defendants, and each of them, acting in concert, only disclosed some of the material facts concerning repayment to BondIt of the principal amount of the BondIt Loan plus all fees, interest, expenses, and costs due and owing, their rights in and to the film tax credits, and BondIt's ability to enforce its rights in and to the film tax credits and the proceeds of those tax credits, but intentionally failed to disclose other material facts, making the disclosures defective. The material facts that Defendants, and each of them, acting in concert, failed to disclose to BondIt were known only to Defendants, and each of them, and, thus, BondIt could not have discovered them.

126.   Prior to entering into the BondIt Loan and Security Agreement, the Guaranty Agreements, the Assignment of Proceeds of the Kentucky Tax Credit, the

Promissory Note, the Copyright Mortgage and Assignment and the Power of Attorney, BondIt is informed and believes, and based thereon alleges, that Defendants, and each of them, actively concealed and failed to disclose material facts, which include, but are not limited to, the following:

a. That HM-Canada had failed to secure funding, and proof thereof, for the entirety of the production of the Picture;

b. That Cassian Elwes had not agreed to co-produce the Picture;

c. That Bobby Cohen had no interest in producing the Picture;

d. That Defendants, and each of them, had no intention to produce the Picture; and

e. That Defendants, and each of them, did not intend to use the proceeds of the BondIt Loan for the production of the Picture.

127. Prior to entering into the First Amendment to the BondIt Loan and Security Agreement and the Security and Guaranty Agreements, BondIt is informed and believes, and based thereon alleges, that Defendants, and each of them, actively concealed and failed to disclose material facts, which include, but are not limited to, the following:

a. That HM-Louisiana, not HM-Puerto Rico, was producing *The Recovery aka Above*;

b. That HM-Louisiana, not HM-Puerto Rico, held all right, title and interest to the Alabama Tax Credit;

c. That HM-Puerto Rico did not have the right to assign the Alabama Tax Credit to BondIt;

d. That a lien against the Alabama Tax Credit was filed by a third party lender in the State of Louisiana on October 14, 2018;

e. That on or around July 29, 2019, the proceeds of the Alabama Tax Credit to be issued by the State of Alabama in connection with *The*

HAMRICK & EVANS, LLP

-42-
**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

HAMRICK & EVANS, LLP

1  *Recovery aka Above*, which were pledged to BondIt were, instead,
2  paid to one or more of the Defendants.

3  f.   That despite the distribution of the proceeds of the Alabama Tax
4       Credit to one or more of the Defendants, on August 20, 2019,
5       Defendant Lee directed an e-mail communication to BondIt
6       falsely stating that Alabama Tax Credit had not yet been issued,
7       but that it was expected to be issued around "Labor Day"
8       [September 2, 2019];

9  g.   That Defendants, and each of them, used a portion of the Alabama
10      Tax Credit to pay back a third party creditor;

11 h.   That Defendants, and each of them, lacked the legal authority to
12      enter into an agreement on behalf of Utopia Film-Puerto Rico to
13      assign the Puerto Rico Tax Credit to BondIt;

14 i.   That Defendants, and each of them, conspired to use Defendant
15      Martinez-Davila as a "straw man" to satisfy residency
16      requirements in an attempt to enhance the percentage value of the
17      *Utopia* film tax credit and the amount of the tax credit; and

18 j.   That the proceeds of film tax credit on *Utopia* were, at the time of
19      their assignment to BondIt, and are, the subject of litigation over
20      competing claims by the owner of Defendant Utopia Film-Puerto
21      Rico, Defendant Martinez-Davila, arising from an agreement
22      between Defendants Ginzburg and Martinez-Davila for Defendant
23      Ginzburg to: (i) finance *Utopia*, (ii) pay $75,000 to Defendant
24      Martinez-Davila, and (iii) provide an on screen acting role in
25      *Utopia* for Defendant Martinez-Davila, in exchange for a promise
26      by Defendant Martinez-Davila, who, as a resident of the
27      Commonwealth of Puerto Rico and the owner or controlling
28      member of Defendant Utopia Film-Puerto Rico, was purportedly

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

1
2
3

entitled to a film tax credit of up to ninety percent (90%) of the qualified costs expenditure, to assign to Defendant Ginzburg the proceeds of the *Utopia* film tax credit.

4       128.   By engaging in the conduct alleged herein and above, Defendants, and
5   each of them, conspired to deprive BondIt of its rightful interests, including the right
6   of timely repayment, in the BondIt Loan and Security Agreement, the First
7   Amendment to the BondIt Loan and Security Agreement and all agreements executed
8   contemporaneously or at a later time. Defendants, and each of them, intentionally
9   misled BondIt and fraudulently concealed from it their intent not to repay the BondIt
10   Loan and Security Agreement, the First Amendment to the BondIt Loan and Security
11   Agreement and all agreements executed contemporaneously or at a later time for the
12   purpose of inducing BondIt to act in reliance on their intentional misrepresentations
13   and/or material omissions. At a minimum, Defendants, and each of them, should have
14   known their representations were false, as they were made recklessly and without
15   regard for their truth.

16       129.   Defendants, and each of them, knew that BondIt would reasonably rely
17   on their integrity and honesty in making the false representations asserted herein and,
18   in fact, BondIt did so. BondIt actually and justifiably relied on Defendants' fraudulent
19   concealment and intentional misrepresentations by, among other things, including,
20   but not limited to, advancing substantial funds, in the principal amount of $1.5 Million
21   Dollars to HM-Canada to finance the production of the Picture, and refraining from
22   engaging in earlier efforts to collect the monies advanced by BondIt, plus all fees,
23   interest, expenses, and costs due and owing.

24       130.   As a result of the foregoing fraudulent conduct, BondIt has suffered
25   actual damages in an amount to be determined at trial, but in an amount believed to
26   be not less than not less than the Commitment Amount of $1.925 Million Dollars
27   under the BondIt Loan and Security Agreement, representing the principal amount of
28   the BondIt Loan, the Interest Fee and the Legal Fee.

131.   As a further direct and proximate result of the breaches by Defendants, and each of them, BondIt is also entitled to Default Interest on the Commitment Amount at a rate equal to three percent (3%), compounded monthly and payable on demand, until the default has been cured.

132.   Defendants, and each of them, may have committed other acts of fraud and deceit, which caused damage to BondIt and of which BondIt is currently unaware. Upon ascertainment of such further acts and damage, BondIt will seek such other relief and damages as may be warranted.

133.   The acts of the wrongful conduct of Defendants, and each of them, were willful, oppressive, fraudulent, and malicious. Said acts were authorized, ratified, and approved by Ginzburg, Lee and Kim, and managing agents, officers and/or members of HM-Canada, Let it Play, Crossface, HM-Puerto Rico, HM-Louisiana and Utopia Film-Puerto Rico. BondIt is therefore entitled to punitive damages according to proof at trial.

## EIGHTH CLAIM FOR RELIEF

**(Negligent Misrepresentation Against Defendants HM-Canada, Let it Play, Crossface, Ginzburg, Lee, Kim, HM-Puerto Rico, HM-Louisiana and Utopia Film-Puerto Rico)**

134.   BondIt incorporates herein by reference each and every allegation contained in paragraphs 1 through 133, inclusive.

135.   Defendants, and each of them, made representations regarding the production of the Picture, repayment and the validity of the assignment of film tax credits, including the Puerto Rico Tax Credits and the Alabama Tax Credits to BondIt.

136.   The representations by Defendants, and each of them, were not true.

137.   Although Defendants, and each of them, may have honestly believed that the representations were true, they had no reasonable grounds for believing they were true at the time they were made.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

HAMRICK & EVANS, LLP

138.   Defendants, and each of them intended that BondIt rely on these representations.

139.   BondIt reasonably relied on the representations by Defendants, and each of them, when entering into the BondIt Loan and Security Agreement, the First Amendment to the BondIt Loan and Security Agreement and all agreements executed contemporaneously or at a later time, including, but not limited to, advancing substantial funds, in the principal amount of $1.5 Million Dollars to HM-Canada to finance the production of the Picture.

140.   BondIt was harmed by such representations as it would not have entered into the BondIt Loan and Security Agreement, the First Amendment to the BondIt Loan and Security Agreement and all agreements executed contemporaneously or at a later time, including, but not limited to, advancing substantial funds, in the principal amount of $1.5 Million Dollars to HM-Canada to finance the production of the Picture had it known the true facts. The BondIt Loan is now in default, and BondIt has not received a penny.

141.   BondIt's reliance on the representations by Defendants, and each of them, was a  substantial factor in causing its harm and damages

142.   As a direct and proximate result of the misrepresentations by Defendants, and each of them, BondIt has incurred substantial financial losses and has been damaged in an amount not less than the Commitment Amount of $1.925 Million Dollars under the BondIt Loan and Security Agreement, representing the principal amount of the BondIt Loan, the Interest Fee and the Legal Fee.

143.   As a further direct and proximate result of the breaches by Defendants, and each of them, BondIt is also entitled to Default Interest on the Commitment Amount at a rate equal to three percent (3%), compounded monthly and payable on demand, until the default has been cured.

//

//

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

## NINTH CLAIM FOR RELIEF

### (Intentional Interference with Contractual Relations
### Against Defendant Martinez-Davila)

144.   BondIt incorporates herein by reference each and every allegation contained in paragraphs 1 through 143, inclusive.

145.   BondIt is informed and believes, and based thereon alleges, that Defendant Martinez-Davila was, and is, aware of the BondIt Loan and Security Agreement, the First Amendment to the BondIt Loan and Security Agreement and all agreements executed contemporaneously or at a later time, assigning the Alabama Tax Credit and the Puerto Rico Tax Credit to BondIt by virtue of his agreement with Defendant Ginzburg for Defendant Ginzburg to: (i) finance *Utopia*, (ii) pay $75,000 to Defendant Martinez-Davila, and (iii) provide an on screen acting role in *Utopia* for Defendant Martinez-Davila, in exchange for a promise by Defendant Martinez-Davila, who, as a resident of the Commonwealth of Puerto Rico and the owner or controlling member of Defendant Utopia Film-Puerto Rico, was purportedly entitled to a film tax credit of up to ninety percent (90%) of the qualified costs expenditure, to assign to Defendant Ginzburg the proceeds of the Utopia film tax credit.

146.   BondIt is informed and believes, and based thereon alleges, that on or around March 2018, Utopia Film-Puerto Rico received the proceeds of the Puerto Rico Tax Credit valued at $810,633.29.

147.   BondIt is informed and believes, and based thereon alleges, that Defendant Martinez-Davila has sole access to the proceeds of the Puerto Rico Tax Credit and has knowingly withheld them from BondIt despite full and actual knowledge of BondIt's superior security interest to those funds. BondIt is further informed and believes, and thereon alleges, that Martinez-Davila is intentionally withholding the proceeds of the Puerto Rico Tax Credit to induce a breach or disruption of the contractual relationships between BondIt and other Defendants.

148.   The decision by Defendant Martinez-Davila to receive and retain the proceeds of the Puerto Rico Tax Credit was, and is, intended to disrupt or interfere with BondIt's rights under the BondIt Loan and Security Agreement, the First Amendment to the BondIt Loan and Security Agreement and all agreements executed contemporaneously or at a later time, assigning the Alabama Tax Credit and the Puerto Rico Tax Credit to BondIt, and has frustrated and substantially prejudiced BondIt's ability to obtain the proceeds of the Puerto Rico Tax Credit to which it is entitled.

149.   Defendant Martinez-Davila intended to disrupt BondIt's rights under the BondIt Loan and Security Agreement, the First Amendment to the BondIt Loan and Security Agreement and all agreements executed contemporaneously or at a later time, by his actions, or knew that such disruption was certain or substantially certain to occur.

150.   The conduct as alleged herein was a substantial factor in causing BondIt's harm and damages.

151.   As a result of the foregoing conduct, BondIt has suffered actual damages in an amount to be determined at trial, but in an amount believed to be not less than not less than the Commitment Amount of $1.925 Million Dollars under the BondIt Loan and Security Agreement, representing the principal amount of the BondIt Loan, the Interest Fee and the Legal Fee.

152.   As a further direct and proximate result of the breaches by Defendant Martinez-Davila, BondIt is also entitled to Default Interest on the Commitment Amount at a rate equal to three percent (3%), compounded monthly and payable on demand, until the default has been cured.

153.   Martinez-Davila may have committed other acts of interference, which caused damage to BondIt and of which BondIt is currently unaware. Upon ascertainment of such further acts and damage, BondIt will seek such other relief and damages as may be warranted.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

154.   The acts of the wrongful conduct of Defendant Martinez-Davila were willful, oppressive, fraudulent, and malicious. BondIt is therefore entitled to punitive damages according to proof at trial.

### TENTH CLAIM FOR RELIEF

### (Unfair Competition Against All Defendants)

155.   BondIt incorporates herein by reference each and every allegation contained in paragraphs 1 through 154, inclusive.

156.   Defendants, and each of them, have engaged in a variety of conduct directed toward BondIt that constitutes unlawful, unfair, and fraudulent business practices within the meaning, and in violation, of California *Business and Professions Code* Section 17200. Defendants, and each of them, took these actions with the intent to injure BondIt, gain an unfair competitive advantage, and diminish competition.

157.   The unfair, fraudulent, and illegal acts and practices enumerated herein have caused substantial harm to BondIt and other California consumers.

158.   The business acts and practices of Defendants, and each of them, constitute unfair business practices under California law in that said acts and practices offend public policy and are substantially injurious to BondIt and other like consumers. Said acts and practices have no utility whatsoever, much less sufficient utility to outweigh the substantial harm to BondIt and other like consumers.

159.   Defendants, and each of them have profited and will, in the future, profit unjustly from their unfair business practices. Accordingly, pursuant to California *Business and Professions Code* Section 17203, BondIt seek an award of restitution and disgorgement.

160.   As a proximate result of the conduct of Defendants, and each of them, BondIt has been and will continue to be damaged. Unless enjoined by this Court, the unlawful competition by Defendants, and each of them, has and will continue to cause great and irreparable injury to BondIt. BondIt has no other adequate remedy at law for such acts and threatened acts. BondIt therefore requests, pursuant to California

HAMRICK & EVANS, LLP

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

*Business and Professions Code* Section 17203, that during the pendency of this action, this Court issue a preliminary injunction, and that after trial, this Court issue a permanent injunction, restraining and enjoining Defendants, and each of them, and their agents, employees, attorneys and representatives, and anyone acting at their direction, from engaging in the unlawful, unfair, and fraudulent business practice alleged herein.

## ELEVENTH CLAIM FOR RELIEF

### (Conversion Against All Defendants)

161. BondIt incorporates herein by reference each and every allegation contained in paragraphs 1 through 160, inclusive.

162. BondIt is informed and believes, and based thereon alleges, that Defendants, and each of them, converted the proceeds of the BondIt Loan, the Alabama Tax Credit and the Puerto Rico Tax Credit because either they took and spent the proceeds of the BondIt Loan, the Alabama Tax Credit and the Puerto Rico Tax Credit, or the proceeds were applied to other debts or obligations owed by Defendants, and each of them. In any event, Defendants, and each of them, have not paid the BondIt Loan, the Alabama Tax Credit or the Puerto Rico Tax Credit, or any portion of the proceeds thereof, to BondIt.

163. As an actual and proximate result of the conversion of the proceeds of the BondIt Loan, the Alabama Tax Credit and the Puerto Rico Tax Credit by Defendants, and each of them, BondIt has incurred substantial financial losses and has been damaged in an amount not less than the Commitment Amount of $1.925 Million Dollars under the BondIt Loan and Security Agreement, representing the principal amount of the BondIt Loan, the Interest Fee and the Legal Fee.

164. As an actual and proximate result of the conversion of the BondIt Loan, the Alabama Tax Credit and the Puerto Rico Tax Credit by Defendants, and each of them, BondIt is also entitled to Default Interest on the Commitment Amount at a rate

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

equal to three percent (3%), compounded monthly and payable on demand, until the default has been cured.

165.   The acts of the wrongful conduct of Defendants, and each of them, were willful, oppressive, fraudulent, and malicious. BondIt is therefore entitled to punitive damages according to proof at trial.

## TWELFTH CLAIM FOR RELIEF

### (Fraudulent Conveyance Against All Defendants)

166.   BondIt incorporates herein by reference each and every allegation contained in paragraphs 1 through 165, inclusive.

167.   BondIt is informed and believes, and based thereon alleges, that either Defendants, and each of them, took and spent the proceeds of the BondIt Loan, the Alabama Tax Credit and the Puerto Rico Tax Credit or the proceeds thereof were applied to other debts or obligations owed by Defendants, and each of them. In either event, the proceeds of the BondIt Loan, the Alabama Tax Credit and the Puerto Rico Tax Credit were transferred to parties other than BondIt.

168.   BondIt is informed and believes, and based thereon alleges, that Defendants, and each of them, transferred the proceeds of the BondIt Loan, the Alabama Tax Credit and the Puerto Rico Tax Credit to other parties with an intent to hinder, delay or defraud their existing and future creditors, including BondIt.

169.   BondIt is informed and believes, and based thereon alleges, that Defendants, and each of them, did not receive reasonably equivalent value in exchange for the assets it transferred to other parties.

170.   BondIt is informed and believes, and based thereon alleges, that when Defendants, and each of them, transferred the proceeds of the BondIt Loan, the Alabama Tax Credit and the Puerto Rico Tax Credit to other parties, they intended, and/or they believed or reasonably should have believed, that Defendants, and each of them, would thereafter have debts which they would be unable to pay.

-51-
**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

171.   BondIt is informed and believes, and based thereon alleges, that the assets remaining in the names of Defendants, and each of them, after the transfer of the proceeds of the BondIt Loan, the Alabama Tax Credit and the Puerto Rico Tax Credit to other parties were unreasonably small in relation to their obligations to creditors, including BondIt.

172.   As an actual and proximate result of the transfer of the proceeds of the BondIt Loan, the Alabama Tax Credit and the Puerto Rico Tax Credit to other parties by Defendants, and each of them, BondIt has incurred substantial financial losses and has been damaged in an amount not less than the Commitment Amount of $1.925 Million Dollars under the BondIt Loan and Security Agreement, representing the principal amount of the BondIt Loan, the Interest Fee and the Legal Fee.

173.   As an actual and proximate result of the transfer of the proceeds of the BondIt Loan, the Alabama Tax Credit and the Puerto Rico Tax Credit to other parties by Defendants, and each of them, BondIt is also entitled to Default Interest on the Commitment Amount at a rate equal to three percent (3%), compounded monthly and payable on demand, until the default has been cured.

174.   The acts of the wrongful conduct of Defendants, and each of them, were willful, oppressive, fraudulent, and malicious. BondIt is therefore entitled to punitive damages according to proof at trial.

## THIRTEENTH CLAIM FOR RELIEF

**(Breach of Covenant of Good Faith and Fair Dealing Against Defendants HM-Canada, HM-Puerto Rico, Utopia Film-Puerto Rico, Let it Play LLC, Crossface, Ginzburg, Lee and Kim)**

175.   BondIt incorporates herein by reference each and every allegation contained in paragraphs 1 through 174, inclusive.

176.   In every contract or agreement there is an implied promise of good faith and fair dealing.  Each and every party to a contract promises to not do anything to

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

HAMRICK & EVANS, LLP

unfairly interfere with the right of any other party to receive the benefits of the contract.

177.   The conduct of Defendants, and each of them, as described above, evidences a repeated and intentional avoidance of repayment of the BondIt Loan, in bad faith, and repeated and intentional breaches, in bad faith, of the BondIt Loan and Security Agreement, the Guaranty Agreements, the Assignment of Proceeds of the Kentucky Tax Credit, the Promissory Note, the Copyright Mortgage and Assignment, the Power of Attorney, the First Amendment to the BondIt Loan and Security Agreement and the Security and Guaranty Agreements.

178.   As a direct and proximate result of the breaches by Defendants, and each of them, of the implied covenants of good faith and fair dealing in the BondIt Loan and Security Agreement, the Guaranty Agreements, the Assignment of Proceeds of the Kentucky Tax Credit, the Promissory Note, the Copyright Mortgage and Assignment, the Power of Attorney, the First Amendment to the BondIt Loan and Security Agreement and the Security and Guaranty Agreements, BondIt has incurred substantial financial losses and has been damaged in an amount not less than the Commitment Amount of $1.925 Million Dollars, representing the principal amount of the BondIt Loan, the Interest Fee and the Legal Fee.

179.   As a further direct and proximate result of the breaches by Defendants, and each of them, of the implied covenants of good faith and fair dealing in the BondIt Loan and Security Agreement, the Guaranty Agreements, the Assignment of Proceeds of the Kentucky Tax Credit, the Promissory Note, the Copyright Mortgage and Assignment, the Power of Attorney, the First Amendment to the BondIt Loan and Security Agreement and the Security and Guaranty Agreements, BondIt is also entitled to Default Interest on the Commitment Amount at a rate equal to three percent (3%), compounded monthly and payable on demand, until the default has been cured, from Defendants, and each of them.

//

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

HAMRICK & EVANS, LLP

## FOURTEENTH CLAIM FOR RELIEF

### (Declaratory Relief Against All Defendants)

180.   BondIt incorporates herein by reference each and every allegation contained in paragraphs 1 through 179, inclusive.

181.   A dispute has arisen and an actual controversy now exists between BondIt, on the one hand, and Defendants, and each of them, on the other hand, relating to their respective rights, obligations and interests arising out of the BondIt Loan and Security Agreement, the First Amendment to the BondIt Loan and Security Agreement and all agreements executed contemporaneously or at a later time. BondIt contends that:

   a.   The BondIt Loan and Security Agreement, the Guaranty Agreements, the Assignment of Proceeds of the Kentucky Tax Credit, the Promissory Note, the Copyright Mortgage and Assignment, the Power of Attorney, the First Amendment to the BondIt Loan and Security Agreement and the Security and Guaranty Agreements are valid and enforceable contracts; and

   b.   The security interests granted BondIt pursuant to the BondIt Loan and Security Agreement, the Guaranty Agreements, the Assignment of Proceeds of the Kentucky Tax Credit, the Promissory Note, the Copyright Mortgage and Assignment, the Power of Attorney, the First Amendment to the BondIt Loan and Security Agreement and the Security and Guaranty Agreements are valid and enforceable.

182.   BondIt is informed and believes, and based thereon alleges, that Defendants, and each of them, dispute each of BondIt's contentions and contend otherwise.

183.   BondIt seeks a declaration of its rights and duties and the rights and duties of Defendants, and each of them, as set forth herein.  A judicial declaration is

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

HAMRICK & EVANS, LLP

necessary and appropriate at this time to avoid a multiplicity of suits and so that the parties may ascertain their respective rights, remedies, and obligations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

## FIRST CLAIM FOR RELIEF

1. For compensatory and consequential damages in the sum of not less than $1,925,000;

2. For compensatory and consequential damages in the form of Default Interest on the Commitment Amount at a rate equal to three percent (3%), compounded monthly and payable on demand, until the default has been cured, in an amount to be proven at trial;

## SECOND CLAIM FOR RELIEF

3. For compensatory and consequential damages in the sum of not less than $1,925,000;

4. For compensatory and consequential damages in the form of Default Interest on the Commitment Amount at a rate equal to three percent (3%), compounded monthly and payable on demand, until the default has been cured, in an amount to be proven at trial;

## THIRD CLAIM FOR RELIEF

5. For compensatory and consequential damages in the sum of not less than $1,925,000;

6. For compensatory and consequential damages in the form of Default Interest on the Commitment Amount at a rate equal to three percent (3%), compounded monthly and payable on demand, until the default has been cured, in an amount to be proven at trial;

7. For treble damages pursuant to California *Penal Code* Section 496(c);

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1

## FOURTH CLAIM FOR RELIEF

2

8.     For compensatory and consequential damages in the sum of not less than

3

$1,925,000;

4

9.     For compensatory and consequential damages in the form of Default

5

Interest on the Commitment Amount at a rate equal to three percent (3%),

6

compounded monthly and payable on demand, until the default has been cured, in an

7

amount to be proven at trial;

8

## FIFTH CLAIM FOR RELIEF

9

10.    For compensatory and consequential damages in the sum of not less than

10

$1,925,000;

11

11.    For compensatory and consequential damages in the form of Default

12

Interest on the Commitment Amount at a rate equal to three percent (3%),

13

compounded monthly and payable on demand, until the default has been cured, in an

14

amount to be proven at trial;

15

## SIXTH CLAIM FOR RELIEF

16

12.    For compensatory and consequential damages in the sum of not less than

17

$1,925,000;

18

13.    For compensatory and consequential damages in the form of Default

19

Interest on the Commitment Amount at a rate equal to three percent (3%),

20

compounded monthly and payable on demand, until the default has been cured, in an

21

amount to be proven at trial;

22

## SEVENTH CLAIM FOR RELIEF

23

14.    For compensatory and consequential damages in the sum of not less than

24

$1,925,000;

25

15.    For compensatory and consequential damages in the form of Default

26

Interest on the Commitment Amount at a rate equal to three percent (3%),

27

compounded monthly and payable on demand, until the default has been cured, in an

28

amount to be proven at trial;

HAMRICK & EVANS, LLP

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

16.     For punitive and exemplary damages;

## EIGHTH CLAIM FOR RELIEF

17.     For compensatory and consequential damages in the sum of not less than $1,925,000;

18.     For compensatory and consequential damages in the form of Default Interest on the Commitment Amount at a rate equal to three percent (3%), compounded monthly and payable on demand, until the default has been cured, in an amount to be proven at trial;

## NINTH CLAIM FOR RELIEF

19.     For compensatory and consequential damages in the sum of not less than $1,925,000;

20.     For compensatory and consequential damages in the form of Default Interest on the Commitment Amount at a rate equal to three percent (3%), compounded monthly and payable on demand, until the default has been cured, in an amount to be proven at trial;

21.     For punitive and exemplary damages;

## TENTH CLAIM FOR RELIEF

22.     Pursuant to California *Business and Professions Code* Section 17203, that Defendants, their successors, agents, representatives, employees, and all persons who act in concert with them, be permanently enjoined from committing any unfair business practices in violation of Section 17200, including, but not limited to, the violations alleged herein;

## ELEVENTH CLAIM FOR RELIEF

23.     For compensatory and consequential damages in the sum of not less than $1,925,000;

24.     For compensatory and consequential damages in the form of Default Interest on the Commitment Amount at a rate equal to three percent (3%),

HAMRICK & EVANS, LLP

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

compounded monthly and payable on demand, until the default has been cured, in an amount to be proven at trial;

25.    For punitive and exemplary damages;

### TWELFTH CLAIM FOR RELIEF

26.    For compensatory and consequential damages in the sum of not less than $1,925,000;

27.    For compensatory and consequential damages in the form of Default Interest on the Commitment Amount at a rate equal to three percent (3%), compounded monthly and payable on demand, until the default has been cured, in an amount to be proven at trial;

28.    For punitive and exemplary damages;

### THIRTEENTH CLAIM FOR RELIEF

29.    For compensatory and consequential damages in the sum of not less than $1,925,000;

30.    For compensatory and consequential damages in the form of Default Interest on the Commitment Amount at a rate equal to three percent (3%), compounded monthly and payable on demand, until the default has been cured, in an amount to be proven at trial;

### FOURTEENTH CLAIM FOR RELIEF

31.    For a declaration of the respective rights and obligations of the parties hereto under the BondIt Loan and Security Agreement, the Guaranty Agreements, the Assignment of Proceeds of the Kentucky Tax Credit, the Promissory Note, the Copyright Mortgage and Assignment, the Power of Attorney, the First Amendment to the BondIt Loan and Security Agreement and the Security and Guaranty Agreements;

### ALL CLAIMS FOR RELIEF

32.    For restitution and disgorgement of all profits in an amount sufficient to force Defendants, and each of them, to disgorge all ill-gotten gains;

HAMRICK & EVANS, LLP

33.     For the imposition of a constructive trust upon all profits and proceeds related to or arising out of the BondIt Loan and Security Agreement, the First Amendment to the BondIt Loan and Security Agreement and all agreements executed contemporaneously or at a later time, presently in the possession, custody or control of any one, several or all of the Defendants;

34.     For the Assignment of all copyrights, rights of any kind, title, proceeds, profits, interest, and anything of value associated with the creative works/motion pictures entitled *Crossface*, *Utopia*, *The Recovery aka Above*, and *Fistful of Dirt aka Creatures of the Storm*;

35.     For an accounting;

36.     For costs of suit incurred herein;

37.     For attorneys' fees as may be provided by contract and/or law;

38.     For interest as may be provided by law; and

39.     For such other and further relief as the Court may deem just and proper.

DATED:  November 14, 2019                          HAMRICK & EVANS, LLP

By: _____

MARTIN J. BARAB
A. RAYMOND HAMRICK, III
JOSH H. EICHENSTEIN
Attorneys for Plaintiff
BONDIT LLC

HAMRICK & EVANS, LLP

1

## **DEMAND FOR JURY TRIAL**

2         Plaintiff BONDIT LLC hereby demands a jury trial on all issues as permitted

3   by law.

4

5   DATED:  November 14, 2019                           HAMRICK & EVANS, LLP

6

7   By: _____

8   MARTIN J. BARAB
    A. RAYMOND HAMRICK, III
9   JOSH H. EICHENSTEIN
    Attorneys for Plaintiff
10  BONDIT LLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HAMRICK & EVANS, LLP

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

# EXHIBIT "1"

**From:** Alex Ginzburg <alexg@letitplay.com>
**Sent:** Friday, July 28, 2017 12:44 AM
**To:** Matthew Helderman <matthewhelderman@bondit.us>
**Cc:** Tony Lee <tonyl@letitplay.com>
**Subject:** Re[2]: Crossface

Hey Matthew,

Here are the answers to your questions... and Lexi Alexander is our director. She was nominated for an Oscar. Was first woman to direct a comic book film, a Marvel one, Punisher: War Zone. And she made Charlie Hunnam's career by directing him in the award-winning Green Street Hooligans. Wired magazine latest issue has a whole write up on her and her career.

1. Finance Plan: We have $5.5m out of $7m. We were planning to shoot in Georgia, where the tax credit back to the production is 25%. Georgia is where the actual events of our story took place in real life. But we were able to convince our director to shoot in Kentucky, where the tax credit is 35%, which means some of the credit will go toward repaying the investor.

2. Gersh is selling the film domestically. No foreign yet because we're still casting, but Gersh is estimating with Jai Courtney (or Garrett Hedlund) and Kristen Stewart that we're at $4.5m on foreign and around $2m-$2.5m domestically.

3. Cassian Elwes has agreed to produce with us. We are holding off on that because there may be some interest from Bobby Cohen. Both are amazing and huge names in Hollywood.

4. The bond that we discussed is for We Kill Death, a much larger film that we plan to shoot in Puerto Rico. WME is raising the funds for that. The budget for it is about 3 times bigger than we can handle and contains real-life stunts without any safety. Since Crossface has been funded for a while, we can't waste hundreds of thousands of dollars we need for the production on a bond.

5. We need to begin casting now. We have Jai Courtney ready to go if we choose to take him and Suicide Squad 2 will take him from us in March. We are doing a director polish now. That will be done in two weeks. We would need the rest of the money by end of August at the latest. We will cast till October and be at AFM the month after.

Regarding tranches, the tax credit is almost $2.5m, but we only need $1.5m. I don't know if it's your requirement that we must take a loan against the entire tax credit amount, but we would obviously prefer to save some money and borrow only the $1.5m.

Alex

# EXHIBIT "2"

## LOAN AND SECURITY AGREEMENT

THIS LOAN AND SECURITY AGREEMENT ("Agreement") is made and entered into as of September 18th, 2017 (the "Effective Date"), by and between Hallows Movie Inc., a Canadian corporation, registered to do business in the state of Kentucky ("Borrower"), on the one hand, and BondIt LLC, a limited liability company organized and existing under the laws of California ("Lender"), on the other hand.

Reference is hereby made to the following:

A.    Borrower is producing a theatrical motion picture (under whatever title such motion picture is now or may hereafter be known, the "Picture") currently entitled "Crossface", based on the original screenplay by the same name written by Jake Goldberger.  Said screenplay and all prior and future drafts and versions thereof are herein referred to as the "Screenplay."

B.    Borrower has requested that Lender lend and advance funds to Borrower for use in the payment of pre-production, production, and post-production costs of the Picture in the aggregate principal amount not to exceed One Million Five Hundred Thousand United States Dollars (US$1,500,000.00) (the "Loan", i.e., the "Commitment Amount"), less the "Interest Fee" and the "Legal Fee", each as further defined below).

C.    Lender is willing to make the Loan upon the terms and conditions herein contained and in consideration of the agreements, representations and warranties of Borrower hereinafter set forth.

NOW, THEREFORE, the parties hereto hereby agree as follows:

1.    DEFINITIONS.

The following terms used in this Agreement or in any promissory note, certificate, report or other document or instrument made or delivered pursuant to this Agreement have the following meanings:

1.1    "Affiliated Person" means any Person which directly or indirectly controls, is controlled by or is under common control with the Borrower. For the purposes of this definition, "control" (including with corresponding meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities, by contract or otherwise.

1.2    "Agreement" means this Loan and Security Agreement as originally executed and as the same may hereafter from time to time be amended, supplemented, modified, extended, renewed or replaced.

1.3    "Assignment of Proceeds" means the Assignment of Proceeds, dated concurrently herewith, between Borrower and Lender, in form and substance reasonably acceptable to Lender and its counsel, as amended, restated, supplemented or otherwise modified from time to time, substantially in a form as set forth on Exhibit "A".

1.4    "AUP Audit" has the meaning specified in paragraph 7.1.1 hereof.

1.5    "Borrower" means Hallows Movie Inc., a Canadian corporation, registered to do business in the state of Kentucky.

1.6    "Borrowing Certificate" has the meaning specified in paragraph 2.3 hereof.

1.7    "Budget" means the production budget for the Picture dated as of June 27th, 2017, as approved by Lender, and attached as Exhibit "B" hereto.

1.8      "Business Day" means any day other than a Saturday, Sunday or holiday scheduled by law for commercial banking institutions in the city of Los Angeles, California.

1.9      "Certificate of Incumbency" has the meaning specified in paragraph 6.2.8 hereof.

1.10     "Collateral" has the meaning specified in paragraph 4.1 hereof.

1.11     "Commitment Amount" has the meaning specified in Recital B hereof.

1.12     "Commitment Fee" has the meaning specified in paragraph 10.6.

1.13     "Copyright Mortgage" means the Copyright Mortgage dated concurrently herewith, between Borrower and Lender, in form and substance acceptable to Lender and its counsel, as amended, restated, supplemented or otherwise modified from time to time, substantially in a form as set forth on Exhibit "C".

1.14     "Default Interest" has the meaning specified in paragraph 2.8.1.

1.15     "Distribution Agreements" means, collectively and individually, each distribution agreement, between Borrower (or a Sales Agent or other Licensing Intermediary for the Picture) and a Distributor, now or hereafter entered into, pursuant to which the Distributor has been granted, sold, conveyed, licensed, sub-licensed, sub-leased, or otherwise transferred rights with respect to the distribution, sub-distribution, sale, rental, lease, sub-lease, licensing, sub-licensing, exhibition, telecast, broadcast, transmission (including, without limitation, by way of satellite or cable) or other use, exploitation or disposition of the Picture or any elements thereof and/or the copyright in any of the foregoing or any part thereof in any media existing now or in the future and in any territory specified therein (including, without limitation, motion picture, television, "home video" and all other audio-visual device rights, merchandising and commercial tie-ups, soundtrack album, music publishing, novelization and publishing rights, trailer rights, and all other allied, incidental, ancillary, and subsidiary rights), and any permitted amendments, modifications and supplements thereto.

1.16     "Distributor" shall mean any Person, as sublicensee of Borrower, or a Licensing Intermediary, that has entered into, or in the future enters into, a Distribution Agreement.

1.17     "Dollars" or "$" means the legal currency of the United States.

1.18     "Equipment" shall have the meaning specified in paragraph 4.1.3.

1.19     "Estimated Tax Credits" has the meaning specified in paragraph 2.3.2 hereof.

1.20     "Event of Default" has the meaning specified in paragraph 9.1 hereof.

1.21     "Expiration Date" shall have the meaning specified in paragraph 2.5 hereof.

1.22     "Film Office" means the Kentucky Tourism Development Finance Authority or any other authority or government entity that administers the Film Production Tax Incentive program.

1.23     "Film Production Facility" has the meaning ascribed under the State Tax Credit Law.

1.24     "Gross Receipts" has the meaning specified in paragraph 4.1.1 hereof.

1.25     "Guild Intercreditor Agreements" means collectively the SAG-AFTRA Intercreditor Agreement, if any.

1.26     "Guilds" means collectively SAG-AFTRA.

2

1.27    "Indebtedness" means all monetary obligations, contingent and otherwise, of Borrower to Lender hereunder, and under the Promissory Note, and under the other Loan Documents, including, without limitation, the Commitment Amount, the Default Interest thereon (if any), and all fees, costs and expenses Borrower is obligated to pay Lender hereunder or thereunder.

1.28    "Independent Accountant" means accountant that is approved in writing by Lender.

1.29    "Independent Accountant Report" means the report prepared by the Independent Accountant for the Picture confirming the amount of Estimated Tax Credits, in a form approved by Lender as set forth in paragraph 2.3.2.

1.30    "Interest Fee" has the meaning specified in paragraph 2.8.1.

1.31    "Legal Fee" has the meaning in paragraph 2.4 hereof.

1.32    "Lender" means BondIt LLC, a limited liability company organized and existing under the laws of the State of California.

1.33    "Lender Account" means account number 9319858438 and any other bank account of Lender as may be provided by Lender to Borrower from time to time in writing.

1.34    "Licensing Intermediary" means each Person approved by Lender (in its sole discretion) that has been granted distribution rights in the Picture by Borrower in order to mitigate foreign withholding taxes (Fintage House and its affiliates are hereby deemed pre-approved).

1.35    "Literary Property" shall have the meaning specified in paragraph 4.1.1.1.

1.36    "Loan" has the meaning specified in Recital B hereof.

1.37    "Loan Documents" means this Agreement, the Promissory Note, the Power of Attorney, the Assignment of Proceeds, the Copyright Mortgage, the Borrowing Certificate, and all other documents, instruments and agreements executed or required to be delivered hereunder or pursuant to any transaction contemplated herein.

1.38    "Person" means any natural person, entity, corporation, company, association, partnership, limited liability company, joint venture, association, joint stock company, unincorporated organization, trust, individual (including personal representatives, executors and heirs of a deceased individual), nation, state, government (including governmental agencies, departments, bureaus, boards, divisions and instrumentalities thereof), trustee, receiver or liquidator.

1.39    "Physical Property" shall have the meaning specified in paragraph 4.1.1.2.

1.40    "Picture" has the meaning specified in Recital A hereof.

