# EXHIBIT "1"

**LOAN AND SECURITY AGREEMENT**

THIS LOAN AND SECURITY AGREEMENT ("Agreement") is made and entered into as of September 18th, 2017 (the "Effective Date"), by and between Hallows Movie Inc., a Canadian corporation, registered to do business in the state of Kentucky  ("Borrower"), on the one hand, and BondIt LLC, a limited liability company organized and existing under the laws of California ("Lender"), on the other hand.

Reference is hereby made to the following:

A.      Borrower is producing a theatrical motion picture (under whatever title such motion picture is now or may hereafter be known, the "Picture") currently entitled "Crossface", based on the original screenplay by the same name written by Jake Goldberger.  Said screenplay and all prior and future drafts and versions thereof are herein referred to as the "Screenplay."

B.      Borrower has requested that Lender lend and advance funds to Borrower for use in the payment of pre-production, production, and post-production costs of the Picture in the aggregate principal amount not to exceed One Million Five Hundred Thousand United States Dollars (US$1,500,000.00) (the "Loan", i.e., the "Commitment Amount", less the "Interest Fee" and the "Legal Fee", each as further defined below).

C.      Lender is willing to make the Loan upon the terms and conditions herein contained and in consideration of the agreements, representations and warranties of Borrower hereinafter set forth.

NOW, THEREFORE, the parties hereto hereby agree as follows:

1.      DEFINITIONS.

The following terms used in this Agreement or in any promissory note, certificate, report or other document or instrument made or delivered pursuant to this Agreement have the following meanings:

1.1      "Affiliated Person" means any Person which directly or indirectly controls, is controlled by or is under common control with the Borrower. For the purposes of this definition, "control" (including with corresponding meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities, by contract or otherwise.

1.2      "Agreement" means this Loan and Security Agreement as originally executed and as the same may hereafter from time to time be amended, supplemented, modified, extended, renewed or replaced.

1.3      "Assignment of Proceeds" means the Assignment of Proceeds, dated concurrently herewith, between Borrower and Lender, in form and substance reasonably acceptable to Lender and its counsel, as amended, restated, supplemented or otherwise modified from time to time, substantially in a form as set forth on Exhibit "A".

1.4      "AUP Audit" has the meaning specified in paragraph 7.1.1 hereof.

1.5      "Borrower" means Hallows Movie Inc., a Canadian corporation, registered to do business in the state of Kentucky.

1.6      "Borrowing Certificate" has the meaning specified in paragraph 2.3 hereof.

1.7      "Budget" means the production budget for the Picture dated as of June 27th, 2017, as approved by Lender, and attached as Exhibit "B" hereto.

1

1.8     "Business Day" means any day other than a Saturday, Sunday or holiday scheduled by law for commercial banking institutions in the city of Los Angeles, California.

1.9     "Certificate of Incumbency" has the meaning specified in paragraph 6.2.8 hereof.

1.10    "Collateral" has the meaning specified in paragraph 4.1 hereof.

1.11    "Commitment Amount" has the meaning specified in Recital B hereof.

1.12    "Commitment Fee" has the meaning specified in paragraph 10.6.

1.13    "Copyright Mortgage" means the Copyright Mortgage dated concurrently herewith, between Borrower and Lender, in form and substance acceptable to Lender and its counsel, as amended, restated, supplemented or otherwise modified from time to time, substantially in a form as set forth on Exhibit "C".

1.14    "Default Interest" has the meaning specified in paragraph 2.8.1.

1.15    "Distribution Agreements" means, collectively and individually, each distribution agreement, between Borrower (or a Sales Agent or other Licensing Intermediary for the Picture) and a Distributor, now or hereafter entered into, pursuant to which the Distributor has been granted, sold, conveyed, licensed, sub-licensed, leased, sub-leased, or otherwise transferred rights with respect to the distribution, sub-distribution, sale, rental, lease, sub-lease, licensing, sub-licensing, exhibition, telecast, broadcast, transmission (including, without limitation, by way of satellite or cable) or other use, exploitation or disposition of the Picture or any elements thereof and/or the copyright in any of the foregoing or any part thereof in any media existing now or in the future and in any territory specified therein (including, without limitation, motion picture, television, "home video" and all other audio-visual device rights, merchandising and commercial tie-ups, soundtrack album, music publishing, novelization and publishing rights, trailer rights, and all other allied, incidental, ancillary, and subsidiary rights), and any permitted amendments, modifications and supplements thereto.

1.16    "Distributor" shall mean any Person, as sublicensee of Borrower, or a Licensing Intermediary, that has entered into, or in the future enters into, a Distribution Agreement.

1.17    "Dollars" or "$" means the legal currency of the United States.

1.18    "Equipment" shall have the meaning specified in paragraph 4.1.3.

1.19    "Estimated Tax Credits" has the meaning specified in paragraph 2.3.2 hereof.

1.20    "Event of Default" has the meaning specified in paragraph 9.1 hereof.

1.21    "Expiration Date" shall have the meaning specified in paragraph 2.5 hereof.

1.22    "Film Office" means the Kentucky Tourism Development Finance Authority or any other authority or government entity that administers the Film Production Tax Incentive program.

1.23    "Film Production Facility" has the meaning ascribed under the State Tax Credit Law.

1.24    "Gross Receipts" has the meaning specified in paragraph 4.1.1 hereof.

1.25    "Guild Intercreditor Agreements" means collectively the SAG-AFTRA Intercreditor Agreement, if any.

1.26    "Guilds" means collectively SAG-AFTRA.

1.27    "Indebtedness" means all monetary obligations, contingent and otherwise, of Borrower to Lender hereunder, and under the Promissory Note, and under the other Loan Documents, including, without limitation, the Commitment Amount, the Default Interest thereon (if any), and all fees, costs and expenses Borrower is obligated to pay Lender hereunder or thereunder.

1.28    "Independent Accountant" means accountant that is approved in writing by Lender.

1.29    "Independent Accountant Report" means the report prepared by the Independent Accountant for the Picture confirming the amount of Estimated Tax Credits, in a form approved by Lender as set forth in paragraph 2.3.2.

1.30    "Interest Fee" has the meaning specified in paragraph 2.8.1.

1.31    "Legal Fee" has the meaning in paragraph 2.4 hereof.

1.32    "Lender" means BondIt LLC, a limited liability company organized and existing under the laws of the State of California.

1.33    "Lender Account" means account number 9319858438 and any other bank account of Lender as may be provided by Lender to Borrower from time to time in writing.

1.34    "Licensing Intermediary" means each Person approved by Lender (in its sole discretion) that has been granted distribution rights in the Picture by Borrower in order to mitigate foreign withholding taxes (Fintage House and its affiliates are hereby deemed pre-approved).

1.35    "Literary Property" shall have the meaning specified in paragraph 4.1.1.1.

1.36    "Loan" has the meaning specified in Recital B hereof.

1.37    "Loan Documents" means this Agreement, the Promissory Note, the Power of Attorney, the Assignment of Proceeds, the Copyright Mortgage, the Borrowing Certificate, and all other documents, instruments and agreements executed or required to be delivered hereunder or pursuant to any transaction contemplated herein.

1.38    "Person" means any natural person, entity, corporation, company, association, partnership, limited liability company, joint venture, association, joint stock company, unincorporated organization, trust, individual (including personal representatives, executors and heirs of a deceased individual), nation, state, government (including governmental agencies, departments, bureaus, boards, divisions and instrumentalities thereof), trustee, receiver or liquidator.

1.39    "Physical Property" shall have the meaning specified in paragraph 4.1.1.2.

1.40    "Picture" has the meaning specified in Recital A hereof.

1.41    "Power of Attorney" means a Power of Attorney, dated concurrently herewith, from Borrower in favor of Lender in form and substance acceptable to Lender, substantially in a form as set forth on Exhibit "D", and provided there is no uncured Event of Default, Lender agrees to use reasonable efforts to notify Borrower of when Lender intends to exercise its rights under the Power of Attorney solely in connection with the terms and conditions thereof.

1.42    "Production Account" collectively mean account number 203595910 and any other account maintained by Borrower into which production funds for the Picture are to be advanced of which Borrower gives Lender prior written notice.  The proceeds of the Loan made hereunder, except as otherwise provided in this Agreement, shall first be credited, in accordance with the applicable Borrowing Certificate, into the Production Account set forth on such Borrowing Certificate. Borrower shall maintain the Production Account through to the end of production of the Picture.

1.43     "Production Schedule" means the final production and post-production schedule(s) for the Picture.

1.44     "Production Services Agreement" has the meaning set forth in paragraph 7.14 hereof.

1.45     "Promissory Note" means the promissory note to be made and delivered by Borrower to Lender pursuant to paragraph 2.6 hereof, substantially in a form as set forth on Exhibit "E".

1.46     "Qualified Film Production Company" means a "Qualified Film Production Company" under the State Tax Credit Law.

1.47     "Qualified Production Costs" means "qualified production costs" under the State Tax Credit Law.

1.48     "Qualified Production Facility" means a Level 1 "qualified production facility" (as approved by the Film Office).

1.49     "Repayment Date(s)" has the meaning specified in paragraph 2.7 hereof.

1.50     "SAG" means the Screen Actors Guild-American Federation of Television and Radio Artists.

1.51     "SAG Intercreditor Agreement" means that certain Intercreditor Agreement, if any, of approximately even date herewith, among Borrower, Lender and SAG, in form and substance reasonably satisfactory to Lender and its counsel.

1.52     "Sales Agent" shall mean any sales agent approved by Lender and Borrower.

1.53     "Screenplay" has the meaning specified in Recital A hereof.

1.54     "Security Interest" means a valid first priority security interest in the Collateral.

1.55     State Authority" means any of Kentucky State, the Kentucky State Department of Taxation and Finance, Kentucky Tourism Development Finance Authority, and the Kentucky Film Office.

1.56     "State Tax Credit Law" means all legislation and regulations enacted and in force in connection with the Film Production Tax Incentive program, including Kentucky Revised Statutes ("KRS").

1.57     "Tax Credit Certificate" has the meaning set forth in paragraph 7.1.1.

1.58     "Tax Credit Proceeds" means all refunds, subsidies, rebates or other amounts payable by Kentucky State, its agencies or instrumentalities in connection with any Tax Credits.

1.59     "Tax Credit" means all tax incentives, credits, and rebates in connection with the Picture pursuant to the State Tax Credit Law.

1.60     "UCC" means the Uniform Commercial Code as in effect from time to time in the State of Kentucky or any other state the laws of which are required to be applied in connection with the issue and perfection of the Security Interest. Terms defined in the UCC which are not otherwise defined in this Agreement are used herein as defined in the UCC.

1.61     "Uniform Commercial Code Financing Statement" has the meaning specified in paragraph 4.2 hereof.

1.62     "WGA" means the Writers Guild of America.

1.63    "<u>WGA Intercreditor Agreement</u>" means that certain Intercreditor Agreement, if any, of approximately even date herewith, among Borrower, Lender and WGA, in form and substance reasonably satisfactory to Lender and its counsel.

2.    <u>AGREEMENT TO LEND; LENDER SERVICES.</u>

2.1    <u>Commitment</u>. Subject to the terms and conditions of this Agreement, following execution and delivery of the Loan Documents to Lender, and the satisfaction of the "<u>Conditions Precedent</u>" (as defined below), and further subject to an uncured "<u>Event of Default</u>" (as defined below), Lender hereby agrees to disburse the Loan to Borrower in the following installments: (i) One Million Five Hundred Thousand United States Dollars US $1,500,000.00 by 10/06/2017.