1.41    "Power of Attorney" means a Power of Attorney, dated concurrently herewith, from Borrower in favor of Lender in form and substance acceptable to Lender, substantially in a form as set forth in Exhibit "D", and provided there is no uncured Event of Default, Lender agrees to use reasonable efforts to notify Borrower of when Lender intends to exercise its rights under the Power of Attorney solely in connection with the terms and conditions thereof.

1.42    "Production Account" collectively mean account number 203595910 and any other account maintained by Borrower into which production funds for the Picture are to be advanced of which Borrower gives Lender prior written notice. The proceeds of the Loan made hereunder, except as otherwise provided in this Agreement, shall first be credited, in accordance with the applicable Borrowing Certificate, into the Production Account set forth on such Borrowing Certificate. Borrower shall maintain the Production Account through to the end of production of the Picture.

1.43    "Production Schedule" means the final production and post-production schedule(s) for the Picture.

1.44    "Production Services Agreement" has the meaning set forth in paragraph 7.14 hereof.

1.45    "Promissory Note" means the promissory note to be made and delivered by Borrower to Lender pursuant to paragraph 2.6 hereof, substantially in a form as set forth on Exhibit "E".

1.46    "Qualified Film Production Company" means a "Qualified Film Production Company" under the State Tax Credit Law.

1.47    "Qualified Production Costs" means "qualified production costs" under the State Tax Credit Law.

1.48    "Qualified Production Facility" means a Level 1 "qualified production facility" (as approved by the Film Office).

1.49    "Repayment Date(s)" has the meaning specified in paragraph 2.7 hereof.

1.50    "SAG" means the Screen Actors Guild-American Federation of Television and Radio Artists.

1.51    "SAG Intercreditor Agreement" means that certain Intercreditor Agreement, if any, of approximately even date herewith, among Borrower, Lender and SAG, in form and substance reasonably satisfactory to Lender and its counsel.

1.52    "Sales Agent" shall mean any sales agent approved by Lender and Borrower.

1.53    "Screenplay" has the meaning specified in Recital A hereof.

1.54    "Security Interest" means a valid first priority security interest in the Collateral.

1.55    State Authority" means any of Kentucky State, the Kentucky State Department of Taxation and Finance, Kentucky Tourism Development Finance Authority, and the Kentucky Film Office.

1.56    "State Tax Credit Law" means all legislation and regulations enacted and in force in connection with the Film Production Tax Incentive program, including Kentucky Revised Statutes ("KRS").

1.57    "Tax Credit Certificate" has the meaning set forth in paragraph 7.1.1.

1.58    "Tax Credit Proceeds" means all refunds, subsidies, rebates or other amounts payable by Kentucky State, its agencies or instrumentalities in connection with any Tax Credits.

1.59    "Tax Credit" means all tax incentives, credits, and rebates in connection with the Picture pursuant to the State Tax Credit Law.

1.60    "UCC" means the Uniform Commercial Code as in effect from time to time in the State of Kentucky or any other state the laws of which are required to be applied in connection with the issue and perfection of the Security Interest. Terms defined in the UCC which are not otherwise defined in this Agreement are used herein as defined in the UCC.

1.61    "Uniform Commercial Code Financing Statement" has the meaning specified in paragraph 4.2 hereof.

1.62    "WGA" means the Writers Guild of America.

4

1.63    "WGA Intercreditor Agreement" means that certain Intercreditor Agreement, if any, of approximately even date herewith, among Borrower, Lender and WGA, in form and substance reasonably satisfactory to Lender and its counsel.

2.    AGREEMENT TO LEND; LENDER SERVICES.

2.1    Commitment. Subject to the terms and conditions of this Agreement, following execution and delivery of the Loan Documents to Lender, and the satisfaction of the "Conditions Precedent" (as defined below), and further subject to an uncured "Event of Default" (as defined below), Lender hereby agrees to disburse the Loan to Borrower in the following installments: (i) One Million Five Hundred Thousand United States Dollars US $1,500,000.00 by 10/06/2017.

2.2    Intentionally Omitted.

2.3    Audit of Eligible Expenses; Borrowing Certificate.

2.3.1    Borrowing Certificate. Subject to the last sentence of this paragraph 2.3.1, if and when Borrower wishes Lender to disburse an installment of the Loan hereunder, Borrower shall give Lender not less than three (3) Business Days prior written notice of such request for disbursement, specifying in such notice the desired amount and proposed date of such disbursement of the Loan (as set forth in paragraph 2.1 above, or as otherwise agreed to by the parties in writing). Such notice shall be sent to Lender by first class U.S. mail, messenger, and e-mail or by facsimile. The request for the installment of the Loan shall be accompanied by a certificate ("Borrowing Certificate") in the form of Exhibit "F" executed by an authorized officer of Borrower, whose signature appears on the Certificate of Incumbency. Subject to the other provisions hereof, and provided that no Event of Default has occurred hereunder (unless such Event of Default has been cured within the applicable time period [if any] expressly permitted hereunder) and Lender is reasonably satisfied that, upon disbursement, the aggregate of the disbursements of the Loan shall not exceed the Loan (i.e., Commitment Amount less the Interest Fee and the Legal Fee), the disbursement of the installment of the Loan shall be made by Lender on the date and in the amount set forth in the Borrowing Certificate by deposit of the same, in immediately available funds, into the Production Account.

2.3.2    Audit of Eligible Expenses.    Prior to the submission of the Borrowing Certificate pursuant to paragraph 2.3.1, Borrower shall submit to Lender the Budget and/or a detailed cost report and other information reasonably requested by Lender to enable the Independent Accountant to conduct a review of expenses funded prior to such date by Borrower to enable Independent Accountant, at Borrower's sole expense, to determine in good faith an estimated amount of Tax Credits ("Estimated Tax Credits") that have been generated in connection with the pre-production, production and post production of the Picture and prepare a written report ("Independent Accountant's Report") to Lender of the same, the costs of such review and Independent Accountant's Report to be paid by Borrower.

2.4    Legal Fee. Borrower shall pay to Lender legal fees in the amount of Forty Thousand United States Dollars (US $40,000.00) to cover Lender's due diligence and internal audit fees and expenses, and Lender's legal fees and expenses in connection with the preparation and negotiation of the Loan Documents (collectively, the "Legal Fee"), which Legal Fee shall be deducted from disbursement of the first installment of the Loan made hereunder (i.e., Lender shall advance the Commitment Amount, less the Interest Fee and the Legal Fee, pursuant to paragraph 2.1 above). Such Legal Fee is in addition to any other payments to Lender provided for hereunder and shall not be credited against or applied to any other sums payable to Lender hereunder or under any other Loan Document including, without limitation, the Loan, the Default Interest, if any, and the Interest Fee.

2.5    Event of Default. Lender shall have no obligation to disburse the Loan to Borrower after 9/29/2017(the "Expiration Date") or at any time after an Event of Default has occurred hereunder, unless such Event of Default has been cured within the applicable time period (if any) expressly permitted hereunder.

2.6     Promissory Note. Prior to Lender making a disbursement of the Loan to Borrower hereunder and as a condition thereof, Borrower shall execute in favor of Lender and deliver to Lender a promissory note (the "Promissory Note"), in the form of Exhibit "E" in the principal sum equal to the Commitment Amount (i.e., the Loan, plus the Interest Fee and Legal Fee). The Lender shall maintain an account or accounts evidencing the Indebtedness of Borrower to Lender hereunder, including any amounts of principal and interest payable and paid to Lender from time-to-time hereunder. The entries made in such account or accounts shall be prima facie evidence of the existence and amounts of the obligations recorded therein absent manifest error; provided that the failure of Lender to maintain any such account or any error therein shall not in any manner affect the obligation of Borrower to pay the Indebtedness in accordance with the terms of this Agreement.

2.7     Repayment Dates. The Commitment Amount and any Default Interest on the Promissory Note shall be immediately due and payable on the following dates (the "Repayment Date(s)"): (i) US$1,925,000.00 on the earlier of 9/14/2018 or Borrower receiving any monies from the tax incentive proceeds.

2.8     Interest on the Loan.

2.8.1     Return Interest Fee; Default Interest Rate. The unpaid Indebtedness shall bear no interest until the applicable Repayment Date other than a return interest fee equal to Three Hundred and Eighty Five Thousand Dollars (US $385,000,00.00) (the "Interest Fee"), which Interest Fee may be deemed interest; provided that from and after the occurrence of an Event of Default (and without constituting a waiver of such Event of Default), the unpaid Indebtedness will bear interest ("Default Interest") at a rate equal to three percent (3%) until the Event of Default has been cured.  All interest provided for in this paragraph 2.8.1 will be compounded monthly and payable on demand.

2.8.2     Maximum Rate. If the provisions of this Agreement or the Promissory Note would at any time otherwise require payment to Lender of an amount of interest in excess of the maximum amount then permitted by the law applicable to the Loan, such interest payments shall be reduced to the extent necessary so as to ensure that Lender shall not receive interest in excess of such maximum amount.

2.8.3.     Rebate. A rebate of Two Percent (2%) per month of the total value of the Loan (for any instance of doubt, the 2% is equivalent to US $30,000.00) will be reduced from the Interest amount owed to Lender from Borrower for every thirty (30) days that the total Loan and Interest is remitted to the Lender by the Borrower earlier than the Repayment date, with a maximum if Four Percent (4%) of the total Loan rebated to Borrower.

2.9     Manner of Payment.

2.9.1     Time and Place of Payment; Notice of Payment. Any and all Indebtedness payable by Borrower pursuant to this Agreement, the Promissory Note and any other Loan Document (including, without limitation, the Commitment Amount and Default Interest [if any]), shall be made to the Lender in same day funds, without defense, setoff or counterclaim, to the Lender Account. Each payment by Borrower shall be made not later than 1:00 P.M. (Pacific time) on the date such payment is due and shall be deemed to have been paid by Borrower to Lender two (2) Business Days after receipt thereof into such account.  Any payment received by Lender after such time on the date payment is received shall be deemed to have been paid by Borrower to Lender three (3) Business Days after receipt thereof into such account.

2.9.2     Payments on Non-Business Days.  Whenever any payment to be made pursuant to this Agreement, the Promissory Note or any other Loan Document shall be due on a day which is not a Business Day, the payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of Default Interest pursuant to this Agreement, the Promissory Note or any other such Loan Document, as applicable; provided, however, that in the event the day upon which payment is due is not a Business Day, but is a day of the month after which no further Business Day occurs in that month, then the due date thereof shall be the next preceding Business Day.

2.9.3    Payment in Dollars. Any and all Indebtedness payable by Borrower pursuant to this Agreement, the Promissory Note or any other Loan Document (including, without limitation, the Commitment Amount and Default interest [if any]): (i) shall be dischargeable only by payment in Dollars regardless of any law, rule, regulation or statute, whether now or hereafter in existence or in effect in any jurisdiction which affects or purports to affect such obligation, and (ii) shall not be discharged or satisfied by any tender, or any recovery pursuant to any judgment, which is expressed in or converted by Lender to any currency other than the full amount of Dollars expressed to be payable in respect of the principal, interest, fees, costs, expenses (including legal fees) and all other amounts payable by Borrower pursuant to this Agreement. The obligation of Borrower to make payments in Dollars as aforesaid shall be enforceable as an alternative or additional cause of action (which shall survive the termination of this Agreement) for the purpose of recovery in Dollars in the amount (if any) by which such actual receipt shall fall short of the full amount of Dollars expressed to be payable in respect of the principal, interest, fees, costs, expenses (including legal fees) and all other amounts payable by Borrower pursuant to this Agreement, and shall not be affected by judgment being obtained for any other sums due under this Agreement, the Promissory Note or any other Loan Document.

3.    PAYMENT OF INDEBTEDNESS.

3.1    Payment of the Tax Credit Proceeds; Payment Under Distribution Agreements. Until such time as the Indebtedness is indefeasibly repaid in full, Borrower shall pay:

3.1.1    all Tax Credit Proceeds received by it in good and collected funds in Dollars, directly to the Lender Account for the benefit of Lender; and

3.1.2    Borrower shall require all Distributors to pay all sums payable to Borrower under Distribution Agreements in good and collected funds in Dollars, directly to the Lender Account for the benefit of Lender. If a Distributor shall pay any such sums to Borrower or any other Person, Borrower or such other Person shall receive such sums as trustee for Lender and promptly upon receipt thereof shall remit such sums (or cause such sums to be remitted) to Lender.

3.2    Application of Payments. Until Borrower has indefeasibly repaid in full the Indebtedness in accordance with the terms and conditions hereof, all amounts paid into the Lender Account for the benefit of Lender shall be applied by Lender to reduce the Indebtedness in the following priority: (i) first, to the payment of the amounts payable to Lender in reimbursement of its costs and expenses pursuant to paragraphs 7.5 and 7.7 hereof to the extent the same are not duly and timely paid to Lender as required by paragraphs 7.5 and 7.7 hereof; (ii) second, to the payment of the Commitment Amount and Default Interest (if any); and (iii) last, to the repayment of any other indebtedness payable to Lender by the Borrower. Upon full repayment of the Indebtedness by Borrower to Lender, Lender shall promptly remit to Borrower all amounts received by Lender in excess of the Indebtedness.

3.3    Enforcement by Borrower. Borrower, at its own expense, shall promptly make collection, and take all reasonable legal action necessary to enforce collection, of all such receipts and revenues which may be owing from Distributors pursuant to Distribution Agreements and shall remit all sums so collected to the Lender Account.

3.4    Contingency Lien. In the event that the contingency is not fully spent on budgeted production items, the remaining contingency amount shall be paid to Lender to repay the Indebtedness, until such time as the Indebtedness is indefeasibly repaid in full.

3.5    Collection Account. In the event a collection account management agreement ("CAMA") is established in connection with the Picture, Lender shall be made a party, which collection account shall be pre-approved by Lender in writing (Freeway and Fintage shall be pre-approved), provided there shall be no obligation to name Lender as a party to the CAMA (or grant such pre-approval rights) if the CAMA is established following indefeasible repayment of the Indebtedness.

4.    SECURITY FOR LOAN.

4.1    Security Interest.  As security for the full, timely and indefeasible repayment of the Indebtedness, and for the full and timely payment, performance and discharge by Borrower of all of the terms and conditions of this Agreement and of the other Loan Documents, Borrower hereby irrevocably, unconditionally and absolutely grants to Lender a first priority Security Interest in and to all of Borrower's assets, including, without limitation, all of Borrower's right, title and interest in and to (the following collectively referred to herein as the "Collateral") (to the extent any materials and/or rights in and to the Picture or any other Collateral are not yet in existence or not yet acquired, such materials and rights are [to the extent applicable] hereby assigned and conveyed to Lender by way of present assignment of future copyright):

4.1.1    Film Collateral and Copyright.  The Picture and all of Borrower's rights therein and thereto, and all properties and things of value pertaining thereto, and all products and proceeds thereof, whether now in existence or hereafter made, acquired or produced (as used in this paragraph, the term the "Picture" shall mean and include the Picture, all of the aforesaid rights and the rights of Borrower set forth in subparagraphs 4.2.1.1 through 4.2.1.16 below), including, without limitation:

4.1.1.1  To the extent owned or controlled by Borrower, all rights of every kind and nature (including, without limitation copyrights) in and to the literary material upon which, in whole or in part, the Picture is or may be based, or which may be or has been used or included in the Picture, including, without limitation, the Screenplay and all other scripts, scenarios, screenplays, bibles, stories, treatments, novels, outlines, books, titles, concepts, manuscripts or other properties or materials of any kind or nature, in whatever state of completion and all drafts, versions and variations thereof (all of the foregoing herein collectively referred to as the "Literary Property");

4.1.1.2  All physical properties of every kind or nature of or relating to the Picture and all versions thereof, including, without limitation, all physical properties relating to the development, production, completion, delivery, exhibition, distribution or other exploitation of the Picture, and all versions thereof or any part thereof, including, without limitation, the Literary Property, exposed film, developed film, positives, negatives, prints, answer prints, special effects, pre-print materials (including interpositives, negatives, duplicate negatives, internegatives, color reversals, intermediates, lavenders, fine grain master prints and matrices, and all other forms of pre-print elements which may be necessary or useful to produce prints or other copies or additional pre-print elements, whether now known or hereafter devised), soundtracks, recordings, audio and video tapes and discs of all types and gauges, cutouts, trims and any and all other physical properties of every kind and nature relating to the Picture in whatever state of completion, and all duplicates, drafts, versions, variations and copies of each thereof (all of the foregoing herein collectively referred to as the "Physical Property");

4.1.1.3  To the extent owned or controlled by Borrower, all rights of every kind or nature in and to any and all music and musical compositions created for, used in or to be used in connection with the Picture, including, without limitation, all copyrights therein and all rights to perform, copy, record, re-record, produce, reproduce and/or synchronize any or all music and musical compositions, as well as all other rights to exploit such music including record, soundtrack recording and music publishing rights;

4.1.1.4  To the extent owned or controlled by Borrower, all collateral, allied, ancillary, subsidiary, publishing and merchandising rights of every kind and nature, without limitation, derived from, appurtenant to or related to the Picture or the Literary Property, including, without limitation, all production, exploitation or reissue rights by use of film, tape or any other recording devices now known or hereafter devised, whether based upon, derived from or inspired by the Picture, the Literary Property or any part thereof all rights to use, exploit and license others to use or exploit any and all novelization, publishing, commercial tie-ups and merchandising rights of every kind and nature, including, without limitation, all novelization, publishing, merchandising rights and commercial tie-ups arising out of or

8

connected with or inspired by the Picture or the Literary Property, the title or titles of the Picture, the characters appearing in the Picture or said Literary Property and/or the names or characteristics of said characters, and including further, without limitation, any and all commercial exploitation in connection with or related to the Picture and/or the Literary Property;

4.1.1.5  All rights of every kind or nature, present and future, in and to all agreements relating to the development, production, completion, delivery and exploitation of the Picture, including, without limitation, all agreements for personal services, including the services of writers, directors, cast, producers, special effects personnel, animators, cameramen and other creative artistic and technical staff and agreements for the use of studio space, equipment, facilities animation services, special effects services and laboratory contracts;

4.1.1.6  All insurance and insurance policies heretofore or hereafter obtained in connection with the Picture or the insurable properties thereof and/or any person or persons engaged in the development, production, completion, delivery or exploitation of the Picture and proceeds thereof;

4.1.1.7  All copyrights and renewals and extensions of copyrights, domestic and foreign, heretofore or hereafter obtained in the Picture or the Literary Property or any part thereof, and the right (but not the obligation) to make publication thereof for copyright purposes, to register claim under copyright, and the right (but not the obligation) to renew and extend such copyrights, and the right (but not the obligation) to sue in the name(s) of Borrower and/or Lender for past, present and future infringements of copyright;

4.1.1.8  To the extent owned or controlled by Borrower, all rights to produce, release, sell, distribute, subdistribute, lease, sublease, market, license, sublicense, exhibit, broadcast, reproduce, publicize or otherwise exploit the Picture, the Literary Property and any and all rights therein in perpetuity, without limitation, in any manner and in any media whatsoever throughout the universe, including without limitation, by projection, radio, all forms of television (including, without limitation, free, pay, toll, cable, sustaining, subscription, sponsored and direct satellite broadcast), in theatres, non-theatrically, on cassettes, cartridges, discs and other similar and dissimilar video devices, and by any and all other scientific, mechanical or electronic means, methods, processes or devices now known or hereafter conceived, devised or created;

4.1.1.9  All right, title and interest in and to the Distribution Agreements, and all other agreements of any kind or nature licensing, granting or selling rights to distribute, broadcast, exhibit or otherwise exploit the Picture or rights therein, including, without limitation, any and all rights to the extent owned or controlled by Borrower, relating to merchandising, publishing, music and phonorecords derived from or connected with the Picture, and the proceeds of all of said agreements;

4.1.1.10 All rights of Borrower of any kind or nature, direct or indirect, to acquire, produce, develop, reacquire, finance, release, sell, distribute, subdistribute, lease, sublease, market, license, sublicense, exhibit, broadcast, transmit, reproduce, publicize, or otherwise exploit the Picture, or any rights in the Picture, including, without limitation, pursuant to any agreements between Borrower and any company controlling, controlled by, or under common control with Borrower (each, a "Subsidiary") which relate to the ownership, production or financing of the Picture;

4.1.1.11 All contract rights and general intangibles and all rights in, to and under all security agreements leases and other contracts securing or otherwise relating to any such contract rights and general intangibles, which grant to any Person any right to acquire, produce, develop, reacquire, finance, release, sell, distribute, subdistribute, lease, sublease, market, license, sublicense, exhibit, broadcast, transmit, reproduce, publicize, or otherwise exploit the Picture or any rights in the Picture including, without limitation, all such rights pursuant to agreements between Borrower and any Subsidiary which relate to the ownership, production or financing of the Picture;

9

4.1.1.12 To the extent owned or controlled by Borrower, all rent, revenues, income, compensation, products, increases, proceeds and profits or other property obtained or to be obtained from the production, sale, distribution, marketing, licensing, exhibition, reproduction, publication, ownership, exploitation or other uses or disposition of the Picture and the Literary Property (or any rights therein or part thereof), in any and all media, without limitation, the properties thereof and of any collateral, allied, ancillary and subsidiary rights and any and all merchandising and publishing rights therein and thereto, and amounts recovered as damages by reason of unfair competition, the infringement of copyright, breach of any contract or infringement of any rights or derived therefrom in any manner whatsoever including, without limitation, all monies standing to the credit of the Production Account (all of the foregoing herein collectively referred to as the "Gross Receipts");

4.1.1.13 Any and all accounts, including the Production Account, accounts receivable, general intangibles, contract rights, chattel paper, documents, instruments and goods, including inventory (as those terms are defined in the UCC), not elsewhere included in this definition, which may arise in connection with the production, sale, distribution or exploitation of the Picture or any element thereof, including, without limitation, all general intangibles constituting rights to receive the payment of money or other valuable consideration, all receivables and all other rights to receive the payment of money including, without limitation, under present or future contracts or agreements (whether or not earned by performance), from the sale, distribution, exhibition, disposition, leasing, subleasing, licensing, sublicensing and other exploitation of the Picture or the Literary Property or any part thereof or any rights therein or related thereto in any medium, whether now known or hereafter developed, by any means, method, process or device in any market including, without limitation, all of Borrower's right, title and interest in, to and under the Distribution Agreements, and any other existing or future agreements for the distribution or other exploitation of the Picture, as the same may presently exist or hereafter from time to time come into existence, be amended, renewed, modified, supplemented, extended or replaced, including Borrower's rights to receive payments thereunder, and all other rights to receive film rentals, license fees, distribution fees, producer's shares, royalties and other amounts of every description including, without limitation, from (i) theatrical exhibitors, nontheatrical exhibitors, television networks and stations and airlines, cable television systems, pay television operators, whether on a subscription, per program charge basis or otherwise, and other exhibitors, (ii) distributors, subdistributors, lessees, sublessees, licensees and sublicensees (including any affiliated Person) and (iii) any other Person or entity that distributes, exhibits or exploits the Picture or the Literary Property or elements or components of the Picture or the Literary Property or rights relating thereto;

4.1.1.14 Any and all documents, receipts or books and records, including, without limitation, documents or receipts of any kind or nature issued by any pledgeholder, warehouseman or bailee with respect to the Picture or any element thereof;

4.1.1.15 All proceeds, products, additions and accessions (including insurance proceeds) of the Picture, as defined and referred to in subparagraphs 4.1.1.1 through 4.1.1.14 above;

4.1.1.16 All funds in or to be credited to the Production Account into which the proceeds of the Loan made shall be or shall have been credited; and

4.1.2   Personal Property. The following personal property, whether now owned or hereafter acquired, and the proceeds thereof: (i) all of Borrower's rights in and to the title of the Picture and the exclusive use thereof including (without limitation) any and all rights protected pursuant to trademark, service mark, unfair competition and/or other laws, rules or principles of law or equity and (ii) all inventions, processes, formulae, licenses, patents, patent rights, trademarks, trademark rights, service marks, service mark rights, trade names, trade name rights, logos, indicia, corporate and company names, business source or business identifiers and renewals and extensions thereof, domestic and foreign, relating to the Picture, whether now owned or hereafter acquired, and the accompanying good will and other like business property rights, and the right (but not the obligation) to register claim under trademark or patent and to renew and extend such trademarks or

patents and the right (but not the obligation) to sue in the name(s) of Borrower and/or Lender for past, present or future infringement of trademark or patent; and

4.1.3   Equipment. All machinery, electrical and electronic components, equipment, fixtures, furniture, office machinery, vehicles, trailers, implements and other tangible personal property of every kind and description to the extent owned or controlled by Borrower now owned or hereafter acquired by and used in connection with the Picture (including without limitation, all wardrobe, props, mikes, scenery, sound stages, movable, permanent or vehicular dressing rooms, sets, lighting equipment, cameras and other photographic, sound recording and editing equipment, projectors, film developing equipment and machinery) and all goods of like kind or type hereafter acquired by Borrower in substitution or replacement thereof, and all additions and accessions thereto (collectively hereinafter referred to as the "Equipment") and all rents, proceeds and products of the Equipment, including without limitation, the rights to insurance covering the Equipment; and

4.1.4   Cash Equivalents. All cash and cash equivalents of Borrower derived from or relating to the Picture and all drafts, checks, certificates of deposit, notes, bills of exchange and other writings which evidence a right to the payment of money and are not themselves security agreements or leases and are of a type which is in the ordinary course of business transferred by delivery with any necessary endorsement or assignment whether now owned or hereafter acquired (all such drafts, checks, certificates of deposit, notes, bills of exchange and other writings, whenever acquired, collectively are called "Instruments"); and

4.1.5   Tax Credit Proceeds. The Tax Credits and Tax Credit Proceeds, whether now owned or hereafter acquired (including all property and/or assets converted or substituted for such Tax Credits or Tax Credit Proceeds); and

4.1.6   To the extent not included in the items described in paragraphs 4.1.1 through 4.1.5 above, all accounts, contract rights, general intangibles, documents, instruments, chattel paper, goods, inventory and equipment (as such terms are defined in the UCC) now owned or hereafter acquired by Borrower, and the proceeds and products thereof.

4.2   Perfection of Security Interest. Concurrently with the execution of this Agreement, Borrower hereby authorizes Lender to file the appropriate financing statement(s) in the applicable jurisdictions under the UCC ("Uniform Commercial Code Financing Statement(s)") and Borrower shall execute and deliver or cause to be executed and delivered to Lender any and all other instruments which Lender may request from time to time to perfect Lender's Security Interest hereunder and to effectuate the purposes and intent hereof, including, without limitation, to the Copyright Mortgage.

4.3   Guild Intercreditor Agreement. For the avoidance of doubt, the respective rights of the parties with respect to the Collateral are subject to the Guild Intercreditor Agreements, if any.

4.4   Release of Security Interests. Upon full and indefeasible repayment of the Indebtedness, and as long as Borrower is not entitled to any further disbursements of the Loan hereunder, Lender shall, upon Borrower's request and at Borrower's expense, timely (but no later than five (5) Business Days after receipt of such request), execute and deliver to Borrower a release of the Copyright Mortgage which Borrower may file with the United States Copyright Office, and deliver to Borrower a form UCC-3 termination statement in respect of the Uniform Commercial Code Financing Statement filed by Lender.

5.   REPRESENTATIONS AND WARRANTIES. In order to induce Lender to enter into this Agreement, Borrower agrees, represents and warrants to Lender as follows, which agreements, representations and warranties shall survive the execution and delivery of this Agreement:

5.1   Organization, Etc. Borrower is a corporation in good standing duly organized under the laws of Nova Scotia, Canada as well as to do business in the State of Kentucky and has the requisite power and authority to own its properties and to transact the business in which it is engaged in all places at which it engages in business. All actions heretofore taken and agreements heretofore entered into by Borrower in connection with the Collateral were duly

authorized and constitute actions and obligations of Borrower. The chief office and principal place of business of Borrower and place where Borrower's books and records are maintained is located at 212 North 2nd St. Suite 100 Richmond, Kentucky 40475. Borrower shall notify Lender immediately upon any change in its chief office or principal place of business or of the place where its books and records are maintained.

     5.2    Financial Statements. The production budget and cost reports furnished by Borrower to Lender in connection with Borrower's application for credit hereunder, if any, are, in all material respects, accurate and correct, prepared in accordance with generally accepted, accounting principles and accurately represent the financial status of the Picture; no materially adverse changes have occurred since the dates of said documents; and no material liabilities, contingent or otherwise, not shown or contemplated on said documents exist. Borrower has furnished to Lender copies of all material agreements, indentures, and other instruments pursuant to which it has incurred indebtedness or may be obligated, whether directly or indirectly, for borrowed money.

     5.3    Power and Authority. Borrower has the power and authority to execute deliver and carry out the terms and provisions of this Agreement and to execute and deliver the Promissory Note, and all other Loan Documents, and has taken all necessary corporate action to authorize the execution and delivery of this Agreement, the borrowing hereunder, and the execution and delivery of the Promissory Note, and said other Loan Documents.

     5.4    No Conflicts. Neither the execution and delivery of this Agreement, the Promissory Note or any other Loan Document, instrument or agreement to be executed pursuant hereto, nor the consummation of the transactions herein contemplated, nor compliance with the terms and provisions hereof or with the terms and provisions of the Promissory Note or any other Loan Document (i) will violate any provision of law or of any applicable regulation, order or decree of any court or governmental instrumentality or administrative body or agency, (ii) will conflict or will be inconsistent with, or will result in any breach of, any of the terms, covenants, conditions or provisions of any mortgage, indenture, deed of trust, agreement or other instrument to which Borrower is a party or by which it may be bound or to which it may be subject, or (iii) will violate any provision of the articles of incorporation pursuant to which Borrower was formed or any other organizational document thereof.

     5.5    No Pending Legal Actions. There are and will be no claims, actions, suits or proceedings, pending or threatened, against, affecting or relating to, Borrower or the Collateral before any court or governmental or administrative body or agency which might result in any material adverse change in the business, operations, properties or assets or in the condition, financial or otherwise, of Borrower or which would otherwise adversely affect the rights and Security Interest granted to Lender hereunder. Borrower is not in default under any applicable statute, rule, order or regulation of any governmental authority, bureau or agency having jurisdiction over it.

     5.6    Binding Obligation. This Agreement, the Promissory Note, and each other Loan Document, when executed and delivered pursuant hereto, will constitute legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with the respective terms hereof and thereof (except as may be limited by bankruptcy, insolvency, reorganization, or moratorium or other similar laws now or hereafter in effect relating to or affecting creditors' rights generally).

     5.7    First Priority Security Interest. This Agreement and the other instruments, agreements and documents to be executed and delivered to Lender hereunder will effect (upon due execution and delivery and after the proper recordation of those documents required to be recorded) a valid first priority security interest in favor of Lender in the Collateral (including, without limitation, Tax Credits , Tax Incentives, and Tax Credit Proceeds).

     5.8    No Other Consent. In connection with the execution, delivery, performance, validity and enforceability of this Agreement, and the Promissory Note or any other instrument, agreement or document to be executed and delivered hereunder, no consent of any Person, and no consent, license, approval, authorization, registration or declaration with any governmental authority, bureau or agency is required.

     5.9    Tax Credits. Borrower will comply with all applicable rules and requirements of the State of Kentucky for the Borrower to qualify for the Tax Credits in connection with the Picture, and Borrower shall take all actions

necessary in order for the Picture to qualify for the payment of Tax Credit Proceeds in an amount not less than the Indebtedness.

5.10    Principal Photography. Principal photography of the Picture ("Principal Photography") shall commence on or about February 28th, 2018.

5.11    Financial and Tax Years; Income. Borrower's current financial and tax year will end on May 31, 2018. Borrower will have no income to report on its Kentucky State income tax return for the tax year ending May 31, 2018.

5.12    Ownership. Borrower owns all motion picture and allied rights in and to the Screenplay and the copyright thereof as are necessary for the production, distribution, exhibition and exploitation of the Picture by all manner and means in all media throughout the universe in perpetuity, including, without limitation, all rights granted to Distributors under the Distribution Agreements.

5.13    Borrower's Acts; No Encumbrance of Tax Credits. Borrower has not performed, nor will Borrower perform, any acts (including, without limitation, any acts that would result in the revocation of any of the Tax Credits) or execute any other instruments which prevent or could reasonably likely prevent Lender from deriving the full benefits of any of the terms or conditions of this Agreement. Borrower has not and will not have pledged, assigned, transferred or otherwise disposed of or encumbered the Tax Credits or the Tax Credit Proceeds, or any of its right, title, or interest in and to the Tax Credits or the Tax Credit Proceeds, other than to the Lender. No third party has any right, title or interest in or to the Tax Credits or Tax Credit Proceeds.

5.14    Third Party Rights. Except as expressly acknowledged herein and in the Guild Intercreditor Agreements: (i) Borrower (and/or others on its behalf) has not transferred, assigned, or encumbered any rights heretofore (or hereafter to be) acquired by Borrower with respect to the Collateral; and (ii) no Person (other than Borrower) has any rights of any kind in or to the Collateral. No rights, property or interests exist or will be granted to any third party which are in any way inconsistent with or adversely affect Lender's rights and/or Lender's Security Interest under this Agreement.

5.15    No Litigation. No litigation, suits, proceedings or claims exist or are threatened relating to the Picture or rights therein or thereto or otherwise, which would have a material adverse effect on the rights and Security Interest granted to Lender hereunder or the ability of Borrower to perform its obligations hereunder or under any other agreement to which it is a party which relates to the Collateral.

5.16    Intentionally Deleted.

5.17    No Pending Insolvency Proceeding. No insolvency proceedings of any nature are now pending or threatened by or against Borrower.

5.18    Proceeds of Loan. None of the proceeds of the Loan shall be used, directly or indirectly, for any purpose other than for the payment of the costs of production of the Picture in accordance with the Budget as expressly provided herein and to pay Lender's costs and expenses specified in paragraphs 7.5 and 7.7 hereof.

5.19    Representations with Respect to the Picture. The Picture as produced: (i) will be original and will not violate or infringe any copyright to the best of Borrower's knowledge or any other rights whatsoever of any Person; (ii) will be produced and duly and timely delivered to Distributors in accordance with the requirements of the Distribution Agreements (if any), and Borrower shall acquire all such rights (including, without limitation, all rights in and to the music of the Picture) as may be required by the Distribution Agreements and as may be necessary for Distributors to fully exercise all rights granted to them under the Distribution Agreements; (iii) shall conform to the Screenplay except for minor deviations normally made by the director which do not materially change the storyline or result in an overall increase in the cost of the Picture; and (iv) shall receive an MPAA rating no more restrictive than "R".

5.20    Qualified Film Production Company. Borrower is a Qualified Film Production Company and shall maintain such existence until repayment of the Indebtedness.

5.21   <u>Accurate Information</u>. No information, exhibit, or written report or the content of any schedule furnished by or on behalf of Borrower to Lender in connection with the Loan, or the Collateral, and no representation or statement made by Borrower in any Loan Document, contains any material misstatement of fact or omits the statement of a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances in which it was made. There is no fact presently known to Borrower which has not been disclosed to Lender which materially adversely affects nor could reasonably be expected to materially adversely affect, the property or the business, operations or condition (financial or otherwise) of Borrower or the value, marketability or sufficiency of the Collateral.

5.22   <u>Timely Performance</u>. Borrower will duly and timely perform all of its respective material obligations and agreements hereunder and under any other agreement to which it is a party and which relates to the Picture.

6.   <u>CONDITIONS PRECEDENT</u>. Notwithstanding anything to the contrary herein contained, Lender shall not be obligated to advance funds under the Loan unless all of the following conditions have been satisfied at the time of each disbursement of an installment of the Loan:

6.1   <u>Chain-of-Title</u>. Lender has been provided with documentation satisfactory to Lender and its counsel that Borrower has the right to produce the Picture and such other chain of title documentation in form and substance satisfactory to Lender and its counsel as Lender may reasonably require.

6.2   <u>Required Documents</u>. There shall have been delivered to Lender the following documents, instruments and agreements (such documents, instruments and agreements to be executed to the extent they can be executed) in form and substance reasonably satisfactory to Lender and to Lender's counsel:

6.2.1   <u>Financing Statements</u>. Uniform Commercial Code Financing Statements with respect to the Security Interests granted to Lender hereunder for all jurisdictions in which Lender, in its discretion, deems it necessary to file such Uniform Commercial Code Financing Statements to perfect the Security Interest;

6.2.2   <u>Loan Documents</u>. Copies of all Loan Documents, duly executed by all parties thereto, together with all exhibits, schedules, attachments and supplementary documents thereto;

6.2.3   <u>Insurance Certificates; Notice to Insurer</u>. Insurance certificates with respect to the insurance coverages required to be obtained and maintained pursuant to paragraph 7.10 hereof, including, without limitation, any essential elements insurance;

6.2.4   <u>UCC Security Interest Search Reports</u>. Reports confirming that there are no filings of record which indicate that another Person has rights or a security interest in the Collateral hereunder, other than as expressly set forth herein, which would be inconsistent with the Security Interest granted to Lender hereunder;

6.2.5   <u>Articles of Organization and Operating Agreement; Good Standing Certificates</u>. A true copy of the articles of organization of Borrower, together with a certificate of the date of filing thereof, and letter of good standing from the Secretary of State of Borrower's state of organization, dated as of a recent date; and the Operating Agreement of Borrower, duly certified as of a recent date by the secretary of Borrower;

6.2.6   <u>Distribution Agreements</u>. Copies of any Distribution Agreements that have been entered into by Borrower prior to the date of each disbursement of the Loan, duly executed by Distributor and Borrower.