2.2    <u>Intentionally Omitted</u>.

2.3    <u>Audit of Eligible Expenses; Borrowing Certificate</u>.

2.3.1    <u>Borrowing Certificate</u>. Subject to the last sentence of this paragraph 2.3.1, if and when Borrower wishes Lender to disburse an installment of the Loan hereunder, Borrower shall give Lender not less than three (3) Business Days prior written notice of such request for disbursement, specifying in such notice the desired amount and proposed date of such disbursement of the Loan (as set forth in paragraph 2.1 above, or as otherwise agreed to by the parties in writing). Such notice shall be sent to Lender by first class U.S. mail, messenger, and e-mail or by facsimile. The request for the installment of the Loan shall be accompanied by a certificate ("<u>Borrowing Certificate</u>") in the form of <u>Exhibit "F"</u> executed by an authorized officer of Borrower, whose signature appears on the Certificate of Incumbency.  Subject to the other provisions hereof, and provided that no Event of Default has occurred hereunder (unless such Event of Default has been cured within the applicable time period [if any] expressly permitted hereunder) and Lender is reasonably satisfied that, upon disbursement, the aggregate of the disbursements of the Loan shall not exceed the Loan (i.e., Commitment Amount less the Interest Fee and the Legal Fee), the disbursement of the installment of the Loan shall be made by Lender on the date and in the amount set forth in the Borrowing Certificate by deposit of the same, in immediately available funds, into the Production Account.

2.3.2    <u>Audit of Eligible Expenses</u>.  Prior to the submission of the Borrowing Certificate pursuant to paragraph 2.3.1, Borrower shall submit to Lender the Budget and/or a detailed cost report and other information reasonably requested by Lender to enable the Independent Accountant to conduct a review of expenses funded prior to such date by Borrower to enable Independent Accountant, at Borrower's sole expense, to determine in good faith an estimated amount of Tax Credits ("<u>Estimated Tax Credits</u>") that have been generated in connection with the pre-production, production and post production of the Picture and prepare a written report ("<u>Independent Accountant's Report</u>") to Lender of the same, the costs of such review and Independent Accountant's Report to be paid by Borrower.

2.4    <u>Legal Fee</u>. Borrower shall pay to Lender legal fees in the amount of Forty Thousand United States Dollars (US $40,000.00) to cover Lender's due diligence and internal audit fees and expenses, and Lender's legal fees and expenses in connection with the preparation and negotiation of the Loan Documents (collectively, the "<u>Legal Fee</u>"), which Legal Fee shall be deducted from disbursement of the first installment of the Loan made hereunder (i.e., Lender shall advance the Commitment Amount, less the Interest Fee and the Legal Fee, pursuant to paragraph 2.1 above).  Such Legal Fee is in addition to any other payments to Lender provided for hereunder and shall not be credited against or applied to any other sums payable to Lender hereunder or under any other Loan Document including, without limitation, the Loan, the Default Interest, if any, and the Interest Fee.

2.5    <u>Event of Default</u>.  Lender shall have no obligation to disburse the Loan to Borrower after 9/29/2017(the "<u>Expiration Date</u>") or at any time after an Event of Default has occurred hereunder, unless such Event of Default has been cured within the applicable time period (if any) expressly permitted hereunder.

2.6     <u>Promissory Note</u>. Prior to Lender making a disbursement of the Loan to Borrower hereunder and as a condition thereof, Borrower shall execute in favor of Lender and deliver to Lender a promissory note (the "<u>Promissory Note</u>"), in the form of <u>Exhibit "E"</u> in the principal sum equal to the Commitment Amount (i.e., the Loan, plus the Interest Fee and Legal Fee). The Lender shall maintain an account or accounts evidencing the Indebtedness of Borrower to Lender hereunder, including any amounts of principal and interest payable and paid to Lender from time-to-time hereunder. The entries made in such account or accounts shall be <u>prima facie</u> evidence of the existence and amounts of the obligations recorded therein absent manifest error; provided that the failure of Lender to maintain any such account or any error therein shall not in any manner affect the obligation of Borrower to pay the Indebtedness in accordance with the terms of this Agreement.

2.7     <u>Repayment Dates</u>. The Commitment Amount and any Default Interest on the Promissory Note shall be immediately due and payable on the following dates (the "<u>Repayment Date(s)</u>"): (i) US$1,925,000.00 on the earlier of 9/14/2018 or Borrower receiving any monies from the tax incentive proceeds.

2.8     <u>Interest on the Loan</u>.

2.8.1     <u>Return Interest Fee; Default Interest Rate</u>. The unpaid Indebtedness shall bear no interest until the applicable Repayment Date other than a return interest fee equal to Three Hundred and Eighty Five Thousand Dollars (US $385,000,00.00) (the "Interest Fee"), which Interest Fee may be deemed interest; provided that from and after the occurrence of an Event of Default (and without constituting a waiver of such Event of Default), the unpaid Indebtedness will bear interest ("<u>Default Interest</u>") at a rate equal to three percent (3%) until the Event of Default has been cured. All interest provided for in this paragraph 2.8.1 will be compounded monthly and payable on demand.

2.8.2     <u>Maximum Rate</u>. If the provisions of this Agreement or the Promissory Note would at any time otherwise require payment to Lender of an amount of interest in excess of the maximum amount then permitted by the law applicable to the Loan, such interest payments shall be reduced to the extent necessary so as to ensure that Lender shall not receive interest in excess of such maximum amount.

2.8.3.     <u>Rebate</u>. A rebate of Two Percent (2%) per month of the total value of the Loan (for any instance of doubt, the 2% is equivalent to US $30,000.00) will be reduced from the Interest amount owed to Lender from Borrower for every thirty (30) days that the total Loan and Interest is remitted to the Lender by the Borrower earlier than the Repayment date, with a maximum if Four Percent (4%) of the total Loan rebated to Borrower.

2.9     <u>Manner of Payment</u>.

2.9.1     <u>Time and Place of Payment; Notice of Payment</u>. Any and all Indebtedness payable by Borrower pursuant to this Agreement, the Promissory Note and any other Loan Document (including, without limitation, the Commitment Amount and Default Interest [if any]), shall be made to the Lender in same day funds, without defense, setoff or counterclaim, to the Lender Account. Each payment by Borrower shall be made not later than 1:00 P.M. (Pacific time) on the date such payment is due and shall be deemed to have been paid by Borrower to Lender two (2) Business Days after receipt thereof into such account. Any payment received by Lender after such time on the date payment is received shall be deemed to have been paid by Borrower to Lender three (3) Business Days after receipt thereof into such account.

2.9.2     <u>Payments on Non-Business Days</u>. Whenever any payment to be made pursuant to this Agreement, the Promissory Note or any other Loan Document shall be due on a day which is not a Business Day, the payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of Default Interest pursuant to this Agreement, the Promissory Note or any other such Loan Document, as applicable; provided, however, that in the event the day upon which payment is due is not a Business Day, but is a day of the month after which no further Business Day occurs in that month, then the due date thereof shall be the next preceding Business Day.

     2.9.3   <u>Payment in Dollars</u>. Any and all Indebtedness payable by Borrower pursuant to this Agreement, the Promissory Note or any other Loan Document (including, without limitation, the Commitment Amount and Default interest [if any]): (i) shall be dischargeable only by payment in Dollars regardless of any law, rule, regulation or statute, whether now or hereafter in existence or in effect in any jurisdiction which affects or purports to affect such obligation, and (ii) shall not be discharged or satisfied by any tender, or any recovery pursuant to any judgment, which is expressed in or converted by Lender to any currency other than the full amount of Dollars expressed to be payable in respect of the principal, interest, fees, costs, expenses (including legal fees) and all other amounts payable by Borrower pursuant to this Agreement.  The obligation of Borrower to make payments in Dollars as aforesaid shall be enforceable as an alternative or additional cause of action (which shall survive the termination of this Agreement) for the purpose of recovery in Dollars in the amount (if any) by which such actual receipt shall fall short of the full amount of Dollars expressed to be payable in respect of the principal, interest, fees, costs, expenses (including legal fees) and all other amounts payable by Borrower pursuant to this Agreement, and shall not be affected by judgment being obtained for any other sums due under this Agreement, the Promissory Note or any other Loan Document.

3.     <u>PAYMENT OF INDEBTEDNESS</u>.

     3.1   <u>Payment of the Tax Credit Proceeds; Payment Under Distribution Agreements</u>.  Until such time as the Indebtedness is indefeasibly repaid in full, Borrower shall pay:

         3.1.1   all Tax Credit Proceeds received by it in good and collected funds in Dollars, directly to the Lender Account for the benefit of Lender; and

         3.1.2   Borrower shall require all Distributors to pay all sums payable to Borrower under Distribution Agreements in good and collected funds in Dollars, directly to the Lender Account for the benefit of Lender. If a Distributor shall pay any such sums to Borrower or any other Person, Borrower or such other Person shall receive such sums as trustee for Lender and promptly upon receipt thereof shall remit such sums (or cause such sums to be remitted) to Lender.

     3.2   <u>Application of Payments</u>.  Until Borrower has indefeasibly repaid in full the Indebtedness in accordance with the terms and conditions hereof, all amounts paid into the Lender Account for the benefit of Lender shall be applied by Lender to reduce the Indebtedness in the following priority: (i) first, to the payment of the amounts payable to Lender in reimbursement of its costs and expenses pursuant to paragraphs 7.5 and 7.7 hereof to the extent the same are not duly and timely paid to Lender as required by paragraphs 7.5 and 7.7 hereof; (ii) second, to the payment of the Commitment Amount and Default Interest (if any); and (iii) last, to the repayment of any other indebtedness payable to Lender by the Borrower.  Upon full repayment of the Indebtedness by Borrower to Lender, Lender shall promptly remit to Borrower all amounts received by Lender in excess of the Indebtedness.

     3.3   <u>Enforcement by Borrower</u>. Borrower, at its own expense, shall promptly make collection, and take all reasonable legal action necessary to enforce collection, of all such receipts and revenues which may be owing from Distributors pursuant to Distribution Agreements and shall remit all sums so collected to the Lender Account.

     3.4   <u>Contingency Lien</u>.  In the event that the contingency is not fully spent on budgeted production items, the remaining contingency amount shall be paid to Lender to repay the Indebtedness, until such time as the Indebtedness is indefeasibly repaid in full.

     3.5   <u>Collection Account</u>. In the event a collection account management agreement ("CAMA") is established in connection with the Picture, Lender shall be made a party, which collection account shall be pre-approved by Lender in writing (Freeway and Fintage shall be pre-approved), provided there shall be no obligation to name Lender as a party to the CAMA (or grant such pre-approval rights) if the CAMA is established following indefeasible repayment of the Indebtedness.