6.2.7   <u>Guild Intercreditor Agreements</u>. If Borrower has previously granted to SAG, DGA, WGA or any other talent union or guild a security interest in the Collateral, the SAG Intercreditor Agreement, or a subordination agreement from such other talent union or guild, duly executed on behalf of SAG, DGA, WGA or such other talent union or guild, provided that if Borrower has not granted a security interest to SAG, DGA, WGA or such other talent union or guild prior to closing it will provide a Guild Intercreditor Agreement, or subordination agreement(s) promptly after Borrower is asked to execute any such security agreement(s);

6.2.8    Borrowing Resolutions; Certificate of Incumbency.  Certified copies of the resolutions of the members of the Borrower, authorizing, as applicable, the execution, delivery and performance of this Agreement and the other Loan Documents, as well as all of the transactions contemplated thereby, and such other documents relating thereto as Lender may reasonably request, together with an member's certificate ("Certificate of Incumbency"), dated as of a recent date, certifying as to the incumbency and signatures of the person(s) authorized to execute and deliver the applicable Loan Documents on behalf of the Borrower;

6.2.9    Budget, Cash Flow Schedule, Screenplay, Production Schedule(s) and Tax Credit Certificate. A copy of the Budget (which shall, in the opinion of the Lender, be sufficient to complete the Picture and for the Borrower to qualify for the aggregate Tax Credit amount of no less than Two Million One Hundred and Eighty One Thousand Eight Hundred and Twenty Three United States Dollars (US$2,181,823.00) in accordance with the laws, regulations and program administrator policies relevant to the Tax Credits), cash flow schedule, Screenplay, the schedule(s) of production and post-production for the Picture and copies of the Borrower's application to the Film Office for the Tax Credits for the Picture and confirmation by the Film Office that the application process is in good standing and there are no outstanding information requests that will prevent the submission of the Borrower's "final application" for Tax Credits and the AUP Audit, and a copy of the Film Office's Certificate of Conditional Eligibility in response thereto confirming that the Picture is conditionally approved in the "Pool allocation";

6.2.10    Legal Opinion.  The favorable written opinion of counsel for Borrower, addressed to Lender, relating to such matters as Lender may request in form and substance satisfactory to Lender and its counsel;

6.2.11    Borrowing Certificate.  A Borrowing Certificate, in form and substance satisfactory to Lender and Borrower, duly signed by Borrower;

6.2.12    Independent Accountant's Report.  An Independent Accountant's Report, in form and substance satisfactory to Lender;

6.2.13    Certificate of the Members.  Duly signed certificate of the members of the Borrower in form and substance satisfactory to Lender;

6.2.14    Form 8832.  Copy of an IRS Form 8832 whereby the Borrower elects to be taxed as a corporation, and proof of filing of the same with the Internal Revenue Service; and

6.2.15    Miscellaneous.  Such other documents as Lender may reasonably request in order to effect fully the purposes of this Agreement and/or the other Loan Documents.

6.3    Event of Default.  At the time of disbursement of an installment of the Loan (both before and after giving effect thereto), there shall exist no uncured Event of Default and no condition, event or act which with notice or lapse of time, or both, would constitute an Event of Default hereunder.

6.4    Representations and Warranties.  All representations and warranties contained herein or otherwise made in writing in connection herewith shall be true and correct in all material respects with the same effect as though the representations and warranties had been made on the date of disbursement of each installment of the Loan.

6.5    Material Changes.  There has been no material adverse change in the Picture's Budget, Qualified Production Costs, Picture elements, financing structure, timing of production (including post production) or Borrower's key production team.

6.6    Change In Law.  No laws, rules, administrative procedures or similar authority of either the State Authority or any other relevant governmental agencies of the State of Kentucky have been changed, altered or construed in any manner to prevent the issuance of the Tax Credits, or to defer beyond the dates set forth herein, eliminate or suspend the ability to use or issue the Tax Credits, or the issuance of the tax rebate to Borrower.

6.7    Production and Post-Production Accountants.  Lender's due diligence and approval of the production accountant and post-production accountant, approval not to be unreasonably withheld, and Lender is reasonably satisfied that the production accountant has not failed to follow reasonable reporting standards and guidelines as defined by the Lender to such production accountant.

6.8    Financial Condition of Borrower.  No material adverse change in the financial condition of Borrower has occurred at the time of the requested Loan.  It is understood that this review shall be conducted by Lender in good faith in accordance with its customary practice.

6.9    Background Checks.  Background checks performed on the officers of the Borrower that are executing Loan Documents are reasonably satisfactory to Lender.

6.10    All Other Budgeted Funds Committed and Funds Paid.  Lender is provided with evidence reasonably satisfactory to Lender and its counsel that: (i) there shall be sufficient funds in the Picture's budget to complete the Picture for Borrower to qualify for the Estimated Tax Credits in accordance with all laws, regulations and Film Office policies; and (ii) all funds for the Budget (other than the Commitment Amount and documented deferments) have been funded to the Production Account.

7.    AFFIRMATIVE COVENANTS.  Borrower hereby covenants and agrees as follows:

7.1    Kentucky State Tax Credit.

7.1.1    Borrower shall take all actions necessary in order for the Picture to qualify for the Tax Credits in an amount not less than the Estimated Tax Credits Two Million One Hundred Eighty One Thousand Eight Hundred and Twenty Three United States Dollars (US$2,181,283.00) including, without limitation, ensuring:

7.1.1.1    not less than one full day of filming of Principal Photography of the Picture shall be at a Qualified Production Facility on a film set built specifically for the Picture;

7.1.1.2    not less than one hundred percent (100%) of the aggregate of all expenses related to work on the Picture (excluding post-production work on the Picture) performed at Film Production Facilities, wherever located, shall be related to work on the Picture performed at an Qualified Production Facility;

7.1.1.3    not less than one hundred percent (100%) of the aggregate of all post production costs related to work on the Picture shall be "qualified post production costs" under the State Tax Credit Law;

7.1.1.4    not less than one hundred percent 100%) of all Principal Photography days filmed outside a Qualified Production Facility shall be filmed in Kentucky State;

7.1.1.5    all taxable tangible property and services, the costs of which qualify as Qualified Production Costs, are purchased only from entities registered to collect and remit Kentucky State and local sales taxes; and

7.1.1.6    the end credits for the Picture shall include (i) the following credit, "Filmed With the Support of the"Kentucky Tourism Development Finance Authority", and (ii) the Kentucky Film logo provided to Borrower by the Film Office.  Borrower shall provide the Film Office with proof of compliance with these credit and logo requirements prior to filing for the final "Certificate of Tax Credit" with the Film Office.

7.1.2    Borrower shall apply to the Film Office voluntary audit "agreed-upon procedures" program to obtain a verification letter stating that the Tax Credits were verified, such voluntary audit "agreed-upon procedures" process ("AUP Audit") to be performed by the Independent Accountant at Borrower's sole expense

and Lender's approval. Borrower shall ensure that the AUP Audit shall be submitted to the Film Office to request the "Certificate of Tax Credits" (the "<u>Tax Credit Certificate</u>") no later than May 31st, 2018.

   7.1.3 The Borrower will provide Lender a signed and completed Kentucky State tax return in connection with which it will file the "Certificate of Tax Credit" issued by the Film Office in a timely manner, but in any event no later than two (2) weeks following receipt of the Tax Credit Certificate from the Film Office, and such tax return shall have the postal address of the Lender as the address to send any rebate checks. Borrower shall only use a person or firm approved by Lender to prepare its Kentucky State tax return in connection with which it will file the "Certificate of Tax Credit".

   7.1.4 Until such time as Lender has received an amount equal to the Indebtedness, in any tax return which Borrower files with the State of Kentucky, Borrower shall specify that all monies payable to Borrower in connection with any such tax return (including, without limitation, the Tax Credits) shall be paid to the Lender Account.

   7.1.5 If any Tax Credit Proceeds are paid directly to Borrower, Borrower shall hold such amounts in trust for Lender and shall immediately pay any such amounts to Lender.

  7.2 <u>Books and Records</u>.  Borrower shall maintain, at all times and in accordance with good and generally accepted accounting principles in the motion picture industry, true, full and complete books and records showing the financial transactions of Borrower and (to the extent Borrower has access to or possession of the books and records of) any other Person with respect to the Picture, and Borrower shall permit Lender (or its designee) to examine the same upon fifteen (15) Business Days' prior written notice at such time(s) during reasonable business hours as Lender (or its designee) may request upon reasonable notice and to take excerpts therefrom and to make copies thereof only until the Indebtedness is repaid in full.  Until such time as the Indebtedness is indefeasibly repaid in full and Borrower is not entitled to any further disbursements of the Loan hereunder, all such books and records (or duplicates thereof) shall be maintained at 212 North 2nd St. Suite 100 Richmond, Kentucky 40475, and shall not be maintained in any other place without Lender's prior written consent. Borrower shall inform Lender of the identity of the proposed post-production accountant for the Picture and Lender shall be entitled to conduct reasonable customary due diligence on such accountant and shall have approval of the post-production accountant for the Picture, approval not to be unreasonably withheld, delayed or conditioned.

  7.3 <u>Statements, Etc</u>.  Until such time as the Indebtedness is indefeasibly repaid in full and Borrower is not entitled to any further disbursements of the Loan hereunder, Borrower shall furnish or cause to be furnished to Lender in form reasonably satisfactory to Lender all such information in connection with the Picture as Lender may reasonably request, including, but not limited to, the following:

   7.3.1 Copies of all bank statements and other financial information with respect to the Picture received by Borrower or any Affiliated Person during the preceding financial quarter;

   7.3.2 Copies of all weekly production reports, if any, indicating by Budget category all expenditures theretofore made by Borrower in connection with the Picture, the amount of cost overrun, if any, for the week immediately preceding submission of such report and the estimated cost to complete the Picture during the preceding financial quarter.  Borrower's failure to promptly provide such reports shall not constitute an Event of Default hereunder unless Borrower fails to provide same within five (5) Business Days after any reasonable request therefor by Lender;

   7.3.3 Copies of any correspondence, applications, certificates, tax forms and other documents or instruments submitted to, or received from, the State Authority with respect to the Picture and the Tax Credits within five (5) Business Days of receipt or submission thereof, as the case may be.

  7.4 <u>Notice of Legal Proceedings</u>.  Borrower shall promptly give written notice to Lender of all litigation, proceedings, controversies (which in any material way may adversely affect Lender's rights and/or Lender's Security

Interest hereunder or under any documents referred to herein, including Lender's rights to the Tax Credit Proceeds) or material interruptions (i.e., events of force majeure) in the production, post-production or distribution of, or claims materially affecting the Collateral or any of the rights of Borrower with respect thereto, including the Tax Credits, in each case only if and to the extent Borrower is actually aware or has received written notice thereof, and, where applicable, Borrower shall appear in and defend any and all such actions and proceedings and shall obtain and furnish to Lender from time to time, promptly following a written demand by Lender, all instruments, agreements, financial statements, documents, releases and subordinations of claims or liens as Lender may reasonably require, consistent with this Agreement, to maintain the priority of Lender's Security Interest under this Agreement. In this regard, Borrower shall defend the Collateral against the claims and demands of all other parties claiming by, through or under Borrower, and will keep the Collateral free and clear from all security interests or other encumbrances created by, through or under Borrower, except the Security Interest created hereunder and those security interests expressly permitted hereunder.

7.5     Costs and Expenses; Taxes. After the occurrence of an Event of Default (which has not been cured by Borrower as provided herein), Borrower shall pay immediately upon demand by Lender all actual, out-of-pocket costs and expenses incurred in connection with the enforcement of the rights of the Lender hereunder or under the Promissory Note or any other Loan Document or otherwise in connection with the realization upon any Collateral. Such unpaid costs and expenses (including court costs and reasonable outside attorneys' fees) shall constitute an additional disbursement of the Loan hereunder and shall be secured and recoupable and shall bear interest in the same manner as provided for in paragraph 2 hereof. At Lender's election, Lender shall have the right (and is hereby authorized by Borrower) to deduct all amounts payable to Lender pursuant to this paragraph 7.5 or pursuant to paragraph 7.7 hereof from a disbursement of the Loan made by Lender to Borrower, or to make additional disbursements under the Loan for the repayment to Lender of all such amounts.

7.6     Performance; Copyright Registration. Borrower shall diligently and duly perform and observe all the terms, covenants and conditions on its part to be performed and observed under and pursuant to the Production Services Agreement and Distribution Agreements, as applicable. Borrower shall make all necessary recordations and copyright filings with the US Copyright Office as Lender may reasonably require. Promptly upon completion of the Picture, Borrower shall notify Lender in writing and shall also register the Picture with the United States Copyright Office. Borrower shall also give Lender prompt written notice each time the Screenplay and/or the Picture may acquire or become known by a new or different name or title.

7.7     Indemnity. Borrower shall, at all times, defend and indemnify and hold Lender (which for the purposes of this paragraph shall include the shareholders, officers, directors, employees, representatives and agents of Lender) harmless from and against any and all liabilities, claims, demands, causes of action, losses, damages, expenses (including, without limitation, reasonable outside attorneys' fees), costs, settlements, judgments or recoveries, unless a court of competent jurisdiction determines in a final and non-appealable judgment that any such claim results from Lender's gross negligence, fraud or willful misconduct, arising out of or resulting from (i) any breach of the representations, warranties, agreements or covenants made by Borrower herein or any other Loan Document, (ii) any suit or proceeding of any kind or nature whatsoever against Lender arising from or connected with the transactions contemplated by this Agreement or any of the documents, instruments or agreements to be executed pursuant hereto or any of the rights and properties assigned to Lender hereunder, (iii) the amount of the Tax Credits pursuant to the Tax Credit Certificate duly issued to Borrower in connection with the Picture being reduced below the amount of Estimated Tax Credits, cancelled, revoked, terminated or recaptured, and/or (iv) any suit or proceeding that Lender may deem necessary or advisable to institute, in the name of Lender or Borrower or both, against any other Person for any reason whatsoever to protect the title and/or the rights of Lender hereunder, or any rights granted to Lender, including reasonable outside attorneys' fees and court costs and all other out-of-pocket costs and expenses incurred by Lender, all of which shall be charged to and paid by Borrower and shall be secured by Lender's Security Interest in the Collateral. The foregoing indemnity shall survive repayment of the Loan and the termination of this Agreement.

7.8     Further Assurances. Borrower shall, upon request from Lender, execute and deliver, or cause to be executed and delivered, to Lender the documents referred to in paragraph 6.2 hereof and such further instruments, documents and agreements consistent herewith as Lender may reasonably require and shall do, or cause to be done, such further acts as Lender may reasonably desire to carry out or effectuate the purposes of this Agreement consistent with

18

the terms and conditions set forth herein and to enable Lender to exercise its rights and remedies hereunder. If Borrower shall fail to execute or deliver to Lender any further instruments, documents or agreements under the provisions of this paragraph 7.8 within five (5) Business Days after Borrower's receipt of Lender's written request for same from Lender, (following Borrower's reasonable opportunity to review and comment on the same), then Borrower hereby appoints Lender as Borrower's irrevocable attorney-in-fact, with full power of substitution and with the right, but not the obligation, to do any and all acts and things necessary to execute, acknowledge and deliver any and all such further instruments, documents or agreements, in Borrower's name and on Borrower's behalf, which appointment shall be deemed to be a power coupled with an interest and shall be irrevocable. Lender shall promptly provide Borrower copies of all documents so executed, provided that failure to so provide such copies of documents shall not be a default hereunder.

7.9     Notice of Events of Default. Borrower shall give Lender prompt written notice of all Events of Default under any of the terms or provisions of this Agreement and of any changes in management, litigation, or of any other matter which has resulted in or may result in a material adverse change in the financial condition or operation of Borrower.

7.10    Insurance.

7.10.1 "Producer's Package" Coverage. Borrower shall at all times hereunder at its own cost and expense obtain and keep in full force and effect in amount, kind and form reasonably satisfactory to Lender and with insurers approved by Lender, the following types of insurance providing such coverage as is customarily provided by such types of insurance: Cast Insurance in an amount equal to at least the Commitment Amount covering the director, the director of photography and the principal cast members, among others; Negative Insurance in an amount equal to the amount of the Budget and projected interest hereunder; Faulty Stock, Camera and Processing Insurance; Props, Sets and Wardrobe Insurance; Miscellaneous Equipment Insurance; Property Damage Liability Insurance; Worker's Compensation Insurance and any insurance coverage required by applicable collective bargaining agreements.

7.10.2 Lender Named as Loss Payee. The Property Damage Liability Insurance shall include Lender as a loss payee and include (i) a provision for the issuance to Lender of written notice of any cancellation of or material change in such insurance coverage which written notice shall be given to Lender not less than ten (10) Business Days in advance of such cancellation of or material change in such insurance coverage and (ii) customary waiver of subrogation language in form and substance acceptable to Lender.

7.10.3 Liability Insurance. Borrower shall at all times hereunder at its own cost and expense obtain and keep in full force and effect and in an amount, kind and form reasonably satisfactory to Lender and with insurers approved by Lender the following types of liability insurance which shall provide such coverage as is customarily provided by such types of insurance:

7.10.3.1 Errors and Omissions Insurance covering, among other things, the legal liability and defense of the producer of the Picture against lawsuits alleging the unauthorized use of title, format, ideas, characters, plots, plagiarism, copyright infringement and unfair competition. Such insurance shall also protect against alleged libel, slander, defamation of character and invasion of privacy. The Errors and Omissions Insurance shall be in the minimum amount of One Million Dollars ($1,000,000) per occurrence and Three Million Dollars ($3,000,000) in the aggregate, with a deductible of Twenty-Five Thousand Dollars ($25,000) per occurrence and a period of coverage of not less than three (3) years from the date of commencement of Principal Photography of the Picture.

7.10.3.2 Comprehensive Liability Insurance covering Alex Ginzburg, Dong Lee, and other producers of the Picture against, among other things, all claims for bodily injury, personal injury or property damage which arise in connection with the Picture, including, without limitation, coverage for all owned, non-owned and hired vehicles (both on and off camera) with minimum liability limits of One Million Dollars ($1,000,000).

7.10.4   <u>Naming Lender as "Additional Insured"</u>.  The insurance enumerated in subparagraph 7.10.3 shall name Lender (and its agents, officers, directors and employees) as an additional insured thereunder and shall (i) provide for the issuance to Lender of written notice of any cancellation of or material change in any such insurance coverage which written notice shall be given to Lender not less than ten (10) days in advance of such cancellation of or material change in such insurance coverage and (ii) include customary waiver of subrogation language in form and substance acceptable to Lender.

7.10.5   <u>Payment of Premiums</u>.  The policies of insurance (or the Certificates of Insurance reflecting that such coverage is in effect) referred to in this paragraph 7.10 shall (a) contain an endorsement which negates the "other insurance" clause in said policies and a statement that the insurance being provided is primary and any insurance carried by a Lender is neither primary nor contributory and (b) be delivered to Lender. Lender shall not have any liability to pay for any premiums or calls with respect to any of the insurance policies referred to in this paragraph 7.10.

7.11   <u>Reconciliation of Statements</u>. Upon the reasonable request of Lender, Borrower shall promptly furnish to Lender a reconciliation of information concerning any discrepancy with respect to any item in any summary or statement of revenues paid and payable by Distributors or any other Person, and Borrower further agrees that, if Lender in its good faith business judgment believes that an Event of Default may have occurred, Lender shall have the right to appoint an accountant to prepare such information as Lender may require, the reasonable fees and expenses of such accountant to be borne and paid by Borrower

7.12   <u>Fair Labor Standards Act</u>.  Borrower shall comply in all respects with the Fair Labor Standards Act.

7.13   <u>Intentionally Deleted.</u>

7.14   <u>Payments from Distributors</u>. At all times (including, without limitation, after the occurrence of an Event of Default hereunder) prior to the full, timely and indefeasible repayment of the Indebtedness hereunder, Borrower shall supervise and monitor the performance of and payments from Distributors under the Distribution Agreements, and Borrower shall keep true, full and complete books and records of such payments and of all production costs of the Picture, which books and records shall be in accordance with good and generally accepted accounting practices in the motion picture industry. Until such time as the Indebtedness is indefeasibly repaid in full under this Agreement, Borrower shall pay all amounts payable to Borrower under any Distribution Agreement or from any other exploitation of the Picture in good and collected funds in Dollars, directly to the Lender Account. If any Distributor shall pay any such amounts to Borrower, Borrower shall receive such amounts as trustee for Lender and promptly upon receipt thereof shall remit such amounts (or cause such amounts to be remitted) to the Lender Account.

8.   <u>NEGATIVE COVENANTS</u>.

8.1   <u>Written Consent</u>.  Borrower hereby covenants and agrees that, so long as this Agreement is in effect and until Borrower's obligations to Lender hereunder are fully paid, performed and discharged, Borrower will not, and will not allow any Person to, without first having procured the written consent of Lender:

8.1.1   Terminate, amend, alter or modify, or consent to or permit the termination, amendment, alteration or modification of any agreement referred to herein or forming part of Lender's Security Interest in any manner, or enter into any other agreement, that would adversely affect or lessen any of the rights granted to Lender under this Agreement, or under any instruments, documents or agreements executed by Borrower in connection herewith;

8.1.2   Wind up, liquidate or dissolve its affairs, or sell, lease, license, transfer, or otherwise dispose of or grant an interest in all or a substantial part of its properties and assets, or change its company or trade name or modify its company existence;

20

8.1.3    Create, assume or suffer to exist any security interest, mortgage, pledge, encumbrance, assignment, lien or charge of any kind upon the Collateral (other than the security interests of Lender or the Guilds, referred to in paragraph 5.14 hereof or otherwise disclosed to Lender in writing prior to execution of this Agreement);

8.1.4    Take any action, or fail to take any action, that would adversely affect the payment of the Tax Credit Proceeds to Lender including, without limitation, filming parts of the Picture outside of Kentucky State unless otherwise approved in advance in writing by Lender (such approval shall not be unreasonably withheld or delayed by Lender) or filing a Kentucky State tax return to apply for Tax Credits in excess of Two Million One Hundred Eighty One Thousand Eight Hundred and Twenty Three United States Dollars (US $2,181,823.00) without the prior written approval of the Lender;

8.1.5    Except as provided in paragraph 4 and 5.16 of this Agreement, otherwise sell, assign, encumber, grant a security interest in, transfer or allocate any or all of the Collateral (including, without limitation, the Tax Credits and the Tax Credit Proceeds) to any Person other than Lender;

8.1.6    Permit any Tax Credit or Tax Credit Proceeds to be applied to any tax liability for which Borrower is liable; or

8.1.7    Elect to become an "S corporation" or form of disregarded entity pursuant to rules and regulations of the United States Internal Revenue Service.

8.2    Use of Funds.  Borrower shall not use any funds disbursed by Lender under the Loan for any purpose or thing except to pay the costs of production of the Picture in accordance with the approved Budget and Lender's costs and expenses specified in paragraphs 7.5 and 7.7 hereof.

9.    EVENTS OF DEFAULT.

9.1    Specified Events of Default.  Each of the following specified events hereby constitutes and is herein referred to individually as an "Event of Default", it being understood that an Event of Default shall not be deemed to have occurred until the cure period set forth in the applicable subparagraph below, if any, shall have expired, other than with respect to the calculation of Default Interest if such Event of Default is not cured within the applicable cure period:

9.1.1    Borrower's failure to make (or cause to be made) any payments to Lender hereunder when the same are due, including without limitation, payment of the Commitment Amount (and Default Interest, if any), by the applicable Repayment Date(s);

9.1.2    Borrower's failure to pay any Tax Credit Proceeds to Lender in accordance with paragraph 7.1.5 hereof; or

9.1.3    Borrower's failure to submit the AUP Audit to the Film Office by the date specified in paragraph 7.1.2; or

9.1.4    Borrower's failure to maintain (or cause to be maintained) in full force and effect the policies of insurance as provided in paragraph 7.10 hereof for the full periods required by Lender; provided, however, if a policy is terminated for some reason other than by a default of Borrower, Borrower shall have five (5) Business Days to reinstate or replace such policy; or

9.1.5    Default in the due and timely observance or performance of the terms, provisions, covenants, conditions, agreements or obligations of Borrower contained in this Agreement, the Promissory Note or in any other agreement relating to the Loan or the Collateral which would materially adversely affect the validity, perfection or priority of the Lender's Security Interest in the Collateral, or the value of the Collateral or the Promissory Note; or

9.1.6    Borrower's failure to perform or observe, in a due and timely manner, any of the other (i.e., other than those subject to the immediately preceding subparagraphs 9.1.1 through 9.1.5) material terms, provisions, covenants, conditions, agreements or obligations contained herein, in the Loan Documents or in any other agreement, contract, indenture, document or instrument executed, or to be executed, by Borrower in connection with this Agreement or pursuant hereto and which would have a material adverse effect on the ability or obligation of Borrower to perform its obligations under this Agreement and under the other Loan Documents to be executed by Borrower pursuant hereto; or

9.1.7    If any Uniform Commercial Code Financing Statement, Financial Statement, the application form or other information submitted to the Film Office or the State Authority for the Tax Credits or representation or warranty made by Borrower herein or otherwise in writing in connection with this Agreement or in connection with the instruments, documents and assignments to be executed by Borrower hereunder or pursuant hereto shall be false or untrue on the date made and which would have a material adverse effect on the ability or obligation of Borrower to perform its obligations under this Agreement and under the other Loan Documents to be executed by Borrower pursuant hereto; or

9.1.8    Default of any third party hereto in the observance or performance by such party of any material term, covenant, condition, warranty or representation made or agreed to in any agreement referred to herein or secured by Lender's Security Interest hereunder which materially adversely affects Lender's Security Interest hereunder, including, without limitation, the Picture's production accountant and post-production accountant's failure to follow certain reporting standards and guidelines as defined by the Lender; or

9.1.9    Suspension by any of Borrower of its respective business operations; or

9.1.10    If any warrant of attachment, execution or other writ in an aggregate amount of greater than Fifty Thousand United States Dollars (US$50,000.00) shall be issued or levied upon the proceeds payable pursuant to any agreement referred to herein or secured by Lender's Security Interest hereunder, and such attachment, execution or other writ shall remain undischarged and unstayed for a period in excess of thirty (30) days or Borrower shall fail to post (or cause to be posted) an indemnity bond for the maximum liability pursuant to any such attachment, execution or other writ; or

9.1.11    If Borrower should become insolvent; or should be unable to pay its respective debts as they mature (including Borrower's failure to pay the Indebtedness); or should make an assignment for the benefit of creditors or to an agent authorized to liquidate any substantial amount of its respective properties or assets, or should file a voluntary petition in bankruptcy or seeking reorganization or to effect a plan or other arrangement with creditors; or should file an answer admitting the jurisdiction of any court and the material allegations of an involuntary petition filed pursuant to any Act of Congress relating to bankruptcy or reorganization; or should join in any such petition for an adjudication or for a reorganization or other arrangement; or should become or be adjudicated a bankrupt; or should apply for or consent to the appointment of or consent that an order be made appointing any receiver or trustee for itself or for any of its respective properties, assets or business; or if an order should be entered pursuant to any Act of Congress relating to bankruptcy or reorganization; or if a receiver or a trustee should be appointed otherwise than upon its own application or consent for all or a substantial part of its properties, assets or business and any such receiver or trustee so appointed is not discharged within sixty (60) days after the date of such appointment; or if an involuntary petition is filed and not dismissed within sixty (60) days after the date of such petition; or

9.1.12    If there shall exist or occur, and Lender shall notify Borrower of, any event or condition which in Lender's good faith business judgment (exercised in Lender's sole discretion) is an Event of Default or which would have a material adverse effect on the ability or obligation of Borrower to perform its material obligations under this Agreement and under the other Loan Documents to be executed by Borrower pursuant hereto; or

9.1.13    If final judgment or judgments for the payment of money aggregating in excess of Fifty Thousand Dollars ($50,000.00) shall be entered or affirmed by a court against Borrower, and Borrower shall not

discharge the same or provide for its or their discharge in accordance with its or their terms or procure a stay of execution thereof within sixty (60) days from the date of entry thereof; or

        9.1.14   If any Loan Document shall cease to be in full force and effect; or

        9.1.15   If Borrower shall default under any Loan Document and such default is not cured with the proscribed cure period thereunder; or

        9.1.16   If there shall exist any material change in lowering the Budget, lowering qualified production costs, financing structure, timing of production, including post-production, or the key production team of the Picture (i.e., Alex Ginzburg and Dong Lee are no longer producers) unless approved by Lender; or

        9.1.17   Borrower's failure to adhere to Lender's approval rights as set forth in this Agreement; or

        9.1.18   The failure of Borrower to effect delivery of the Picture to Sales Agents and/or Distributors in accordance with the terms and conditions of the relevant Distribution Agreement.

    9.2    Remedies.  Upon the occurrence of any of the Events of Default set forth in paragraph 9.1 hereof, subject to paragraph 9.3, all Indebtedness shall immediately become due and payable.  At Lender's option (subject to paragraph 9.3 below), upon the occurrence of any other Event of Default, and at any time thereafter if such Event of Default shall then be continuing:

        9.2.1   Unless such Event of Default is cured within the time period (if any) provided for hereunder, Lender may terminate its obligations to advance funds to Borrower and/or the Indebtedness may, without presentment, demand, protest, or notice of any kind, all of which are hereby expressly waived by Borrower, be forthwith called due and payable, if not otherwise then due and payable (anything herein or in the Promissory Note or other agreement, contract, indenture, document or instrument contained to the contrary notwithstanding) and the Repayment Date(s) shall be accelerated accordingly;

        9.2.2   Lender may pursue the remedies afforded to Lender hereunder (including, without limitation, pursuant to paragraph 9.4 hereof) or under any of the documents executed in connection herewith, or any other remedy afforded to Lender by law or equity, and Lender may, at its option, do and perform all other acts and things necessary for the proper preservation and protection of Lender's rights hereunder, solely with respect to the Collateral (and the receipts therefrom) or pursuant to any agreement secured by Lender's Security Interest hereunder, all at the cost and expense of Borrower, which amount so expended shall constitute costs recoupable by Lender and secured as provided hereunder; and

        9.2.3   Lender may, at its option, engage others to exercise or discharge any of its rights or obligations hereunder.  The amounts payable to such others by Lender shall be recoupable by Lender and secured as provided in paragraph 7.5 hereof.

    9.3    Cure Period.  With respect to the Events of Default set forth in subparagraphs 9.1 hereof, provided such event is curable, Borrower shall have a period of seven (7) Business Days from receipt of written notice thereof from Lender within which to cure any such Event of Default.  At Lender's sole and exclusive option, upon the occurrence of any other Event of Default, and at any time thereafter, Lender may permit Borrower to cure such Event of Default, but Lender shall have no obligation to do so.

    9.4    Attorney-in-Fact.  Should an Event of Default occur hereunder, Borrower hereby irrevocably designates, constitutes and appoints Lender its true and lawful attorney-in-fact with full power of substitution and with full and irrevocable power (which power shall be deemed coupled with an interest), in the place and stead of Borrower and in the name of the Borrower, Lender, or both of them, at any time or from time to time in the sole discretion of Lender: (i) to take over and complete production of the Picture and to lease, license, sell or otherwise dispose of the Picture and/or such distribution rights in and to the Picture and such rights therein as have not been disposed of on the date of such default

by Borrower as permitted hereunder (or to engage others to do so with the costs and expenses thereof to be recoupable by Lender as provided in paragraph 7.5 and 7.7 hereof); (ii) to negotiate such lease, license, sale or other agreements and to enter into such agreements on behalf of Borrower on such terms and conditions (not in conflict with the terms and conditions of such agreements consistent with this Agreement with respect to the Collateral only as have theretofore been entered into by Borrower and which Lender has been made aware of) as Lender deems appropriate; (iii) to renegotiate a Distribution Agreement or such other agreements as Lender has a Security Interest in pursuant to paragraph 4 hereof as Lender in its sole and exclusive discretion deems proper; (iv) to require, demand, collect, receive, settle, adjust, compromise and to give acquittances and receipts for the payment of any and all monies payable pursuant to the a Distribution Agreement or such other agreements as Lender has a Security Interest in pursuant to paragraph 4 hereof and such licenses and agreements as Lender may enter into as aforesaid; (v) to file any claims and/or proofs of claim, to commence, maintain or discontinue any actions, suits or other proceedings deemed by Lender advisable for the purpose of collecting or enforcing payment of any such monies against the Collateral only; (vi) to endorse any checks, drafts or other orders or instruments for the payment of monies payable to Borrower in connection with the Collateral only which shall be issued in respect of such monies; (vii) to execute any and all such instruments, agreements or documents consistent herewith as may be necessary or desirable in the premises, and Lender shall promptly provide copies to Borrower of such instruments, agreements or documents so executed upon written request of Borrower, provided that failure to so provide such copies of documents shall not be a default hereunder; (viii) to apply any receipts so derived as herein provided; (ix) to exercise all rights available to it under the UCC; and (x) to have a receiver appointed and to sell the Collateral at a public or private sale. Lender, however, shall not be obligated to make any demand or present or file any claim or take any action authorized hereby. Borrower shall gather up and deliver to Lender all materials, books, records, documents and things of any nature required by Lender in the exercise of its rights hereunder upon Lender's reasonable request. Notwithstanding the foregoing, the Lender agrees that it shall not exercise its rights under this paragraph 9.4 unless an Event of Default has occurred and is continuing and/or if the exercise of such rights restrain or interfere with the production, completion, exhibition, advertising, promotion, marketing and/or exploitation of the Picture in any manner whatsoever.

        9.5     Notwithstanding anything else to the contrary in this Agreement or any other agreement between or among any of the parties hereto, Lender hereby agrees that, notwithstanding any Event of Default hereunder, Lender shall not be entitled to seek to or obtain injunctive relief or seek or to enjoin or otherwise restrain or interfere with the production, completion, exhibition, advertising, promotion, marketing and/or exploitation of the Picture for any reason whatsoever, all of which remedies are hereby irrevocably waived by Lender.

10.    <u>MISCELLANEOUS</u>.

        10.1    <u>Notices</u>. All notices, requests, demands or other communications to the respective parties hereto shall be in writing and shall be deemed to have been given when received by the party to which sent and shall be addressed to Lender or Borrower, as the case may be, at their respective addresses shown opposite their signatures hereto. A courtesy copy of each notice sent by Borrower to Lender shall be sent to Ramo Law PC, 315 S. Beverly Drive, Suite 412, Beverly Hills, CA 90212, Email: eramo@ramolaw.com; Attn: Elsa Ramo, Esq. A courtesy copy of each notice sent by Lender to Borrower shall be sent to Alex Ginzburg at 212 North 2nd St. Suite 100 Richmond, Kentucky 40475.

        10.2    <u>No Waiver; Amendments in Writing</u>. Except as expressly provided herein to the contrary, no failure of, nor any delay on the part of, Lender or Borrower in exercising any right, power or privilege hereunder, or under any agreement, contract, indenture, document or instrument mentioned herein, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder, or under any agreement, contract, indenture, document or instrument mentioned herein, preclude other or further exercise thereof or the exercise of any other right, power or privilege; nor shall any waiver of any right, power, privilege or default hereunder, or under any agreement, contract, indenture, document or instrument mentioned herein, constitute a waiver of any other right, power, privilege or default or constitute a waiver of any other default of the same or of any other term or provision. All rights and remedies herein provided are cumulative and not exclusive of any rights or remedies otherwise provided by law or equity.

        10.3    <u>Consent to Jurisdiction and Service of Process</u>. Borrower (i) hereby irrevocably submits itself to the jurisdiction of the state courts of the State of California and to the jurisdiction of the United States District Court for the

Central District of California, for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, the Promissory Note or any of the Loan Documents or the subject matter hereof or thereof brought by Lender or its successors or assigns and (ii) hereby waives, and agrees not to assert, by way of motion, a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court (provided, however, that the then applicable jurisdiction minimums are not waived), and (iii) hereby waives any offsets or counterclaims in any such action, suit or proceeding. Borrower hereby consents to service of process by registered mail at the address to which notices are to be given. Borrower agrees that its submission to jurisdiction and its consent to service of process by mail is made for the express benefit of Lender. Final judgment against Borrower in any such action, suit or proceeding shall be conclusive, and may be enforced in other jurisdictions (i) by suit, action or proceeding on the judgment, a certified or true copy of which shall be conclusive evidence of the fact and of the amount of any indebtedness or liability of Borrower therein described or (ii) in any other manner provided by or pursuant to the laws of such other jurisdiction; provided, however, that Lender may at its option bring suit, or institute other judicial proceedings against Borrower or any of its assets in any state or Federal court of the United States or of any country or place where Borrower or such assets may be found. Borrower further covenants and agrees that so long as this Agreement shall be in effect, it shall maintain a duly appointed agent for the receipt and acceptance on its behalf of service of summons and other legal processes (and Borrower hereby appoints TBD attorney its attorney-in-fact to receive service of the process in any action, suit or proceeding with respect to which Borrower has submitted to jurisdiction, as set forth above), and upon failure to do so the clerk of each court to whose jurisdiction it has submitted shall be deemed to be its designated agent upon whom such process may be served on its behalf, and notification by the attorney for plaintiff, complainant or petitioner therein by mail or confirmed transmission by facsimile (with confirmation provided by the sender's facsimile machine) or by e-mail (unless the sender has received a failure delivery notice and with confirmation of transmission provided by the sender's e-mail) to Borrower of the filing of such suit, action or proceeding shall be deemed sufficient notice thereof.

     10.4    Successors and Assigns. Lender may invite third parties to participate in the Loan without the consent of or notice to Borrower; provided, however, that, Borrower shall continue to make all payments due hereunder directly to Lender. Borrower may not assign any of its rights or obligations hereunder without the prior written consent of Lender and any purported assignment shall be void and of no force or effect. This Agreement shall be binding upon and inure to the benefit of Borrower and its permitted successors and assigns and Lender and its successors and assigns. The Borrower hereby acknowledges that the Lender, without the consent of the Borrower, may sell, transfer and otherwise assign all of Lender's rights in this Agreement and the other Loan Documents including, without limitation, its rights in the Lender Account and the Collateral.

     10.5    Severability. In case any one or more of the provisions hereof should be invalid, illegal or unenforceable in any respect, such provision(s) shall be curtailed and limited only to the extent necessary to bring it within the legal requirements and the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

     10.6    Governing Law. This Agreement and the rights and obligations of the parties hereunder and under the documents executed concurrently herewith shall be construed in accordance with and be governed by the laws of the State of California. California law shall govern (i) the validity and interpretation of the Agreement, (ii) the performance of the parties of their respective obligations hereunder, and (iii) all other causes of action (whether sounding in contract or in tort) arising out of or relating to this Agreement or the termination of this Agreement.

     10.7    Waiver of Jury Trial. To the extent permissible by law, Borrower and Lender each waives their respective rights to a trial by jury of any claim or cause of action based upon or arising out of or related to this agreement or the transactions contemplated hereby, in any action, proceeding or other litigation of any type brought by any of the parties against any other party or any agent-related person, participant or assignee, whether with respect to contract claims, tort claims, or otherwise. The Borrower and Lender each agree that any such claim or cause of action shall be tried by a court trial without a jury. Without limiting the foregoing, the parties further agree that their respective right to a trial by jury is waived by operation of this section as to any action, counterclaim or other proceeding which seeks, in

whole or in part, to challenge the validity or enforceability of this agreement or any provision hereof. This waiver shall apply to any subsequent amendments, renewals, supplements or modifications to this Agreement.

10.8    Entire Agreement; Counterparts. This Agreement, the Promissory Note and the documents, instruments and agreements delivered (or, as the case may be, to be delivered) pursuant hereto shall constitute the entire agreement between the parties hereto with respect to the Loan and shall supersede all other agreements written or oral with respect thereto including, but not limited to the term sheet between the parties dated August 31st, 2017 (the "Term Sheet"). This Agreement may be executed in two counterparts, each of which shall be deemed an original and which together shall constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by facsimile or transmitted electronically in either a Tagged Image Format File ("TIFF") or Portable Document Format ("PDF") shall be equally effective as delivery of a manually executed counterpart of this Agreement. No party has relied on any representation and/or warranty not expressly set forth herein.