4.      SECURITY FOR LOAN.

        4.1     Security Interest.  As security for the full, timely and indefeasible repayment of the Indebtedness, and for the full and timely payment, performance and discharge by Borrower of all of the terms and conditions of this Agreement and of the other Loan Documents, Borrower hereby irrevocably, unconditionally and absolutely grants to Lender a first priority Security Interest in and to all of Borrower's assets, including, without limitation, all of Borrower's right, title and interest in and to (the following collectively referred to herein as the "Collateral") (to the extent any materials and/or rights in and to the Picture or any other Collateral are not yet in existence or not yet acquired, such materials and rights are [to the extent applicable] hereby assigned and conveyed to Lender by way of present assignment of future copyright):

                4.1.1   Film Collateral and Copyright.  The Picture and all of Borrower's rights therein and thereto, and all properties and things of value pertaining thereto, and all products and proceeds thereof, whether now in existence or hereafter made, acquired or produced (as used in this paragraph, the term the "Picture" shall mean and include the Picture, all of the aforesaid rights and the rights of Borrower set forth in subparagraphs 4.2.1.1 through 4.2.1.16 below), including, without limitation:

                        4.1.1.1  To the extent owned or controlled by Borrower, all rights of every kind and nature (including, without limitation copyrights) in and to the literary material upon which, in whole or in part, the Picture is or may be based, or which may be or has been used or included in the Picture, including, without limitation, the Screenplay and all other scripts, scenarios, screenplays, bibles, stories, treatments, novels, outlines, books, titles, concepts, manuscripts or other properties or materials of any kind or nature, in whatever state of completion and all drafts, versions and variations thereof (all of the foregoing herein collectively referred to as the "Literary Property");

                        4.1.1.2  All physical properties of every kind or nature of or relating to the Picture and all versions thereof, including, without limitation, all physical properties relating to the development, production, completion, delivery, exhibition, distribution or other exploitation of the Picture, and all versions thereof or any part thereof, including, without limitation, the Literary Property, exposed film, developed film, positives, negatives, prints, answer prints, special effects, pre-print materials (including interpositives, negatives, duplicate negatives, internegatives, color reversals, intermediates, lavenders, fine grain master prints and matrices, and all other forms of pre-print elements which may be necessary or useful to produce prints or other copies or additional pre-print elements, whether now known or hereafter devised), soundtracks, recordings, audio and video tapes and discs of all types and gauges, cutouts, trims and any and all other physical properties of every kind and nature relating to the Picture in whatever state of completion, and all duplicates, drafts, versions, variations and copies of each thereof (all of the foregoing herein collectively referred to as the "Physical Property");

                        4.1.1.3  To the extent owned or controlled by Borrower, all rights of every kind or nature in and to any and all music and musical compositions created for, used in or to be used in connection with the Picture, including, without limitation, all copyrights therein and all rights to perform, copy, record, re-record, produce, reproduce and/or synchronize any or all music and musical compositions, as well as all other rights to exploit such music including record, soundtrack recording and music publishing rights;

                        4.1.1.4  To the extent owned or controlled by Borrower, all collateral, allied, ancillary, subsidiary, publishing and merchandising rights of every kind and nature, without limitation, derived from, appurtenant to or related to the Picture or the Literary Property, including, without limitation, all production, exploitation or reissue rights by use of film, tape or any other recording devices now known or hereafter devised, whether based upon, derived from or inspired by the Picture, the Literary Property or any part thereof all rights to use, exploit and license others to use or exploit any and all novelization, publishing, commercial tie-ups and merchandising rights of every kind and nature, including, without limitation, all novelization, publishing, merchandising rights and commercial tie-ups arising out of or

8

connected with or inspired by the Picture or the Literary Property, the title or titles of the Picture, the characters appearing in the Picture or said Literary Property and/or the names or characteristics of said characters, and including further, without limitation, any and all commercial exploitation in connection with or related to the Picture and/or the Literary Property;

4.1.1.5   All rights of every kind or nature, present and future, in and to all agreements relating to the development, production, completion, delivery and exploitation of the Picture, including, without limitation, all agreements for personal services, including the services of writers, directors, cast, producers, special effects personnel, animators, cameramen and other creative artistic and technical staff and agreements for the use of studio space, equipment, facilities animation services, special effects services and laboratory contracts;

4.1.1.6   All insurance and insurance policies heretofore or hereafter obtained in connection with the Picture or the insurable properties thereof and/or any person or persons engaged in the development, production, completion, delivery or exploitation of the Picture and proceeds thereof;

4.1.1.7   All copyrights and renewals and extensions of copyrights, domestic and foreign, heretofore or hereafter obtained in the Picture or the Literary Property or any part thereof, and the right (but not the obligation) to make publication thereof for copyright purposes, to register claim under copyright, and the right (but not the obligation) to renew and extend such copyrights, and the right (but not the obligation) to sue in the name(s) of Borrower and/or Lender for past, present and future infringements of copyright;

4.1.1.8   To the extent owned or controlled by Borrower, all rights to produce, release, sell, distribute, subdistribute, lease, sublease, market, license, sublicense, exhibit, broadcast, reproduce, publicize or otherwise exploit the Picture, the Literary Property and any and all rights therein in perpetuity, without limitation, in any manner and in any media whatsoever throughout the universe, including without limitation, by projection, radio, all forms of television (including, without limitation, free, pay, toll, cable, sustaining, subscription, sponsored and direct satellite broadcast), in theatres, non-theatrically, on cassettes, cartridges, discs and other similar and dissimilar video devices, and by any and all other scientific, mechanical or electronic means, methods, processes or devices now known or hereafter conceived, devised or created;

4.1.1.9   All right, title and interest in and to the Distribution Agreements, and all other agreements of any kind or nature licensing, granting or selling rights to distribute, broadcast, exhibit or otherwise exploit the Picture or rights therein, including, without limitation, any and all rights to the extent owned or controlled by Borrower, relating to merchandising, publishing, music and phonorecords derived from or connected with the Picture, and the proceeds of all of said agreements;

4.1.1.10 All rights of Borrower of any kind or nature, direct or indirect, to acquire, produce, develop, reacquire, finance, release, sell, distribute, subdistribute, lease, sublease, market, license, sublicense, exhibit, broadcast, transmit, reproduce, publicize, or otherwise exploit the Picture, or any rights in the Picture, including, without limitation, pursuant to any agreements between Borrower and any company controlling, controlled by, or under common control with Borrower (each, a "Subsidiary") which relate to the ownership, production or financing of the Picture;

4.1.1.11 All contract rights and general intangibles and all rights in, to and under all security agreements leases and other contracts securing or otherwise relating to any such contract rights and general intangibles, which grant to any Person any right to acquire, produce, develop, reacquire, finance, release, sell, distribute, subdistribute, lease, sublease, market, license, sublicense, exhibit, broadcast, transmit, reproduce, publicize, or otherwise exploit the Picture or any rights in the Picture including, without limitation, all such rights pursuant to agreements between Borrower and any Subsidiary which relate to the ownership, production or financing of the Picture;

4.1.1.12 To the extent owned or controlled by Borrower, all rent, revenues, income, compensation, products, increases, proceeds and profits or other property obtained or to be obtained from the production, sale, distribution, marketing, licensing, exhibition, reproduction, publication, ownership, exploitation or other uses or disposition of the Picture and the Literary Property (or any rights therein or part thereof), in any and all media, without limitation, the properties thereof and of any collateral, allied, ancillary and subsidiary rights and any and all merchandising and publishing rights therein and thereto, and amounts recovered as damages by reason of unfair competition, the infringement of copyright, breach of any contract or infringement of any rights or derived therefrom in any manner whatsoever including, without limitation, all monies standing to the credit of the Production Account (all of the foregoing herein collectively referred to as the "Gross Receipts");

4.1.1.13 Any and all accounts, including the Production Account, accounts receivable, general intangibles, contract rights, chattel paper, documents, instruments and goods, including inventory (as those terms are defined in the UCC), not elsewhere included in this definition, which may arise in connection with the production, sale, distribution or exploitation of the Picture or any element thereof, including, without limitation, all general intangibles constituting rights to receive the payment of money or other valuable consideration, all receivables and all other rights to receive the payment of money including, without limitation, under present or future contracts or agreements (whether or not earned by performance), from the sale, distribution, exhibition, disposition, leasing, subleasing, licensing, sublicensing and other exploitation of the Picture or the Literary Property or any part thereof or any rights therein or related thereto in any medium, whether now known or hereafter developed, by any means, method, process or device in any market including, without limitation, all of Borrower's right, title and interest in, to and under the Distribution Agreements, and any other existing or future agreements for the distribution or other exploitation of the Picture, as the same may presently exist or hereafter from time to time come into existence, be amended, renewed, modified, supplemented, extended or replaced, including Borrower's rights to receive payments thereunder, and all other rights to receive film rentals, license fees, distribution fees, producer's shares, royalties and other amounts of every description including, without limitation, from (i) theatrical exhibitors, nontheatrical exhibitors, television networks and stations and airlines, cable television systems, pay television operators, whether on a subscription, per program charge basis or otherwise, and other exhibitors, (ii) distributors, subdistributors, lessees, sublessees, licensees and sublicensees (including any affiliated Person) and (iii) any other Person or entity that distributes, exhibits or exploits the Picture or the Literary Property or elements or components of the Picture or the Literary Property or rights relating thereto;

4.1.1.14 Any and all documents, receipts or books and records, including, without limitation, documents or receipts of any kind or nature issued by any pledgeholder, warehouseman or bailee with respect to the Picture or any element thereof;

4.1.1.15 All proceeds, products, additions and accessions (including insurance proceeds) of the Picture, as defined and referred to in subparagraphs 4.1.1.1 through 4.1.1.14 above;

4.1.1.16 All funds in or to be credited to the Production Account into which the proceeds of the Loan made shall be or shall have been credited; and

4.1.2   Personal Property. The following personal property, whether now owned or hereafter acquired, and the proceeds thereof: (i) all of Borrower's rights in and to the title of the Picture and the exclusive use thereof including (without limitation) any and all rights protected pursuant to trademark, service mark, unfair competition and/or other laws, rules or principles of law or equity and (ii) all inventions, processes, formulae, licenses, patents, patent rights, trademarks, trademark rights, service marks, service mark rights, trade names, trade name rights, logos, indicia, corporate and company names, business source or business identifiers and renewals and extensions thereof, domestic and foreign, relating to the Picture, whether now owned or hereafter acquired, and the accompanying good will and other like business property rights, and the right (but not the obligation) to register claim under trademark or patent and to renew and extend such trademarks or

10

patents and the right (but not the obligation) to sue in the name(s) of Borrower and/or Lender for past, present or future infringement of trademark or patent; and

                4.1.3    Equipment. All machinery, electrical and electronic components, equipment, fixtures, furniture, office machinery, vehicles, trailers, implements and other tangible personal property of every kind and description to the extent owned or controlled by Borrower now owned or hereafter acquired by and used in connection with the Picture (including without limitation, all wardrobe, props, mikes, scenery, sound stages, movable, permanent or vehicular dressing rooms, sets, lighting equipment, cameras and other photographic, sound recording and editing equipment, projectors, film developing equipment and machinery) and all goods of like kind or type hereafter acquired by Borrower in substitution or replacement thereof, and all additions and accessions thereto (collectively hereinafter referred to as the "Equipment") and all rents, proceeds and products of the Equipment, including without limitation, the rights to insurance covering the Equipment; and

                4.1.4    Cash Equivalents. All cash and cash equivalents of Borrower derived from or relating to the Picture and all drafts, checks, certificates of deposit, notes, bills of exchange and other writings which evidence a right to the payment of money and are not themselves security agreements or leases and are of a type which is in the ordinary course of business transferred by delivery with any necessary endorsement or assignment whether now owned or hereafter acquired (all such drafts, checks, certificates of deposit, notes, bills of exchange and other writings, whenever acquired, collectively are called "Instruments"); and

                4.1.5    Tax Credit Proceeds. The Tax Credits and Tax Credit Proceeds, whether now owned or hereafter acquired (including all property and/or assets converted or substituted for such Tax Credits or Tax Credit Proceeds); and

                4.1.6    To the extent not included in the items described in paragraphs 4.1.1 through 4.1.5 above, all accounts, contract rights, general intangibles, documents, instruments, chattel paper, goods, inventory and equipment (as such terms are defined in the UCC) now owned or hereafter acquired by Borrower, and the proceeds and products thereof.