10.9    Confidentiality. The terms of this Agreement are strictly confidential and Borrower agrees not to disclose the terms contained herein to any third party without the prior written consent of Lender, except that Borrower may disclose such terms to its officers, directors, attorneys, other advisors, State Authority and any other governmental entities and other parties with a right to access such information, including Guilds or parties required by law.

10.10   No Third Party Beneficiaries. This Agreement is not made for the benefit of any third party or parties.

10.11   Relationship of Parties. The relationship between Borrower and Lender hereunder is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with Borrower, and no term or provision of any of the Loan Documents shall be construed so as to deem the relationship between Borrower, on the one hand, and Lender, on the other hand, to be other than that of debtor and creditor.

10.12   Setoff. Nothing in this Agreement shall be deemed to constitute a waiver or prohibition of Lender's right of banker's lien or setoff and Borrower hereby expressly acknowledges that Lender has such right, it being understood and agreed that Lender shall not use the Commitment Amount to setoff against any non-Picture related obligations of Borrower to Lender.

10.13   Intentionally Deleted.

10.14   Premiere; One Sheet; Press Release. Borrower shall use reasonable commercial efforts to cause Distributor of the Picture to provide the Lender with four (4) tickets to the U.S. premiere of the Picture, if any; provided that any failure to so provide such tickets shall not be a breach hereof. Borrower shall use reasonable commercial efforts to provide Lender with one (1) high quality image used for the "one-sheet" (or electronic file thereof) for the Picture, if any, which Lender may use for its own marketing purposes, subject to any third party obligations. Borrower shall use reasonable commercial efforts to reference "BondIt" as a financier in any press releases regarding the Picture.

10.15   Credits.

10.15.1 Lender shall receive a company credit on screen, on all positive prints of the Picture, in the main titles of the Picture (i.e., wherever all producer credits appear), substantially in the form of "In Association with BondIt Media Capital".

10.15.2 Lender shall receive three (3) executive producer credits (to persons designated by Lender in Lender's sole discretion), on screen, on all positive prints of the Picture, in the main titles of the Picture (i.e., wherever all producer credits appear), on a shared card, with no more than four (4) executive producer credits on such shared card.

10.15.3 Lender shall receive a financing credit and company logo, on screen, on all positive prints of the Picture, in the end crawl or in such other position as is determined by Borrower, substantially in the form of

"Financing Provided by BondIt LLC" accompanied by Lender's logo. Lender acknowledges and agrees such credits may be shared with other financiers.

10.15.4 All other aspects of the above credits shall be in Borrower's and distributors' sole discretion. No casual or inadvertent failure to comply with the credit provisions set forth in this paragraph 10.15 shall be deemed a breach by Borrower provided that upon receipt of written notice from Lender of Borrower's failure to properly accord credit as specified herein, Borrower shall take such steps as are reasonably practicable to cure such failure on a prospective basis except with respect to any materials already in existence.

10.16   Commitment Fee. Borrower acknowledges that, in committing to make the Loan, Lender may be prevented from accepting other potential funding opportunities. In the event that, through no material fault of Lender: (i) the Conditions Precedent are not satisfied on or before the Expiration Date; or (ii) Borrower does not proceed with the Loan for any reason, then, as consideration of Lender's commitment to make the Loan, Borrower agrees to pay a fee to Lender in the amount of Fifty Thousand United States Dollars (US$50,000.00) ("Commitment Fee") as well as all actual, reasonable, direct, verifiable outside legal fees and expenses incurred by Lender that were not covered under the Legal Fee. Payment by Borrower hereunder shall be made concurrently with written notice that Borrower is not proceeding with the Loan or within five (5) Business Days' of the Expiration Date, as applicable. The Expiration Date may be extended by Lender in Lender's sole discretion (on written notice from Lender to Borrower), it being understood that Lender shall have no obligation to extend the Expiration Date. For purposes of clarity, the Commitment Fee shall be payable solely in the event that Borrower does not proceed with the Loan following execution of the Term Sheet and/or Borrower has not satisfied all of the Conditions Precedent on or before the Expiration Date.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers as of the Effective Date.

"BORROWER"

Hallows Movie Inc.

By: **Alex Ginzburg**
Its: Authorized Agent

"LENDER"

BondIt LLC

By: _____
Its: Authorized Agent

**EXHIBIT "A"**

**[Assignment of Proceeds]**

**EXHIBIT "B"**

**[Budget]**

**EXHIBIT "C"**

**[Copyright Mortgage]**

**EXHIBIT "D"**

**[Power of Attorney]**

**EXHIBIT "E"**

[Promissory Note]

EXHIBIT "F"

[Borrowing Certificate]

# EXHIBIT "3"

**GUARANTY**
(*"Crossface"*)

THIS GUARANTY (the **"Guaranty"**) dated as of the September 18th, 2017 is made by Hallows Movie Inc., a Canadian corporation, registered to do business in the state of Kentucky (**"Guarantor"**), in favor of BondIt LLC a California limited liability company (**"Beneficiary"**), with reference to the following facts:

    A.    Hallows Movie Inc., a Canadian corporation, registered to do business in the state of Kentucky (**"Borrower"**), is concurrently herewith entering into that certain agreement (such agreement, as the same may be modified, supplemented, amended, restated, or amended and restated from time to time, together with all replacement and substitute agreements therefor, is referred to herein as the **"Loan and Security Agreement"**), dated September 18th, 2017 with Beneficiary, relating to the audio-visual work currently entitled *"Crossface"* (**"Project"**), all on the terms and subject to the provisions more particularly set forth in the Loan and Security Agreement and certain other agreements, documents and instruments to which Borrower is party.

    B.    As a condition to Beneficiary's entering into the Loan and Security Agreement and being granted certain rights relating to the Project and entering into other transactions with Borrower (whether or not pursuant to the Loan and Security Agreement), Beneficiary is requiring that Guarantor enter into this Guaranty.

    C.    Guarantor is willing to execute and deliver this Guaranty in order to induce Beneficiary to enter into the Purchase Agreement and to engage in other transactions with Borrower.

NOW, THEREFORE, as a material inducement to Beneficiary to enter into and to perform their obligations under the Loan and Security Agreement and the Subject Agreements (as defined herein), and in consideration therefor, and for other good and valuable consideration, the receipt, adequacy and legal sufficiency of which Guarantor hereby acknowledges, Guarantor hereby unconditionally, absolutely and irrevocably covenants and agrees as follows:

    1.    **Definitions.** In addition to the words, terms and phrases (and variations thereof) defined elsewhere herein, the following words, terms and phrases (and variations thereof) shall have the following meanings for purposes of this Guaranty: **"Person"** shall mean any individual, corporation, limited liability company, association, partnership, trust, estate or other entity or organization; and **"Subject Agreements"** shall mean (a) the Loan and Security Agreement, (b) each and all of the agreements, documents and instruments executed and delivered by Borrower, or by any Person acting on behalf of or as agent for Borrower, pursuant to the terms of the Loan and Security Agreement or any of such agreements, documents and instruments, and (c) each and all of such other agreements, documents and instruments as may be executed and delivered by Borrower, or by any Person acting on behalf of or as agent for Borrower, in favor of Beneficiary, as each of the foregoing may be modified, supplemented, amended, restated, or amended and restated from time to time.

    2.    **Unconditional Guaranty.** Guarantor hereby unconditionally, absolutely and irrevocably Guarantees to Beneficiary and its successors and assigns the full, faithful and complete performance by Borrower of each and every covenant, agreement, duty, liability and/or obligation (known, unknown, fixed, contingent or otherwise) of Borrower under or contained in any Subject Agreement including, without limitation, the due and timely payment of amounts payable by Borrower under any Subject Agreement, all in strict accordance with the terms and provisions of such Subject Agreement (collectively the **"Borrower's Obligations"**), and all as if Guarantor were the primary obligor with respect to each and all of the Borrower's Obligations. Guarantor acknowledges and agrees that this Guaranty constitutes a Guaranty of payment and performance and not merely of collection. At the written request of Beneficiary, Guarantor will provide financial reports demonstrating the ability of the Guarantor to cover the Borrower's Obligations.

3.    **Certain Authorizations.**  In the event of a default (as defined in Subject Agreements) Guarantor authorizes Beneficiary, without notice or demand and without affecting Guarantor's liability hereunder, without prejudice to Borrower's rights and remedies under any Subject Agreement, from time to time to renew, compromise, extend, accelerate or otherwise change the time for payment of or otherwise change the terms of any of the Borrower's Obligations or any part thereof, take and hold security for the payment of any or all of the Borrower's Obligations, and exchange, enforce, waive and release any such security; apply such security and direct the order or manner of sale thereof as Guarantor in its discretion may determine; and release and/or substitute any one or more of any endorsers or guarantors for any or all of the Borrower's Obligations.

4.    **Subordination.**  Guarantor hereby subordinates any indebtedness of Borrower now or hereafter held by Guarantor to the Borrower's Obligations, and Guarantor shall collect, enforce and receive such indebtedness of Borrower to Guarantor, if Beneficiary so requests, as trustee for Beneficiary and shall pay over to Beneficiary all collections on and proceeds of such indebtedness of Borrower to Beneficiary, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty.

5.    **No Subrogation; etc.**  Guarantor hereby: (a) expressly and irrevocably waives, to the fullest extent possible, on behalf of itself and its successors and assigns (including any surety) and any other Person, any and all rights at law or in equity to subrogation, to reimbursement, to exoneration, to contribution, to indemnification, to set off or to any other rights that could accrue to a surety against a principal, to a guarantor against a maker or obligor, to an accommodation party against the party accommodated, to a holder or transferee against a maker, or to the holder of any claim against any Person, and which Guarantor may have or hereafter acquire against Borrower or any Person in connection with or as a result of Guarantor's execution, delivery and/or performance of this Guaranty, or any other documents to which Guarantor is a party or otherwise; (b) expressly and irrevocably waives any "claim" (as such term is defined in the United States Bankruptcy Code) of any kind against Borrower, and further agrees that it shall not have or assert any rights with respect to any such claim against any Person (including any surety), either directly or as an attempted set off to any action commenced against Guarantor by Beneficiary; and (c) acknowledges and agrees (i) that this waiver is intended to benefit Beneficiary and shall not limit or otherwise affect Guarantor's liability hereunder or the enforceability of this Guaranty, and (ii) that the rights of Beneficiary under this sentence shall survive payment and performance in full of the Borrower's Obligations.

6.    **Certain Waivers.**  Neither Beneficiary nor any other Person shall be required to take any action of any kind or nature against Borrower or any other Person, or resort to any security held by Beneficiary or any other Person, at any time before Beneficiary may proceed against Guarantor on this Guaranty.  Guarantor hereby expressly waives, relinquishes and releases, in any action brought on, arising out of or relating to this Guaranty or otherwise: (a) pursuant to California Civil Code Section 2856(a)(1), all of Guarantor's rights of subrogation, reimbursement, indemnification and contribution and any other rights and defenses that are or may become available to Guarantor by reason of California Civil Code Sections 2787 to 2855, inclusive, (b) pursuant to California Civil Code Section 2856(a)(2), all rights or defenses Guarantor may have in respect of its obligations as a guarantor by reason of any election of remedies by the Beneficiary, even if that election of remedies has destroyed Guarantor's rights of subrogation and reimbursement against Borrower, (c) any claim (i) that any obligation of Guarantor hereunder is larger in amount or more burdensome than that of Borrower, (ii) based on Borrower's liability ceasing for any reason, (iii) that this Guaranty may be revoked, (iv) based on any alteration of any original Borrower's Obligation without Guarantor's consent, (v) that acceptance by Beneficiary of anything in partial satisfaction of the Borrower's Obligations reduces the obligations of Guarantor hereunder, (vi) that performance or any offer of performance of any or all of the Borrower's Obligations exonerates Guarantor, (vii) that Guarantor may require Beneficiary to proceed against Borrower or pursue any other remedy, (viii) that Guarantor may compel Borrower to perform any Borrower's Obligation when due, (ix) that if Guarantor satisfies any of the Borrower's Obligations in whole or in part, Borrower is bound to reimburse Guarantor, (x) that Guarantor, upon satisfying all or any part of the Borrower's Obligations, is entitled to enforce any remedy which Beneficiary then has against Borrower, (xi) that Guarantor is entitled to the benefit of any security for the performance of any of the Borrower's Obligations, (xii) that as to any property of Guarantor that has been

hypothecated with property of Borrower, Guarantor is entitled to have Borrower's property first applied to discharge of the Borrower's Obligations, (xiii) that Beneficiary, or any other Person, must resort to property upon which Beneficiary, or such other Person, has a lien in any particular order, or must otherwise marshal any such liens, or (xiv) that Guarantor may require Beneficiary, or any other Person, to seek satisfaction from funds to which Guarantor has no claim or to marshal assets, (d) any claim, right or defense based upon any other action or circumstance which might otherwise constitute a legal or equitable discharge, defense or exoneration of a guarantor or surety, (e) notice of the acceptance of this Guaranty by any Person, (f) notice of the Borrower's Obligations now existing or which may hereafter exist or be created or incurred, (g) notice of any adverse change in the financial condition of Borrower or of any other fact that might increase Guarantor's risk hereunder, (h) presentment, notice of demand for payment or performance, notice of default or nonpayment or nonperformance, protest, notice of protest, and notice of dishonor, under the Subject Agreements (or any of them) or otherwise in respect of any of the Borrower's Obligations and (i) all other notices to which Guarantor might otherwise be entitled in connection with this Guaranty, the Subject Agreements (or any of them) or otherwise in respect of any Borrower's Obligation.

7. **Non-Impairment By Bankruptcy; etc.**  Guarantor's liability hereunder shall continue notwithstanding, and shall be unaltered, unaffected and unimpaired by, (a) the bankruptcy, insolvency, reorganization, merger, liquidation, dissolution, winding-up or cessation of existence of Borrower or any other Person, and/or (b) any fraudulent, illegal or improper act by Borrower, and/or (c) any payment made on the Borrower's Obligations which the recipient repays or is liable to repay to Borrower or any other Person pursuant to any court order or as otherwise required by law.

8. **Effect of Non-Enforcement; etc.**  Guarantor hereby covenants and agrees that the failure by Beneficiary, or any other Person, to file or enforce a claim against Guarantor or Borrower, or any other Person, shall not affect Guarantor's liability hereunder nor shall Guarantor be released from liability hereunder if recovery from Borrower, any other guarantor, payor, endorser or surety in respect of any of the Borrower's Obligations or any other Person becomes barred by any statute of limitations applicable to any cause of action upon any Borrower's Obligation or upon this Guaranty or any obligation or liability founded upon this Guaranty.  The obligations of Guarantor hereunder are independent of the obligations of Borrower under the Subject Agreements (and each of them) and of any security for or other Guaranty of the Borrower's Obligations.  In the event of a default in the performance of any of the Borrower's Obligations, Beneficiary may maintain an action against Guarantor upon this Guaranty, whether or not Borrower is joined therein or a separate action is brought against Borrower.

9. **Acceleration of Maturity.**  In the event that the maturity of any Borrower's Obligation is accelerated by bankruptcy or otherwise, such maturity shall also be accelerated for purposes of this Guaranty (and the Guaranty of Guarantor hereunder), and without demand or notice to Guarantor.

10. **Legal Fees.**  In the event that any action, suit, or other proceeding is brought by Beneficiary to enforce the obligations of Guarantor under this Guaranty, the prevailing party shall be entitled to recover all of such party's costs and expenses (including, without limitation, court costs and attorneys' fees) incurred in each and every such action, suit or other proceeding, including any and all appeals or petitions therefrom.  As used herein, attorneys' fees shall mean the full and actual cost of any legal services actually performed in connection with the matters involved, calculated on the basis of the fees charged by the attorneys performing such services and shall not be limited to "reasonable attorneys' fees" as defined in any statute or rule of court.

11. **Governing Law.**  THIS GUARANTY HAS BEEN MADE AND ENTERED INTO IN THE STATE OF CALIFORNIA, AND THE INTERNAL SUBSTANTIVE LAWS (AS DISTINGUISHED FROM THE CHOICE OF LAW RULES) OF SAID STATE SHALL GOVERN THE VALIDITY AND INTERPRETATION HEREOF, AND THE PERFORMANCE BY GUARANTOR OF ITS DUTIES AND OBLIGATIONS HEREUNDER.  WHENEVER POSSIBLE, EACH PROVISION OF THIS GUARANTY SHALL BE INTERPRETED IN SUCH MANNER AS TO BE EFFECTIVE AND VALID UNDER

APPLICABLE LAW.   IF ANY PROVISION OF THIS GUARANTY SHALL BE INVALID OR UNENFORCEABLE UNDER APPLICABLE LAW, SUCH PROVISION SHALL BE INEFFECTIVE ONLY TO THE EXTENT OF SUCH INVALIDITY OR UNENFORCEABILITY WITHOUT INVALIDATING OR RENDERING UNENFORCEABLE THE REMAINDER OF SUCH PROVISION OR THE REMAINING PROVISIONS OF THIS GUARANTY.

12.    **Certain Information.**  Guarantor has informed itself of, and hereby assumes all responsibility for being and keeping informed of, the financial condition and assets of Borrower and of all of the circumstances bearing upon the risk of nonpayment or nonperformance of the Borrower's Obligations thereby and the nature, scope and extent of the risks which Guarantor assumes and incurs hereunder.  Beneficiary shall have no duty to advise Guarantor of any information regarding such circumstances or risks.

13.    **Legal Proceedings.**  Guarantor hereby agrees that any legal action, suit or proceeding against Guarantor (or any successor-in-interest thereto) arising out of or relating to this Guaranty may (but need not) be initiated by Beneficiary in a state or federal court located in the County of Los Angeles, State of California.  By execution and delivery of this Guaranty, Guarantor hereby (a) waives any objection that it may now or hereafter have to the laying of venue of any such action, suit or proceeding in any such court, (b) waives any claim that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum, (c) submits to the personal jurisdiction of any such court in any such action, suit or proceeding, and (d) agrees to be bound by any judgment, order or decree rendered by any such court in any such action, suit or proceeding.

14.    **Successors and Assigns.**  This Guaranty shall bind Guarantor and any and all heirs, administrators, executors, successors and assigns (whether or not by operation of law) of Guarantor.  No delegation or assignment by Guarantor of this Guaranty or any of its obligations hereunder shall relieve Guarantor of any of its obligations hereunder, all of which shall survive any such delegation or assignment.  This Guaranty shall inure to the benefit of Beneficiary and Beneficiary's successors and assigns.  Beneficiary may without notice assign the benefit of this Guaranty in whole or in part.

15.    **Entire Agreement.**  This Guaranty embodies the entire understanding of Beneficiary and Guarantor with respect to Guarantor's obligation to Guaranty the full payment, performance and satisfaction of the Borrower's Obligations and there are no further or other agreements or understandings, written or oral, in effect between said parties relating to the Guaranty by Guarantor of the Borrower's Obligations unless otherwise referred to herein or in any agreement executed by each of Beneficiary and Guarantor.

IN WITNESS WHEREOF, this Guaranty has been executed and delivered by Guarantor as of the date first above set forth.

"GUARANTOR"
Hallows Movie Inc., a Canadian corporation, registered
to do business in the state of Kentucky

By: _____
Name:    Alex Ginzburg
Its:    Principal

ACCEPTED BY:
"BENEFICIARY"
BondIt LLC

By: _____
Name: _____
Its: _____

# EXHIBIT "4"

### GUARANTY
#### (*"Crossface"*)

THIS GUARANTY (the "**Guaranty**") dated as of the September 18th, 2017 is made by Let It Play, LLC a Connecticut limited liability company ("**Guarantor**"), in favor of BondIt LLC, a California limited liability company ("**Beneficiary**"), with reference to the following facts:

  A.    Hallows Movie Inc., a Canadian corporation, registered to do business in the state of Kentucky ("**Borrower**"), is concurrently herewith entering into that certain agreement (such agreement, as the same may be modified, supplemented, amended, restated, or amended and restated from time to time, together with all replacement and substitute agreements therefor, is referred to herein as the "**Loan and Security Agreement**"), dated September 18th, 2017 with Beneficiary, relating to the audio-visual work currently entitled *"Crossface"* ("**Project**"), all on the terms and subject to the provisions more particularly set forth in the Loan and Security Agreement and certain other agreements, documents and instruments to which Borrower is party.

  B.    As a condition to Beneficiary's entering into the Loan and Security Agreement and being granted certain rights relating to the Project and entering into other transactions with Borrower (whether or not pursuant to the Loan and Security Agreement), Beneficiary is requiring that Guarantor enter into this Guaranty.

  C.    Guarantor is willing to execute and deliver this Guaranty in order to induce Beneficiary to enter into the Purchase Agreement and to engage in other transactions with Borrower.

NOW, THEREFORE, as a material inducement to Beneficiary to enter into and to perform their obligations under the Loan and Security Agreement and the Subject Agreements (as defined herein), and in consideration therefor, and for other good and valuable consideration, the receipt, adequacy and legal sufficiency of which Guarantor hereby acknowledges, Guarantor hereby unconditionally, absolutely and irrevocably covenants and agrees as follows:

  1.    **Definitions.**  In addition to the words, terms and phrases (and variations thereof) defined elsewhere herein, the following words, terms and phrases (and variations thereof) shall have the following meanings for purposes of this Guaranty: "**Person**" shall mean any individual, corporation, limited liability company, association, partnership, trust, estate or other entity or organization; and "**Subject Agreements**" shall mean (a) the Loan and Security Agreement, (b) each and all of the agreements, documents and instruments executed and delivered by Borrower, or by any Person acting on behalf of or as agent for Borrower, pursuant to the terms of the Loan and Security Agreement or any of such agreements, documents and instruments, and (c) each and all of such other agreements, documents and instruments as may be executed and delivered by Borrower, or by any Person acting on behalf of or as agent for Borrower, in favor of Beneficiary, as each of the foregoing may be modified, supplemented, amended, restated, or amended and restated from time to time.

  2.    **Unconditional Guaranty.**  Guarantor hereby unconditionally, absolutely and irrevocably Guarantees to Beneficiary and its successors and assigns the full, faithful and complete performance by Borrower of each and every covenant, agreement, duty, liability and/or obligation (known, unknown, fixed, contingent or otherwise) of Borrower under or contained in any Subject Agreement including, without limitation, the due and timely payment of amounts payable by Borrower under any Subject Agreement, all in strict accordance with the terms and provisions of such Subject Agreement (collectively the "**Borrower's Obligations**"), and all as if Guarantor were the primary obligor with respect to each and all of the Borrower's Obligations.  Guarantor acknowledges and agrees that this Guaranty constitutes a Guaranty of payment and performance and not merely of collection. At the written request of Beneficiary, Guarantor will provide financial reports demonstrating the ability of the Guarantor to cover the Borrower's Obligations.

3.    **Certain Authorizations.** In the event of a default (as defined in Subject Agreements) Guarantor authorizes Beneficiary, without notice or demand and without affecting Guarantor's liability hereunder, without prejudice to Borrower's rights and remedies under any Subject Agreement, from time to time to renew, compromise, extend, accelerate or otherwise change the time for payment of or otherwise change the terms of any of the Borrower's Obligations or any part thereof, take and hold security for the payment of any or all of the Borrower's Obligations, and exchange, enforce, waive and release any such security; apply such security and direct the order or manner of sale thereof as Guarantor in its discretion may determine; and release and/or substitute any one or more of any endorsers or guarantors for any or all of the Borrower's Obligations.

4.    **Subordination.** Guarantor hereby subordinates any indebtedness of Borrower now or hereafter held by Guarantor to the Borrower's Obligations, and Guarantor shall collect, enforce and receive such indebtedness of Borrower to Guarantor, if Beneficiary so requests, as trustee for Beneficiary and shall pay over to Beneficiary all collections on and proceeds of such indebtedness of Borrower to Beneficiary, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty.

5.    **No Subrogation; etc.** Guarantor hereby: (a) expressly and irrevocably waives, to the fullest extent possible, on behalf of itself and its successors and assigns (including any surety) and any other Person, any and all rights at law or in equity to subrogation, to reimbursement, to exoneration, to contribution, to indemnification, to set off or to any other rights that could accrue to a surety against a principal, to a guarantor against a maker or obligor, to an accommodation party against the party accommodated, to a holder or transferee against a maker, or to the holder of any claim against any Person, and which Guarantor may have or hereafter acquire against Borrower or any Person in connection with or as a result of Guarantor's execution, delivery and/or performance of this Guaranty, or any other documents to which Guarantor is a party or otherwise; (b) expressly and irrevocably waives any "claim" (as such term is defined in the United States Bankruptcy Code) of any kind against Borrower, and further agrees that it shall not have or assert any rights with respect to any such claim against any Person (including any surety), either directly or as an attempted set off to any action commenced against Guarantor by Beneficiary; and (c) acknowledges and agrees (i) that this waiver is intended to benefit Beneficiary and shall not limit or otherwise affect Guarantor's liability hereunder or the enforceability of this Guaranty, and (ii) that the rights of Beneficiary under this sentence shall survive payment and performance in full of the Borrower's Obligations.

6.    **Certain Waivers.** Neither Beneficiary nor any other Person shall be required to take any action of any kind or nature against Borrower or any other Person, or resort to any security held by Beneficiary or any other Person, at any time before Beneficiary may proceed against Guarantor on this Guaranty. Guarantor hereby expressly waives, relinquishes and releases, in any action brought on, arising out of or relating to this Guaranty or otherwise: (a) pursuant to California Civil Code Section 2856(a)(1), all of Guarantor's rights of subrogation, reimbursement, indemnification and contribution and any other rights and defenses that are or may become available to Guarantor by reason of California Civil Code Sections 2787 to 2855, inclusive, (b) pursuant to California Civil Code Section 2856(a)(2), all rights or defenses Guarantor may have in respect of its obligations as a guarantor by reason of any election of remedies by the Beneficiary, even if that election of remedies has destroyed Guarantor's rights of subrogation and reimbursement against Borrower, (c) any claim (i) that any obligation of Guarantor hereunder is larger in amount or more burdensome than that of Borrower, (ii) based on Borrower's liability ceasing for any reason, (iii) that this Guaranty may be revoked, (iv) based on any alteration of any original Borrower's Obligation without Guarantor's consent, (v) that acceptance by Beneficiary of anything in partial satisfaction of the Borrower's Obligations reduces the obligations of Guarantor hereunder, (vi) that performance or any offer of performance of any or all of the Borrower's Obligations exonerates Guarantor, (vii) that Guarantor may require Beneficiary to proceed against Borrower or pursue any other remedy, (viii) that Guarantor may compel Borrower to perform any Borrower's Obligation when due, (ix) that if Guarantor satisfies any of the Borrower's Obligations in whole or in part, Borrower is bound to reimburse Guarantor, (x) that Guarantor, upon satisfying all or any part of the Borrower's Obligations, is entitled to enforce any remedy which Beneficiary then has against Borrower, (xi) that Guarantor is entitled to the benefit of any security for the performance of any of the Borrower's Obligations, (xii) that as to any property of Guarantor that has been

hypothecated with property of Borrower, Guarantor is entitled to have Borrower's property first applied to discharge of the Borrower's Obligations, (xiii) that Beneficiary, or any other Person, must resort to property upon which Beneficiary, or such other Person, has a lien in any particular order, or must otherwise marshal any such liens, or (xiv) that Guarantor may require Beneficiary, or any other Person, to seek satisfaction from funds to which Guarantor has no claim or to marshal assets, (d) any claim, right or defense based upon any other action or circumstance which might otherwise constitute a legal or equitable discharge, defense or exoneration of a guarantor or surety, (e) notice of the acceptance of this Guaranty by any Person, (f) notice of the Borrower's Obligations now existing or which may hereafter exist or be created or incurred, (g) notice of any adverse change in the financial condition of Borrower or of any other fact that might increase Guarantor's risk hereunder, (h) presentment, notice of demand for payment or performance, notice of default or nonpayment or nonperformance, protest, notice of protest, and notice of dishonor, under the Subject Agreements (or any of them) or otherwise in respect of any of the Borrower's Obligations and (i) all other notices to which Guarantor might otherwise be entitled in connection with this Guaranty, the Subject Agreements (or any of them) or otherwise in respect of any Borrower's Obligation.

7.   **Non-Impairment By Bankruptcy; etc.**   Guarantor's liability hereunder shall continue notwithstanding, and shall be unaltered, unaffected and unimpaired by, (a) the bankruptcy, insolvency, reorganization, merger, liquidation, dissolution, winding-up or cessation of existence of Borrower or any other Person, and/or (b) any fraudulent, illegal or improper act by Borrower, and/or (c) any payment made on the Borrower's Obligations which the recipient repays or is liable to repay to Borrower or any other Person pursuant to any court order or as otherwise required by law.

8.   **Effect of Non-Enforcement; etc.**   Guarantor hereby covenants and agrees that the failure by Beneficiary, or any other Person, to file or enforce a claim against Guarantor or Borrower, or any other Person, shall not affect Guarantor's liability hereunder nor shall Guarantor be released from liability hereunder if recovery from Borrower, any other guarantor, payor, endorser or surety in respect of any of the Borrower's Obligations or any other Person becomes barred by any statute of limitations applicable to any cause of action upon any Borrower's Obligation or upon this Guaranty or any obligation or liability founded upon this Guaranty. The obligations of Guarantor hereunder are independent of the obligations of Borrower under the Subject Agreements (and each of them) and of any security for or other Guaranty of the Borrower's Obligations. In the event of a default in the performance of any of the Borrower's Obligations, Beneficiary may maintain an action against Guarantor upon this Guaranty, whether or not Borrower is joined therein or a separate action is brought against Borrower.

9.   **Acceleration of Maturity.**   In the event that the maturity of any Borrower's Obligation is accelerated by bankruptcy or otherwise, such maturity shall also be accelerated for purposes of this Guaranty (and the Guaranty of Guarantor hereunder), and without demand or notice to Guarantor.

10.   **Legal Fees.**   In the event that any action, suit, or other proceeding is brought by Beneficiary to enforce the obligations of Guarantor under this Guaranty, the prevailing party shall be entitled to recover all of such party's costs and expenses (including, without limitation, court costs and attorneys' fees) incurred in each and every such action, suit or other proceeding, including any and all appeals or petitions therefrom. As used herein, attorneys' fees shall mean the full and actual cost of any legal services actually performed in connection with the matters involved, calculated on the basis of the fees charged by the attorneys performing such services and shall not be limited to "reasonable attorneys' fees" as defined in any statute or rule of court.

11.   **Governing Law.**   THIS GUARANTY HAS BEEN MADE AND ENTERED INTO IN THE STATE OF CALIFORNIA, AND THE INTERNAL SUBSTANTIVE LAWS (AS DISTINGUISHED FROM THE CHOICE OF LAW RULES) OF SAID STATE SHALL GOVERN THE VALIDITY AND INTERPRETATION HEREOF, AND THE PERFORMANCE BY GUARANTOR OF ITS DUTIES AND OBLIGATIONS HEREUNDER. WHENEVER POSSIBLE, EACH PROVISION OF THIS GUARANTY SHALL BE INTERPRETED IN SUCH MANNER AS TO BE EFFECTIVE AND VALID UNDER

APPLICABLE LAW.   IF ANY PROVISION OF THIS GUARANTY SHALL BE INVALID OR
UNENFORCEABLE UNDER APPLICABLE LAW, SUCH PROVISION SHALL BE INEFFECTIVE ONLY
TO THE EXTENT OF SUCH INVALIDITY OR UNENFORCEABILITY WITHOUT INVALIDATING OR
RENDERING UNENFORCEABLE THE REMAINDER OF SUCH PROVISION OR THE REMAINING
PROVISIONS OF THIS GUARANTY.

12.     **Certain Information.**  Guarantor has informed itself of, and hereby assumes all responsibility for
being and keeping informed of, the financial condition and assets of Borrower and of all of the circumstances
bearing upon the risk of nonpayment or nonperformance of the Borrower's Obligations thereby and the nature,
scope and extent of the risks which Guarantor assumes and incurs hereunder.  Beneficiary shall have no duty to
advise Guarantor of any information regarding such circumstances or risks.

13.     **Legal Proceedings.**  Guarantor hereby agrees that any legal action, suit or proceeding against
Guarantor (or any successor-in-interest thereto) arising out of or relating to this Guaranty may (but need not) be
initiated by Beneficiary in a state or federal court located in the County of Los Angeles, State of California.  By
execution and delivery of this Guaranty, Guarantor hereby (a) waives any objection that it may now or hereafter
have to the laying of venue of any such action, suit or proceeding in any such court, (b) waives any claim that any
such action, suit or proceeding brought in any such court has been brought in an inconvenient forum, (c) submits
to the personal jurisdiction of any such court in any such action, suit or proceeding, and (d) agrees to be bound
by any judgment, order or decree rendered by any such court in any such action, suit or proceeding.

14.     **Successors and Assigns.**  This Guaranty shall bind Guarantor and any and all heirs, administrators,
executors, successors and assigns (whether or not by operation of law) of Guarantor.  No delegation or assignment
by Guarantor of this Guaranty or any of its obligations hereunder shall relieve Guarantor of any of its obligations
hereunder, all of which shall survive any such delegation or assignment.  This Guaranty shall inure to the benefit
of Beneficiary and Beneficiary's successors and assigns.  Beneficiary may without notice assign the benefit of
this Guaranty in whole or in part.

15.     **Entire Agreement.**  This Guaranty embodies the entire understanding of Beneficiary and
Guarantor with respect to Guarantor's obligation to Guaranty the full payment, performance and satisfaction of
the Borrower's Obligations and there are no further or other agreements or understandings, written or oral, in
effect between said parties relating to the Guaranty by Guarantor of the Borrower's Obligations unless otherwise
referred to herein or in any agreement executed by each of Beneficiary and Guarantor.

IN WITNESS WHEREOF, this Guaranty has been executed and delivered by Guarantor as of the date first above
set forth.

> **"GUARANTOR"**
> Let It Play, LLC
> a Connecticut limited liability company
>
> By: _____
> Name:  Alex Ginzburg
> Its:      Principal

ACCEPTED BY:
"BENEFICIARY"
BondIt LLC

By: _____
Name: _____
Its: _____

# EXHIBIT "5"

**GUARANTY**
*("Crossface")*

THIS GUARANTY (the "**Guaranty**") dated as of the September 18th, 2017 is made by Alex Ginzburg, an individual who resides at 50 Maiden Lane Monroe, Connecticut 06468 ("**Guarantor**"), in favor of BondIt LLC, a California limited liability company ("**Beneficiary**"), with reference to the following facts:

      A.    Hallows Movie Inc., a Canadian corporation, registered to do business in the state of Kentucky ("**Borrower**"), is concurrently herewith entering into that certain agreement (such agreement, as the same may be modified, supplemented, amended, restated, or amended and restated from time to time, together with all replacement and substitute agreements therefor, is referred to herein as the "**Loan and Security Agreement**"), dated September 18th, 2017 with Beneficiary, relating to the audio-visual work currently entitled "*Crossface*" ("**Project**"), all on the terms and subject to the provisions more particularly set forth in the Loan and Security Agreement and certain other agreements, documents and instruments to which Borrower is party.

      B.    As a condition to Beneficiary's entering into the Loan and Security Agreement and being granted certain rights relating to the Project and entering into other transactions with Borrower (whether or not pursuant to the Loan and Security Agreement), Beneficiary is requiring that Guarantor enter into this Guaranty.

      C.    Guarantor is willing to execute and deliver this Guaranty in order to induce Beneficiary to enter into the Purchase Agreement and to engage in other transactions with Borrower.

NOW, THEREFORE, as a material inducement to Beneficiary to enter into and to perform their obligations under the Loan and Security Agreement and the Subject Agreements (as defined herein), and in consideration therefor, and for other good and valuable consideration, the receipt, adequacy and legal sufficiency of which Guarantor hereby acknowledges, Guarantor hereby unconditionally, absolutely and irrevocably covenants and agrees as follows:

      1.    **Definitions.**  In addition to the words, terms and phrases (and variations thereof) defined elsewhere herein, the following words, terms and phrases (and variations thereof) shall have the following meanings for purposes of this Guaranty: "**Person**" shall mean any individual, corporation, limited liability company, association, partnership, trust, estate or other entity or organization; and "**Subject Agreements**" shall mean (a) the Loan and Security Agreement, (b) each and all of the agreements, documents and instruments executed and delivered by Borrower, or by any Person acting on behalf of or as agent for Borrower, pursuant to the terms of the Loan and Security Agreement or any of such agreements, documents and instruments, and (c) each and all of such other agreements, documents and instruments as may be executed and delivered by Borrower, or by any Person acting on behalf of or as agent for Borrower, in favor of Beneficiary, as each of the foregoing may be modified, supplemented, amended, restated, or amended and restated from time to time.

      2.    **Unconditional Guaranty.**  Guarantor hereby unconditionally, absolutely and irrevocably Guarantees to Beneficiary and its successors and assigns the full, faithful and complete performance by Borrower of each and every covenant, agreement, duty, liability and/or obligation (known, unknown, fixed, contingent or otherwise) of Borrower under or contained in any Subject Agreement including, without limitation, the due and timely payment of amounts payable by Borrower under any Subject Agreement, all in strict accordance with the terms and provisions of such Subject Agreement (collectively the "**Borrower's Obligations**"), and all as if Guarantor were the primary obligor with respect to each and all of the Borrower's Obligations.  Guarantor acknowledges and agrees that this Guaranty constitutes a Guaranty of payment and performance and not merely of collection. At the written request of Beneficiary, Guarantor will provide financial reports demonstrating the ability of the Guarantor to cover the Borrower's Obligations.

3. **Certain Authorizations.** In the event of a default (as defined in Subject Agreements) Guarantor authorizes Beneficiary, without notice or demand and without affecting Guarantor's liability hereunder, without prejudice to Borrower's rights and remedies under any Subject Agreement, from time to time to renew, compromise, extend, accelerate or otherwise change the time for payment of or otherwise change the terms of any of the Borrower's Obligations or any part thereof, take and hold security for the payment of any or all of the Borrower's Obligations, and exchange, enforce, waive and release any such security; apply such security and direct the order or manner of sale thereof as Guarantor in its discretion may determine; and release and/or substitute any one or more of any endorsers or guarantors for any or all of the Borrower's Obligations.

4. **Subordination.** Guarantor hereby subordinates any indebtedness of Borrower now or hereafter held by Guarantor to the Borrower's Obligations, and Guarantor shall collect, enforce and receive such indebtedness of Borrower to Guarantor, if Beneficiary so requests, as trustee for Beneficiary and shall pay over to Beneficiary all collections on and proceeds of such indebtedness of Borrower to Beneficiary, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty.