        4.2    Perfection of Security Interest. Concurrently with the execution of this Agreement, Borrower hereby authorizes Lender to file the appropriate financing statement(s) in the applicable jurisdictions under the UCC ("Uniform Commercial Code Financing Statement(s)") and Borrower shall execute and deliver or cause to be executed and delivered to Lender any and all other instruments which Lender may request from time to time to perfect Lender's Security Interest hereunder and to effectuate the purposes and intent hereof, including, without limitation, to the Copyright Mortgage.

        4.3    Guild Intercreditor Agreement. For the avoidance of doubt, the respective rights of the parties with respect to the Collateral are subject to the Guild Intercreditor Agreements, if any.

        4.4    Release of Security Interests. Upon full and indefeasible repayment of the Indebtedness, and as long as Borrower is not entitled to any further disbursements of the Loan hereunder, Lender shall, upon Borrower's request and at Borrower's expense, timely (but no later than five (5) Business Days after receipt of such request), execute and deliver to Borrower a release of the Copyright Mortgage which Borrower may file with the United States Copyright Office, and deliver to Borrower a form UCC-3 termination statement in respect of the Uniform Commercial Code Financing Statement filed by Lender.

5.    REPRESENTATIONS AND WARRANTIES. In order to induce Lender to enter into this Agreement, Borrower agrees, represents and warrants to Lender as follows, which agreements, representations and warranties shall survive the execution and delivery of this Agreement:

        5.1    Organization, Etc. Borrower is a corporation in good standing duly organized under the laws of Nova Scotia, Canada as well as to do business in the State of Kentucky and has the requisite power and authority to own its properties and to transact the business in which it is engaged in all places at which it engages in business. All actions heretofore taken and agreements heretofore entered into by Borrower in connection with the Collateral were duly

authorized and constitute actions and obligations of Borrower.  The chief office and principal place of business of Borrower and place where Borrower's books and records are maintained is located at 212 North 2nd St. Suite 100 Richmond, Kentucky 40475.  Borrower shall notify Lender immediately upon any change in its chief office or principal place of business or of the place where its books and records are maintained.

5.2   <u>Financial Statements</u>.  The production budget and cost reports furnished by Borrower to Lender in connection with Borrower's application for credit hereunder, if any, are, in all material respects, accurate and correct, prepared in accordance with generally accepted, accounting principles and accurately represent the financial status of the Picture; no materially adverse changes have occurred since the dates of said documents; and no material liabilities, contingent or otherwise, not shown or contemplated on said documents exist.  Borrower has furnished to Lender copies of all material agreements, indentures, and other instruments pursuant to which it has incurred indebtedness or may be obligated, whether directly or indirectly, for borrowed money.

5.3   <u>Power and Authority</u>.  Borrower has the power and authority to execute deliver and carry out the terms and provisions of this Agreement and to execute and deliver the Promissory Note, and all other Loan Documents, and has taken all necessary corporate action to authorize the execution and delivery of this Agreement, the borrowing hereunder, and the execution and delivery of the Promissory Note, and said other Loan Documents.

5.4   <u>No Conflicts</u>.  Neither the execution and delivery of this Agreement, the Promissory Note or any other Loan Document, instrument or agreement to be executed pursuant hereto, nor the consummation of the transactions herein contemplated, nor compliance with the terms and provisions hereof or with the terms and provisions of the Promissory Note or any other Loan Document (i) will violate any provision of law or of any applicable regulation, order or decree of any court or governmental instrumentality or administrative body or agency, (ii) will conflict or will be inconsistent with, or will result in any breach of, any of the terms, covenants, conditions or provisions of any mortgage, indenture, deed of trust, agreement or other instrument to which Borrower is a party or by which it may be bound or to which it may be subject, or (iii) will violate any provision of the articles of incorporation pursuant to which Borrower was formed or any other organizational document thereof.

5.5   <u>No Pending Legal Actions</u>.  There are and will be no claims, actions, suits or proceedings, pending or threatened, against, affecting or relating to, Borrower or the Collateral before any court or governmental or administrative body or agency which might result in any material adverse change in the business, operations, properties or assets or in the condition, financial or otherwise, of Borrower or which would otherwise adversely affect the rights and Security Interest granted to Lender hereunder.  Borrower is not in default under any applicable statute, rule, order or regulation of any governmental authority, bureau or agency having jurisdiction over it.

5.6   <u>Binding Obligation</u>.  This Agreement, the Promissory Note, and each other Loan Document, when executed and delivered pursuant hereto, will constitute legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with the respective terms hereof and thereof (except as may be limited by bankruptcy, insolvency, reorganization, or moratorium or other similar laws now or hereafter in effect relating to or affecting creditors' rights generally).

5.7   <u>First Priority Security Interest</u>.  This Agreement and the other instruments, agreements and documents to be executed and delivered to Lender hereunder will effect (upon due execution and delivery and after the proper recordation of those documents required to be recorded) a valid first priority security interest in favor of Lender in the Collateral (including, without limitation, Tax Credits , Tax Incentives, and Tax Credit Proceeds).

5.8   <u>No Other Consent</u>.  In connection with the execution, delivery, performance, validity and enforceability of this Agreement, and the Promissory Note or any other instrument, agreement or document to be executed and delivered hereunder, no consent of any Person, and no consent, license, approval, authorization, registration or declaration with any governmental authority, bureau or agency is required.

5.9   <u>Tax Credits</u>. Borrower will comply with all applicable rules and requirements of the State of Kentucky for the Borrower to qualify for the Tax Credits in connection with the Picture, and Borrower shall take all actions

necessary in order for the Picture to qualify for the payment of Tax Credit Proceeds in an amount not less than the Indebtedness.

5.10     Principal Photography. Principal photography of the Picture ("Principal Photography") shall commence on or about February 28th, 2018.

5.11     Financial and Tax Years; Income.  Borrower's current financial and tax year will end on May 31, 2018. Borrower will have no income to report on its Kentucky State income tax return for the tax year ending May 31, 2018.

5.12     Ownership. Borrower owns all motion picture and allied rights in and to the Screenplay and the copyright thereof as are necessary for the production, distribution, exhibition and exploitation of the Picture by all manner and means in all media throughout the universe in perpetuity, including, without limitation, all rights granted to Distributors under the Distribution Agreements.

5.13     Borrower's Acts; No Encumbrance of Tax Credits. Borrower has not performed, nor will Borrower perform, any acts (including, without limitation, any acts that would result in the revocation of any of the Tax Credits) or execute any other instruments which prevent or could reasonably likely prevent Lender from deriving the full benefits of any of the terms or conditions of this Agreement. Borrower has not and will not have pledged, assigned, transferred or otherwise disposed of or encumbered the Tax Credits or the Tax Credit Proceeds, or any of its right, title, or interest in and to the Tax Credits or the Tax Credit Proceeds, other than to the Lender.  No third party has any right, title or interest in or to the Tax Credits or Tax Credit Proceeds.

5.14     Third Party Rights. Except as expressly acknowledged herein and in the Guild Intercreditor Agreements: (i) Borrower (and/or others on its behalf) has not transferred, assigned, or encumbered any rights heretofore (or hereafter to be) acquired by Borrower with respect to the Collateral; and (ii) no Person (other than Borrower) has any rights of any kind in or to the Collateral.  No rights, property or interests exist or will be granted to any third party which are in any way inconsistent with or adversely affect Lender's rights and/or Lender's Security Interest under this Agreement.

5.15     No Litigation. No litigation, suits, proceedings or claims exist or are threatened relating to the Picture or rights therein or thereto or otherwise, which would have a material adverse effect on the rights and Security Interest granted to Lender hereunder or the ability of Borrower to perform its obligations hereunder or under any other agreement to which it is a party which relates to the Collateral.

5.16     Intentionally Deleted.

5.17     No Pending Insolvency Proceeding.  No insolvency proceedings of any nature are now pending or threatened by or against Borrower.

5.18     Proceeds of Loan.  None of the proceeds of the Loan shall be used, directly or indirectly, for any purpose other than for the payment of the costs of production of the Picture in accordance with the Budget as expressly provided herein and to pay Lender's costs and expenses specified in paragraphs 7.5 and 7.7 hereof.

5.19     Representations with Respect to the Picture.  The Picture as produced: (i) will be original and will not violate or infringe any copyright to the best of Borrower's knowledge or any other rights whatsoever of any Person; (ii) will be produced and duly and timely delivered to Distributors in accordance with the requirements of the Distribution Agreements (if any), and Borrower shall acquire all such rights (including, without limitation, all rights in and to the music of the Picture) as may be required by the Distribution Agreements and as may be necessary for Distributors to fully exercise all rights granted to them under the Distribution Agreements; (iii) shall conform to the Screenplay except for minor deviations normally made by the director which do not materially change the storyline or result in an overall increase in the cost of the Picture; and (iv) shall receive an MPAA rating no more restrictive than "R".

5.20     Qualified Film Production Company.  Borrower is a Qualified Film Production Company and shall maintain such existence until repayment of the Indebtedness.

5.21    _Accurate Information_. No information, exhibit, or written report or the content of any schedule furnished by or on behalf of Borrower to Lender in connection with the Loan, or the Collateral, and no representation or statement made by Borrower in any Loan Document, contains any material misstatement of fact or omits the statement of a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances in which it was made. There is no fact presently known to Borrower which has not been disclosed to Lender which materially adversely affects nor could reasonably be expected to materially adversely affect, the property or the business, operations or condition (financial or otherwise) of Borrower or the value, marketability or sufficiency of the Collateral.

5.22    _Timely Performance_. Borrower will duly and timely perform all of its respective material obligations and agreements hereunder and under any other agreement to which it is a party and which relates to the Picture.

6.    CONDITIONS PRECEDENT. Notwithstanding anything to the contrary herein contained, Lender shall not be obligated to advance funds under the Loan unless all of the following conditions have been satisfied at the time of each disbursement of an installment of the Loan:

6.1    _Chain-of-Title_.  Lender has been provided with documentation satisfactory to Lender and its counsel that Borrower has the right to produce the Picture and such other chain of title documentation in form and substance satisfactory to Lender and its counsel as Lender may reasonably require.

6.2    _Required Documents_.  There shall have been delivered to Lender the following documents, instruments and agreements (such documents, instruments and agreements to be executed to the extent they can be executed) in form and substance reasonably satisfactory to Lender and to Lender's counsel:

6.2.1    _Financing Statements_.  Uniform Commercial Code Financing Statements with respect to the Security Interests granted to Lender hereunder for all jurisdictions in which Lender, in its discretion, deems it necessary to file such Uniform Commercial Code Financing Statements to perfect the Security Interest;

6.2.2    _Loan Documents_. Copies of all Loan Documents, duly executed by all parties thereto, together with all exhibits, schedules, attachments and supplementary documents thereto;

6.2.3    _Insurance Certificates; Notice to Insurer_. Insurance certificates with respect to the insurance coverages required to be obtained and maintained pursuant to paragraph 7.10 hereof, including, without limitation, any essential elements insurance;

6.2.4    _UCC Security Interest Search Reports_.  Reports confirming that there are no filings of record which indicate that another Person has rights or a security interest in the Collateral hereunder, other than as expressly set forth herein, which would be inconsistent with the Security Interest granted to Lender hereunder;

6.2.5    _Articles of Organization and Operating Agreement; Good Standing Certificates_.  A true copy of the articles of organization of Borrower, together with a certificate of the date of filing thereof, and letter of good standing from the Secretary of State of Borrower's state of organization, dated as of a recent date; and the Operating Agreement of Borrower, duly certified as of a recent date by the secretary of Borrower;

6.2.6    _Distribution Agreements_. Copies of any Distribution Agreements that have been entered into by Borrower prior to the date of each disbursement of the Loan, duly executed by Distributor and Borrower.