5. **No Subrogation; etc.** Guarantor hereby: (a) expressly and irrevocably waives, to the fullest extent possible, on behalf of itself and its successors and assigns (including any surety) and any other Person, any and all rights at law or in equity to subrogation, to reimbursement, to exoneration, to contribution, to indemnification, to set off or to any other rights that could accrue to a surety against a principal, to a guarantor against a maker or obligor, to an accommodation party against the party accommodated, to a holder or transferee against a maker, or to the holder of any claim against any Person, and which Guarantor may have or hereafter acquire against Borrower or any Person in connection with or as a result of Guarantor's execution, delivery and/or performance of this Guaranty, or any other documents to which Guarantor is a party or otherwise; (b) expressly and irrevocably waives any "claim" (as such term is defined in the United States Bankruptcy Code) of any kind against Borrower, and further agrees that it shall not have or assert any rights with respect to any such claim against any Person (including any surety), either directly or as an attempted set off to any action commenced against Guarantor by Beneficiary; and (c) acknowledges and agrees (i) that this waiver is intended to benefit Beneficiary and shall not limit or otherwise affect Guarantor's liability hereunder or the enforceability of this Guaranty, and (ii) that the rights of Beneficiary under this sentence shall survive payment and performance in full of the Borrower's Obligations.

6. **Certain Waivers.** Neither Beneficiary nor any other Person shall be required to take any action of any kind or nature against Borrower or any other Person, or resort to any security held by Beneficiary or any other Person, at any time before Beneficiary may proceed against Guarantor on this Guaranty. Guarantor hereby expressly waives, relinquishes and releases, in any action brought on, arising out of or relating to this Guaranty or otherwise: (a) pursuant to California Civil Code Section 2856(a)(1), all of Guarantor's rights of subrogation, reimbursement, indemnification and contribution and any other rights and defenses that are or may become available to Guarantor by reason of California Civil Code Sections 2787 to 2855, inclusive, (b) pursuant to California Civil Code Section 2856(a)(2), all rights or defenses Guarantor may have in respect of its obligations as a guarantor by reason of any election of remedies by the Beneficiary, even if that election of remedies has destroyed Guarantor's rights of subrogation and reimbursement against Borrower, (c) any claim (i) that any obligation of Guarantor hereunder is larger in amount or more burdensome than that of Borrower, (ii) based on Borrower's liability ceasing for any reason, (iii) that this Guaranty may be revoked, (iv) based on any alteration of any original Borrower's Obligation without Guarantor's consent, (v) that acceptance by Beneficiary of anything in partial satisfaction of the Borrower's Obligations reduces the obligations of Guarantor hereunder, (vi) that performance or any offer of performance of any or all of the Borrower's Obligations exonerates Guarantor, (vii) that Guarantor may require Beneficiary to proceed against Borrower or pursue any other remedy, (viii) that Guarantor may compel Borrower to perform any Borrower's Obligation when due, (ix) that if Guarantor satisfies any of the Borrower's Obligations in whole or in part, Borrower is bound to reimburse Guarantor, (x) that Guarantor, upon satisfying all or any part of the Borrower's Obligations, is entitled to enforce any remedy which Beneficiary then has against Borrower, (xi) that Guarantor is entitled to the benefit of any security for the performance of any of the Borrower's Obligations, (xii) that as to any property of Guarantor that has been

hypothecated with property of Borrower, Guarantor is entitled to have Borrower's property first applied to discharge of the Borrower's Obligations, (xiii) that Beneficiary, or any other Person, must resort to property upon which Beneficiary, or such other Person, has a lien in any particular order, or must otherwise marshal any such liens, or (xiv) that Guarantor may require Beneficiary, or any other Person, to seek satisfaction from funds to which Guarantor has no claim or to marshal assets, (d) any claim, right or defense based upon any other action or circumstance which might otherwise constitute a legal or equitable discharge, defense or exoneration of a guarantor or surety, (e) notice of the acceptance of this Guaranty by any Person, (f) notice of the Borrower's Obligations now existing or which may hereafter exist or be created or incurred, (g) notice of any adverse change in the financial condition of Borrower or of any other fact that might increase Guarantor's risk hereunder, (h) presentment, notice of demand for payment or performance, notice of default or nonpayment or nonperformance, protest, notice of protest, and notice of dishonor, under the Subject Agreements (or any of them) or otherwise in respect of any of the Borrower's Obligations and (i) all other notices to which Guarantor might otherwise be entitled in connection with this Guaranty, the Subject Agreements (or any of them) or otherwise in respect of any Borrower's Obligation.

7.   **Non-Impairment By Bankruptcy; etc.**   Guarantor's liability hereunder shall continue notwithstanding, and shall be unaltered, unaffected and unimpaired by, (a) the bankruptcy, insolvency, reorganization, merger, liquidation, dissolution, winding-up or cessation of existence of Borrower or any other Person, and/or (b) any fraudulent, illegal or improper act by Borrower, and/or (c) any payment made on the Borrower's Obligations which the recipient repays or is liable to repay to Borrower or any other Person pursuant to any court order or as otherwise required by law.

8.   **Effect of Non-Enforcement; etc.**   Guarantor hereby covenants and agrees that the failure by Beneficiary, or any other Person, to file or enforce a claim against Guarantor or Borrower, or any other Person, shall not affect Guarantor's liability hereunder nor shall Guarantor be released from liability hereunder if recovery from Borrower, any other guarantor, payor, endorser or surety in respect of any of the Borrower's Obligations or any other Person becomes barred by any statute of limitations applicable to any cause of action upon any Borrower's Obligation or upon this Guaranty or any obligation or liability founded upon this Guaranty. The obligations of Guarantor hereunder are independent of the obligations of Borrower under the Subject Agreements (and each of them) and of any security for or other Guaranty of the Borrower's Obligations. In the event of a default in the performance of any of the Borrower's Obligations, Beneficiary may maintain an action against Guarantor upon this Guaranty, whether or not Borrower is joined therein or a separate action is brought against Borrower.

9.   **Acceleration of Maturity.**   In the event that the maturity of any Borrower's Obligation is accelerated by bankruptcy or otherwise, such maturity shall also be accelerated for purposes of this Guaranty (and the Guaranty of Guarantor hereunder), and without demand or notice to Guarantor.

10.   **Legal Fees.**   In the event that any action, suit, or other proceeding is brought by Beneficiary to enforce the obligations of Guarantor under this Guaranty, the prevailing party shall be entitled to recover all of such party's costs and expenses (including, without limitation, court costs and attorneys' fees) incurred in each and every such action, suit or other proceeding, including any and all appeals or petitions therefrom. As used herein, attorneys' fees shall mean the full and actual cost of any legal services actually performed in connection with the matters involved, calculated on the basis of the fees charged by the attorneys performing such services and shall not be limited to "reasonable attorneys' fees" as defined in any statute or rule of court.

11.   **Governing Law.**   THIS GUARANTY HAS BEEN MADE AND ENTERED INTO IN THE STATE OF CALIFORNIA, AND THE INTERNAL SUBSTANTIVE LAWS (AS DISTINGUISHED FROM THE CHOICE OF LAW RULES) OF SAID STATE SHALL GOVERN THE VALIDITY AND INTERPRETATION HEREOF, AND THE PERFORMANCE BY GUARANTOR OF ITS DUTIES AND OBLIGATIONS HEREUNDER. WHENEVER POSSIBLE, EACH PROVISION OF THIS GUARANTY SHALL BE INTERPRETED IN SUCH MANNER AS TO BE EFFECTIVE AND VALID UNDER

APPLICABLE LAW.  IF ANY PROVISION OF THIS GUARANTY SHALL BE INVALID OR UNENFORCEABLE UNDER APPLICABLE LAW, SUCH PROVISION SHALL BE INEFFECTIVE ONLY TO THE EXTENT OF SUCH INVALIDITY OR UNENFORCEABILITY WITHOUT INVALIDATING OR RENDERING UNENFORCEABLE THE REMAINDER OF SUCH PROVISION OR THE REMAINING PROVISIONS OF THIS GUARANTY.

12.     **Certain Information.**  Guarantor has informed itself of, and hereby assumes all responsibility for being and keeping informed of, the financial condition and assets of Borrower and of all of the circumstances bearing upon the risk of nonpayment or nonperformance of the Borrower's Obligations thereby and the nature, scope and extent of the risks which Guarantor assumes and incurs hereunder.  Beneficiary shall have no duty to advise Guarantor of any information regarding such circumstances or risks.

13.     **Legal Proceedings.**  Guarantor hereby agrees that any legal action, suit or proceeding against Guarantor (or any successor-in-interest thereto) arising out of or relating to this Guaranty may (but need not) be initiated by Beneficiary in a state or federal court located in the County of Los Angeles, State of California.  By execution and delivery of this Guaranty, Guarantor hereby (a) waives any objection that it may now or hereafter have to the laying of venue of any such action, suit or proceeding in any such court, (b) waives any claim that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum, (c) submits to the personal jurisdiction of any such court in any such action, suit or proceeding, and (d) agrees to be bound by any judgment, order or decree rendered by any such court in any such action, suit or proceeding.

14.     **Successors and Assigns.**  This Guaranty shall bind Guarantor and any and all heirs, administrators, executors, successors and assigns (whether or not by operation of law) of Guarantor.  No delegation or assignment by Guarantor of this Guaranty or any of its obligations hereunder shall relieve Guarantor of any of its obligations hereunder, all of which shall survive any such delegation or assignment.  This Guaranty shall inure to the benefit of Beneficiary and Beneficiary's successors and assigns.  Beneficiary may without notice assign the benefit of this Guaranty in whole or in part.

15.     **Entire Agreement.**  This Guaranty embodies the entire understanding of Beneficiary and Guarantor with respect to Guarantor's obligation to Guaranty the full payment, performance and satisfaction of the Borrower's Obligations and there are no further or other agreements or understandings, written or oral, in effect between said parties relating to the Guaranty by Guarantor of the Borrower's Obligations unless otherwise referred to herein or in any agreement executed by each of Beneficiary and Guarantor.

IN WITNESS WHEREOF, this Guaranty has been executed and delivered by Guarantor as of the date first above set forth.

"**GUARANTOR**"
Alex Ginzburg

By: _____
Name:   Alex Ginzburg
An individual

ACCEPTED BY:
"**BENEFICIARY**"
BondIt LLC

By: _____
Name: _____
Its: _____

# EXHIBIT "6"

**GUARANTY**
(*"Crossface"*)

THIS GUARANTY (the "**Guaranty**") dated as of the September 18th, 2017 is made by Dong K Lee, an individual who resides at 50 Forest Street #909 Stamford, Connecticut 06901 ("**Guarantor**"), in favor of BondIt LLC, a California limited liability company ("**Beneficiary**"), with reference to the following facts:

  A. Hallows Movie Inc., a Canadian corporation, registered to do business in the state of Kentucky ("**Borrower**"), is concurrently herewith entering into that certain agreement (such agreement, as the same may be modified, supplemented, amended, restated, or amended and restated from time to time, together with all replacement and substitute agreements therefor, is referred to herein as the "**Loan and Security Agreement**"), dated September 18th, 2017 with Beneficiary, relating to the audio-visual work currently entitled *"Crossface"* ("**Project**"), all on the terms and subject to the provisions more particularly set forth in the Loan and Security Agreement and certain other agreements, documents and instruments to which Borrower is party.

  B. As a condition to Beneficiary's entering into the Loan and Security Agreement and being granted certain rights relating to the Project and entering into other transactions with Borrower (whether or not pursuant to the Loan and Security Agreement), Beneficiary is requiring that Guarantor enter into this Guaranty.

  C. Guarantor is willing to execute and deliver this Guaranty in order to induce Beneficiary to enter into the Purchase Agreement and to engage in other transactions with Borrower.

NOW, THEREFORE, as a material inducement to Beneficiary to enter into and to perform their obligations under the Loan and Security Agreement and the Subject Agreements (as defined herein), and in consideration thereof, and for other good and valuable consideration, the receipt, adequacy and legal sufficiency of which Guarantor hereby acknowledges, Guarantor hereby unconditionally, absolutely and irrevocably covenants and agrees as follows:

  1. **Definitions.** In addition to the words, terms and phrases (and variations thereof) defined elsewhere herein, the following words, terms and phrases (and variations thereof) shall have the following meanings for purposes of this Guaranty: "**Person**" shall mean any individual, corporation, limited liability company, association, partnership, trust, estate or other entity or organization; and "**Subject Agreements**" shall mean (a) the Loan and Security Agreement, (b) each and all of the agreements, documents and instruments executed and delivered by Borrower, or by any Person acting on behalf of or as agent for Borrower, pursuant to the terms of the Loan and Security Agreement or any of such agreements, documents and instruments, and (c) each and all of such other agreements, documents and instruments as may be executed and delivered by Borrower, or by any Person acting on behalf of or as agent for Borrower, in favor of Beneficiary, as each of the foregoing may be modified, supplemented, amended, restated, or amended and restated from time to time.

  2. **Unconditional Guaranty.** Guarantor hereby unconditionally, absolutely and irrevocably Guarantees to Beneficiary and its successors and assigns the full, faithful and complete performance by Borrower of each and every covenant, agreement, duty, liability and/or obligation (known, unknown, fixed, contingent or otherwise) of Borrower under or contained in any Subject Agreement including, without limitation, the due and timely payment of amounts payable by Borrower under any Subject Agreement, all in strict accordance with the terms and provisions of such Subject Agreement (collectively the "**Borrower's Obligations**"), and all as if Guarantor were the primary obligor with respect to each and all of the Borrower's Obligations. Guarantor acknowledges and agrees that this Guaranty constitutes a Guaranty of payment and performance and not merely of collection. At the written request of Beneficiary, Guarantor will provide financial reports demonstrating the ability of the Guarantor to cover the Borrower's Obligations.

3.   **Certain Authorizations.** In the event of a default (as defined in Subject Agreements) Guarantor authorizes Beneficiary, without notice or demand and without affecting Guarantor's liability hereunder, without prejudice to Borrower's rights and remedies under any Subject Agreement, from time to time to renew, compromise, extend, accelerate or otherwise change the time for payment of or otherwise change the terms of any of the Borrower's Obligations or any part thereof, take and hold security for the payment of any or all of the Borrower's Obligations, and exchange, enforce, waive and release any such security; apply such security and direct the order or manner of sale thereof as Guarantor in its discretion may determine; and release and/or substitute any one or more of any endorsers or guarantors for any or all of the Borrower's Obligations.

4.   **Subordination.** Guarantor hereby subordinates any indebtedness of Borrower now or hereafter held by Guarantor to the Borrower's Obligations, and Guarantor shall collect, enforce and receive such indebtedness of Borrower to Guarantor, if Beneficiary so requests, as trustee for Beneficiary and shall pay over to Beneficiary all collections on and proceeds of such indebtedness of Borrower to Beneficiary, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty.

5.   **No Subrogation; etc.** Guarantor hereby: (a) expressly and irrevocably waives, to the fullest extent possible, on behalf of itself and its successors and assigns (including any surety) and any other Person, any and all rights at law or in equity to subrogation, to reimbursement, to exoneration, to contribution, to indemnification, to set off or to any other rights that could accrue to a surety against a principal, to a guarantor against a maker or obligor, to an accommodation party against the party accommodated, to a holder or transferee against a maker, or to the holder of any claim against any Person, and which Guarantor may have or hereafter acquire against Borrower or any Person in connection with or as a result of Guarantor's execution, delivery and/or performance of this Guaranty, or any other documents to which Guarantor is a party or otherwise; (b) expressly and irrevocably waives any "claim" (as such term is defined in the United States Bankruptcy Code) of any kind against Borrower, and further agrees that it shall not have or assert any rights with respect to any such claim against any Person (including any surety), either directly or as an attempted set off to any action commenced against Guarantor by Beneficiary; and (c) acknowledges and agrees (i) that this waiver is intended to benefit Beneficiary and shall not limit or otherwise affect Guarantor's liability hereunder or the enforceability of this Guaranty, and (ii) that the rights of Beneficiary under this sentence shall survive payment and performance in full of the Borrower's Obligations.

6.   **Certain Waivers.** Neither Beneficiary nor any other Person shall be required to take any action of any kind or nature against Borrower or any other Person, or resort to any security held by Beneficiary or any other Person, at any time before Beneficiary may proceed against Guarantor on this Guaranty. Guarantor hereby expressly waives, relinquishes and releases, in any action brought on, arising out of or relating to this Guaranty or otherwise: (a) pursuant to California Civil Code Section 2856(a)(1), all of Guarantor's rights of subrogation, reimbursement, indemnification and contribution and any other rights and defenses that are or may become available to Guarantor by reason of California Civil Code Sections 2787 to 2855, inclusive, (b) pursuant to California Civil Code Section 2856(a)(2), all rights or defenses Guarantor may have in respect of its obligations as a guarantor by reason of any election of remedies by the Beneficiary, even if that election of remedies has destroyed Guarantor's rights of subrogation and reimbursement against Borrower, (c) any claim (i) that any obligation of Guarantor hereunder is larger in amount or more burdensome than that of Borrower, (ii) based on Borrower's liability ceasing for any reason, (iii) that this Guaranty may be revoked, (iv) based on any alteration of any original Borrower's Obligation without Guarantor's consent, (v) that acceptance by Beneficiary of anything in partial satisfaction of the Borrower's Obligations reduces the obligations of Guarantor hereunder, (vi) that performance or any offer of performance of any or all of the Borrower's Obligations exonerates Guarantor, (vii) that Guarantor may require Beneficiary to proceed against Borrower or pursue any other remedy, (viii) that Guarantor may compel Borrower to perform any Borrower's Obligation when due, (ix) that if Guarantor satisfies any of the Borrower's Obligations in whole or in part, Borrower is bound to reimburse Guarantor, (x) that Guarantor, upon satisfying all or any part of the Borrower's Obligations, is entitled to enforce any remedy which Beneficiary then has against Borrower, (xi) that Guarantor is entitled to the benefit of any security for the performance of any of the Borrower's Obligations, (xii) that as to any property of Guarantor that has been

hypothecated with property of Borrower, Guarantor is entitled to have Borrower's property first applied to discharge of the Borrower's Obligations, (xiii) that Beneficiary, or any other Person, must resort to property upon which Beneficiary, or such other Person, has a lien in any particular order, or must otherwise marshal any such liens, or (xiv) that Guarantor may require Beneficiary, or any other Person, to seek satisfaction from funds to which Guarantor has no claim or to marshal assets, (d) any claim, right or defense based upon any other action or circumstance which might otherwise constitute a legal or equitable discharge, defense or exoneration of a guarantor or surety, (e) notice of the acceptance of this Guaranty by any Person, (f) notice of the Borrower's Obligations now existing or which may hereafter exist or be created or incurred, (g) notice of any adverse change in the financial condition of Borrower or of any other fact that might increase Guarantor's risk hereunder, (h) presentment, notice of demand for payment or performance, notice of default or nonpayment or nonperformance, protest, notice of protest, and notice of dishonor, under the Subject Agreements (or any of them) or otherwise in respect of any of the Borrower's Obligations and (i) all other notices to which Guarantor might otherwise be entitled in connection with this Guaranty, the Subject Agreements (or any of them) or otherwise in respect of any Borrower's Obligation.

7. **Non-Impairment By Bankruptcy; etc.** Guarantor's liability hereunder shall continue notwithstanding, and shall be unaltered, unaffected and unimpaired by, (a) the bankruptcy, insolvency, reorganization, merger, liquidation, dissolution, winding-up or cessation of existence of Borrower or any other Person, and/or (b) any fraudulent, illegal or improper act by Borrower, and/or (c) any payment made on the Borrower's Obligations which the recipient repays or is liable to repay to Borrower or any other Person pursuant to any court order or as otherwise required by law.

8. **Effect of Non-Enforcement; etc.** Guarantor hereby covenants and agrees that the failure by Beneficiary, or any other Person, to file or enforce a claim against Guarantor or Borrower, or any other Person, shall not affect Guarantor's liability hereunder nor shall Guarantor be released from liability hereunder if recovery from Borrower, any other guarantor, payor, endorser or surety in respect of any of the Borrower's Obligations or any other Person becomes barred by any statute of limitations applicable to any cause of action upon any Borrower's Obligation or upon this Guaranty or any obligation or liability founded upon this Guaranty. The obligations of Guarantor hereunder are independent of the obligations of Borrower under the Subject Agreements (and each of them) and of any security for or other Guaranty of the Borrower's Obligations. In the event of a default in the performance of any of the Borrower's Obligations, Beneficiary may maintain an action against Guarantor upon this Guaranty, whether or not Borrower is joined therein or a separate action is brought against Borrower.

9. **Acceleration of Maturity.** In the event that the maturity of any Borrower's Obligation is accelerated by bankruptcy or otherwise, such maturity shall also be accelerated for purposes of this Guaranty (and the Guaranty of Guarantor hereunder), and without demand or notice to Guarantor.

10. **Legal Fees.** In the event that any action, suit, or other proceeding is brought by Beneficiary to enforce the obligations of Guarantor under this Guaranty, the prevailing party shall be entitled to recover all of such party's costs and expenses (including, without limitation, court costs and attorneys' fees) incurred in each and every such action, suit or other proceeding, including any and all appeals or petitions therefrom. As used herein, attorneys' fees shall mean the full and actual cost of any legal services actually performed in connection with the matters involved, calculated on the basis of the fees charged by the attorneys performing such services and shall not be limited to "reasonable attorneys' fees" as defined in any statute or rule of court.

11. **Governing Law.** THIS GUARANTY HAS BEEN MADE AND ENTERED INTO IN THE STATE OF CALIFORNIA, AND THE INTERNAL SUBSTANTIVE LAWS (AS DISTINGUISHED FROM THE CHOICE OF LAW RULES) OF SAID STATE SHALL GOVERN THE VALIDITY AND INTERPRETATION HEREOF, AND THE PERFORMANCE BY GUARANTOR OF ITS DUTIES AND OBLIGATIONS HEREUNDER. WHENEVER POSSIBLE, EACH PROVISION OF THIS GUARANTY SHALL BE INTERPRETED IN SUCH MANNER AS TO BE EFFECTIVE AND VALID UNDER

APPLICABLE LAW.   IF ANY PROVISION OF THIS GUARANTY SHALL BE INVALID OR UNENFORCEABLE UNDER APPLICABLE LAW, SUCH PROVISION SHALL BE INEFFECTIVE ONLY TO THE EXTENT OF SUCH INVALIDITY OR UNENFORCEABILITY WITHOUT INVALIDATING OR RENDERING UNENFORCEABLE THE REMAINDER OF SUCH PROVISION OR THE REMAINING PROVISIONS OF THIS GUARANTY.

12.   **Certain Information.**  Guarantor has informed itself of, and hereby assumes all responsibility for being and keeping informed of, the financial condition and assets of Borrower and of all of the circumstances bearing upon the risk of nonpayment or nonperformance of the Borrower's Obligations thereby and the nature, scope and extent of the risks which Guarantor assumes and incurs hereunder.  Beneficiary shall have no duty to advise Guarantor of any information regarding such circumstances or risks.

13.   **Legal Proceedings.**  Guarantor hereby agrees that any legal action, suit or proceeding against Guarantor (or any successor-in-interest thereto) arising out of or relating to this Guaranty may (but need not) be initiated by Beneficiary in a state or federal court located in the County of Los Angeles, State of California.  By execution and delivery of this Guaranty, Guarantor hereby (a) waives any objection that it may now or hereafter have to the laying of venue of any such action, suit or proceeding in any such court, (b) waives any claim that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum, (c) submits to the personal jurisdiction of any such court in any such action, suit or proceeding, and (d) agrees to be bound by any judgment, order or decree rendered by any such court in any such action, suit or proceeding.

14.   **Successors and Assigns.**  This Guaranty shall bind Guarantor and any and all heirs, administrators, executors, successors and assigns (whether or not by operation of law) of Guarantor.  No delegation or assignment by Guarantor of this Guaranty or any of its obligations hereunder shall relieve Guarantor of any of its obligations hereunder, all of which shall survive any such delegation or assignment.  This Guaranty shall inure to the benefit of Beneficiary and Beneficiary's successors and assigns.  Beneficiary may without notice assign the benefit of this Guaranty in whole or in part.

15.   **Entire Agreement.**  This Guaranty embodies the entire understanding of Beneficiary and Guarantor with respect to Guarantor's obligation to Guaranty the full payment, performance and satisfaction of the Borrower's Obligations and there are no further or other agreements or understandings, written or oral, in effect between said parties relating to the Guaranty by Guarantor of the Borrower's Obligations unless otherwise referred to herein or in any agreement executed by each of Beneficiary and Guarantor.

IN WITNESS WHEREOF, this Guaranty has been executed and delivered by Guarantor as of the date first above set forth.

**"GUARANTOR"**
Dong K Lee

By: _____
Name:  Dongkwan Lee
An individual

ACCEPTED BY:
"BENEFICIARY"
BondIt LLC

By: _____
Name: _____
Its: _____

# EXHIBIT "7"

**GUARANTY**
**("*Crossface*")**

THIS GUARANTY (the "**Guaranty**") dated as of the September 18th, 2017 is made by Hyun Kim ("**Guarantor**"), in favor of Bondlt LLC, a California limited liability company ("**Beneficiary**"), with reference to the following facts:

    A.    Hallows Movie Inc., a Canadian corporation, registered to do business in the state of Kentucky ("**Borrower**"), is concurrently herewith entering into that certain agreement (such agreement, as the same may be modified, supplemented, amended, restated, or amended and restated from time to time, together with all replacement and substitute agreements therefor, is referred to herein as the "**Loan and Security Agreement**"), dated September 18th, 2017 with Beneficiary, relating to the audio-visual work currently entitled "*Crossface*" ("**Project**"), all on the terms and subject to the provisions more particularly set forth in the Loan and Security Agreement and certain other agreements, documents and instruments to which Borrower is party.

    B.    As a condition to Beneficiary's entering into the Loan and Security Agreement and being granted certain rights relating to the Project and entering into other transactions with Borrower (whether or not pursuant to the Loan and Security Agreement), Beneficiary is requiring that Guarantor enter into this Guaranty.

    C.    Guarantor is willing to execute and deliver this Guaranty in order to induce Beneficiary to enter into the Purchase Agreement and to engage in other transactions with Borrower.

NOW, THEREFORE, as a material inducement to Beneficiary to enter into and to perform their obligations under the Loan and Security Agreement and the Subject Agreements (as defined herein), and in consideration therefor, and for other good and valuable consideration, the receipt, adequacy and legal sufficiency of which Guarantor hereby acknowledges, Guarantor hereby unconditionally, absolutely and irrevocably covenants and agrees as follows:

    1.    **Definitions.** In addition to the words, terms and phrases (and variations thereof) defined elsewhere herein, the following words, terms and phrases (and variations thereof) shall have the following meanings for purposes of this Guaranty: "**Person**" shall mean any individual, corporation, limited liability company, association, partnership, trust, estate or other entity or organization; and "**Subject Agreements**" shall mean (a) the Loan and Security Agreement, (b) each and all of the agreements, documents and instruments executed and delivered by Borrower, or by any Person acting on behalf of or as agent for Borrower, pursuant to the terms of the Loan and Security Agreement or any of such agreements, documents and instruments, and (c) each and all of such other agreements, documents and instruments as may be executed and delivered by Borrower, or by any Person acting on behalf of or as agent for Borrower, in favor of Beneficiary, as each of the foregoing may be modified, supplemented, amended, restated, or amended and restated from time to time.

    2.    **Unconditional Guaranty.** Guarantor hereby unconditionally, absolutely and irrevocably Guarantees to Beneficiary and its successors and assigns the full, faithful and complete performance by Borrower of each and every covenant, agreement, duty, liability and/or obligation (known, unknown, fixed, contingent or otherwise) of Borrower under or contained in any Subject Agreement including, without limitation, the due and timely payment of amounts payable by Borrower under any Subject Agreement, all in strict accordance with the terms and provisions of such Subject Agreement (collectively the "**Borrower's Obligations**"), and all as if Guarantor were the primary obligor with respect to each and all of the Borrower's Obligations. Guarantor acknowledges and agrees that this Guaranty constitutes a Guaranty of payment and performance and not merely of collection. At the written request of Beneficiary, Guarantor will provide financial reports demonstrating the ability of the Guarantor to cover the Borrower's Obligations.

3.    **Certain Authorizations.** In the event of a default (as defined in Subject Agreements) Guarantor authorizes Beneficiary, without notice or demand and without affecting Guarantor's liability hereunder, without prejudice to Borrower's rights and remedies under any Subject Agreement, from time to time to renew, compromise, extend, accelerate or otherwise change the time for payment of or otherwise change the terms of any of the Borrower's Obligations or any part thereof, take and hold security for the payment of any or all of the Borrower's Obligations, and exchange, enforce, waive and release any such security; apply such security and direct the order or manner of sale thereof as Guarantor in its discretion may determine; and release and/or substitute any one or more of any endorsers or guarantors for any or all of the Borrower's Obligations.

4.    **Subordination.** Guarantor hereby subordinates any indebtedness of Borrower now or hereafter held by Guarantor to the Borrower's Obligations, and Guarantor shall collect, enforce and receive such indebtedness of Borrower to Guarantor, if Beneficiary so requests, as trustee for Beneficiary and shall pay over to Beneficiary all collections on and proceeds of such indebtedness of Borrower to Beneficiary, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty.

5.    **No Subrogation; etc.** Guarantor hereby: (a) expressly and irrevocably waives, to the fullest extent possible, on behalf of itself and its successors and assigns (including any surety) and any other Person, any and all rights at law or in equity to subrogation, to reimbursement, to exoneration, to contribution, to indemnification, to set off or to any other rights that could accrue to a surety against a principal, to a guarantor against a maker or obligor, to an accommodation party against the party accommodated, to a holder or transferee against a maker, or to the holder of any claim against any Person, and which Guarantor may have or hereafter acquire against Borrower or any Person in connection with or as a result of Guarantor's execution, delivery and/or performance of this Guaranty, or any other documents to which Guarantor is a party or otherwise; (b) expressly and irrevocably waives any "claim" (as such term is defined in the United States Bankruptcy Code) of any kind against Borrower, and further agrees that it shall not have or assert any rights with respect to any such claim against any Person (including any surety), either directly or as an attempted set off to any action commenced against Guarantor by Beneficiary; and (c) acknowledges and agrees (i) that this waiver is intended to benefit Beneficiary and shall not limit or otherwise affect Guarantor's liability hereunder or the enforceability of this Guaranty, and (ii) that the rights of Beneficiary under this sentence shall survive payment and performance in full of the Borrower's Obligations.

6.    **Certain Waivers.** Neither Beneficiary nor any other Person shall be required to take any action of any kind or nature against Borrower or any other Person, or resort to any security held by Beneficiary or any other Person, at any time before Beneficiary may proceed against Guarantor on this Guaranty. Guarantor hereby expressly waives, relinquishes and releases, in any action brought on, arising out of or relating to this Guaranty or otherwise: (a) pursuant to California Civil Code Section 2856(a)(1), all of Guarantor's rights of subrogation, reimbursement, indemnification and contribution and any other rights and defenses that are or may become available to Guarantor by reason of California Civil Code Sections 2787 to 2855, inclusive, (b) pursuant to California Civil Code Section 2856(a)(2), all rights or defenses Guarantor may have in respect of its obligations as a guarantor by reason of any election of remedies by the Beneficiary, even if that election of remedies has destroyed Guarantor's rights of subrogation and reimbursement against Borrower, (c) any claim (i) that any obligation of Guarantor hereunder is larger in amount or more burdensome than that of Borrower, (ii) based on Borrower's liability ceasing for any reason, (iii) that this Guaranty may be revoked, (iv) based on any alteration of any original Borrower's Obligation without Guarantor's consent, (v) that acceptance by Beneficiary of anything in partial satisfaction of the Borrower's Obligations reduces the obligations of Guarantor hereunder, (vi) that performance or any offer of performance of any or all of the Borrower's Obligations exonerates Guarantor, (vii) that Guarantor may require Beneficiary to proceed against Borrower or pursue any other remedy, (viii) that Guarantor may compel Borrower to perform any Borrower's Obligation when due, (ix) that if Guarantor satisfies any of the Borrower's Obligations in whole or in part, Borrower is bound to reimburse Guarantor, (x) that Guarantor, upon satisfying all or any part of the Borrower's Obligations, is entitled to enforce any remedy which Beneficiary then has against Borrower, (xi) that Guarantor is entitled to the benefit of any security for the performance of any of the Borrower's Obligations, (xii) that as to any property of Guarantor that has been

hypothecated with property of Borrower. Guarantor is entitled to have Borrower's property first applied to discharge of the Borrower's Obligations, (xiii) that Beneficiary, or any other Person, must resort to property upon which Beneficiary, or such other Person, has a lien in any particular order, or must otherwise marshal any such liens, or (xiv) that Guarantor may require Beneficiary, or any other Person, to seek satisfaction from funds to which Guarantor has no claim or to marshal assets, (d) any claim, right or defense based upon any other action or circumstance which might otherwise constitute a legal or equitable discharge, defense or exoneration of a guarantor or surety, (e) notice of the acceptance of this Guaranty by any Person, (f) notice of the Borrower's Obligations now existing or which may hereafter exist or be created or incurred, (g) notice of any adverse change in the financial condition of Borrower or of any other fact that might increase Guarantor's risk hereunder, (h) presentment, notice of demand for payment or performance, notice of default or nonpayment or nonperformance, protest, notice of protest, and notice of dishonor, under the Subject Agreements (or any of them) or otherwise in respect of any of the Borrower's Obligations and (i) all other notices to which Guarantor might otherwise be entitled in connection with this Guaranty, the Subject Agreements (or any of them) or otherwise in respect of any Borrower's Obligation.

7.     **Non-Impairment By Bankruptcy; etc.** Guarantor's liability hereunder shall continue notwithstanding, and shall be unaltered, unaffected and unimpaired by, (a) the bankruptcy, insolvency, reorganization, merger, liquidation, dissolution, winding-up or cessation of existence of Borrower or any other Person, and/or (b) any fraudulent, illegal or improper act by Borrower, and/or (c) any payment made on the Borrower's Obligations which the recipient repays or is liable to repay to Borrower or any other Person pursuant to any court order or as otherwise required by law.

8.     **Effect of Non-Enforcement; etc.** Guarantor hereby covenants and agrees that the failure by Beneficiary, or any other Person, to file or enforce a claim against Guarantor or Borrower, or any other Person, shall not affect Guarantor's liability hereunder nor shall Guarantor be released from liability hereunder if recovery from Borrower, any other guarantor, payor, endorser or surety in respect of any of the Borrower's Obligations or any other Person becomes barred by any statute of limitations applicable to any cause of action upon any Borrower's Obligation or upon this Guaranty or any obligation or liability founded upon this Guaranty. The obligations of Guarantor hereunder are independent of the obligations of Borrower under the Subject Agreements (and each of them) and of any security for or other Guaranty of the Borrower's Obligations. In the event of a default in the performance of any of the Borrower's Obligations, Beneficiary may maintain an action against Guarantor upon this Guaranty, whether or not Borrower is joined therein or a separate action is brought against Borrower.

9.     **Acceleration of Maturity.** In the event that the maturity of any Borrower's Obligation is accelerated by bankruptcy or otherwise, such maturity shall also be accelerated for purposes of this Guaranty (and the Guaranty of Guarantor hereunder), and without demand or notice to Guarantor.

10.    **Legal Fees.** In the event that any action, suit, or other proceeding is brought by Beneficiary to enforce the obligations of Guarantor under this Guaranty, the prevailing party shall be entitled to recover all of such party's costs and expenses (including, without limitation, court costs and attorneys' fees) incurred in each and every such action, suit or other proceeding, including any and all appeals or petitions therefrom. As used herein, attorneys' fees shall mean the full and actual cost of any legal services actually performed in connection with the matters involved, calculated on the basis of the fees charged by the attorneys performing such services and shall not be limited to "reasonable attorneys' fees" as defined in any statute or rule of court.

11.    **Governing Law.** THIS GUARANTY HAS BEEN MADE AND ENTERED INTO IN THE STATE OF CALIFORNIA, AND THE INTERNAL SUBSTANTIVE LAWS (AS DISTINGUISHED FROM THE CHOICE OF LAW RULES) OF SAID STATE SHALL GOVERN THE VALIDITY AND INTERPRETATION HEREOF, AND THE PERFORMANCE BY GUARANTOR OF ITS DUTIES AND OBLIGATIONS HEREUNDER. WHENEVER POSSIBLE, EACH PROVISION OF THIS GUARANTY SHALL BE INTERPRETED IN SUCH MANNER AS TO BE EFFECTIVE AND VALID UNDER

APPLICABLE LAW.   IF ANY PROVISION OF THIS GUARANTY SHALL BE INVALID OR UNENFORCEABLE UNDER APPLICABLE LAW, SUCH PROVISION SHALL BE INEFFECTIVE ONLY TO THE EXTENT OF SUCH INVALIDITY OR UNENFORCEABILITY WITHOUT INVALIDATING OR RENDERING UNENFORCEABLE THE REMAINDER OF SUCH PROVISION OR THE REMAINING PROVISIONS OF THIS GUARANTY.

12.     **Certain Information.**  Guarantor has informed itself of, and hereby assumes all responsibility for being and keeping informed of, the financial condition and assets of Borrower and of all of the circumstances bearing upon the risk of nonpayment or nonperformance of the Borrower's Obligations thereby and the nature, scope and extent of the risks which Guarantor assumes and incurs hereunder.  Beneficiary shall have no duty to advise Guarantor of any information regarding such circumstances or risks.

13.     **Legal Proceedings.**  Guarantor hereby agrees that any legal action, suit or proceeding against Guarantor (or any successor-in-interest thereto) arising out of or relating to this Guaranty may (but need not) be initiated by Beneficiary in a state or federal court located in the County of Los Angeles, State of California.  By execution and delivery of this Guaranty, Guarantor hereby (a) waives any objection that it may now or hereafter have to the laying of venue of any such action, suit or proceeding in any such court, (b) waives any claim that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum, (c) submits to the personal jurisdiction of any such court in any such action, suit or proceeding, and (d) agrees to be bound by any judgment, order or decree rendered by any such court in any such action, suit or proceeding.

14.     **Successors and Assigns.**  This Guaranty shall bind Guarantor and any and all heirs, administrators, executors, successors and assigns (whether or not by operation of law) of Guarantor.  No delegation or assignment by Guarantor of this Guaranty or any of its obligations hereunder shall relieve Guarantor of any of its obligations hereunder, all of which shall survive any such delegation or assignment.  This Guaranty shall inure to the benefit of Beneficiary and Beneficiary's successors and assigns.  Beneficiary may without notice assign the benefit of this Guaranty in whole or in part.

15.     **Entire Agreement.**  This Guaranty embodies the entire understanding of Beneficiary and Guarantor with respect to Guarantor's obligation to Guaranty the full payment, performance and satisfaction of the Borrower's Obligations and there are no further or other agreements or understandings, written or oral, in effect between said parties relating to the Guaranty by Guarantor of the Borrower's Obligations unless otherwise referred to herein or in any agreement executed by each of Beneficiary and Guarantor.