6.2.7    _Guild Intercreditor Agreements_.  If Borrower has previously granted to SAG, DGA, WGA or any other talent union or guild a security interest in the Collateral, the SAG Intercreditor Agreement, or a subordination agreement from such other talent union or guild, duly executed on behalf of SAG, DGA, WGA or such other talent union or guild, provided that if Borrower has not granted a security interest to SAG, DGA, WGA or such other talent union or guild prior to closing it will provide a Guild Intercreditor Agreement, or subordination agreement(s) promptly after Borrower is asked to execute any such security agreement(s);

6.2.8   Borrowing Resolutions; Certificate of Incumbency.  Certified copies of the resolutions of the members of the Borrower, authorizing, as applicable, the execution, delivery and performance of this Agreement and the other Loan Documents, as well as all of the transactions contemplated thereby, and such other documents relating thereto as Lender may reasonably request, together with a member's certificate ("Certificate of Incumbency"), dated as of a recent date, certifying as to the incumbency and signatures of the person(s) authorized to execute and deliver the applicable Loan Documents on behalf of the Borrower;

6.2.9   Budget, Cash Flow Schedule, Screenplay, Production Schedule(s) and Tax Credit Certificate. A copy of the Budget (which shall, in the opinion of the Lender, be sufficient to complete the Picture and for the Borrower to qualify for the aggregate Tax Credit amount of no less than Two Million One Hundred and Eighty One Thousand Eight Hundred and Twenty Three United States Dollars (US$2,181,823.00) in accordance with the laws, regulations and program administrator policies relevant to the Tax Credits), cash flow schedule, Screenplay, the schedule(s) of production and post-production for the Picture and copies of the Borrower's application to the Film Office for the Tax Credits for the Picture and confirmation by the Film Office that the application process is in good standing and there are no outstanding information requests that will prevent the submission of the Borrower's "final application" for Tax Credits and the AUP Audit, and a copy of the Film Office's Certificate of Conditional Eligibility in response thereto confirming that the Picture is conditionally approved in the "Pool allocation";

6.2.10   Legal Opinion.  The favorable written opinion of counsel for Borrower, addressed to Lender, relating to such matters as Lender may request in form and substance satisfactory to Lender and its counsel;

6.2.11   Borrowing Certificate.  A Borrowing Certificate, in form and substance satisfactory to Lender and Borrower, duly signed by Borrower;

6.2.12   Independent Accountant's Report.  An Independent Accountant's Report, in form and substance satisfactory to Lender;

6.2.13   Certificate of the Members.  Duly signed certificate of the members of the Borrower in form and substance satisfactory to Lender;

6.2.14   Form 8832.  Copy of an IRS Form 8832 whereby the Borrower elects to be taxed as a corporation, and proof of filing of the same with the Internal Revenue Service; and

6.2.15   Miscellaneous.  Such other documents as Lender may reasonably request in order to effect fully the purposes of this Agreement and/or the other Loan Documents.

6.3   Event of Default.  At the time of disbursement of an installment of the Loan (both before and after giving effect thereto), there shall exist no uncured Event of Default and no condition, event or act which with notice or lapse of time, or both, would constitute an Event of Default hereunder.

6.4   Representations and Warranties.  All representations and warranties contained herein or otherwise made in writing in connection herewith shall be true and correct in all material respects with the same effect as though the representations and warranties had been made on the date of disbursement of each installment of the Loan.

6.5   Material Changes.  There has been no material adverse change in the Picture's Budget, Qualified Production Costs, Picture elements, financing structure, timing of production (including post production) or Borrower's key production team.

6.6   Change In Law.  No laws, rules, administrative procedures or similar authority of either the State Authority or any other relevant governmental agencies of the State of Kentucky have been changed, altered or construed in any manner to prevent the issuance of the Tax Credits, or to defer beyond the dates set forth herein, eliminate or suspend the ability to use or issue the Tax Credits, or the issuance of the tax rebate to Borrower.

6.7    Production and Post-Production Accountants.  Lender's due diligence and approval of the production accountant and post-production accountant, approval not to be unreasonably withheld, and Lender is reasonably satisfied that the production accountant has not failed to follow reasonable reporting standards and guidelines as defined by the Lender to such production accountant.

6.8    Financial Condition of Borrower.  No material adverse change in the financial condition of Borrower has occurred at the time of the requested Loan.  It is understood that this review shall be conducted by Lender in good faith in accordance with its customary practice.

6.9    Background Checks.  Background checks performed on the officers of the Borrower that are executing Loan Documents are reasonably satisfactory to Lender.

6.10    All Other Budgeted Funds Committed and Funds Paid.  Lender is provided with evidence reasonably satisfactory to Lender and its counsel that: (i) there shall be sufficient funds in the Picture's budget to complete the Picture for Borrower to qualify for the Estimated Tax Credits in accordance with all laws, regulations and Film Office policies; and (ii) all funds for the Budget (other than the Commitment Amount and documented deferments) have been funded to the Production Account.

7.    AFFIRMATIVE COVENANTS. Borrower hereby covenants and agrees as follows:

7.1    Kentucky State Tax Credit.

7.1.1    Borrower shall take all actions necessary in order for the Picture to qualify for the Tax Credits in an amount not less than the Estimated Tax Credits Two Million One Hundred Eighty One Thousand Eight Hundred and Twenty Three United States Dollars (US$2,181,283.00) including, without limitation, ensuring:

7.1.1.1   not less than one full day of filming of Principal Photography of the Picture shall be at a Qualified Production Facility on a film set built specifically for the Picture;

7.1.1.2   not less than one hundred percent (100%) of the aggregate of all expenses related to work on the Picture (excluding post-production work on the Picture) performed at Film Production Facilities, wherever located, shall be related to work on the Picture performed at an Qualified Production Facility;

7.1.1.3   not less than one hundred percent (100%) of the aggregate of all post production costs related to work on the Picture shall be "qualified post production costs" under the State Tax Credit Law;

7.1.1.4   not less than one hundred percent 100%) of all Principal Photography days filmed outside a Qualified Production Facility shall be filmed in Kentucky State;

7.1.1.5   all taxable tangible property and services, the costs of which qualify as Qualified Production Costs, are purchased only from entities registered to collect and remit Kentucky State and local sales taxes; and

7.1.1.6   the end credits for the Picture shall include (i) the following credit, "Filmed With the Support of the"Kentucky Tourism Development Finance Authority", and (ii) the Kentucky Film logo provided to Borrower by the Film Office.  Borrower shall provide the Film Office with proof of compliance with these credit and logo requirements prior to filing for the final "Certificate of Tax Credit" with the Film Office.

7.1.2    Borrower shall apply to the Film Office voluntary audit "agreed-upon procedures" program to obtain a verification letter stating that the Tax Credits were verified, such voluntary audit "agreed-upon procedures" process ("AUP Audit") to be performed by the Independent Accountant at Borrower's sole expense

and Lender's approval. Borrower shall ensure that the AUP Audit shall be submitted to the Film Office to request the "Certificate of Tax Credits" (the "Tax Credit Certificate") no later than May 31st, 2018.

7.1.3    The Borrower will provide Lender a signed and completed Kentucky State tax return in connection with which it will file the "Certificate of Tax Credit" issued by the Film Office in a timely manner, but in any event no later than two (2) weeks following receipt of the Tax Credit Certificate from the Film Office, and such tax return shall have the postal address of the Lender as the address to send any rebate checks.  Borrower shall only use a person or firm approved by Lender to prepare its Kentucky State tax return in connection with which it will file the "Certificate of Tax Credit".

7.1.4    Until such time as Lender has received an amount equal to the Indebtedness, in any tax return which Borrower files with the State of Kentucky, Borrower shall specify that all monies payable to Borrower in connection with any such tax return (including, without limitation, the Tax Credits) shall be paid to the Lender Account.

7.1.5    If any Tax Credit Proceeds are paid directly to Borrower, Borrower shall hold such amounts in trust for Lender and shall immediately pay any such amounts to Lender.

7.2    Books and Records.  Borrower shall maintain, at all times and in accordance with good and generally accepted accounting principles in the motion picture industry, true, full and complete books and records showing the financial transactions of Borrower and (to the extent Borrower has access to or possession of the books and records of) any other Person with respect to the Picture, and Borrower shall permit Lender (or its designee) to examine the same upon fifteen (15) Business Days' prior written notice at such time(s) during reasonable business hours as Lender (or its designee) may request upon reasonable notice and to take excerpts therefrom and to make copies thereof only until the Indebtedness is repaid in full.  Until such time as the Indebtedness is indefeasibly repaid in full and Borrower is not entitled to any further disbursements of the Loan hereunder, all such books and records (or duplicates thereof) shall be maintained at 212 North 2nd St. Suite 100 Richmond, Kentucky 40475, and shall not be maintained in any other place without Lender's prior written consent. Borrower shall inform Lender of the identity of the proposed post-production accountant for the Picture and Lender shall be entitled to conduct reasonable customary due diligence on such accountant and shall have approval of the post-production accountant for the Picture, approval not to be unreasonably withheld, delayed or conditioned.

7.3    Statements, Etc.  Until such time as the Indebtedness is indefeasibly repaid in full and Borrower is not entitled to any further disbursements of the Loan hereunder, Borrower shall furnish or cause to be furnished to Lender in form reasonably satisfactory to Lender all such information in connection with the Picture as Lender may reasonably request, including, but not limited to, the following:

7.3.1    Copies of all bank statements and other financial information with respect to the Picture received by Borrower or any Affiliated Person during the preceding financial quarter;

7.3.2    Copies of all weekly production reports, if any, indicating by Budget category all expenditures theretofore made by Borrower in connection with the Picture, the amount of cost overrun, if any, for the week immediately preceding submission of such report and the estimated cost to complete the Picture during the preceding financial quarter.  Borrower's failure to promptly provide such reports shall not constitute an Event of Default hereunder unless Borrower fails to provide same within five (5) Business Days after any reasonable request therefor by Lender;

7.3.3    Copies of any correspondence, applications, certificates, tax forms and other documents or instruments submitted to, or received from, the State Authority with respect to the Picture and the Tax Credits within five (5) Business Days of receipt or submission thereof, as the case may be.

7.4    Notice of Legal Proceedings.  Borrower shall promptly give written notice to Lender of all litigation, proceedings, controversies (which in any material way may adversely affect Lender's rights and/or Lender's Security

Interest hereunder or under any documents referred to herein, including Lender's rights to the Tax Credit Proceeds) or material interruptions (i.e., events of force majeure) in the production, post-production or distribution of, or claims materially affecting the Collateral or any of the rights of Borrower with respect thereto, including the Tax Credits, in each case only if and to the extent Borrower is actually aware or has received written notice thereof, and, where applicable, Borrower shall appear in and defend any and all such actions and proceedings and shall obtain and furnish to Lender from time to time, promptly following a written demand by Lender, all instruments, agreements, financial statements, documents, releases and subordinations of claims or liens as Lender may reasonably require, consistent with this Agreement, to maintain the priority of Lender's Security Interest under this Agreement.  In this regard, Borrower shall defend the Collateral against the claims and demands of all other parties claiming by, through or under Borrower, and will keep the Collateral free and clear from all security interests or other encumbrances created by, through or under Borrower, except the Security Interest created hereunder and those security interests expressly permitted hereunder.