IN WITNESS WHEREOF, this Guaranty has been executed and delivered by Guarantor as of the date first above set forth.

> **"GUARANTOR"**
> Hyun Kim
>
> By: _____
> Name: _____
> An individual

ACCEPTED BY:
"BENEFICIARY"
BondIt LLC

By: _____
Name: _____
Its: _____

# EXHIBIT "8"

## ASSIGNMENT OF PROCEEDS

**THIS ASSIGNMENT** is made and entered into as of September 18th, 2017 (the "Effective Date") Hallows Movie Inc., a Canadian corporation, registered to do business in the state of Kentucky having an address at 212 North 2nd St. Suite 100 Richmond, Kentucky 40475, (the "Assignor") to BondIt LLC, a California limited liability company with a business address at 1639 11th St. #250 Santa Monica, CA 90404 (the "Assignee").

### PURPOSE

**WHEREAS**, contemporaneously herewith Assignor and Assignee have entered into that certain Loan and Security Agreement (the "Agreement"), dated as of the date hereof, for the financing of the motion picture presently entitled "Crossface" (the "Picture"), the indebtedness under which Agreement is to be primarily repaid by Assignor with all refunds, subsidies, rebates or other amounts payable by Kentucky State, its agencies or instrumentalities in connection with any Tax Credits (the "Proceeds"). All capitalized terms used herein without definition shall have the respective meaning ascribed to such terms in the Agreement.

**WHEREAS**, subject to the terms and conditions in the Agreement, Assignee will fund up to One Million Five Hundred Thousand United States Dollars (US $1,500,000.00) to the Assignor in advance of receiving the Proceeds all pursuant to the terms of the Agreement.

**WHEREAS**, Assignor agrees to assign its rights to the Proceeds that Assignor receives in connection with the Picture to Assignee pursuant to the terms and conditions herein to secure the payments made by Assignee under the Agreement.

**NOW THEREFORE**, for good and valuable consideration, the receipt of which is hereby acknowledged, and as additional security for the payment and performance by Assignor of its obligations under the Agreement, it is agreed by the parties as follows:

1.      _Assignment of Proceeds_.  Subject to the terms and conditions hereinafter set forth, Assignor does hereby transfer, assign and deliver unto Assignee all of the right, title and interest of Assignor in and to the Proceeds together with all the rights, privileges and appurtenances now or hereafter in any way belonging or pertaining thereto.

2.      _Covenants of Assignor_.  Assignor represents and warrants that:

(i)      Subject to the terms and conditions of the Proceeds statutes in the State of Kentucky, it has the power and authority to assign the Proceeds;

(ii)      It will not assign, pledge or otherwise encumber (other than in connection with the security interests granted the Guilds [as defined in the Agreement]) the Proceeds without the prior written consent of Assignee;

(iii)      It will not cancel, terminate or accept any surrender of its rights to receive the Proceeds, or amend or modify the same directly or indirectly in any respect whatsoever (including, without limitation, to sell, assign, transfer or allocate any of the Proceeds to any Person [as defined in the Agreement] or entity other than the Assignee or to permit any Proceeds received by the Assignor to be applied to any other tax liability [or other liability] for which the Assignor is liable), without having obtained the prior written consent of Assignee thereto;

(iv)      It will not waive or give any consent with respect to any default or variation in the performance of the receipt of the Proceeds, it will at all times take proper steps to enforce all of the provisions and conditions thereof, and it will forthwith notify Assignee of any defaults with respect to receipt of the Proceeds;

(v)      It will perform and observe, or cause to be performed and observed, all of the terms, covenants and conditions on its part to be performed and observed with respect to the Proceeds and the rights and obligations to obtain the Proceeds;

1

(vi)     It will timely file all necessary income tax returns, including the requisite credit claim forms, to obtain the Proceeds; and

(vii)    It will execute any and all additional assignments to Assignee relating to the Proceeds, as Assignee may at any time reasonably request and which are consistent with the terms and conditions of the Agreement.

3.       <u>No satisfaction; No obligation</u>.  The Assignee's acceptance of this Assignment shall not constitute a satisfaction of any indebtedness, liability or obligation, or any part thereof, now or hereafter owed by Assignor to Assignee pursuant to the Agreement. Nothing in this Assignment shall be deemed to obligate Assignee at any time to undertake or perform any of the terms or conditions applicable to Assignor's receipt of the Proceeds, or to enforce compliance therewith.  Assignee may institute such legal action and otherwise exercise any of its rights and powers, under the Agreement or otherwise, in such manner as it may deem advisable at any time it shall see fit to do so, and for any cause for which the same might have been instituted or done had this Assignment not been made.  No waiver or condonation by Assignee of any breach or default, and no waiver of any right of Assignee, hereunder shall be deemed to constitute a waiver of any other or subsequent breach or default or to prevent subsequent exercise of any such right or any other similar right.

4.       <u>Termination of Assignment</u>.  Upon (i) the payment in full of all obligations of Assignor under the Agreement or receipt of the Proceeds by Assignee (or its designee or assignee) pursuant to the Agreement and (ii) the cancellation and discharge of the Indebtedness (as defined in the Agreement) and obligations, this Assignment shall become null and void, and thereupon Assignee shall execute and deliver to Assignor any instruments which may be necessary or appropriate to terminate this Assignment and Assignee will promptly fund to Assignor's production account any Proceeds in excess of the amount required to repay the Indebtedness to the Assignee.

5.       <u>Assignment; Amendment</u>.  The terms, covenants, agreements and conditions contained herein shall extend to, include and inure to the benefit of and be binding upon Assignor and Assignee and their respective heirs, executors, administrators, successors and assigns, as the case may be, and may not be terminated, changed or amended orally. Assignee, in Assignee's sole discretion, may assign this Assignment as security to any of its secured lenders without notice to Assignor.

This Assignment shall be governed and construed in accordance with the laws of the State of California without resort to its conflicts of laws rules. Each party hereto hereby irrevocably submits itself to the jurisdiction of the state courts of the State of California. California law shall govern (i) the validity and interpretation of the Agreement, (ii) the performance of the parties of their respective obligations hereunder, and (iii) all other causes of action (whether sounding in contract or in tort) arising out of or relating to this Agreement or the termination of this Agreement.  The parties irrevocably submit to the exclusive jurisdiction of the United States District Court for the Central District of California, for the purpose of any suit, action or other proceeding arising out of or based upon this Assignment or the subject matter hereof, and each party hereby waives, and agrees not to assert, by way of motion, a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Assignment or the subject matter hereof may not be enforced in or by such court (provided, however, that the then applicable jurisdiction minimums are not waived).  Assignor hereby consents to service of process by registered mail at the address to which notices are to be given. Assignor agrees that its submission to jurisdiction and its consent to service of process by mail is made for the express benefit of Assignee.

**IN WITNESS WHEREOF**, the parties hereto have executed this instrument as of the Effective Date.

Hallows Movie Inc.,
a Canadian corporation registered to do business in the state of Kentucky

By: _____

Its: Authorized Signatory


**BONDIT LLC**
a California limited liability company

By: _____
    Matthew Helderman

Its: Authorized Signatory

3

# EXHIBIT "9"

**PROMISSORY NOTE**

US $1,925,000.00 ("Commitment Amount")

As of September 18th, 2017 (the "Effective Date")

     1.    FOR VALUE RECEIVED, the undersigned, Hallows Movie Inc., a Canadian corporation, registered to do business in the state of Kentucky with an address at 212 North 2nd St. Suite 100 Richmond, Kentucky 40475, ("Borrower"), hereby promises to pay to the order of BondIt LLC ("Lender"), or holder, at 1639 11th St. Santa Monica, CA 90404, or at such other address as the holder may specify in writing, the Commitment Amount (i.e., the Loan, plus the Interest Fee and the Legal Fee), in lawful money of the United States of America, on or prior to the Repayment Dates as determined pursuant to that certain Loan and Security Agreement by and between the Borrower and Lender dated as of September 18th, 2017, (the "Loan and Security Agreement"). Any capitalized terms not otherwise defined hereunder shall have the meaning as set forth in the Loan and Security Agreement.

     2.    If the principal balance of this Promissory Note is not paid in full on or before the Maturity Date or, upon the occurrence of an Event of Default, the principal balance of this Promissory Note shall be immediately due and payable and the undersigned promises to pay interest on the principal balance of this Promissory Note at an interest rate ("Default Interest Rate") equal to the lesser of (i) the maximum legal rate of interest permitted by applicable law with respect to lenders or, (ii) three percent (3%) per month, as provided for in Paragraph 2.8.1 of the Loan and Security Agreement. The Default Interest, if any, shall be due and owing, and shall accrue and be payable, from the applicable Repayment Date or the date of the respective Event of Default (after expiration of the applicable cure period, if any), to and including the date of payment of all sums due hereunder (or cure of such default, if permitted pursuant to said Loan and Security Agreement). All payments received hereunder shall be applied in the manner and in the order set forth in Paragraph 2.8.1 of the Loan and Security Agreement.

     3.    If this Promissory Note is not paid in full when due, the Borrower promises to pay all third party, actual, out-of-pocket costs and expenses of collection and reasonable outside attorneys' fees and court costs (including, without limitation, reasonable travel and accommodation expenses) incurred by the holder hereof on account of such collection, whether or not a suit is filed in relation thereto.

     4.    The Lender will make notations of borrowings and payments of the Loan and, if applicable, interest calculated at the applicable Default Interest Rate; provided, however, that the failure to make any such notation shall not limit or otherwise affect the obligations of the Borrower or the rights of the Lender hereunder. This Promissory Note is issued pursuant to said Loan and Security Agreement which, among other things provides for the making of the Loan by Lender to Borrower from time-to-time, such indebtedness of Borrower resulting from each such installment of the Loan being evidenced by this Promissory Note.

     5.    This Promissory Note is secured by the Collateral. Reference is hereby made to the Loan and Security Agreement for a description of the Collateral, the nature and extent of the security for this Promissory Note and the rights of the holder of this Promissory Note in respect of such security.

     6.    The Borrower hereby waives protest, diligence, presentment, demand for payment, notice of default or nonpayment, notice of dishonor and all other demands and notices in connection with the delivery, acceptance, performance and enforcement of this Promissory Note, and, to the fullest extent permitted by law, all rights to assert any statute of limitations to an action hereunder.

     7.    If any provision or any word, term, clause or part of any provision of this Promissory Note shall be invalid for any reason, the same shall be ineffective, but the remainder of this Promissory Note and the provision shall not be affected and shall remain in full force and effect.

     8.    This Promissory Note is executed under and shall be governed by and construed in accordance with the laws of the State of California without reference to the conflict of laws provisions thereof. In any action brought under

or arising out of this Promissory Note, the Borrower hereby irrevocably submits to the jurisdiction of the state courts of the State of California and to the jurisdiction of the United States District Court for the Southern District of California and hereby consents to service of process by registered mail at the address first written above. The Borrower hereby waives any right which the Borrower may have to transfer or change the venue of any action brought by the holder of this Promissory Note.

IN WITNESS WHEREOF, this Promissory Note has been executed and delivered as of the Effective Date.

Hallows Movie Inc.,
a Canadian corporation, registered to do business in the state of Kentucky

By: **Alex Ginzburg**
Its: Authorized Signatory

2

# EXHIBIT "10"

## COPYRIGHT MORTGAGE AND ASSIGNMENT

KNOW ALL MEN BY THESE PRESENTS that for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned, Hallows Movie Inc., a Canadian corporation, registered to do business in the state of Kentucky ("Mortgagor"), does hereby mortgage, assign, grant, convey and transfer for security to BondIt LLC, a California limited liability company ("Mortgagee"), and Mortgagee's successors and assigns, exclusively throughout the world in perpetuity, as security for the full, timely and indefeasible repayment and discharge by Mortgagor of the Indebtedness as contained in that certain Loan and Security Agreement, of even date herewith, between Mortgagor and Mortgagee as amended, restated, supplemented or otherwise modified from time to time (the "Loan and Security Agreement"), Mortgagor hereby irrevocably, unconditionally and absolutely grants to Mortgagee a first priority security interest in and to the Tax Credit and Tax Credit Proceeds and Mortgagee shall further be granted a valid first priority security interest, subordinate only to the applicable guilds, in all of Mortgagor's assets, whether now owned or hereafter acquired, including, without limitation, all of Mortgagor's right, title and interest in connection with "Crossface" (the "Picture") including but not limited to all works based upon, incorporated in, derived from, incorporating or relating to the Picture and the collateral described in Schedule "A" hereto and by this reference incorporated herein, but subject in all cases to the terms and conditions of the Loan and Security Agreement, whether now owned or from time to time after the date hereof owned or acquired by Mortgagor.  Mortgagee may assign its rights and benefits hereunder to the party, if any, to whom it assigns as security the Loan and Security Agreement.  This Copyright Mortgage and Assignment is made pursuant to and is subject to all of the terms and conditions of the Loan and Security Agreement. Where such Loan and Security Agreement is in conflict as to the terms set forth herein, the Loan and Security Agreement shall control.  Capitalized terms not defined herein shall have the meaning as set forth in the Loan and Security Agreement.

Dated: As of September 18th, 2017

Hallows Movie Inc.,
a Canadian corporation, registered to do business in the
state of Kentucky

By: _DONATHAN LEE_

Its: Authorized Agent

State of NEW YORK            )
                             ) SS.
County of NEW YORK           )

On OCTOBER 3RD, 2017, before me, PERGER VKCUTI, a notary public, personally appeared DONGLET, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of NEW YORK that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

ROBERT JAMES VISCONTI
Notary Public - State of New York
NO. 01VI6320420
Qualified In Nassau County
My Commission Expires Mar 2, 2019

1

Schedule A

Collateral

All of Mortgagor's property, in accordance with the Loan and Security Agreement, including, without limitation, all of Mortgagor's right, title and interest, now owned or hereafter acquired, in and to the following property:

(a)     That certain feature-length motion picture ("**Picture**") currently entitled "Crossface", based on the screenplay of the same name written by Jake Goldberger and Sarah Coulter (the "**Screenplay**"), under whatever title the Picture may be released, and all collateral, allied, ancillary, subsidiary and merchandising rights therein and thereto, and all collateral, allied, ancillary, subsidiary and merchandising rights therein, and all properties and things of value pertaining thereto and all products and proceeds thereof whether now in existence or hereafter made, acquired or produced (as used in this paragraph, the term "**Picture**" shall mean and include the Picture, all of the aforesaid rights and the rights set forth in subparagraphs (i) through (xiv) below), including, without limitation:

(i)     All rights of Mortgagor of every kind and nature (including, without limitation, copyrights) in and to the Screenplay, any literary, musical, dramatic or other material of any kind or nature upon which, in whole or in part, the Picture is or may be based, or from which it is or may be adapted or inspired, or which may be or has been used or included in the Picture including, without limitation, all scripts, scenarios, screenplays, bibles, stories, treatments, novels, outlines, books, titles, concepts, manuscripts or other properties or materials of any kind or nature in whatever state of completion and all drafts, versions and variations thereof (collectively, the "**Literary Property**");

(ii)     All rights of Mortgagor of every kind and nature in and to all physical properties of every kind or nature of or relating to the Picture and all versions thereof, including, without limitation, all physical properties relating to the development, production, completion, delivery, exhibition, distribution or other exploitation of the Picture, and all versions thereof or any part thereof, including, without limitation, the Literary Property, exposed film, developed film, positives, negatives, prints, answer prints, special effects, preprint materials (including interpositives, negatives, duplicate negatives, internegatives, color reversals, intermediates, lavenders, fine grain master prints and matrices and all other forms of preprint elements which may be necessary or useful to produce prints or other copies or additional pre-print elements, whether now known or hereafter devised), soundtracks, recordings, audio and video tapes and discs of all types and gauges, cutouts, trims and any and all other physical properties of every kind and nature relating to the Picture in whatever state of completion, and all duplicates, drafts, versions, variations and copies of each thereof (collectively, the "**Physical Properties**");

(iii)     All rights of Mortgagor of every kind or nature in and to any and all music and musical compositions created for, used in or to be used in connection with the Picture to the extent owned by Mortgagor including, without limitation, all copyrights therein and all rights to perform, copy, record, rerecord, produce, publish, reproduce or synchronize any or all of said music and musical compositions as well as all other rights to exploit such music including record, soundtrack recording, and music publishing rights;

(iv)     All collateral, allied, ancillary, subsidiary, publishing and merchandising rights of Mortgagor of every kind and nature, without limitation, derived from, appurtenant to or related to the Picture or the Literary Property, including, without limitation, all production, exploitation, or reissue production rights by use of film, tape or any other recording devices now known or hereafter devised, whether based upon, derived from or inspired by the Picture, the Literary Property or any part thereof; all rights of Mortgagor to use, exploit and license others to use or exploit any and all novelization, publishing, commercial tieups and merchandising rights of every kind and nature, including, without limitation, all novelization, publishing, merchandising rights and commercial tie-ups arising out of or connected with or inspired by the Picture or the Literary Property, the title or titles of the Picture, the characters appearing in the Picture or said Literary Property and/or the names or characteristics of said characters (all of which rights may be nonexclusive), and including further, without limitation, any and all commercial exploitation in connection with or related to the Picture and/or said Literary Property, but excluding any sequel, prequel and remake rights to the Picture;

2

(v)     All rights of Mortgagor of every kind or nature, present and future, in and to all agreements relating to the development, production, completion, delivery and exploitation of the Picture, including, without limitation, all agreements for personal services, including the services of writers, directors, cast, producers, special effects personnel, animators, cameramen and other creative, artistic and technical staff and agreements for the use of studio space, equipment, facilities, locations, animation services, special effects services and laboratory contracts;

(vi)     All insurance and insurance policies heretofore or hereafter placed upon the Picture or the insurable properties thereof and/or any person or persons engaged in the development, production, completion, delivery or exploitation of the Picture and the proceeds thereof;

(vii)     All copyrights, rights in copyrights, interests in copyrights and renewals and extensions of copyrights, domestic and foreign, heretofore or hereafter obtained upon the Picture or the Literary Property or any part thereof, and the right (but not the obligation) to make publication thereof for copyright purposes, to register claims under copyright, and the right (but not the obligation) to renew and extend such copyrights, and the right (but not the obligation) after prior notice, to sue in the name of Mortgagor and/or in the name of Mortgagee for past, present and future infringements of copyright;

(viii)     All rights to produce, acquire, release, sell, distribute, subdistribute, lease, sublease, market, license, sublicense, exhibit, broadcast, transmit, reproduce, publicize or otherwise exploit the Picture, the Literary Property and any and all rights therein (including, without limitation, the rights referred to in subparagraph (a)(iv) above) in perpetuity, without limitation, in any manner and in any media whatsoever throughout the universe, including, without limitation, by projection, radio, all forms of television (including, without limitation, free, pay, toll, cable, sustaining subscription, sponsored and direct satellite broadcast), in theatres, nontheatrically, on cassettes, cartridges and discs and by any and all other scientific, mechanical or electronic means, methods, processes or devices now known or hereafter conceived, devised or created;

(ix)     All rights of Mortgagor of any kind or nature, direct or indirect, to acquire, produce, develop, reacquire, finance, release, sell, distribute, subdistribute, lease, sublease, market, license, sublicense, exhibit, broadcast, transmit, reproduce, publicize, or otherwise exploit the Picture, or any rights in the Picture, including, without limitation, pursuant to the Production Services Agreement and any other agreements between Mortgagor and any company controlling, controlled by, or under common control with Mortgagor (each, a **"Subsidiary"**) which relate to the ownership, production or financing of the Picture;

(x)     All contract rights and general intangibles and all rights in, to and under all security agreements leases and other contracts securing or otherwise relating to any such contract rights and general intangibles, which grant to any Person any right to acquire, produce, develop, reacquire, finance, release, sell, distribute, subdistribute, lease, sublease, market, license, sublicense, exhibit, broadcast, transmit, reproduce, publicize, or otherwise exploit the Picture or any rights in the Picture including, without limitation, all such rights pursuant to agreements between Mortgagor and any Subsidiary which relate to the ownership, production or financing of the Picture;

(xi)     All rent, revenues, income, compensation, products, increases, proceeds and profits or other property obtained or to be obtained by Mortgagor from the production, release, sale, distribution, subdistribution, lease, sublease, marketing, licensing, sublicensing, exhibition, broadcast, transmission, reproduction, publication, ownership, exploitation or other uses or disposition of the Picture and the Literary Property (or any rights therein or part thereof), in any and all media, including, without limitation, the properties thereof and of any collateral, allied, ancillary, merchandising and subsidiary rights therein and thereto, and amounts recovered as damages by reason of unfair competition, the infringement of copyright, breach of any contract or infringement of any rights, or derived therefrom in any manner whatever;

(xii)     Any and all accounts, accounts receivable, general intangibles, contract rights, chattel paper, documents, instruments and goods, including inventory (as those terms are defined in the UCC), not

elsewhere included in this definition, which may arise in connection with the creation, production, completion, delivery, financing, ownership, possession or exploitation of the Picture;

(xiii)   Any and all documents, receipts or books and records, including, without limitation, documents or receipts of any kind or nature issued by any pledgeholder, warehouseman or bailee with respect to the Picture and any element thereof and the equipment containing such books and records;

(xiv)   All accounts receivable, all contract rights, all general intangibles (as such terms are defined in the UCC) in connection with or relating to the Picture including, without limitation, all accounts receivable, all contract rights and general intangibles constituting rights to receive the payment of money, or other valuable consideration, all receivables and all other rights to receive the payment of money including, without limitation, under present or future contracts or agreements (whether or not earned by performance), from the sale, distribution, exhibition, disposition, leasing, subleasing, licensing, sublicensing and other exploitation of the Picture or the Literary Property or any part thereof or any rights therein or related thereto in any medium, whether now known or hereafter developed, by any means, method, process or device in any market including, without limitation, all of Mortgagor's right, title and interest in, to and under any existing or future agreements for the distribution or other exploitation of the Picture, as the same may presently exist or hereafter from time to time come into existence, be amended, renewed, modified, supplemented, extended or replaced, including Mortgagor's rights to receive payments thereunder, and all other rights to receive film rentals, license fees, distribution fees, producer's shares, royalties and other amounts of every description including, without limitation, from (a) theatrical exhibitors, nontheatrical exhibitors, television networks and stations and airlines, cable television systems, pay television operators, whether on a subscription, per program charge basis or otherwise, and other exhibitors, (b) distributors, subdistributors, lessees, sublessees, licensees and sublicensees (including any Subsidiary) and (c) any other Person or entity that distributes, exhibits or exploits the Picture or the Literary Property or elements or components of the Picture or the Literary Property or rights relating thereto; and,

(xv)   All proceeds, products, additions and accessions (including insurance proceeds) of the Picture, as defined and referred to in subparagraphs (a)(i) through (a)(xiv) above;

(xvi)   All funds in or to be credited to the Production Account into which the proceeds of all Advances made hereunder shall be or shall have been credited;

(xvii)   All machinery, electrical and electronic components, equipment, fixtures, furniture, office machinery, vehicles, trailers, implements and other tangible personal property of every kind and description now owned or hereafter acquired by Mortgagor and used or useful in connection with the Picture (including, without limitation, all wardrobe, props, mikes, scenery, sound stages, movable, permanent or vehicular dressing rooms, sets, lighting equipment, cameras and other photographic, sound recording and editing equipment, projectors, film developing equipment and machinery) and all goods of like kind or type hereafter acquired by Mortgagor in substitution or replacement thereof, and all additions and accessions thereto (collectively, the "**Equipment**") and all rents, proceeds and products of the Equipment including, without limitation, the rights to insurance covering the Equipment;

(xviii)   The following personal property, whether now owned or hereafter acquired: (i) the title or titles of the Picture and all of Mortgagor's rights to the exclusive use thereof including rights protected pursuant to trademark, service mark, unfair competition and/or other laws, rules or principles of law or equity or industry practice, and (ii) all inventions, processes, formulae, licenses, patents, patent rights, trademarks, trademark rights, service marks, service mark rights, trade names, trade name rights, logos, indicia, corporate and company names, business source or business identifiers and renewals and extensions thereof, domestic and foreign, whether now owned or hereafter acquired, and the accompanying good will and other like business property rights relating to the Picture, and the right (but not the obligation) to register claims under trademark or patent and to renew and extend such trademarks or patents and the right (but not the obligation) to sue in the name of Mortgagor or in the name of Mortgagee for past, present or future infringement of trademark or patent;

4

(xix)   All Cash and Cash Equivalents of Mortgagor derived from or relating to the Picture and all drafts, checks, certificates of deposit, notes, bills of exchange and other writings which evidence a right to the payment of money and are not themselves security agreements or leases and are of a type which is in the ordinary course of business transferred by delivery with any necessary endorsement or assignment whether now owned or hereafter acquired (all such drafts, checks, certificates of deposit, notes, bills of exchange and other writings, whenever acquired, collectively are called "**Instruments**");

(xx)   Any and all amounts received or receivable by Mortgagor in the form of tax credits or similar tax based subsidy transactions for which Mortgagor is or may be eligible; and

(xxi)   To the extent not included in the items described in paragraphs (a)(i) through (a)(xx) above, all accounts, contract rights, general intangibles, documents, instruments, chattel paper, goods, inventory and equipment (as such terms are defined in the UCC) now owned or hereafter acquired by Mortgagor, and the proceeds and products thereof.

(b)   Notwithstanding anything to the contrary contained in paragraphs (a)(i) through (a)(xxi) above, there shall be excluded from the Collateral described herein the interest of Mortgagor, whether as owner or lessee, in any property constituting real property under the laws of the jurisdiction in which such property is located.

The respective rights of Mortgagor and Mortgagee with respect to the Collateral are subject to the Loan and Security Agreement.  Capitalized terms used herein without definition shall have the respective meanings ascribed to such terms in the Loan and Security Agreement.

## POWER OF ATTORNEY

**KNOW ALL PERSONS BY THESE PRESENTS** that pursuant and subject to that certain Loan and Security Agreement, dated as of September 18th, 2017 (the "Loan and Security Agreement"), entered into by and between Hallows Movie Inc., a Canadian corporation, registered to do business in the state of Kentucky company ("Borrower"), on the one hand, and BondIt LLC, a California limited liability company ("Lender"), on the other hand, concerning the financing of the motion picture tentatively entitled, "Crossface" ("Picture"), Borrower hereby grants this power of attorney ("Power of Attorney") to Lender, and irrevocably constitutes and appoints Lender as its attorney in fact for the following purposes:

1.      To apply for, receive notices from, and communicate with the Kentucky State, Kentucky State Department of Taxation and Finance, Kentucky Tourism Development Finance Authority, and the Kentucky Film Office. (individually or collectively, "State Office"), on behalf of Borrower, in order to obtain for Borrower the Tax Credits ("Tax Credits") issued pursuant to the Kentucky State Film Production Tax Credit program. Lender shall promptly provide Borrower with any copies of any written communications received by Lender from the State Office, and/or any written communications or documents delivered by Lender to the State Office, in connection with the Tax Credits. No casual or inadvertent failure by Lender to provide Borrower with such copies shall constitute a breach hereof or of the Loan and Security Agreement;

2.      In consultation with Borrower prior to any uncured Event of Default, otherwise in Lender's sole discretion, to complete and file Borrower's income tax returns for Kentucky, and to make all necessary applications to, receive notices from, and communicate with the Kentucky State Department of Taxation and Finance, Kentucky Tourism Development Finance Authority, and the Kentucky Film Office in connection therewith;

3.      To take all actions necessary in order for the Picture to qualify for the Tax Credits in an amount not less than the Estimated Tax Credits, and to comply with all requirements necessary or advisable to obtain and retain the Tax Credits including without limitation, compliance with all the rules and regulations of the State Office in connection with the issuance of Tax Credits;

4.      Without limiting the generality of the foregoing, to submit all documents and reports required by the State Office, complete all audits, procedures and documentation required in connection with the issuance of the tax credit certificate to be issued by the State Office evidencing the Tax Credits earned by Borrower in connection with the Picture, and to comply with the credit requirements of the State Office; and

5.      To execute under hand or under seal and deliver (conditionally or unconditionally), as fully and completely as if such acts and things were done by the undersigned Borrower, any document required to supplement and put into effect this Power of Attorney, and to take such other steps and actions as Lender may deem advisable or necessary to effect the terms hereof pursuant and subject to the terms and conditions of the Loan and Security Agreement that in the opinion of the Lender is necessary to complete the purpose of this Power of Attorney. Lender shall promptly provide copies to Borrower of all documents so executed. No casual or inadvertent failure by Lender to provide Borrower with such copies shall constitute a breach hereof or of the Loan and Security Agreement.

This Power of Attorney is coupled with an interest. Lender shall solely decide the manner, time and purposes in and for which the powers conferred to it shall be used; provided, however, that no term or condition hereof shall be construed in any way which is inconsistent with the terms or conditions of the Loan and Security Agreement. Any capitalized terms not otherwise defined hereunder shall have the meaning as set forth in the Loan and Security Agreement.

BORROWER DECLARES THAT:

(A) The rights and powers given to Lender shall automatically terminate upon repayment of the Indebtedness to Lender in accordance with the terms set forth in the Loan and Security Agreement;

(B) The rights and powers granted to Lender hereby may be exercised by any individual so authorized to act on behalf of Lender;

1

(C)  Borrower hereby ratifies and confirms all actions whatsoever that Lender shall do or cause to be done while acting hereunder. Notwithstanding the termination of this Power of Attorney, any action taken in good faith by Lender pursuant to this Power of Attorney, without notice of such termination, shall be binding upon Borrower, to the same extent as if such termination had not occurred;

(D)  It is specifically understood and agreed that Lender shall incur no liability, except to the extent resulting from Lender's gross negligence or willful misconduct or bad faith, as a result of the execution of any instruments or the taking of any action authorized by this Power of Attorney, all of such liability being expressly assumed by Borrower; and

(E) Borrower agrees to indemnify and save harmless Lender of and from any and all liability which it may incur in connection with the exercise of the powers conferred upon it hereunder, except those resulting from Lender's own gross negligence, willful misconduct or bad faith.  Borrower further agrees to indemnify and defend any and all persons (natural or corporate) relying upon this Power of Attorney from any and all liability arising from his, her, its or their compliance with directions received from Lender except to the extent resulting from Lender's gross negligence, willful misconduct or bad faith.

Executed on September 18th, 2017 by:

Hallows Movie Inc.,
a Canadian corporation, registered to do business in the state of Kentucky

By: _____
Its: Authorized Signatory


STATE OF New York        )
                                              )        SS.
COUNTY OF New York    )

On October 3rd , 2017, before me, Robert Visonti Notary public, DONG LEE , personally known to me (or proved on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

_____
Notary Public

> ROBERT JAMES VISCONTI
> Notary Public - State of New York
> NO. 01VI6320420
> Qualified in Nassau County
> My Commission Expires Mar 2, 2019

2

# EXHIBIT "11"

## POWER OF ATTORNEY

**KNOW ALL PERSONS BY THESE PRESENTS** that pursuant and subject to that certain Loan and Security Agreement, dated as of September 18th, 2017 (the "Loan and Security Agreement"), entered into by and between Hallows Movie Inc., a Canadian corporation, registered to do business in the state of Kentucky company ("Borrower"), on the one hand, and BondIt LLC, a California limited liability company ("Lender"), on the other hand, concerning the financing of the motion picture tentatively entitled, "Crossface" ("Picture"), Borrower hereby grants this power of attorney ("Power of Attorney") to Lender, and irrevocably constitutes and appoints Lender as its attorney in fact for the following purposes:

1.       To apply for, receive notices from, and communicate with the Kentucky State, Kentucky State Department of Taxation and Finance, Kentucky Tourism Development Finance Authority, and the Kentucky Film Office. (individually or collectively, "State Office"), on behalf of Borrower, in order to obtain for Borrower the Tax Credits ("Tax Credits") issued pursuant to the Kentucky State Film Production Tax Credit program.  Lender shall promptly provide Borrower with any copies of any written communications received by Lender from the State Office, and/or any written communications or documents delivered by Lender to the State Office, in connection with the Tax Credits. No casual or inadvertent failure by Lender to provide Borrower with such copies shall constitute a breach hereof or of the Loan and Security Agreement;

2.       In consultation with Borrower prior to any uncured Event of Default, otherwise in Lender's sole discretion, to complete and file Borrower's income tax returns for Kentucky, and to make all necessary applications to, receive notices from, and communicate with the Kentucky State Department of Taxation and Finance, Kentucky Tourism Development Finance Authority, and the Kentucky Film Office in connection therewith;

3.       To take all actions necessary in order for the Picture to qualify for the Tax Credits in an amount not less than the Estimated Tax Credits, and to comply with all requirements necessary or advisable to obtain and retain the Tax Credits including without limitation, compliance with all the rules and regulations of the State Office in connection with the issuance of Tax Credits;

4.       Without limiting the generality of the foregoing, to submit all documents and reports required by the State Office, complete all audits, procedures and documentation required in connection with the issuance of the tax credit certificate to be issued by the State Office evidencing the Tax Credits earned by Borrower in connection with the Picture, and to comply with the credit requirements of the State Office; and

5.       To execute under hand or under seal and deliver (conditionally or unconditionally), as fully and completely as if such acts and things were done by the undersigned Borrower, any document required to supplement and put into effect this Power of Attorney, and to take such other steps and actions as Lender may deem advisable or necessary to effect the terms hereof pursuant and subject to the terms and conditions of the Loan and Security Agreement that in the opinion of the Lender is necessary to complete the purpose of this Power of Attorney.  Lender shall promptly provide copies to Borrower of all documents so executed.  No casual or inadvertent failure by Lender to provide Borrower with such copies shall constitute a breach hereof or of the Loan and Security Agreement.

This Power of Attorney is coupled with an interest.  Lender shall solely decide the manner, time and purposes in and for which the powers conferred to it shall be used; provided, however, that no term or condition hereof shall be construed in any way which is inconsistent with the terms or conditions of the Loan and Security Agreement.  Any capitalized terms not otherwise defined hereunder shall have the meaning as set forth in the Loan and Security Agreement.

BORROWER DECLARES THAT:

(A)  The rights and powers given to Lender shall automatically terminate upon repayment of the Indebtedness to Lender in accordance with the terms set forth in the Loan and Security Agreement;

(B)  The rights and powers granted to Lender hereby may be exercised by any individual so authorized to act on behalf of Lender;

1

(C)  Borrower hereby ratifies and confirms all actions whatsoever that Lender shall do or cause to be done while acting hereunder. Notwithstanding the termination of this Power of Attorney, any action taken in good faith by Lender pursuant to this Power of Attorney, without notice of such termination, shall be binding upon Borrower, to the same extent as if such termination had not occurred;

(D)  It is specifically understood and agreed that Lender shall incur no liability, except to the extent resulting from Lender's gross negligence or willful misconduct or bad faith, as a result of the execution of any instruments or the taking of any action authorized by this Power of Attorney, all of such liability being expressly assumed by Borrower; and

(E) Borrower agrees to indemnify and save harmless Lender of and from any and all liability which it may incur in connection with the exercise of the powers conferred upon it hereunder, except those resulting from Lender's own gross negligence, willful misconduct or bad faith.  Borrower further agrees to indemnify and defend any and all persons (natural or corporate) relying upon this Power of Attorney from any and all liability arising from his, her, its or their compliance with directions received from Lender except to the extent resulting from Lender's gross negligence, willful misconduct or bad faith.

Executed on September 18th, 2017 by:

Hallows Movie Inc.,
a Canadian corporation, registered to do business in the state of Kentucky

By: _____
Its: Authorized Signatory


STATE OF NewYork        )
                                              )     SS.
COUNTY OF NewYork  )

On OCTOBER 3RD , 201 7, before me, ROBERT VISON Notary public, DONG LEE , personally known to me (or proved on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Notary Public

ROBERT JAMES VISCONTI
Notary Public - State of New York
NO. 01VI6320420
Qualified in Nassau County
My Commission Expires Mar 2, 2019

# EXHIBIT "12"



May 3, 2018

Hallows Movie Inc.
Attn: Mr. Dong Lee, Mr. Alex Ginzburg
212 North 2nd St. Suite 100
Richmond, KY 40475

   Re: <u>Notice of Default</u>

Gentlemen:

   Reference is hereby made to that certain Loan and Security Agreement dated of September 18, 2017 by and between, Hallows Movie Inc., a Canadian corporation registered to do business in Kentucky ("<u>Company</u>"), and BondIt LLC ("<u>Lender</u>") (as the same and may hereafter from time to time be amended, supplemented, modified, extended, renewed, or replaced, the "<u>Loan Agreement</u>"). The Loan Agreement and all ancillary documentation, including the Guaranty's will be referred to as the "<u>Loan Documents</u>". Capitalized terms used herein and not otherwise defined shall have the respective meanings ascribed to them in the Loan Agreement.

   We hereby notify you that <u>Events of Default</u> have occurred (and are continuing) under Sections <u>9.1.5</u>, <u>9.1.6</u>, <u>9.1.12</u>, <u>9.1.15</u>, and <u>9.1.16</u> of the Loan Agreement (all of the foregoing referred to here as "<u>Defaults</u>") as a result of, among other things, Company's failure to adhere to the agreed upon <u>Production Schedule</u>, and Company's failure to start Principal Photography by February 28, 2018 (<u>5.10</u>). Inevitably, the mismanagement of Company will result in delinquencies which will constituent additional Events of Default on or before May 30, 2018 (Sections <u>9.1.1</u>, <u>9.1.2</u>, and <u>9.1.3</u>.). Upon the occurrence of any of the Events of Default set forth in paragraph <u>9.1</u>, subject to paragraph <u>9.3</u>, all Indebtedness is hereby immediately due and payable.

   Lender may pursue the remedies afforded to Lender under the Loan Agreements  and related Guaranty's (including, without limitation, pursuant to paragraph <u>9.4</u>) or under any of the documents executed in connection herewith, or any other remedy afforded to Lender by law or equity, and Lender may, at its option, do and perform all other acts and things necessary for the proper preservation and protection of Lender's rights hereunder, solely with respect to the Collateral (and the receipts therefrom) or pursuant to any agreement secured by Lender's Security Interest under the Loan Agreements, all at the cost and expense of Borrower, which amount so expended shall constitute costs recoupable by Lender and secured as provided under the Loan Agreements. Lender may pursue the remedies afforded to Lender hereunder (including, without limitation, pursuant to paragraph <u>9.4</u> of the Loan Agreements) or under any of the documents executed in connection therewith, including Power of Attorney, or any other remedy afforded to Lender by law or equity, and Lender may, at its option, do and perform all other acts



and things necessary for the proper preservation and protection of Lender's rights under the Loan Agreements, solely with respect to the Collateral (and the receipts therefrom) or pursuant to any agreement secured by Lender's Security Interest hereunder, all at the cost and expense of Borrower, which amount so expended shall constitute costs recoupable by Lender and secured as provided hereunder.