      7.5    Costs and Expenses; Taxes. After the occurrence of an Event of Default (which has not been cured by Borrower as provided herein), Borrower shall pay immediately upon demand by Lender all actual, out-of-pocket costs and expenses incurred in connection with the enforcement of the rights of the Lender hereunder or under the Promissory Note or any other Loan Document or otherwise in connection with the realization upon any Collateral.  Such unpaid costs and expenses (including court costs and reasonable outside attorneys' fees) shall constitute an additional disbursement of the Loan hereunder and shall be secured and recoupable and shall bear interest in the same manner as provided for in paragraph 2 hereof.  At Lender's election, Lender shall have the right (and is hereby authorized by Borrower) to deduct all amounts payable to Lender pursuant to this paragraph 7.5 or pursuant to paragraph 7.7 hereof from a disbursement of the Loan made by Lender to Borrower, or to make additional disbursements under the Loan for the repayment to Lender of all such amounts.

      7.6    Performance; Copyright Registration. Borrower shall diligently and duly perform and observe all the terms, covenants and conditions on its part to be performed and observed under and pursuant to the Production Services Agreement and Distribution Agreements, as applicable. Borrower shall make all necessary recordations and copyright filings with the US Copyright Office as Lender may reasonably require. Promptly upon completion of the Picture, Borrower shall notify Lender in writing and shall also register the Picture with the United States Copyright Office. Borrower shall also give Lender prompt written notice each time the Screenplay and/or the Picture may acquire or become known by a new or different name or title.

      7.7    Indemnity.  Borrower shall, at all times, defend and indemnify and hold Lender (which for the purposes of this paragraph shall include the shareholders, officers, directors, employees, representatives and agents of Lender) harmless from and against any and all liabilities, claims, demands, causes of action, losses, damages, expenses (including, without limitation, reasonable outside attorneys' fees), costs, settlements, judgments or recoveries, unless a court of competent jurisdiction determines in a final and non-appealable judgment that any such claim results from Lender's gross negligence, fraud or willful misconduct, arising out of or resulting from (i) any breach of the representations, warranties, agreements or covenants made by Borrower herein or any other Loan Document, (ii) any suit or proceeding of any kind or nature whatsoever against Lender arising from or connected with the transactions contemplated by this Agreement or any of the documents, instruments or agreements to be executed pursuant hereto or any of the rights and properties assigned to Lender hereunder, (iii) the amount of the Tax Credits pursuant to the Tax Credit Certificate duly issued to Borrower in connection with the Picture being reduced below the amount of Estimated Tax Credits, cancelled, revoked, terminated or recaptured, and/or (iv)  any suit or proceeding that Lender may deem necessary or advisable to institute, in the name of Lender or Borrower or both, against any other Person for any reason whatsoever to protect the title and/or the rights of Lender hereunder, or any rights granted to Lender, including reasonable outside attorneys' fees and court costs and all other out-of-pocket costs and expenses incurred by Lender, all of which shall be charged to and paid by Borrower and shall be secured by Lender's Security Interest in the Collateral.  The foregoing indemnity shall survive repayment of the Loan and the termination of this Agreement.

      7.8    Further Assurances.  Borrower shall, upon request from Lender, execute and deliver, or cause to be executed and delivered, to Lender the documents referred to in paragraph 6.2 hereof and such further instruments, documents and agreements consistent herewith as Lender may reasonably require and shall do, or cause to be done, such further acts as Lender may reasonably desire to carry out or effectuate the purposes of this Agreement consistent with

the terms and conditions set forth herein and to enable Lender to exercise its rights and remedies hereunder.  If Borrower shall fail to execute or deliver to Lender any further instruments, documents or agreements under the provisions of this paragraph 7.8 within five (5) Business Days after Borrower's receipt of Lender's written request for same from Lender, (following Borrower's reasonable opportunity to review and comment on the same), then Borrower hereby appoints Lender as Borrower's irrevocable attorney-in-fact, with full power of substitution and with the right, but not the obligation, to do any and all acts and things necessary to execute, acknowledge and deliver any and all such further instruments, documents or agreements, in Borrower's name and on Borrower's behalf, which appointment shall be deemed to be a power coupled with an interest and shall be irrevocable.  Lender shall promptly provide Borrower copies of all documents so executed, provided that failure to so provide such copies of documents shall not be a default hereunder.

7.9    Notice of Events of Default.  Borrower shall give Lender prompt written notice of all Events of Default under any of the terms or provisions of this Agreement and of any changes in management, litigation, or of any other matter which has resulted in or may result in a material adverse change in the financial condition or operation of Borrower.

7.10    Insurance.

7.10.1    "Producer's Package" Coverage.  Borrower shall at all times hereunder at its own cost and expense obtain and keep in full force and effect in amount, kind and form reasonably satisfactory to Lender and with insurers approved by Lender, the following types of insurance providing such coverage as is customarily provided by such types of insurance: Cast Insurance in an amount equal to at least the Commitment Amount covering the director, the director of photography and the principal cast members, among others; Negative Insurance in an amount equal to the amount of the Budget and projected interest hereunder; Faulty Stock, Camera and Processing Insurance; Props, Sets and Wardrobe Insurance; Miscellaneous Equipment Insurance; Property Damage Liability Insurance; Worker's Compensation Insurance and any insurance coverage required by applicable collective bargaining agreements.

7.10.2    Lender Named as Loss Payee.  The Property Damage Liability Insurance shall include Lender as a loss payee and include (i) a provision for the issuance to Lender of written notice of any cancellation of or material change in such insurance coverage which written notice shall be given to Lender not less than ten (10) Business Days in advance of such cancellation of or material change in such insurance coverage and (ii) customary waiver of subrogation language in form and substance acceptable to Lender.

7.10.3    Liability Insurance.  Borrower shall at all times hereunder at its own cost and expense obtain and keep in full force and effect and in an amount, kind and form reasonably satisfactory to Lender and with insurers approved by Lender the following types of liability insurance which shall provide such coverage as is customarily provided by such types of insurance:

7.10.3.1 Errors and Omissions Insurance covering, among other things, the legal liability and defense of the producer of the Picture against lawsuits alleging the unauthorized use of title, format, ideas, characters, plots, plagiarism, copyright infringement and unfair competition.  Such insurance shall also protect against alleged libel, slander, defamation of character and invasion of privacy.  The Errors and Omissions Insurance shall be in the minimum amount of One Million Dollars ($1,000,000) per occurrence and Three Million Dollars ($3,000,000) in the aggregate, with a deductible of Twenty-Five Thousand Dollars ($25,000) per occurrence and a period of coverage of not less than three (3) years from the date of commencement of Principal Photography of the Picture.

7.10.3.2 Comprehensive Liability Insurance covering Alex Ginzburg, Dong Lee, and other producers of the Picture against, among other things, all claims for bodily injury, personal injury or property damage which arise in connection with the Picture, including, without limitation, coverage for all owned, non-owned and hired vehicles (both on and off camera) with minimum liability limits of One Million Dollars ($1,000,000).

7.10.4   <u>Naming Lender as "Additional Insured"</u>.  The insurance enumerated in subparagraph 7.10.3 shall name Lender (and its agents, officers, directors and employees) as an additional insured thereunder and shall (i) provide for the issuance to Lender of written notice of any cancellation of or material change in any such insurance coverage which written notice shall be given to Lender not less than ten (10) days in advance of such cancellation of or material change in such insurance coverage and (ii) include customary waiver of subrogation language in form and substance acceptable to Lender.

7.10.5   <u>Payment of Premiums</u>.  The policies of insurance (or the Certificates of Insurance reflecting that such coverage is in effect) referred to in this paragraph 7.10 shall (a) contain an endorsement which negates the "other insurance" clause in said policies and a statement that the insurance being provided is primary and any insurance carried by a Lender is neither primary nor contributory and (b) be delivered to Lender. Lender shall not have any liability to pay for any premiums or calls with respect to any of the insurance policies referred to in this paragraph 7.10.

7.11   <u>Reconciliation of Statements</u>. Upon the reasonable request of Lender, Borrower shall promptly furnish to Lender a reconciliation of information concerning any discrepancy with respect to any item in any summary or statement of revenues paid and payable by Distributors or any other Person, and Borrower further agrees that, if Lender in its good faith business judgment believes that an Event of Default may have occurred, Lender shall have the right to appoint an accountant to prepare such information as Lender may require, the reasonable fees and expenses of such accountant to be borne and paid by Borrower

7.12   <u>Fair Labor Standards Act</u>.  Borrower shall comply in all respects with the Fair Labor Standards Act.

7.13   <u>Intentionally Deleted.</u>

7.14   <u>Payments from Distributors</u>. At all times (including, without limitation, after the occurrence of an Event of Default hereunder) prior to the full, timely and indefeasible repayment of the Indebtedness hereunder, Borrower shall supervise and monitor the performance of and payments from Distributors under the Distribution Agreements, and Borrower shall keep true, full and complete books and records of such payments and of all production costs of the Picture, which books and records shall be in accordance with good and generally accepted accounting practices in the motion picture industry. Until such time as the Indebtedness is indefeasibly repaid in full under this Agreement, Borrower shall pay all amounts payable to Borrower under any Distribution Agreement or from any other exploitation of the Picture in good and collected funds in Dollars, directly to the Lender Account.  If any Distributor shall pay any such amounts to Borrower, Borrower shall receive such amounts as trustee for Lender and promptly upon receipt thereof shall remit such amounts (or cause such amounts to be remitted) to the Lender Account.

8.   <u>NEGATIVE COVENANTS</u>.

8.1   <u>Written Consent</u>.   Borrower hereby covenants and agrees that, so long as this Agreement is in effect and until Borrower's obligations to Lender hereunder are fully paid, performed and discharged, Borrower will not, and will not allow any Person to, without first having procured the written consent of Lender:

8.1.1   Terminate, amend, alter or modify, or consent to or permit the termination, amendment, alteration or modification of any agreement referred to herein or forming part of Lender's Security Interest in any manner, or enter into any other agreement, that would adversely affect or lessen any of the rights granted to Lender under this Agreement, or under any instruments, documents or agreements executed by Borrower in connection herewith;

8.1.2   Wind up, liquidate or dissolve its affairs, or sell, lease, license, transfer, or otherwise dispose of or grant an interest in all or a substantial part of its properties and assets, or change its company or trade name or modify its company existence;

8.1.3    Create, assume or suffer to exist any security interest, mortgage, pledge, encumbrance, assignment, lien or charge of any kind upon the Collateral (other than the security interests of Lender or the Guilds, referred to in paragraph 5.14 hereof or otherwise disclosed to Lender in writing prior to execution of this Agreement);

8.1.4    Take any action, or fail to take any action, that would adversely affect the payment of the Tax Credit Proceeds to Lender including, without limitation, filming parts of the Picture outside of Kentucky State unless otherwise approved in advance in writing by Lender (such approval shall not be unreasonably withheld or delayed by Lender) or filing a Kentucky State tax return to apply for Tax Credits in excess of Two Million One Hundred Eighty One Thousand Eight Hundred and Twenty Three United States Dollars (US $2,181,823.00) without the prior written approval of the Lender;

8.1.5    Except as provided in paragraph 4 and 5.16 of this Agreement, otherwise sell, assign, encumber, grant a security interest in, transfer or allocate any or all of the Collateral (including, without limitation, the Tax Credits and the Tax Credit Proceeds) to any Person other than Lender;

8.1.6    Permit any Tax Credit or Tax Credit Proceeds to be applied to any tax liability for which Borrower is liable; or

8.1.7    Elect to become an "S corporation" or form of disregarded entity pursuant to rules and regulations of the United States Internal Revenue Service.