Other Defaults under the Loan Agreement may exist or be discovered and Lender does not waive any of its rights and remedies by not listing the same in this Notice. As a result of the Default, Lender is accelerating the Loan, and Lender will cause you to incur the additional costs and expenses incurred by Lender to do so.

From and after an Event of Default, all Indebtedness of the Borrower under the Loan Agreements bears interest at the Default Rate applicable thereto until so paid; and if any other Default or Event of Default occurs, then at the election of Lender, while any such Default or Event of Default is outstanding, all of the Indebtedness shall bear interest at the Default Rate applicable thereto. Interest calculated at the Default Rate shall be immediately due and owing and shall accrue and be payable from the date such payment was due to and including the date of payment. If Indebtedness is not paid in full when due, Borrower has promised to pay all reasonable costs and expenses of collection and reasonable outside attorneys' fees and expenses and court costs incurred by the Lender hereof on account of such collection whether or not suit is filed thereon.

In light of the severity of Lender's now compromised position, Lender hereby accelerates the Repayment Date of the Committment Amount to **Thursday May 17, 2018**. As such, the Commitment Amount of $1,925,000, and Default Fees, must be received by Lender by wire transfer in immediately available funds, or Lender will undertake various actions necessary to protect and preserve its interests, including but not limited to legal action against the Borrower, and the Guarantors.

Nothing contained in this Notice of Default or in any oral or written communication between Lender, on-the-one hand, and Company, and/or any other Person, on the other hand shall constitute a waiver of the Default or any other default under the Loan Agreement or any rights or remedies of Lender as against Company and/or any other Person. Please be advised that Lender hereby continues to reserve and preserve all of it's respective rights and remedies against Company and/or any other Person under the Loan Agreement and/or at law and/or in equity.

This Notice of Default shall not constitute an amendment or waiver by Lender of any provision of the Loan Agreement, which may only be made in writing, and all of the provisions of the Loan Agreement shall continue to remain in full force and effect to the extent in effect on the date hereof.

Notwithstanding anything set forth in this Notice of Default or in any other document or statement issued in connection herewith, the Lender reserves all of the rights, powers, and remedies available to it under the Loan Agreement and at law if the breach described above is not cured promptly or if any subsequent breach of any other portion of the Loan Agreement

002148022vf

**1639 11th St. #160. Santa Monica, CA. 90404.**



should occur. The foregoing is not a complete statement of the facts and circumstances surrounding this matter, and the Lender hereby further reserves all of its other rights, powers, and remedies available under the Loan Agreement, at law, in equity or otherwise.

Sincerely,

Matthew Helderman, CEO

Cc:
Elsa Ramo, Esq. Ramo Law (via e-mail: eramo@ramolaw.com)
Michael Eisner, Esq. Eisner Law (fax: 310-855-3201, Meisner@eisnerlaw.com)

# EXHIBIT "13"

From: alexg@letitplay.com <alexg@letitplay.com>
Sent: Thursday, May 31, 2018 1:17 AM
To: Matthew Helderman <matthewhelderman@bondit.us>
Cc: Luke Taylor <luketaylor@bondit.us>; Tonyl <tonyl@letitplay.com>; Pat Depeters <patdepeters@bondit.us>
Subject: Re: Crossface (the film) - Follow Up
Attachments: Utopia Grant.pdf

Hey guys,

Here is a full update. Please let me know if you have any questions.

We are putting together the paperwork for Jai Courtney to play Chris Benoit. We are hoping this will be fully done within the next few weeks.
We have been discussing start dates of mid-August to mid-September. He is available at that time and so is John Cusack. Regarding the crew, we had a bunch of heads, and will need to reproach them when we are getting closer.

I also spoke to the Kentucky film office. We are good. In fact, we have as much as 2 years to begin filming and 4 years to complete the film. So we're in no danger.

Additional security comes in two ways. There is Utopia, which is a $1.8m film with a $1.5m tax credit (after being sold). The grant is attached. We already shot a good chunk of it and are waiting for a few actors to complete it. That should happen in July or early August. We will then file for the tax credit and hope to get it around December.

We are also working on a film in Alabama, called The Recovery (yes). The application approval will be sent as soon as I can scan it (in the am). It will be shot this year and has a tax credit of about $1.55m. We are planning to shoot it around the same time as Crossface, but obviously either right before or right after.

Regarding October repayment, there are a bunch of things out there.

* Earnings from Good will happen in September. We will know more about the value of the film in about 1.5 months, when fall festivals announce their lineups.

* The $1.5m Utopia tax credit and any earnings from the film. We plan to presell at Toronto and will have a good amount of footage to do so.

* The Recovery is the same. $1.55m tax credit and presales that will take place during Toronto.

* Crossface presales during Toronto and the tax credit. I realize you already own that credit.

There is lots of money out there to cover our debt to you (almost $5m in tax credits alone). It's difficult to say what will happen first and how quickly. What I see is that there's a good chance that except for earnings from Good, nothing else will come in by October. Because of that, we will have to make a decision to take a loan against the credits or presales to repay you on time or potentially wait until the

money comes in and pay the late fees to you. Our team and your team can have this discussion when we get closer to October.

Alex

> Alex and Tony,
>
> Per our discussion yesterday please follow up early this coming week
> with the following:
>
> Proper production updates — including Jai Courtney status, likely
> start dates and key crew members details (line producer, accountant, etc).
>
> Additional security being pledged — both the 'additional Puerto Rico'
> film as well as outside receivables for consideration.
>
> Default resolution — clarification as to how you plan to rectify the
> current default and repay by October per the terms of the agreement.
>
> Again, BondIt holds the Copyright Mortgage here and will reserve all
> rights over the control of the film until we are satisfied with the
> above items.
>
> Thank you and enjoy your Memorial Day weekend with your families.
>
> MATTHEW HELDERMAN
> CEO and co-founder
>
> Office: (213) 204-6552 <tel:213-204-6552> x101
> 1639 11th St. #160 | Santa Monica, CA 90404 www.BondIt.us
> <https://bondit.us/>
>
>
>



**COMMONWEALTH OF**
**PUERTO RICO**
Economic Development

VIA EMAIL
gencio10@yahoo.com

April 18, 2017

Jorge Martínez
Utopia Film, LLC

**Re:   Notification of Grant Issuance and Payment of Filing Fee Act No. 27-2011**
       **Utopia Film, LLC**
       **Film Project: Utopia**
       **Case Number: 020-2016-2017**

Dear Mr. Martínez,

We hereby notify you that the application for the Grant of Film Project Tax Benefits and
Exemptions (the "Grant") by **Utopia Film, LLC** ("Applicant") for the film project **Utopia** (the
"Film Project") under Act No. 27-2011 of March 4, 2011, as amended, known as the Puerto Rico
Film Industry Economic Incentives Act (the "Act"), has been duly endorsed.

In order to comply with the requirements of the Act for the issuance of the Grant, the Applicant
is required to pay the Puerto Rico Film Commission (the "Film Commission") a filing fee
equivalent to 1% of the Puerto Rico Production Expenses qualifying for the tax credit (the
"Filing Fee").

The Applicant has presented estimated total Puerto Rico Production Expenses of $1,801,407.32
which equals $1,801,407.32 paid to Puerto Rico Residents, plus $0.00 paid to Qualified
Nonresidents.

In order for the Department of Economic Development and Commerce to issue the Grant, the
Applicant has 15 working days from this date to accept the Grant as issued and enclosed by
means of a sworn statement.  The Applicant is also required to pay the amount of $9,0,07.04
which is equivalent to 50% of the Filing Fee with regards to Resident and Nonresident "Above-
the-Line" payments.  The payment is made through the purchase of a note from the Puerto Rico
Department of Treasury's Internal Revenue Collections Office (using Code 0754).  The
remaining balance for the Filing Fee pertaining to Resident and Nonresident "Above-the-Line"
expenses will be payable upon completion of the Film Project and certification of qualifying
expenditures.  At such time, the Applicant shall also be required to pay an additional fee totaling
1% of the Puerto Rico Production Expenses corresponding to payments made to Qualified
Nonresidents designated as "Below-the-Line".

PO Box 362350, San Juan, PR 00936-2350
P: 787-765-2900 www.ddecpr.com



The original sworn statement document and payment receipt must be delivered to the Film Commission's office.  Failure to accept the Grant and/or pay the 50% Filing Fee will be deemed as a withdrawal of the application. The Applicant may re-submit the application and the new application will be subject to tax credit availability at the date of its filing.

Once evidence of payment is received, the Puerto Rico Department of Treasury will reserve $1,621,266.59 in tax credits for the Applicant.  In the event the corresponding Auditor Report for the Film Project, as reviewed and certified by the Film Commissioner and the Puerto Rico Department of Treasury, provides for a higher tax credit amount that the tax credit established in the application, such additional tax credits shall be available subject to: (i) tax credit availability at the time of the Audit Report; (ii) the approval of the Film Commissioner and the Puerto Rico Department of Treasury; (iii) the corresponding amendment of the Grant.  Thank you for your attention to this matter.

Sincerely,

Carla Cardona
Film Incentives Program Manager

# EXHIBIT "14"

## FIRST AMENDMENT TO LOAN AND SECURITY AGREEMENT

This First Amendment to Loan and Security Agreement (the "Amendment"), is entered into as of October 20, 2018, by and between Hallows Movie, Inc., a Canadian Corporation, registered to do business in the state of Kentucky ("Borrower"), and BondIt LLC, a limited liability company organized and existing under the laws of California ("Lender"), with respect to the Loan and Security Agreement, dated as of September 18, 2017 (the "Loan Agreement"), between Borrower and Lender. Borrower and Lender are sometimes individually referred to in this Amendment as a "Party" and are collectively referred to as the "Parties." Capitalized terms used in this Amendment without definition have the same meanings that are given to those terms in the Loan Agreement. The Parties' agreement is as follows:

1.    **FACTUAL BACKGROUND.**

   1.1    Borrower and Lender previously entered into the Loan Agreement in which Lender agreed to make a loan to Borrower to be used to fund a portion of the cost of production of the motion picture entitled *Crossface* (the "Picture"), for use in the payment of pre-production, production and post-production costs of the Picture, all as described more fully in the Loan Agreement.

   1.2    Borrower failed to comply with the terms of the Loan Agreement and Lender put Borrower in Default under the terms of the Loan Agreement. In consideration for Lender agreeing to this Amendment to the Loan Agreement as set forth in this Amendment and executing the Assignment and Security Agreements attached hereto as Exhibits in favor of Lender as described below, Lender has agreed to extend the Maturity Date, as set forth in this Amendment, subject to the terms and conditions of this Amendment, the Loan Agreement, and the Exhibits.

2.    **AMENDMENTS TO THE LOAN AGREEMENT.**

   2.1    Paragraph 1.5 of the Loan Agreement is deleted in its entirety and is replaced with the following:

   "Borrower" means Hallows Movie Inc., a Canadian corporation, registered to do business in the state of Kentucky. For purposes of Paragraphs 4 and 5, Borrower shall mean the following: (i) Hallows Movie Inc., a Canadian corporation, registered to do business in the state of Kentucky; (ii) Hallows Movie LLC, a Puerto Rican limited liability company, currently producing the motion picture entitled *Recovery* in the state of Alabama, and Utopia Film LLC, a Puerto Rican limited liability company that produced the motion picture currently entitled *Utopia*, and is in the process of claiming its Puerto Rican tax credit.

   2.2    Paragraph 4.1.1 of the Loan Agreement is deleted in its entirety and is replaced with the following:

   4.1.1.    Film Collateral and Copyright. The Picture, the motion picture project currently entitled *The Recovery* and the motion picture project entitled *Utopia*, (the "Additional Pictures"), and all of Borrower's rights therein and thereto, and all properties and things of value pertaining thereto, and all products and proceeds thereof, whether now in existence or hereafter made, acquired or produced (as used in this paragraph, the term the "Picture" shall mean and include the Picture, all of the aforesaid rights and the rights of Borrower set forth in subparagraphs 4.2.1.1 through 4.2.1.16 below), including, without limitation:

2.3     Paragraph 4.1.5 of the Loan Agreement is deleted in its entirety and is replaced with the following:

4.1.5 Tax Credit Proceeds. The Tax Credits and Tax Credit Proceeds, whether now owned or hereafter acquired (including all property and/or assets converted or substituted for such Tax Credits or Tax Credit Proceeds), and to the extent not included in the items described herein and above, all Tax Credits and Tax Credit Proceeds whether now owned or hereafter acquired for and to the Additional Pictures.

2.4     The following shall be inserted as Paragraph 4.2.1 of the Loan Agreement:

Concurrently with the execution of this Amendment, Borrower hereby authorizes Lender to file the appropriate financing statement(s) in the applicable jurisdictions under the UCC, pursuant to Exhibits 1 and 2 to this Amendment.

2.5     Paragraph 2.7 of the Loan Agreement is deleted in its entirety and is replaced with the following:

2.7.    Repayment Dates. The Commitment Amount and any Default Interest on the Promissory Note shall be immediately due and payable on the following dates (the "Repayment Date(s)"): (i) US$1,925,000.00 on the earlier of September 14, 2018 or Borrower receiving any monies from the tax incentive proceeds for the Additional Pictures.

3.      **ADDITIONAL AGREEMENT.**

The Parties acknowledge that the an Event of Default occurred and that in the event that Borrower fails to repay US$1,925,000.00, then Lender is entitled to charge Borrower all Default Interest as if the Event of Default had occurred as of February 28, 2018.

4.      **CONDITIONS PRECEDENT TO EFFECTIVENESS OF AMENDMENT.**

This Amendment will be effective when the last of the following has occurred: (i) this Amendment has been executed by both Parties; (ii) Hallows Movie LLC has executed the Assignment and Guaranty set forth as Exhibit 1 hereto; and (iii) Utopia LLC has executed the Assignment and Guaranty set forth as Exhibit 2 hereto.

5.      **REPRESENTATIONS AND WARRANTIES.**

In order to induce Lender to enter into this Amendment, Borrower represents and warrants to Lender that:

5.1     No event has occurred or is continuing which constitutes an Event of Default or potential Event of Default under the Loan Agreement.

5.2     Borrower's representations and warranties contained in the Loan Agreement are true, correct and complete on and as of the date of this Amendment, to the same extent as though the representations and warranties were made on and as of the date of this Amendment.

5.3     Borrower's execution, delivery and performance of this Amendment is within its corporate power and has been duly authorized by all necessary corporate action, and this Amendment

constitutes Borrower's valid and binding agreement, enforceable against Borrower in accordance with its terms subject to the effect of any applicable bankruptcy, insolvency, reorganization or other laws relating to or affecting the enforcement of creditors' rights generally.

6.   **COUNTERPARTS.**

This Amendment may be executed in any number of counterparts, and by different Parties, in separate counterparts, each of which when executed and delivered will be deemed an original, but all of which counterparts together will constitute one and the same instrument.   A signed and delivered facsimile copy of this Agreement, or a signed copy transmitted electronically in either a tagged image format file (TIFF) or a portable document format (PDF), will be binding on the Party signing the facsimile or electronically transmitted copy, and that copy will have the same effect as a signed original. A Party who delivers a facsimile or electronically transmitted signature page agrees to later deliver a signed original to any Party who requests it.

7.   **EFFECTIVE AMENDMENT.**

The Parties agree that, except as specifically provided in this Amendment, this Amendment does not in any way affect or impair the terms and conditions of the Loan Agreement, and all of the terms and conditions of the Loan Agreement are to remain in full force and effect unless otherwise specifically amended, waived or changed pursuant to the terms and conditions of this Amendment.

8.   **APPLICABLE LAW.**

This Amendment and the Parties' rights and obligations and all other aspects of this Amendment are deemed to be made under, are governed by and must be construed and enforced in accordance with the laws of the State of California.

The Parties have entered into this Amendment as of the date indicated on the first page.

HALLOWS MOVIE, INC.

By: _____

Its: __**Managing Member**_____

BONDIT LLC

By: _____

Its: __Managing Member_____

- 4 -

# EXHIBIT "15"

## SECURITY AND GUARANTY AGREEMENT

This SECURITY AND GUARANTY AGREEMENT, dated as of October 20, 2018,(as amended, amended and restated, supplemented or otherwise modified from time to time, this "Agreement"), is made by and between Hallow Movie LLC, a Puerto Rico limited liability company with an address at 1379 Paseo Don Juan San Juan, PR 00907 (the "Guarantor"), and BondIt LLC, a California limited liability company, with an address at 1639 11th St. #160 Santa Monica, CA 90404, (213) 204-6552,  (the "Lender").

## RECITALS

A.       Pursuant to the terms of the Loan and Security Agreement dated as of September 18, 2017 (as amended, supplemented or otherwise modified, renewed or replaced from time to time, the "**Loan and Security Agreement**"), by and between a Canadian Corporation, registered to do business in the state of Kentucky (the "Borrower") and Lender, Lender has made a loan to the Borrower in the amount of One Million Five Hundred Thousand United States Dollars (US$1,500,000.00) (the "Loan").

B.       Borrower failed to comply with the terms of the Loan Agreement and Lender put Borrower in Default under the terms of the Loan Agreement. In consideration for Lender agreeing to this Amendment to the Loan Agreement as set forth in the First Amendment to the Loan and Security Agreement, dated as of October __, 2018, and this Agreement in favor of Lender as described below, Lender has agreed to extend the Maturity Date, as set forth in the Amendment, subject to the terms and conditions of the Amendment, the Loan Agreement, and this Agreement.

C.       Guarantor is now pledging its expected tax credit, along with any other Collateral (as that term is defined in the Loan and Security Agreement) in connection with the motion picture currently entitled *The Recovery,* (the "Picture") which is currently in production in Alabama.

D.       It is a condition precedent to the Amendment that the Guarantor execute and deliver this Agreement.

E.       The parties hereto are entering into this Agreement to provide, among other things, for the grant of the security interest in the Collateral (defined in the Loan and Security Agreement) and a guaranty of the Repayment Amount (as defined in the Loan and Security Agreement as amended) by Guarantor.

## AGREEMENT

NOW THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Guarantor and the Lender hereby agrees as follows:

1.       DEFINITIONS; RULES OF INTERPRETATION.

(a)       Terms Defined in Loan and Security Agreement and the UCC.  Unless otherwise defined herein, terms defined in the Loan and Security Agreement and used herein shall have the meanings assigned to them in the Loan and Security Agreement, or, if not defined herein, capitalized terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC.

(b)       Definitions of Certain Terms Used Herein.  As used in this Agreement, the following terms shall have the following meanings:

"**Agreement**" has the meaning set forth in the preamble hereof.

"**Collateral**" has the meaning set forth in Paragraph 4 (and all sub-paragraphs thereto) of the Loan and Security Agreement, as amended.

"**Distributions**" means all dividends, distributions, cash, instruments, options, warrants, securities, returns of capital or principal, income, interest, profits and other property and proceeds from time to time received or receivable or otherwise made upon or distributed in respect of or in exchange for, or as a result of any redemptions or withdraws in respect of, the Collateral.

"**Event of Default**" means (a) any event contained in Paragraph 9 of the Loan and Security Agreement that gives rise to a repayment of the Loan, or (b) any breach by the Guarantor of this Agreement.

"**Governmental Authority**" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank, self-regulatory organization, exchange or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Lender**" has the meaning set forth in the preamble hereof.

"**Lien**" means (a) with respect to any asset any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset and (b) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Loan Documents**" means the Loan and Security Agreement, the Amendment, and this Agreement and any other document delivered or furnished pursuant to the foregoing.

"**Obligations**" means the aggregate amount of principal and interest on the Loan made to the Borrower and all other fees payable by, and obligations and liabilities (including all indemnification obligations and liabilities, the Borrower (including, without limitation, fees and interest accruing at the then applicable rate provided in the Loan and Security Agreement after the maturity of the Loan and interest accruing at the then applicable rate provided therein after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) to the Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, any Loan Document, or any other document made, delivered or given in connection with any of the foregoing, in each case whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses or otherwise (including, without limitation, all fees and disbursements of one counsel to the Lender in each applicable jurisdiction that are required to be paid by the Borrower pursuant to the Loan Documents).

"**Person**" means any natural person, corporation, limited partnership, general partnership, limited liability company, limited liability partnership, joint stock company, joint venture, association, company, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, and any Governmental Authority.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in Puerto Rico; provided, however, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Lender's security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Delaware, the term "**UCC**" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

2.    GRANT OF SECURITY INTEREST.  The Guarantor hereby irrevocably and unconditionally pledges, assigns and grants to the Lender a security interest in all of the Guarantor's right, title and interest in,

- 2 -

to the Picture and the Collateral, as collateral security to secure the payment and performance in full of all the Obligations.

3.    APPROVALS.

Guarantor must obtain written approval by Lender with respect to any broker, lender, financier, or similar third party, prior to entering into an agreement in connection with the Tax Credits or Tax Credit Proceeds for the Picture.

4.    OBLIGATIONS.

The Collateral secures the payment and performance of the Obligations.

5.    THE GUARANTOR'S REPRESENTATIONS AND WARRANTIES.

The Guarantor represents and warrants to Lender all of the Representations and Warranties set forth in paragraph 5 of the Loan and Security Agreement, and those Representation and Warranties are incorporated herein by reference as is if set forth in their entirety herein.

6.    CERTAIN COVENANTS. The Guarantor hereby covenants to the Lender that, unless compliance is waived in writing by the Lender, from and after the date of this Agreement until the Obligations have been paid in full:

(a)    The Guarantor will keep the Collateral free of all liens, claims, security interests and encumbrances of any kind or nature, whether voluntary or involuntary.

(b)    The Guarantor agrees to pay prior to delinquency all taxes, charges, liens and assessments against the Collateral, and upon the failure of the Guarantor to do so, the Lender at its option may pay any of them and shall be the sole judge of the legality or validity thereof and the amount necessary to discharge the same.

(c)    The Guarantor shall not voluntarily (i) sell, assign, lease, transfer, trade, withdraw, redeem, substitute or otherwise dispose of any of the Collateral, or enter into any agreement to do so.

(d)    The Guarantor shall give the Lender at least ten (10) days prior written notice before changing its name, its jurisdiction of organization or, in the case of an individual, the location of its principal residence.

7.    THE LENDER APPOINTED ATTORNEY IN FACT. The Guarantor authorizes and irrevocably appoints the Lender as the Guarantor's true and lawful attorney-in-fact with full power of substitution to take any action and execute or otherwise authenticate any record or other documentation that the Lender considers necessary or advisable to accomplish the purposes of this Agreement, including but not limited to, the following actions (but the Lender shall not be obligated to and shall have no liability to the Guarantor or any third party for failure to so do or take action): (a) to endorse, receive, accept and collect all checks, drafts, other payment orders and instruments representing or included in the Collateral or representing any payment, dividend or distribution relating to any Collateral or to take any other action to enforce, collect or compromise any of the Collateral; (b) to transfer any Collateral into the name of the Lender or its nominee or any broker-dealer (which may be an affiliate of the Lender) and to execute any control agreement covering any Collateral on the Guarantor's behalf and as attorney-in-fact for the Guarantor in order to perfect the Lender's first priority and continuing security interest in the Collateral and in order to provide the Lender with control of the Collateral, and the Guarantor's signature on this Agreement or other authentication of this Agreement shall constitute an irrevocable direction by the Guarantor to any bank, custodian, broker dealer, any other securities intermediary or holding any Collateral to comply with any instructions or entitlement orders, of the Lender without further

- 3 -

consent of the Guarantor; (c) to exercise any right, privilege or option pertaining to any Collateral; (d) to file any claims, take any actions or institute any proceedings which the Lender determines to be necessary or appropriate to collect or preserve the Collateral or to enforce the Lender's rights with respect to the Collateral; (e) to execute in the name or otherwise authenticate on behalf of the Guarantor any record reasonably believed necessary or appropriate by the Lender for compliance with laws, rules or regulations applicable to any Collateral, or in connection with exercising the Lender's rights under this Agreement; (f) to file any financing statement relating to this Agreement electronically, and the Lender's transmission of the Guarantor's signature on and authentication of the financing statement shall constitute the Guarantor's signature on and authentication of the financing statement; (g) to make any compromise or settlement it deems desirable or proper with reference to the Collateral; (h) to do and take any and all actions with respect to the Collateral and to perform any of the Guarantor's obligations under this Agreement; and (i) to execute any documentation reasonably believed necessary by the Lender for compliance with any restrictions, laws, rules or regulations applicable to any Collateral hereunder that constitutes restricted or control securities under the securities laws.  The foregoing appointments are (i) coupled with an interest and irrevocable until this Agreement is terminated and (ii) unless earlier terminated pursuant to clause (i) of this sentence, shall (x) shall survive the death, disability or liquidation of the Guarantor and (y) not be revoked without the Lender's written consent.  To the extent permitted by law, the Guarantor hereby ratifies all said attorney-in-fact shall lawfully do by virtue hereof.

8.    GUARANTY.

(a)    Unconditional Guarantee.   Guarantor hereby unconditionally, absolutely and irrevocably guarantees to Lender and its successors and assigns the full, faithful and complete performance by Guarantor of each and every covenant, agreement, duty, liability and/or obligation (known, unknown, fixed, contingent or otherwise) of Guarantor under or contained in the Loan and Security Agreement including, without limitation, the due and timely payment of all amounts payable by Guarantor under the Loan and Security Agreement, all in strict accordance with the terms and provisions of the Loan and Security Agreement (collectively the "Guarantor Obligations"), and all as if Guarantor were the primary obligor with respect to each and all of the Guarantor Obligations.  Guarantor acknowledges and agrees that this Guarantee Agreement constitutes a guarantee of payment and performance and not merely of collection.

(b)    Certain Authorizations.   Guarantor authorizes Lender, without notice or demand and without affecting Guarantor's liability hereunder, without prejudice to Guarantor' rights and remedies under the Loan and Security Agreement, from time to time to renew, compromise, extend, accelerate or otherwise change the time for payment of or otherwise change the terms of any of the Guarantor Obligations or any part thereof, including increase or decrease of any rate of interest thereon; take and hold security for the payment of any or all of the Guarantor Obligations, and exchange, enforce, waive and release any such security; apply such security and direct the order or manner of sale thereof as Lender in its discretion may determine; and release and/or substitute any one or more of any endorsers or Guarantor for any or all of the Guarantor Obligations.

(c)    Subordination.   Guarantor hereby subordinates any indebtedness of Guarantor now or hereafter held by Guarantor to the Guarantor Obligations, and Guarantor shall collect, enforce and receive such indebtedness of Guarantor to Guarantor, if Lender so requests, as trustee for Lender and shall pay over to Lender all collections on and proceeds of such indebtedness of Guarantor to Lender, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guarantee Agreement.

(d)    No Subrogation. Guarantor hereby: (a) expressly and irrevocably waives, to the fullest extent possible, on behalf of itself and its successors and assigns (including any surety) and any other Person, any and all rights at law or in equity to subrogation, to reimbursement, to exoneration, to contribution, to indemnification, to set off or to any other rights that could accrue to a surety against a principal, to a guarantor against a maker or obligor, to an accommodation party against the party accommodated, to a holder or transferee against a maker, or to the holder of any claim against any Person, and which Guarantor may have or hereafter acquire against Guarantor or any Person in connection with or as a result of Guarantor's execution, delivery and/or performance of this Guarantee Agreement, or any other documents to which Guarantor is a party or

- 4 -

otherwise; (b) expressly and irrevocably waives any "claim" (as such term is defined in the United States Bankruptcy Code) of any kind against Guarantor, and further agrees that it shall not have or assert any rights with respect to any such claim against any Person (including any surety), either directly or as an attempted set off to any action commenced against Guarantor by any of the Lender; and (c) acknowledges and agrees (i) that this waiver is intended to benefit Lender and shall not limit or otherwise affect Guarantor's liability hereunder or the enforceability of this Guarantee Agreement, and (ii) that the rights of Lender under this sentence shall survive payment and performance in full of the Guarantor Obligations.

(e) Certain Waivers. Neither any Lender nor any other Person shall be required to take any action of any kind or nature against Guarantor or any other Person, or resort to any security held by Lender or any other Person, at any time before Lender may proceed against Guarantor on this Guarantee Agreement. Each of the Guarantor hereby expressly waives, relinquishes and releases, in any action brought on, arising out of or relating to this Guarantee Agreement or otherwise: (a) pursuant to California Civil Code Section 2856(a)(1), all of Guarantor's rights of subrogation, reimbursement, indemnification and contribution and any other rights and defenses that are or may become available to Guarantor by reason of California Civil Code Sections 2787 to 2855, inclusive, (b) pursuant to California Civil Code Section 2856(a)(2), all rights or defenses Guarantor may have in respect of its obligations as a guarantor by reason of any election of remedies by the Lender, even if that election of remedies has destroyed Guarantor's rights of subrogation and reimbursement against Guarantor, (c) any claim (i) that any obligation of Guarantor hereunder is larger in amount or more burdensome than that of Guarantor, (ii) based on Guarantor' liability ceasing for any reason, (iii) that this Guarantee Agreement may be revoked, (iv) based on any alteration of any original Obligation without Guarantor's consent, (v) that acceptance by Lender of anything in partial satisfaction of the Guarantor Obligations reduces the obligations of Guarantor hereunder, (vi) that performance or any offer of performance of any or all of the Guarantor Obligations exonerates Guarantor, (vii) that Guarantor may require any Lender to proceed against Guarantor or pursue any other remedy, (viii) that Guarantor may compel Guarantor to perform any Obligation when due, (ix) that if Guarantor satisfies any of the Guarantor Obligations in whole or in part, Guarantor is bound to reimburse Guarantor, (x) that Guarantor, upon satisfying all or any part of the Guarantor Obligations, is entitled to enforce any remedy which a Lender then has against Guarantor, (xi) that Guarantor is entitled to the benefit of any security for the performance of any of the Guarantor Obligations, (xii) that as to any property of Guarantor that has been hypothecated with property of Guarantor, Guarantor is entitled to have Guarantor' property first applied to discharge of the Guarantor Obligations, (xiii) that Lender, or any other Person, must resort to property upon which a Lender, or such other Person, has a lien in any particular order, or must otherwise marshal any such liens, or (xiv) that Guarantor may require a Lender, or any other Person, to seek satisfaction from funds to which Guarantor has no claim or to marshal assets, (d) any claim, right or defense based upon any other action or circumstance which might otherwise constitute a legal or equitable discharge, defense or exoneration of a guarantor or surety, (e) notice of the acceptance of this Guarantee Agreement by any Person, (f) notice of the Guarantor Obligations now existing or which may hereafter exist or be created or incurred, (g) notice of any adverse change in the financial condition of Guarantor or of any other fact that might increase Guarantor's risk hereunder, (h) presentment, notice of demand for payment or performance, notice of default or nonpayment or nonperformance, protest, notice of protest, and notice of dishonor, under the Loan and Security Agreement or any other agreement in connection therewith (or any of them) or otherwise in respect of any of the Guarantor Obligations and (i) all other notices to which Guarantor might otherwise be entitled in connection with this Guarantee Agreement, the Loan and Security Agreement or any other agreement in connection therewith (or any of them) or otherwise in respect of any Obligation.

(f) Non-Impairment by Bankruptcy. Guarantor's liability hereunder shall continue notwithstanding, and shall be unaltered, unaffected and unimpaired by, (a) the bankruptcy, insolvency, reorganization, merger, liquidation, dissolution, winding-up or cessation of existence of Guarantor or any other Person, and/or (b) any fraudulent, illegal or improper act by Guarantor, and/or (c) any payment made on the Guarantor Obligations which the recipient repays or is liable to repay to Guarantor or any other Person pursuant to any court order or as otherwise required by law.

(g)     Effect of Non-Enforcement. Guarantor hereby covenants and agrees that the failure by a Lender, or any other Person, to file or enforce a claim against Guarantor or Guarantor, or any other Person, shall not affect Guarantor's liability hereunder nor shall Guarantor be released from liability hereunder if recovery from Guarantor, any other guarantor, payor, endorser or surety in respect of any of the Guarantor Obligations or any other Person becomes barred by any statute of limitations applicable to any cause of action upon any Obligation or upon this Guarantee Agreement or any obligation or liability founded upon this Guarantee Agreement. The obligations of Guarantor hereunder are independent of the obligations of Guarantor under the Loan and Security Agreement or any other agreement in connection therewith (and each of them) and of any security for or other guarantee of the Guarantor Obligations. In the event of a default in the performance of any of the Guarantor Obligations, a Lender may maintain an action against any or all Guarantor upon this Guarantee Agreement, whether or not Guarantor is joined therein or a separate action is brought against Guarantor.

9.     REMEDIES.

(a)     If an Event of Default occurs and is continuing, the Lender may do any one or more of the following, to the extent permitted by law with respect to any of the Collateral:

(i)     Exercise as to any or all of the Collateral all the rights, powers and remedies of a secured party.

(ii)     Enforce the security interest given hereunder pursuant to the UCC and any other applicable law or in equity.

(iii)     Exercise any and all rights as beneficial and legal owner of the Collateral, including perfecting assignment of and exercising any and all voting, conversion, registration, purchase, consensual and other rights and powers of a holder of any Collateral.

(iv)     Personally, or by agents or attorneys, immediately take possession of the Collateral or any part thereof, from the Guarantor or any other Person who then has possession of any part thereof with or without notice or process of law.

(v)     Demand, sue for, collect or receive any money or property at any time payable or receivable in respect of the Collateral including instructing the obligor or obligors on any agreement, instrument or other obligation constituting part of the Collateral to make any payment required by the terms of such agreement, instrument or other obligation directly to the Lender, and in connection with any of the foregoing, compromise, settle, extend the time for payment and make other modifications with respect thereto; provided, however, that in the event that any such payments are made directly to the Guarantor, prior to receipt by any such obligor of such instruction, the Guarantor shall segregate all amounts received pursuant thereto in trust for the benefit of the Lender and shall promptly (but in no event later than two (2) business days after receipt thereof) pay such amounts to the Lender.

(vi)     Retain and apply the Distributions to the Obligations as provided in provided in Section 9(b).

(vii)     Sell all or any part of the Collateral at public or private sale in accordance with the UCC, without advertisement, in such manner and order as the Lender may elect. The Lender may execute any sale of the Collateral through an affiliate of the Lender. The Lender or any affiliate of the Lender may purchase the Collateral for its own account at any such sale. The Lender shall give the Guarantor such notice of any public or private sale as may be required by the UCC, provided that to the extent notice of any such sale is required by the UCC or other applicable law, the Guarantor agrees that at least ten (10) days' notice to the Guarantors of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Guarantor further acknowledges that a private sale may result in

- 6 -

prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that no such private sale shall, to the extent permitted by applicable law, be deemed not to be "commercially reasonable" solely as a result of such prices and other sale terms. The Guarantor acknowledges and agrees that the Lender, in conducting a private sale, may impose such conditions as the Lender deems appropriate to insure a lawful sale under the securities laws, including, without limitation, the right to approach and negotiate with only a limited number of potential purchasers, and to restrict purchasers to those who can make appropriate representations and warranties. Upon any such sale, the Lender shall have the right to deliver, assign and transfer to the buyer thereof the Collateral so sold. Each buyer at any such sale shall hold the Collateral so sold absolutely and free from any claim or right of whatsoever kind, including any equity or right of redemption of the Guarantor that may be waived or any other right or claim of the Guarantor, and the Guarantor, to the extent permitted by law, hereby specifically waives all rights of redemption, stay or appraisal that such Guarantor has or may have under any law now existing or hereafter adopted. Any sale of the Collateral hereunder may be without giving any warranties as to the Collateral. The Lender may specifically disclaim any warranties of title or the like. This procedure will not be considered to affect adversely the commercial reasonableness of any sale or other disposition of the Collateral

(viii)   Comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and such compliance will not be considered to affect adversely the commercial reasonableness of any sale or other disposition of the Collateral.

(b)   All cash proceeds received by or on behalf of the Lender in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall, unless otherwise required by applicable law or a Government Authority, following the payment of the fees and expenses of the Lender related to such sale, collection and/or realization and enforcement hereunder, be applied by the Lender to the Obligations in such order as the Lender may elect. Any surplus of such cash or cash proceeds held by or on behalf of the Lender and remaining after payment in full of all the Obligations shall be paid to the Guarantor. If the proceeds of sale, collection or other realization of or upon the Collateral pursuant to this Section are insufficient to cover the costs and expenses of such realization and the payment in full of all Obligations, the Guarantor shall remain liable for any deficiency to the extent the Guarantor is obligated therefor under the Loan Documents.

(c)   The Guarantor agrees that the Collateral or any part thereof may be sold by the Lender or any of its affiliate as provided for in this Agreement, and, except as otherwise expressly set forth in this Agreement, expressly waives any rights of notice of sale, advertisement procedures, or related provisions granted under applicable law. The Guarantor hereby waive, to the fullest extent permitted by applicable law, notice or judicial hearing in connection with the Lender's taking possession or the Lender's disposition of the Collateral or any part thereof, including any and all prior notice and hearing for any prejudgment remedy or remedies and any such right which the Guarantor would otherwise have under law, and the Guarantor hereby further waive, to the fullest extent permitted by applicable law: (i) all damages occasioned by such taking of possession; (ii) all other requirements as to the time, place and terms of sale or other requirements with respect to the enforcement of the Lender's rights hereunder; and (iii) all rights of redemption, appraisal, valuation, stay, extension or moratorium now or hereafter in force under any applicable law. The Lender shall not be liable for any incorrect or improper payment made pursuant to this Section 8 in the absence of bad faith, gross negligence or willful misconduct on the part of the Lender as determined by a court of competent jurisdiction by final and nonapplicable judgment. Any sale of, or the grant of options to purchase, or any other realization upon, any Collateral shall operate to divest all right, title, interest, claim and demand, either at law or in equity, of the Guarantor[s] therein and thereto, and shall be a perpetual bar both at law and in equity against the Guarantor and against any and all Persons claiming or attempting to claim the Collateral so sold, optioned or realized upon, or any part thereof, from, through or under the Guarantor.

(d)   The Guarantor shall not attempt to hold the Lender responsible for selling any of the Collateral at an inadequate price even if the Lender accepts the first offer received or if only one possible purchaser appears or bids at any sale thereof.

(e)     The Guarantor will cooperate fully with the Lender with respect to any sale or liquidation by the Lender of any of the Collateral, including full and complete compliance with all requirements of applicable securities laws, and will give to the Lender all information and will do all things necessary, including the execution of all documents, forms, instruments and other items, for the complete and unrestricted sale and/or transfer the Collateral or any portion thereof.

(f)     The Guarantor further agrees that a breach of any of the covenants contained in this Section 8(d) will cause irreparable injury to the Lender, that the Lender has no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section 8(d) shall be specifically enforceable against the Guarantor, and the Guarantor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred and is continuing or payment in full of the Obligations.