8.2    <u>Use of Funds</u>.  Borrower shall not use any funds disbursed by Lender under the Loan for any purpose or thing except to pay the costs of production of the Picture in accordance with the approved Budget and Lender's costs and expenses specified in paragraphs 7.5 and 7.7 hereof.

9.    <u>EVENTS OF DEFAULT</u>.

9.1    <u>Specified Events of Default</u>.  Each of the following specified events hereby constitutes and is herein referred to individually as an "Event of Default", it being understood that an Event of Default shall not be deemed to have occurred until the cure period set forth in the applicable subparagraph below, if any, shall have expired, other than with respect to the calculation of Default Interest if such Event of Default is not cured within the applicable cure period:

9.1.1    Borrower's failure to make (or cause to be made) any payments to Lender hereunder when the same are due, including without limitation, payment of the Commitment Amount (and Default Interest, if any), by the applicable Repayment Date(s);

9.1.2    Borrower's failure to pay any Tax Credit Proceeds to Lender in accordance with paragraph 7.1.5 hereof; or

9.1.3    Borrower's failure to submit the AUP Audit to the Film Office by the date specified in paragraph 7.1.2; or

9.1.4    Borrower's failure to maintain (or cause to be maintained) in full force and effect the policies of insurance as provided in paragraph 7.10 hereof for the full periods required by Lender; provided, however, if a policy is terminated for some reason other than by a default of Borrower, Borrower shall have five (5) Business Days to reinstate or replace such policy; or

9.1.5    Default in the due and timely observance or performance of the terms, provisions, covenants, conditions, agreements or obligations of Borrower contained in this Agreement, the Promissory Note or in any other agreement relating to the Loan or the Collateral which would materially adversely affect the validity, perfection or priority of the Lender's Security Interest in the Collateral, or the value of the Collateral or the Promissory Note; or

9.1.6    Borrower's failure to perform or observe, in a due and timely manner, any of the other (i.e., other than those subject to the immediately preceding subparagraphs 9.1.1 through 9.1.5) material terms, provisions, covenants, conditions, agreements or obligations contained herein, in the Loan Documents or in any other agreement, contract, indenture, document or instrument executed, or to be executed, by Borrower in connection with this Agreement or pursuant hereto and which would have a material adverse effect on the ability or obligation of Borrower to perform its obligations under this Agreement and under the other Loan Documents to be executed by Borrower pursuant hereto; or

9.1.7    If any Uniform Commercial Code Financing Statement, Financial Statement, the application form or other information submitted to the Film Office or the State Authority for the Tax Credits or representation or warranty made by Borrower herein or otherwise in writing in connection with this Agreement or in connection with the instruments, documents and assignments to be executed by Borrower hereunder or pursuant hereto shall be false or untrue on the date made and which would have a material adverse effect on the ability or obligation of Borrower to perform its obligations under this Agreement and under the other Loan Documents to be executed by Borrower pursuant hereto; or

9.1.8    Default of any third party hereto in the observance or performance by such party of any material term, covenant, condition, warranty or representation made or agreed to in any agreement referred to herein or secured by Lender's Security Interest hereunder which materially adversely affects Lender's Security Interest hereunder, including, without limitation, the Picture's production accountant and post-production accountant's failure to follow certain reporting standards and guidelines as defined by the Lender; or

9.1.9    Suspension by any of Borrower of its respective business operations; or

9.1.10    If any warrant of attachment, execution or other writ in an aggregate amount of greater than Fifty Thousand United States Dollars (US$50,000.00) shall be issued or levied upon the proceeds payable pursuant to any agreement referred to herein or secured by Lender's Security Interest hereunder, and such attachment, execution or other writ shall remain undischarged and unstayed for a period in excess of thirty (30) days or Borrower shall fail to post (or cause to be posted) an indemnity bond for the maximum liability pursuant to any such attachment, execution or other writ; or

9.1.11    If Borrower should become insolvent; or should be unable to pay its respective debts as they mature (including Borrower's failure to pay the Indebtedness); or should make an assignment for the benefit of creditors or to an agent authorized to liquidate any substantial amount of its respective properties or assets, or should file a voluntary petition in bankruptcy or seeking reorganization or to effect a plan or other arrangement with creditors; or should file an answer admitting the jurisdiction of any court and the material allegations of an involuntary petition filed pursuant to any Act of Congress relating to bankruptcy or reorganization; or should join in any such petition for an adjudication or for a reorganization or other arrangement; or should become or be adjudicated a bankrupt; or should apply for or consent to the appointment of or consent that an order be made appointing any receiver or trustee for itself or for any of its respective properties, assets or business; or if an order should be entered pursuant to any Act of Congress relating to bankruptcy or reorganization; or if a receiver or a trustee should be appointed otherwise than upon its own application or consent for all or a substantial part of its properties, assets or business and any such receiver or trustee so appointed is not discharged within sixty (60) days after the date of such appointment; or if an involuntary petition is filed and not dismissed within sixty (60) days after the date of such petition; or

9.1.12    If there shall exist or occur, and Lender shall notify Borrower of, any event or condition which in Lender's good faith business judgment (exercised in Lender's sole discretion) is an Event of Default or which would have a material adverse effect on the ability or obligation of Borrower to perform its material obligations under this Agreement and under the other Loan Documents to be executed by Borrower pursuant hereto; or

9.1.13    If final judgment or judgments for the payment of money aggregating in excess of Fifty Thousand Dollars ($50,000.00) shall be entered or affirmed by a court against Borrower, and Borrower shall not

discharge the same or provide for its or their discharge in accordance with its or their terms or procure a stay of execution thereof within sixty (60) days from the date of entry thereof; or

       9.1.14   If any Loan Document shall cease to be in full force and effect; or

       9.1.15   If Borrower shall default under any Loan Document and such default is not cured with the proscribed cure period thereunder; or

       9.1.16   If there shall exist any material change in lowering the Budget, lowering qualified production costs, financing structure, timing of production, including post-production, or the key production team of the Picture (i.e., Alex Ginzburg and Dong Lee are no longer producers) unless approved by Lender; or

       9.1.17   Borrower's failure to adhere to Lender's approval rights as set forth in this Agreement; or

       9.1.18   The failure of Borrower to effect delivery of the Picture to Sales Agents and/or Distributors in accordance with the terms and conditions of the relevant Distribution Agreement.

    9.2   <u>Remedies</u>.  Upon the occurrence of any of the Events of Default set forth in paragraph 9.1 hereof, subject to paragraph 9.3, all Indebtedness shall immediately become due and payable.  At Lender's option (subject to paragraph 9.3 below), upon the occurrence of any other Event of Default, and at any time thereafter if such Event of Default shall then be continuing:

       9.2.1   Unless such Event of Default is cured within the time period (if any) provided for hereunder, Lender may terminate its obligations to advance funds to Borrower and/or the Indebtedness may, without presentment, demand, protest, or notice of any kind, all of which are hereby expressly waived by Borrower, be forthwith called due and payable, if not otherwise then due and payable (anything herein or in the Promissory Note or other agreement, contract, indenture, document or instrument contained to the contrary notwithstanding) and the Repayment Date(s) shall be accelerated accordingly;

       9.2.2   Lender may pursue the remedies afforded to Lender hereunder (including, without limitation, pursuant to paragraph 9.4 hereof) or under any of the documents executed in connection herewith, or any other remedy afforded to Lender by law or equity, and Lender may, at its option, do and perform all other acts and things necessary for the proper preservation and protection of Lender's rights hereunder, solely with respect to the Collateral (and the receipts therefrom) or pursuant to any agreement secured by Lender's Security Interest hereunder, all at the cost and expense of Borrower, which amount so expended shall constitute costs recoupable by Lender and secured as provided hereunder; and

       9.2.3   Lender may, at its option, engage others to exercise or discharge any of its rights or obligations hereunder.  The amounts payable to such others by Lender shall be recoupable by Lender and secured as provided in paragraph 7.5 hereof.

    9.3   <u>Cure Period</u>.  With respect to the Events of Default set forth in subparagraphs 9.1 hereof, provided such event is curable, Borrower shall have a period of seven (7) Business Days from receipt of written notice thereof from Lender within which to cure any such Event of Default.  At Lender's sole and exclusive option, upon the occurrence of any other Event of Default, and at any time thereafter, Lender may permit Borrower to cure such Event of Default, but Lender shall have no obligation to do so.

    9.4   <u>Attorney-in-Fact</u>. Should an Event of Default occur hereunder, Borrower hereby irrevocably designates, constitutes and appoints Lender its true and lawful attorney-in-fact with full power of substitution and with full and irrevocable power (which power shall be deemed coupled with an interest), in the place and stead of Borrower and in the name of the Borrower, Lender, or both of them, at any time or from time to time in the sole discretion of Lender: (i) to take over and complete production of the Picture and to lease, license, sell or otherwise dispose of the Picture and/or such distribution rights in and to the Picture and such rights therein as have not been disposed of on the date of such default

by Borrower as permitted hereunder (or to engage others to do so with the costs and expenses thereof to be recoupable by Lender as provided in paragraph 7.5 and 7.7 hereof); (ii) to negotiate such lease, license, sale or other agreements and to enter into such agreements on behalf of Borrower on such terms and conditions (not in conflict with the terms and conditions of such agreements consistent with this Agreement with respect to the Collateral only as have theretofore been entered into by Borrower and which Lender has been made aware of) as Lender deems appropriate; (iii) to renegotiate a Distribution Agreement or such other agreements as Lender has a Security Interest in pursuant to paragraph 4 hereof as Lender in its sole and exclusive discretion deems proper; (iv) to require, demand, collect, receive, settle, adjust, compromise and to give acquittances and receipts for the payment of any and all monies payable pursuant to the a Distribution Agreement or such other agreements as Lender has a Security Interest in pursuant to paragraph 4 hereof and such licenses and agreements as Lender may enter into as aforesaid; (v) to file any claims and/or proofs of claim, to commence, maintain or discontinue any actions, suits or other proceedings deemed by Lender advisable for the purpose of collecting or enforcing payment of any such monies against the Collateral only; (vi) to endorse any checks, drafts or other orders or instruments for the payment of monies payable to Borrower in connection with the Collateral only which shall be issued in respect of such monies; (vii) to execute any and all such instruments, agreements or documents consistent herewith as may be necessary or desirable in the premises, and Lender shall promptly provide copies to Borrower of such instruments, agreements or documents so executed upon written request of Borrower, provided that failure to so provide such copies of documents shall not be a default hereunder; (viii) to apply any receipts so derived as herein provided; (ix) to exercise all rights available to it under the UCC; and (x) to have a receiver appointed and to sell the Collateral at a public or private sale.  Lender, however, shall not be obligated to make any demand or present or file any claim or take any action authorized hereby.  Borrower shall gather up and deliver to Lender all materials, books, records, documents and things of any nature required by Lender in the exercise of its rights hereunder upon Lender's reasonable request. Notwithstanding the foregoing, the Lender agrees that it shall not exercise its rights under this paragraph 9.4 unless an Event of Default has occurred and is continuing and/or if the exercise of such rights restrain or interfere with the production, completion, exhibition, advertising, promotion, marketing and/or exploitation of the Picture in any manner whatsoever.