10.     LIMITATION ON THE LENDER'S DUTIES.  Except for reasonable care in the custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Lender shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.  The Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Lender accords its own property, it being understood that the Lender shall not have any responsibility for (a) ascertaining, exercising or taking other action or giving the Guarantor[s] notice with respect to subscription rights, calls, conversions, exchanges, maturities, lenders or other matters relative to any Collateral, whether or not the Lender has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve rights against any parties with respect to any Collateral.  The Lender shall not be liable for any loss to the Collateral resulting from acts of God, war, civil commotion, fire, earthquake, or other disaster or for any other loss or damage to the Collateral except to the extent such loss is determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the Lender's gross negligence or willful misconduct.

11.     WAIVERS.  The Lender shall be under no duty or obligation whatsoever and the Guarantor waives any right to require the Lender to (a) make or give any presentment, demands for performances, notices of nonperformance, protests, notices of protest or notices of dishonor in connection with any obligations or evidences of indebtedness held by the Lender as Collateral, or in connection with any obligation or evidences of indebtedness which constitute in whole or in part the Obligations, (b) proceed against any Person, (c) proceed against or exhaust any Collateral, or (d) pursue any other remedy in the Lender's power; and the Guarantor waives any defense arising by reason of any disability or other defense of any other Person, or by reason of the cessation from any cause whatsoever of the liability of any other Person.

12.     CONTINUING AGREEMENT AND POWERS.

(a)     This is a continuing Agreement and all the rights, powers and remedies hereunder shall apply to all Obligations, notwithstanding, without limitation, the death, incapacity, cessation of business, dissolution or bankruptcy of the Guarantor or any other Person, or any other event or proceeding affecting the Guarantor or any other Person.

(b)     Until all Obligations shall have been indefeasibly paid in full, the power of sale and all other rights, powers and remedies granted to the Lender hereunder shall continue to exist and may be exercised by the Lender at the time specified hereunder irrespective of the fact that the Obligations or any part thereof may have become barred by any statute of limitations, or that the personal liability of the Guarantor may have ceased.  The Guarantor waives the benefit of any statute of limitations as applied to this Agreement.

13.     COSTS.  All reasonable costs and expenses, including reasonable attorney's fees, incurred or paid by the Lender in exercising any right, power or remedy conferred by this Agreement or in the enforcement thereof, shall become a part of the Obligations secured hereunder and shall be paid to the Lender by the Guarantor

- 8 -

not later than ten (10) days after written demand therefor. The provisions of this Section 13 shall survive the termination of this Agreement or any provision hereof.

14.    NOTICES.  Unless otherwise provided herein, any notice or other communication herein required or permitted to be given shall be given in the manner and become effective as set forth in the Loan and Security Agreement, (a) as to the Guarantor, at the address, facsimile number, telephone number or email address as set forth above and (b) as to the Lender, at the address, facsimile number or telephone number or email address of the Lender set forth above, or in each case at such other address, facsimile number, telephone number or email address as shall be designated by such party in a written notice to the other party complying as to delivery with the terms of this Section 14.

15.    GOVERNING LAW; JURISDICTION; SERVICE OF PROCESS; WAIVER OF JURY TRIAL.

(a)    Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of California.

(b)    JURISDICTION AND WAIVER OF JURY TRIAL.  The provisions of Paragraph 10.7 of the Loan and Security Agreement are incorporated herein by reference.

16.    CONTINUING SECURITY INTEREST.

(a)    This Agreement shall create a continuing security interest in the Collateral and (i) shall be binding upon and inure to the benefit (i) of the Guarantor and its successors, assigns, executors, administrators, personal representatives, heirs and legatees, and (ii) of the Lender and its successors, assignees and transferees; provided, however, that the Guarantor may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lender (and any attempted assignment or transfer by the Guarantor without such consent shall be null and void).  No other Persons (including any other creditor of the Guarantor) shall have any interest herein or any right or benefit with respect hereto.

(b)    The Guarantor agrees that its Obligations and the security interest and pledge created hereunder shall, to the extent permitted by law, continue to be effective or be reinstated, as applicable, if at any time payment, or any part thereof, of all or any part of the Obligations is rescinded or must otherwise be restored by the Lender upon the bankruptcy or reorganization of the Guarantor or otherwise.

17.    TERMINATION. When the Loan and other Obligations have been paid in full in cash (other than contingent indemnification obligations for which no demand has been made by the Lender on the Borrower), this Agreement shall terminate and all obligations of the Guarantor hereunder shall terminate (other than those obligations which, pursuant to the express terms of this Agreement, survive termination of this Agreement), all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to the Guarantor.  Upon termination of this Agreement, the Collateral (or any remaining portion thereof) shall be released from the Lien of this Agreement and the security interest granted hereunder shall be terminated. At the request of the Borrower or Guarantor and at the expense of the Borrower or Guarantor, following any such termination, the Lender shall promptly return all instruments previously delivered to the Lender representing any Collateral and execute and deliver to the Borrower or Guarantor such documents (including without limitation UCC-3 termination statements) as the Borrower or Guarantor may reasonably request to evidence such termination.

18.    MISCELLANEOUS.

(a)    Amendments.  This Agreement may be waived, altered, modified or amended only by an instrument in writing, duly executed by the Lender and the Guarantor.

(b)     <u>Counterparts</u>. This Agreement may be executed in any number of identical counterparts, each of which shall be deemed an original for all purposes and all of which constitute, collectively, one agreement. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.

(c)     <u>Filing Authorization</u>. The Guarantor hereby irrevocably authorizes the Lender to file one or more financing statements describing all or part of the Collateral in any filing office or jurisdiction as the Lender may determine in its sole discretion, and continuation statements, or amendments thereto, relative to all or part of the Collateral as authorized by applicable law. Such financing statements, continuation statements and amendments will contain any other information required by the UCC for the sufficiency or filing office acceptance of any financing statement, continuation statement or amendment. The Guarantor agrees to furnish any such information to the Lender promptly upon request. The Guarantor also ratifies its authorization for the Lender to have filed any initial financing statement or amendments thereto filed prior to the date hereof.

(d)     <u>Further Assurances</u>. From time to time, the Guarantor shall, at the request of the Lender, execute such other agreements, documents or instruments (including, without limitation, any stock powers, instructions to any securities intermediary, issuer or transfer agent, proxies, or any other documents of transfer) or take any other actions in connection with this Agreement as the Lender may reasonably deem necessary to evidence or perfect the security interests granted herein, to maintain the first priority of the security interests, or to effectuate the rights granted to the Lender herein, but their failure to do so shall not limit or affect any security interest or any other rights of the Lender in and to the Collateral. Such powers or documents may be executed in blank or completed prior to execution, as requested by the Lender.

(e)     <u>No Waiver</u>. No failure or delay by the Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Lender hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that the Lender would otherwise have. Any waiver, express or implied, of any provision hereof and any delay or failure by the Lender to enforce any provision shall not preclude the Lender from enforcing any such provision thereafter.

(f)     <u>Severability</u>. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURE PAGES FOLLOW.]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by as of the day and year first above written.

GUARANTOR

By: _____

Name: **Alex Ginzburg and Tony Lee**

Title: **Managing Members**

LENDER

By: _____

Name: **Matthew Helderman**

Title: **CEO**

[Signature Page to Security and Guaranty Agreement]

# EXHIBIT "16"

## SECURITY AND GUARANTY AGREEMENT

This SECURITY AND GUARANTY AGREEMENT, dated as of October 20, 2018,(as amended, amended and restated, supplemented or otherwise modified, renewed or replaced from time to time, this "Agreement"), is made by and between Utopia Film LLC, a Puerto Rico limited liability company with an address at 1379 Paseo Don Juan San Juan, PR 00907 (the "Guarantor"), and BondIt LLC, a California limited liability company, with an address at 1639 11th St. #160 Santa Monica, CA 90404, (213) 204-6552,  (the "Lender").

### RECITALS

A.      Pursuant to the terms of the Loan and Security Agreement dated as of September 18, 2017 (as amended, supplemented or otherwise modified, renewed or replaced from time to time, the "**Loan and Security Agreement**"), by and between a Canadian Corporation, registered to do business in the state of Kentucky (the "Borrower") and Lender, Lender has made a loan to the Borrower in the amount of One Million Five Hundred Thousand United States Dollars (US$1,500,000.00) (the "Loan").

B.      Borrower failed to comply with the terms of the Loan Agreement and Lender put Borrower in Default under the terms of the Loan Agreement. In consideration for Lender agreeing to this Amendment to the Loan Agreement as set forth in the First Amendment to the Loan and Security Agreement, dated as of October __, 2018, and this Agreement in favor of Lender as described below, Lender has agreed to extend the Maturity Date, as set forth in the Amendment, subject to the terms and conditions of the Amendment, the Loan Agreement, and this Agreement.

C.      Guarantor is now pledging its expected tax credit, along with any other Collateral (as that term is defined in the Loan and Security Agreement) in connection with the motion picture currently entitled *Utopia*, (the "Picture") which is currently in production in Puerto Rico and is fifty percent (50%) completed.

D.      It is a condition precedent to the Amendment that the Guarantor execute and deliver this Agreement.

E.      The parties hereto are entering into this Agreement to provide, among other things, for the grant of the security interest in the Collateral (defined in the Loan and Security Agreement) and a guaranty of the Repayment Amount (as defined in the Loan and Security Agreement as amended) by Guarantor.

### AGREEMENT

NOW THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Guarantor and the Lender hereby agrees as follows:

1.      DEFINITIONS; RULES OF INTERPRETATION.

(a)     Terms Defined in Loan and Security Agreement and the UCC.  Unless otherwise defined herein, terms defined in the Loan and Security Agreement and used herein shall have the meanings assigned to them in the Loan and Security Agreement, or, if not defined herein, capitalized terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC.

(b)     Definitions of Certain Terms Used Herein.  As used in this Agreement, the following terms shall have the following meanings:

"**Agreement**" has the meaning set forth in the preamble hereof.

"**Collateral**" has the meaning set forth in Paragraph 4 (and all sub-paragraphs thereto) of the Loan and Security Agreement, as amended.

"**Distributions**" means all dividends, distributions, cash, instruments, options, warrants, securities, returns of capital or principal, income, interest, profits and other property and proceeds from time to time received or receivable or otherwise made upon or distributed in respect of or in exchange for, or as a result of any redemptions or withdraws in respect of, the Collateral.

"**Event of Default**" means (a) any event contained in Paragraph 9 of the Loan and Security Agreement that gives rise to a repayment of the Loan, or (b) any breach by the Guarantor of this Agreement.

"**Governmental Authority**" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank, self-regulatory organization, exchange or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Lender**" has the meaning set forth in the preamble hereof.

"**Lien**" means (a) with respect to any asset any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset and (b) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Loan Documents**" means the Loan and Security Agreement, the Amendment, and this Agreement and any other document delivered or furnished pursuant to the foregoing.

"**Obligations**" means the aggregate amount of principal and interest on the Loan made to the Borrower and all other fees payable by, and obligations and liabilities (including all indemnification obligations and liabilities, the Borrower (including, without limitation, fees and interest accruing at the then applicable rate provided in the Loan and Security Agreement after the maturity of the Loan and interest accruing at the then applicable rate provided therein after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) to the Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, any Loan Document, or any other document made, delivered or given in connection with any of the foregoing, in each case whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses or otherwise (including, without limitation, all fees and disbursements of one counsel to the Lender in each applicable jurisdiction that are required to be paid by the Borrower pursuant to the Loan Documents).

"**Person**" means any natural person, corporation, limited partnership, general partnership, limited liability company, limited liability partnership, joint stock company, joint venture, association, company, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, and any Governmental Authority.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in Puerto Rico; provided, however, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Lender's security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Delaware, the term "**UCC**" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

2.     GRANT OF SECURITY INTEREST. The Guarantor hereby irrevocably and unconditionally pledges, assigns and grants to the Lender a security interest in all of the Guarantor's right, title and interest in,

- 2 -

to the Picture and the Collateral, as collateral security to secure the payment and performance in full of all the Obligations.

3.   APPROVALS.

Guarantor must obtain written approval by Lender with respect to any broker, lender, financier, or similar third party, prior to entering into an agreement in connection with the Tax Credits or Tax Credit Proceeds for the Picture.

4.   OBLIGATIONS.

The Collateral secures the payment and performance of the Obligations.

5.   THE GUARANTOR'S REPRESENTATIONS AND WARRANTIES.

The Guarantor represents and warrants to Lender all of the Representations and Warranties set forth in paragraph 5 of the Loan and Security Agreement, and those Representation and Warranties are incorporated herein by reference as is if set forth in their entirety herein.

6.   CERTAIN COVENANTS.   The Guarantor hereby covenants to the Lender that, unless compliance is waived in writing by the Lender, from and after the date of this Agreement until the Obligations have been paid in full:

(a)   The Guarantor will keep the Collateral free of all liens, claims, security interests and encumbrances of any kind or nature, whether voluntary or involuntary.

(b)   The Guarantor agrees to pay prior to delinquency all taxes, charges, liens and assessments against the Collateral, and upon the failure of the Guarantor to do so, the Lender at its option may pay any of them and shall be the sole judge of the legality or validity thereof and the amount necessary to discharge the same.

(c)   The Guarantor shall not voluntarily (i) sell, assign, lease, transfer, trade, withdraw, redeem, substitute or otherwise dispose of any of the Collateral, or enter into any agreement to do so.

(d)   The Guarantor shall give the Lender at least ten (10) days prior written notice before changing its name, its jurisdiction of organization or, in the case of an individual, the location of its principal residence.

7.   THE LENDER APPOINTED ATTORNEY IN FACT.   The Guarantor authorizes and irrevocably appoints the Lender as the Guarantor's true and lawful attorney-in-fact with full power of substitution to take any action and execute or otherwise authenticate any record or other documentation that the Lender considers necessary or advisable to accomplish the purposes of this Agreement, including but not limited to, the following actions (but the Lender shall not be obligated to and shall have no liability to the Guarantor or any third party for failure to so do or take action): (a) to endorse, receive, accept and collect all checks, drafts, other payment orders and instruments representing or included in the Collateral or representing any payment, dividend or distribution relating to any Collateral or to take any other action to enforce, collect or compromise any of the Collateral; (b) to transfer any Collateral into the name of the Lender or its nominee or any broker-dealer (which may be an affiliate of the Lender) and to execute any control agreement covering any Collateral on the Guarantor's behalf and as attorney-in-fact for the Guarantor in order to perfect the Lender's first priority and continuing security interest in the Collateral and in order to provide the Lender with control of the Collateral, and the Guarantor's signature on this Agreement or other authentication of this Agreement shall constitute an irrevocable direction by the Guarantor to any bank, custodian, broker dealer, any other securities intermediary or holding any Collateral to comply with any instructions or entitlement orders, of the Lender without further

consent of the Guarantor; (c) to exercise any right, privilege or option pertaining to any Collateral; (d) to file any claims, take any actions or institute any proceedings which the Lender determines to be necessary or appropriate to collect or preserve the Collateral or to enforce the Lender's rights with respect to the Collateral; (e) to execute in the name or otherwise authenticate on behalf of the Guarantor any record reasonably believed necessary or appropriate by the Lender for compliance with laws, rules or regulations applicable to any Collateral, or in connection with exercising the Lender's rights under this Agreement; (f) to file any financing statement relating to this Agreement electronically, and the Lender's transmission of the Guarantor's signature on and authentication of the financing statement shall constitute the Guarantor's signature on and authentication of the financing statement; (g) to make any compromise or settlement it deems desirable or proper with reference to the Collateral; (h) to do and take any and all actions with respect to the Collateral and to perform any of the Guarantor's obligations under this Agreement; and (i) to execute any documentation reasonably believed necessary by the Lender for compliance with any restrictions, laws, rules or regulations applicable to any Collateral hereunder that constitutes restricted or control securities under the securities laws. The foregoing appointments are (i) coupled with an interest and irrevocable until this Agreement is terminated and (ii) unless earlier terminated pursuant to clause (i) of this sentence, shall (x) shall survive the death, disability or liquidation of the Guarantor and (y) not be revoked without the Lender's written consent. To the extent permitted by law, the Guarantor hereby ratifies all said attorney-in-fact shall lawfully do by virtue hereof.

8.    GUARANTY.

(a)    Unconditional Guarantee.    Guarantor hereby unconditionally, absolutely and irrevocably guarantees to Lender and its successors and assigns the full, faithful and complete performance by Guarantor of each and every covenant, agreement, duty, liability and/or obligation (known, unknown, fixed, contingent or otherwise) of Guarantor under or contained in the Loan and Security Agreement including, without limitation, the due and timely payment of all amounts payable by Guarantor under the Loan and Security Agreement, all in strict accordance with the terms and provisions of the Loan and Security Agreement (collectively the "Guarantor Obligations"), and all as if Guarantor were the primary obligor with respect to each and all of the Guarantor Obligations. Guarantor acknowledges and agrees that this Guarantee Agreement constitutes a guarantee of payment and performance and not merely of collection.

(b)    Certain Authorizations.    Guarantor authorizes Lender, without notice or demand and without affecting Guarantor's liability hereunder, without prejudice to Guarantor' rights and remedies under the Loan and Security Agreement, from time to time to renew, compromise, extend, accelerate or otherwise change the time for payment of or otherwise change the terms of any of the Guarantor Obligations or any part thereof, including increase or decrease of any rate of interest thereon; take and hold security for the payment of any or all of the Guarantor Obligations, and exchange, enforce, waive and release any such security; apply such security and direct the order or manner of sale thereof as Lender in its discretion may determine; and release and/or substitute any one or more of any endorsers or Guarantor for any or all of the Guarantor Obligations.

(c)    Subordination.    Guarantor hereby subordinates any indebtedness of Guarantor now or hereafter held by Guarantor to the Guarantor Obligations, and Guarantor shall collect, enforce and receive such indebtedness of Guarantor to Guarantor, if Lender so requests, as trustee for Lender and shall pay over to Lender all collections on and proceeds of such indebtedness of Guarantor to Lender, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guarantee Agreement.

(d)    No Subrogation. Guarantor hereby: (a) expressly and irrevocably waives, to the fullest extent possible, on behalf of itself and its successors and assigns (including any surety) and any other Person, any and all rights at law or in equity to subrogation, to reimbursement, to exoneration, to contribution, to indemnification, to set off or to any other rights that could accrue to a surety against a principal, to a guarantor against a maker or obligor, to an accommodation party against the party accommodated, to a holder or transferee against a maker, or to the holder of any claim against any Person, and which Guarantor may have or hereafter acquire against Guarantor or any Person in connection with or as a result of Guarantor's execution, delivery and/or performance of this Guarantee Agreement, or any other documents to which Guarantor is a party or

- 4 -

otherwise; (b) expressly and irrevocably waives any "claim" (as such term is defined in the United States Bankruptcy Code) of any kind against Guarantor, and further agrees that it shall not have or assert any rights with respect to any such claim against any Person (including any surety), either directly or as an attempted set off to any action commenced against Guarantor by any of the Lender; and (c) acknowledges and agrees (i) that this waiver is intended to benefit Lender and shall not limit or otherwise affect Guarantor's liability hereunder or the enforceability of this Guarantee Agreement, and (ii) that the rights of Lender under this sentence shall survive payment and performance in full of the Guarantor Obligations.

(e)     Certain Waivers.  Neither any Lender nor any other Person shall be required to take any action of any kind or nature against Guarantor or any other Person, or resort to any security held by Lender or any other Person, at any time before Lender may proceed against Guarantor on this Guarantee Agreement. Each of the Guarantor hereby expressly waives, relinquishes and releases, in any action brought on, arising out of or relating to this Guarantee Agreement or otherwise: (a) pursuant to California Civil Code Section 2856(a)(1), all of Guarantor's rights of subrogation, reimbursement, indemnification and contribution and any other rights and defenses that are or may become available to Guarantor by reason of California Civil Code Sections 2787 to 2855, inclusive, (b) pursuant to California Civil Code Section 2856(a)(2), all rights or defenses Guarantor may have in respect of its obligations as a guarantor by reason of any election of remedies by the Lender, even if that election of remedies has destroyed Guarantor's rights of subrogation and reimbursement against Guarantor, (c) any claim (i) that any obligation of Guarantor hereunder is larger in amount or more burdensome than that of Guarantor, (ii) based on Guarantor' liability ceasing for any reason, (iii) that this Guarantee Agreement may be revoked, (iv) based on any alteration of any original Obligation without Guarantor's consent, (v) that acceptance by Lender of anything in partial satisfaction of the Guarantor Obligations reduces the obligations of Guarantor hereunder, (vi) that performance or any offer of performance of any or all of the Guarantor Obligations exonerates Guarantor, (vii) that Guarantor may require any Lender to proceed against Guarantor or pursue any other remedy, (viii) that Guarantor may compel Guarantor to perform any Obligation when due, (ix) that if Guarantor satisfies any of the Guarantor Obligations in whole or in part, Guarantor is bound to reimburse Guarantor, (x) that Guarantor, upon satisfying all or any part of the Guarantor Obligations, is entitled to enforce any remedy which a Lender then has against Guarantor, (xi) that Guarantor is entitled to the benefit of any security for the performance of any of the Guarantor Obligations, (xii) that as to any property of Guarantor that has been hypothecated with property of Guarantor, Guarantor is entitled to have Guarantor' property first applied to discharge of the Guarantor Obligations, (xiii) that Lender, or any other Person, must resort to property upon which a Lender, or such other Person, has a lien in any particular order, or must otherwise marshal any such liens, or (xiv) that Guarantor may require a Lender, or any other Person, to seek satisfaction from funds to which Guarantor has no claim or to marshal assets, (d) any claim, right or defense based upon any other action or circumstance which might otherwise constitute a legal or equitable discharge, defense or exoneration of a guarantor or surety, (e) notice of the acceptance of this Guarantee Agreement by any Person, (f) notice of the Guarantor Obligations now existing or which may hereafter exist or be created or incurred, (g) notice of any adverse change in the financial condition of Guarantor or of any other fact that might increase Guarantor's risk hereunder, (h) presentment, notice of demand for payment or performance, notice of default or nonpayment or nonperformance, protest, notice of protest, and notice of dishonor, under the Loan and Security Agreement or any other agreement in connection therewith (or any of them) or otherwise in respect of any of the Guarantor Obligations and (i) all other notices to which Guarantor might otherwise be entitled in connection with this Guarantee Agreement, the Loan and Security Agreement or any other agreement in connection therewith (or any of them) or otherwise in respect of any Obligation.

(f)     Non-Impairment by Bankruptcy.  Guarantor's liability hereunder shall continue notwithstanding, and shall be unaltered, unaffected and unimpaired by, (a) the bankruptcy, insolvency, reorganization, merger, liquidation, dissolution, winding-up or cessation of existence of Guarantor or any other Person, and/or (b) any fraudulent, illegal or improper act by Guarantor, and/or (c) any payment made on the Guarantor Obligations which the recipient repays or is liable to repay to Guarantor or any other Person pursuant to any court order or as otherwise required by law.

(g)     Effect of Non-Enforcement. Guarantor hereby covenants and agrees that the failure by a Lender, or any other Person, to file or enforce a claim against Guarantor or Guarantor, or any other Person, shall not affect Guarantor's liability hereunder nor shall Guarantor be released from liability hereunder if recovery from Guarantor, any other guarantor, payor, endorser or surety in respect of any of the Guarantor Obligations or any other Person becomes barred by any statute of limitations applicable to any cause of action upon any Obligation or upon this Guarantee Agreement or any obligation or liability founded upon this Guarantee Agreement. The obligations of Guarantor hereunder are independent of the obligations of Guarantor under the Loan and Security Agreement or any other agreement in connection therewith (and each of them) and of any security for or other guarantee of the Guarantor Obligations. In the event of a default in the performance of any of the Guarantor Obligations, a Lender may maintain an action against any or all Guarantor upon this Guarantee Agreement, whether or not Guarantor is joined therein or a separate action is brought against Guarantor.

9.     REMEDIES.

(a)     If an Event of Default occurs and is continuing, the Lender may do any one or more of the following, to the extent permitted by law with respect to any of the Collateral:

(i)     Exercise as to any or all of the Collateral all the rights, powers and remedies of a secured party.

(ii)     Enforce the security interest given hereunder pursuant to the UCC and any other applicable law or in equity.

(iii)     Exercise any and all rights as beneficial and legal owner of the Collateral, including perfecting assignment of and exercising any and all voting, conversion, registration, purchase, consensual and other rights and powers of a holder of any Collateral.

(iv)     Personally, or by agents or attorneys, immediately take possession of the Collateral or any part thereof, from the Guarantor or any other Person who then has possession of any part thereof with or without notice or process of law.

(v)     Demand, sue for, collect or receive any money or property at any time payable or receivable in respect of the Collateral including instructing the obligor or obligors on any agreement, instrument or other obligation constituting part of the Collateral to make any payment required by the terms of such agreement, instrument or other obligation directly to the Lender, and in connection with any of the foregoing, compromise, settle, extend the time for payment and make other modifications with respect thereto; provided, however, that in the event that any such payments are made directly to the Guarantor, prior to receipt by any such obligor of such instruction, the Guarantor shall segregate all amounts received pursuant thereto in trust for the benefit of the Lender and shall promptly (but in no event later than two (2) business days after receipt thereof) pay such amounts to the Lender.

(vi)     Retain and apply the Distributions to the Obligations as provided in provided in Section 9(b).

(vii)     Sell all or any part of the Collateral at public or private sale in accordance with the UCC, without advertisement, in such manner and order as the Lender may elect. The Lender may execute any sale of the Collateral through an affiliate of the Lender. The Lender or any affiliate of the Lender may purchase the Collateral for its own account at any such sale. The Lender shall give the Guarantor such notice of any public or private sale as may be required by the UCC, provided that to the extent notice of any such sale is required by the UCC or other applicable law, the Guarantor agrees that at least ten (10) days' notice to the Guarantors of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Guarantor further acknowledges that a private sale may result in

- 6 -

prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that no such private sale shall, to the extent permitted by applicable law, be deemed not to be "commercially reasonable" solely as a result of such prices and other sale terms. The Guarantor acknowledges and agrees that the Lender, in conducting a private sale, may impose such conditions as the Lender deems appropriate to insure a lawful sale under the securities laws, including, without limitation, the right to approach and negotiate with only a limited number of potential purchasers, and to restrict purchasers to those who can make appropriate representations and warranties. Upon any such sale, the Lender shall have the right to deliver, assign and transfer to the buyer thereof the Collateral so sold. Each buyer at any such sale shall hold the Collateral so sold absolutely and free from any claim or right of whatsoever kind, including any equity or right of redemption of the Guarantor that may be waived or any other right or claim of the Guarantor, and the Guarantor, to the extent permitted by law, hereby specifically waives all rights of redemption, stay or appraisal that such Guarantor has or may have under any law now existing or hereafter adopted. Any sale of the Collateral hereunder may be without giving any warranties as to the Collateral. The Lender may specifically disclaim any warranties of title or the like. This procedure will not be considered to affect adversely the commercial reasonableness of any sale or other disposition of the Collateral

(viii)    Comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and such compliance will not be considered to affect adversely the commercial reasonableness of any sale or other disposition of the Collateral.

(b)    All cash proceeds received by or on behalf of the Lender in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall, unless otherwise required by applicable law or a Government Authority, following the payment of the fees and expenses of the Lender related to such sale, collection and/or realization and enforcement hereunder, be applied by the Lender to the Obligations in such order as the Lender may elect. Any surplus of such cash or cash proceeds held by or on behalf of the Lender and remaining after payment in full of all the Obligations shall be paid to the Guarantor. If the proceeds of sale, collection or other realization of or upon the Collateral pursuant to this Section are insufficient to cover the costs and expenses of such realization and the payment in full of all Obligations, the Guarantor shall remain liable for any deficiency to the extent the Guarantor is obligated therefor under the Loan Documents.

(c)    The Guarantor agrees that the Collateral or any part thereof may be sold by the Lender or any of its affiliate as provided for in this Agreement, and, except as otherwise expressly set forth in this Agreement, expressly waives any rights of notice of sale, advertisement procedures, or related provisions granted under applicable law. The Guarantor hereby waive, to the fullest extent permitted by applicable law, notice or judicial hearing in connection with the Lender's taking possession or the Lender's disposition of the Collateral or any part thereof, including any and all prior notice and hearing for any prejudgment remedy or remedies and any such right which the Guarantor would otherwise have under law, and the Guarantor hereby further waive, to the fullest extent permitted by applicable law: (i) all damages occasioned by such taking of possession; (ii) all other requirements as to the time, place and terms of sale or other requirements with respect to the enforcement of the Lender's rights hereunder; and (iii) all rights of redemption, appraisal, valuation, stay, extension or moratorium now or hereafter in force under any applicable law. The Lender shall not be liable for any incorrect or improper payment made pursuant to this Section 8 in the absence of bad faith, gross negligence or willful misconduct on the part of the Lender as determined by a court of competent jurisdiction by final and nonapplicable judgment. Any sale of, or the grant of options to purchase, or any other realization upon, any Collateral shall operate to divest all right, title, interest, claim and demand, either at law or in equity, of the Guarantor[s] therein and thereto, and shall be a perpetual bar both at law and in equity against the Guarantor and against any and all Persons claiming or attempting to claim the Collateral so sold, optioned or realized upon, or any part thereof, from, through or under the Guarantor.

(d)    The Guarantor shall not attempt to hold the Lender responsible for selling any of the Collateral at an inadequate price even if the Lender accepts the first offer received or if only one possible purchaser appears or bids at any sale thereof.

(e)     The Guarantor will cooperate fully with the Lender with respect to any sale or liquidation by the Lender of any of the Collateral, including full and complete compliance with all requirements of applicable securities laws, and will give to the Lender all information and will do all things necessary, including the execution of all documents, forms, instruments and other items, for the complete and unrestricted sale and/or transfer the Collateral or any portion thereof.

(f)     The Guarantor further agrees that a breach of any of the covenants contained in this Section 8(d) will cause irreparable injury to the Lender, that the Lender has no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section 8(d) shall be specifically enforceable against the Guarantor, and the Guarantor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred and is continuing or payment in full of the Obligations.

10.     LIMITATION ON THE LENDER'S DUTIES.  Except for reasonable care in the custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Lender shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral. The Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Lender accords its own property, it being understood that the Lender shall not have any responsibility for (a) ascertaining, exercising or taking other action or giving the Guarantor[s] notice with respect to subscription rights, calls, conversions, exchanges, maturities, lenders or other matters relative to any Collateral, whether or not the Lender has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve rights against any parties with respect to any Collateral. The Lender shall not be liable for any loss to the Collateral resulting from acts of God, war, civil commotion, fire, earthquake, or other disaster or for any other loss or damage to the Collateral except to the extent such loss is determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the Lender's gross negligence or willful misconduct.

11.     WAIVERS.  The Lender shall be under no duty or obligation whatsoever and the Guarantor waives any right to require the Lender to (a) make or give any presentment, demands for performances, notices of nonperformance, protests, notices of protest or notices of dishonor in connection with any obligations or evidences of indebtedness held by the Lender as Collateral, or in connection with any obligation or evidences of indebtedness which constitute in whole or in part the Obligations, (b) proceed against any Person, (c) proceed against or exhaust any Collateral, or (d) pursue any other remedy in the Lender's power; and the Guarantor waives any defense arising by reason of any disability or other defense of any other Person, or by reason of the cessation from any cause whatsoever of the liability of any other Person.

12.     CONTINUING AGREEMENT AND POWERS.

(a)     This is a continuing Agreement and all the rights, powers and remedies hereunder shall apply to all Obligations, notwithstanding, without limitation, the death, incapacity, cessation of business, dissolution or bankruptcy of the Guarantor or any other Person, or any other event or proceeding affecting the Guarantor or any other Person.

(b)     Until all Obligations shall have been indefeasibly paid in full, the power of sale and all other rights, powers and remedies granted to the Lender hereunder shall continue to exist and may be exercised by the Lender at the time specified hereunder irrespective of the fact that the Obligations or any part thereof may have become barred by any statute of limitations, or that the personal liability of the Guarantor may have ceased. The Guarantor waives the benefit of any statute of limitations as applied to this Agreement.

13.     COSTS.  All reasonable costs and expenses, including reasonable attorney's fees, incurred or paid by the Lender in exercising any right, power or remedy conferred by this Agreement or in the enforcement thereof, shall become a part of the Obligations secured hereunder and shall be paid to the Lender by the Guarantor

not later than ten (10) days after written demand therefor. The provisions of this Section 13 shall survive the termination of this Agreement or any provision hereof.

14.   NOTICES.   Unless otherwise provided herein, any notice or other communication herein required or permitted to be given shall be given in the manner and become effective as set forth in the Loan and Security Agreement, (a) as to the Guarantor, at the address, facsimile number, telephone number or email address as set forth above and (b) as to the Lender, at the address, facsimile number or telephone number or email address of the Lender set forth above, or in each case at such other address, facsimile number, telephone number or email address as shall be designated by such party in a written notice to the other party complying as to delivery with the terms of this Section 14.

15.   GOVERNING LAW; JURISDICTION; SERVICE OF PROCESS; WAIVER OF JURY TRIAL.

(a)   Governing Law.   This Agreement shall be governed by, and construed in accordance with, the laws of the State of California.

(b)   JURISDICTION AND WAIVER OF JURY TRIAL.   The provisions of Paragraph 10.7 of the Loan and Security Agreement are incorporated herein by reference.

16.   CONTINUING SECURITY INTEREST.

(a)   This Agreement shall create a continuing security interest in the Collateral and (i) shall be binding upon and inure to the benefit (i) of the Guarantor and its successors, assigns, executors, administrators, personal representatives, heirs and legatees, and (ii) of the Lender and its successors, assignees and transferees; provided, however, that the Guarantor may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lender (and any attempted assignment or transfer by the Guarantor without such consent shall be null and void).  No other Persons (including any other creditor of the Guarantor) shall have any interest herein or any right or benefit with respect hereto.

(b)   The Guarantor agrees that its Obligations and the security interest and pledge created hereunder shall, to the extent permitted by law, continue to be effective or be reinstated, as applicable, if at any time payment, or any part thereof, of all or any part of the Obligations is rescinded or must otherwise be restored by the Lender upon the bankruptcy or reorganization of the Guarantor or otherwise.

17.   TERMINATION. When the Loan and other Obligations have been paid in full in cash (other than contingent indemnification obligations for which no demand has been made by the Lender on the Borrower), this Agreement shall terminate and all obligations of the Guarantor hereunder shall terminate (other than those obligations which, pursuant to the express terms of this Agreement, survive termination of this Agreement), all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to the Guarantor.  Upon termination of this Agreement, the Collateral (or any remaining portion thereof) shall be released from the Lien of this Agreement and the security interest granted hereunder shall be terminated. At the request of the Borrower or Guarantor and at the expense of the Borrower or Guarantor, following any such termination, the Lender shall promptly return all instruments previously delivered to the Lender representing any Collateral and execute and deliver to the Borrower or Guarantor such documents (including without limitation UCC-3 termination statements) as the Borrower or Guarantor may reasonably request to evidence such termination.

18.   MISCELLANEOUS.

(a)   Amendments.   This Agreement may be waived, altered, modified or amended only by an instrument in writing, duly executed by the Lender and the Guarantor.

- 9 -

(b)      Counterparts.  This Agreement may be executed in any number of identical counterparts, each of which shall be deemed an original for all purposes and all of which constitute, collectively, one agreement. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.

(c)      Filing Authorization.  The Guarantor hereby irrevocably authorizes the Lender to file one or more financing statements describing all or part of the Collateral in any filing office or jurisdiction as the Lender may determine in its sole discretion, and continuation statements, or amendments thereto, relative to all or part of the Collateral as authorized by applicable law.  Such financing statements, continuation statements and amendments will contain any other information required by the UCC for the sufficiency or filing office acceptance of any financing statement, continuation statement or amendment.  The Guarantor agrees to furnish any such information to the Lender promptly upon request.  The Guarantor also ratifies its authorization for the Lender to have filed any initial financing statement or amendments thereto filed prior to the date hereof.

(d)      Further Assurances.  From time to time, the Guarantor shall, at the request of the Lender, execute such other agreements, documents or instruments (including, without limitation, any stock powers, instructions to any securities intermediary, issuer or transfer agent, proxies, or any other documents of transfer) or take any other actions in connection with this Agreement as the Lender may reasonably deem necessary to evidence or perfect the security interests granted herein, to maintain the first priority of the security interests, or to effectuate the rights granted to the Lender herein, but their failure to do so shall not limit or affect any security interest or any other rights of the Lender in and to the Collateral.  Such powers or documents may be executed in blank or completed prior to execution, as requested by the Lender.

(e)      No Waiver. No failure or delay by the Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Lender hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that the Lender would otherwise have.  Any waiver, express or implied, of any provision hereof and any delay or failure by the Lender to enforce any provision shall not preclude the Lender from enforcing any such provision thereafter.

(f)      Severability.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURE PAGES FOLLOW.]

- 10 -

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by as of the day and year first above written.

GUARANTOR

By: _____

Name: **Alex Ginzburg**
Title:  **Managing Member**

LENDER

By: _____

Name: Matthew Helderman
Title:  CEO

[Signature Page to Security and Guaranty Agreement]

# EXHIBIT "17"

**From:** =/b>Matthew Helderman <<u>matthewhelderman@bondit.us</u>>
**Subject:** =/b>Re: THE RECOVERY = Status?
**Date:** =/b>August 20, 2019 at 8:06:06 AM =DT
**To:** =/b>Tony Lee <<u>tonyl@letitplay.com</u>>
**Cc:** Alex Ginzburg <<u>alexg@letitplay.com</u>>

Thank you Tony — we will check back in throughout =ext week and the following to get this finalized and repaid ASAP.

**MATTHEW HELDERMAN**

**CEO and co-founder**

**Office:** <u>(213) 204-6552</u> x101

**1639 11th St. #160 | Santa Monica, =A 90404**

<u>**www.Bondit.us**</u>

On Aug 20, 2019, at 7:22 AM, Tony Lee <<u>tonyl@letitplay.com</u>>=wrote:

Hi Matthew - hope all =s well. There hasn't been any questions regarding the rebate =or spend. As previously discussed, our expectation (based on prior =rojects), is end of August/early September. Given the labor day holiday =oming up, I think it may be shortly after that, but hopefully =ooner.

Tony

On Aug 19, 2019, at 8:27 AM, =atthew Helderman <<u>matthewhelderman@bondit.us</u>> wrote:

Alex and Tony,

Checking back in here =or a status report on both:

- *The Recovery* tax rebate =E2 this has now been more than 6 weeks, do you have an update? =ave you heard anything? Have they contested any of the spend amount / =ebate amount?

- **Jackson Thornton =amp; Co — we are preparing to have our attorney's =each out to the accounting / auditing team this week unless we hear =ack from you side with a detailed response as to where we =tand.**

**Please advise and all rights remain reserved =ere.**

**MATTHEW HELDERMAN**

**CEO and co-founder**

**Office: (213) 204-6552 x101**

**1639 11th St. #160 | Santa Monica, =A 90404**

**www.BondIt.us**