9.5     Notwithstanding anything else to the contrary in this Agreement or any other agreement between or among any of the parties hereto, Lender hereby agrees that, notwithstanding any Event of Default hereunder, Lender shall not be entitled to seek to or obtain injunctive relief or seek or to enjoin or otherwise restrain or interfere with the production, completion, exhibition, advertising, promotion, marketing and/or exploitation of the Picture for any reason whatsoever, all of which remedies are hereby irrevocably waived by Lender.

10.     <u>MISCELLANEOUS</u>.

10.1     <u>Notices</u>.  All notices, requests, demands or other communications to the respective parties hereto shall be in writing and shall be deemed to have been given when received by the party to which sent and shall be addressed to Lender or Borrower, as the case may be, at their respective addresses shown opposite their signatures hereto.  A courtesy copy of each notice sent by Borrower to Lender shall be sent to Ramo Law PC, 315 S. Beverly Drive, Suite 412, Beverly Hills, CA 90212, Email: eramo@ramolaw.com; Attn: Elsa Ramo, Esq. A courtesy copy of each notice sent by Lender to Borrower shall be sent to Alex Ginzburg at 212 North 2nd St. Suite 100 Richmond, Kentucky 40475.

10.2     <u>No Waiver; Amendments in Writing</u>.  Except as expressly provided herein to the contrary, no failure of, nor any delay on the part of, Lender or Borrower in exercising any right, power or privilege hereunder, or under any agreement, contract, indenture, document or instrument mentioned herein, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder, or under any agreement, contract, indenture, document or instrument mentioned herein, preclude other or further exercise thereof or the exercise of any other right, power or privilege; nor shall any waiver of any right, power, privilege or default hereunder, or under any agreement, contract, indenture, document or instrument mentioned herein, constitute a waiver of any other right, power, privilege or default or constitute a waiver of any other default of the same or of any other term or provision.  All rights and remedies herein provided are cumulative and not exclusive of any rights or remedies otherwise provided by law or equity.

10.3     <u>Consent to Jurisdiction and Service of Process</u>. Borrower (i) hereby irrevocably submits itself to the jurisdiction of the state courts of the State of California and to the jurisdiction of the United States District Court for the

Central District of California, for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, the Promissory Note or any of the Loan Documents or the subject matter hereof or thereof brought by Lender or its successors or assigns and (ii) hereby waives, and agrees not to assert, by way of motion, a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court (provided, however, that the then applicable jurisdiction minimums are not waived), and (iii) hereby waives any offsets or counterclaims in any such action, suit or proceeding. Borrower hereby consents to service of process by registered mail at the address to which notices are to be given. Borrower agrees that its submission to jurisdiction and its consent to service of process by mail is made for the express benefit of Lender. Final judgment against Borrower in any such action, suit or proceeding shall be conclusive, and may be enforced in other jurisdictions (i) by suit, action or proceeding on the judgment, a certified or true copy of which shall be conclusive evidence of the fact and of the amount of any indebtedness or liability of Borrower therein described or (ii) in any other manner provided by or pursuant to the laws of such other jurisdiction; provided, however, that Lender may at its option bring suit, or institute other judicial proceedings against Borrower or any of its assets in any state or Federal court of the United States or of any country or place where Borrower or such assets may be found. Borrower further covenants and agrees that so long as this Agreement shall be in effect, it shall maintain a duly appointed agent for the receipt and acceptance on its behalf of service of summons and other legal processes (and Borrower hereby appoints TBD attorney its attorney-in-fact to receive service of the process in any action, suit or proceeding with respect to which Borrower has submitted to jurisdiction, as set forth above), and upon failure to do so the clerk of each court to whose jurisdiction it has submitted shall be deemed to be its designated agent upon whom such process may be served on its behalf, and notification by the attorney for plaintiff, complainant or petitioner therein by mail or confirmed transmission by facsimile (with confirmation provided by the sender's facsimile machine) or by e-mail (unless the sender has received a failure delivery notice and with confirmation of transmission provided by the sender's e-mail) to Borrower of the filing of such suit, action or proceeding shall be deemed sufficient notice thereof.

10.4    Successors and Assigns. Lender may invite third parties to participate in the Loan without the consent of or notice to Borrower; provided, however, that, Borrower shall continue to make all payments due hereunder directly to Lender. Borrower may not assign any of its rights or obligations hereunder without the prior written consent of Lender and any purported assignment shall be void and of no force or effect. This Agreement shall be binding upon and inure to the benefit of Borrower and its permitted successors and assigns and Lender and its successors and assigns. The Borrower hereby acknowledges that the Lender, without the consent of the Borrower, may sell, transfer and otherwise assign all of Lender's rights in this Agreement and the other Loan Documents including, without limitation, its rights in the Lender Account and the Collateral.

10.5    Severability. In case any one or more of the provisions hereof should be invalid, illegal or unenforceable in any respect, such provision(s) shall be curtailed and limited only to the extent necessary to bring it within the legal requirements and the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

10.6    Governing Law. This Agreement and the rights and obligations of the parties hereunder and under the documents executed concurrently herewith shall be construed in accordance with and be governed by the laws of the State of California. California law shall govern (i) the validity and interpretation of the Agreement, (ii) the performance of the parties of their respective obligations hereunder, and (iii) all other causes of action (whether sounding in contract or in tort) arising out of or relating to this Agreement or the termination of this Agreement.

10.7    Waiver of Jury Trial. To the extent permissible by law, Borrower and Lender each waives their respective rights to a trial by jury of any claim or cause of action based upon or arising out of or related to this agreement or the transactions contemplated hereby, in any action, proceeding or other litigation of any type brought by any of the parties against any other party or any agent-related person, participant or assignee, whether with respect to contract claims, tort claims, or otherwise. The Borrower and Lender each agree that any such claim or cause of action shall be tried by a court trial without a jury. Without limiting the foregoing, the parties further agree that their respective right to a trial by jury is waived by operation of this section as to any action, counterclaim or other proceeding which seeks, in

whole or in part, to challenge the validity or enforceability of this agreement or any provision hereof.  This waiver shall apply to any subsequent amendments, renewals, supplements or modifications to this Agreement.

10.8     Entire Agreement; Counterparts.  This Agreement, the Promissory Note and the documents, instruments and agreements delivered (or, as the case may be, to be delivered) pursuant hereto shall constitute the entire agreement between the parties hereto with respect to the Loan and shall supersede all other agreements written or oral with respect thereto including, but not limited to the term sheet between the parties dated August 31st, 2017 (the "Term Sheet").  This Agreement may be executed in two counterparts, each of which shall be deemed an original and which together shall constitute one and the same instrument.  Delivery of an executed counterpart of this Agreement by facsimile or transmitted electronically in either a Tagged Image Format File ("TIFF") or Portable Document Format ("PDF") shall be equally effective as delivery of a manually executed counterpart of this Agreement.  No party has relied on any representation and/or warranty not expressly set forth herein.

10.9     Confidentiality.  The terms of this Agreement are strictly confidential and Borrower agrees not to disclose the terms contained herein to any third party without the prior written consent of Lender, except that Borrower may disclose such terms to its officers, directors, attorneys, other advisors, State Authority and any other governmental entities and other parties with a right to access such information, including Guilds or parties required by law.

10.10    No Third Party Beneficiaries.  This Agreement is not made for the benefit of any third party or parties.

10.11    Relationship of Parties.  The relationship between Borrower and Lender hereunder is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with Borrower, and no term or provision of any of the Loan Documents shall be construed so as to deem the relationship between Borrower, on the one hand, and Lender, on the other hand, to be other than that of debtor and creditor.

10.12    Setoff.  Nothing in this Agreement shall be deemed to constitute a waiver or prohibition of Lender's right of banker's lien or setoff and Borrower hereby expressly acknowledges that Lender has such right, it being understood and agreed that Lender shall not use the Commitment Amount to setoff against any non-Picture related obligations of Borrower to Lender.

10.13    Intentionally Deleted.

10.14    Premiere; One Sheet; Press Release.  Borrower shall use reasonable commercial efforts to cause Distributor of the Picture to provide the Lender with four (4) tickets to the U.S. premiere of the Picture, if any; provided that any failure to so provide such tickets shall not be a breach hereof.  Borrower shall use reasonable commercial efforts to provide Lender with one (1) high quality image used for the "one-sheet" (or electronic file thereof) for the Picture, if any, which Lender may use for its own marketing purposes, subject to any third party obligations. Borrower shall use reasonable commercial efforts to reference "BondIt" as a financier in any press releases regarding the Picture.

10.15    Credits.

10.15.1  Lender shall receive a company credit on screen, on all positive prints of the Picture, in the main titles of the Picture (i.e., wherever all producer credits appear), substantially in the form of "In Association with BondIt Media Capital".

10.15.2  Lender shall receive three (3) executive producer credits (to persons designated by Lender in Lender's sole discretion), on screen, on all positive prints of the Picture, in the main titles of the Picture (i.e., wherever all producer credits appear), on a shared card, with no more than four (4) executive producer credits on such shared card.

10.15.3  Lender shall receive a financing credit and company logo, on screen, on all positive prints of the Picture, in the end crawl or in such other position as is determined by Borrower, substantially in the form of

26

"Financing Provided by BondIt LLC" accompanied by Lender's logo.  Lender acknowledges and agrees such credits may be shared with other financiers.

      10.15.4  All other aspects of the above credits shall be in Borrower's and distributors' sole discretion. No casual or inadvertent failure to comply with the credit provisions set forth in this paragraph 10.15 shall be deemed a breach by Borrower provided that upon receipt of written notice from Lender of Borrower's failure to properly accord credit as specified herein, Borrower shall take such steps as are reasonably practicable to cure such failure on a prospective basis except with respect to any materials already in existence.

10.16    <u>Commitment Fee</u>. Borrower acknowledges that, in committing to make the Loan, Lender may be prevented from accepting other potential funding opportunities. In the event that, through no material fault of Lender: (i) the Conditions Precedent are not satisfied on or before the Expiration Date; or (ii) Borrower does not proceed with the Loan for any reason, then, as consideration of Lender's commitment to make the Loan, Borrower agrees to pay a fee to Lender in the amount of Fifty Thousand United States Dollars (US$50,000.00) ("<u>Commitment Fee</u>") as well as all actual, reasonable, direct, verifiable outside legal fees and expenses incurred by Lender that were not covered under the Legal Fee. Payment by Borrower hereunder shall be made concurrently with written notice that Borrower is not proceeding with the Loan or within five (5) Business Days' of the Expiration Date, as applicable. The Expiration Date may be extended by Lender in Lender's sole discretion (on written notice from Lender to Borrower), it being understood that Lender shall have no obligation to extend the Expiration Date. For purposes of clarity, the Commitment Fee shall be payable solely in the event that Borrower does not proceed with the Loan following execution of the Term Sheet and/or Borrower has not satisfied all of the Conditions Precedent on or before the Expiration Date.

      IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers as of the Effective Date.

"BORROWER"                                        "LENDER"

Hallows Movie Inc.                                  BondIt LLC

_____               _____
By: **Alex Ginzburg**                           By: _____
Its: Authorized Agent                        Its: Authorized Agent

**EXHIBIT "A"**

**[Assignment of Proceeds]**

**EXHIBIT "B"**

**[Budget]**

**EXHIBIT "C"**

**[Copyright Mortgage]**

**EXHIBIT "D"**

**[Power of Attorney]**

**EXHIBIT "E"**

**[Promissory Note]**

**EXHIBIT "F"**

**[Borrowing Certificate]**